1  WILLIAM C. MORISON (State Bar No. 99981)
   William.Morison@morisonansa.com
2  MICHAEL D. PROUGH (State Bar No. 168741)
   Michael.Prough@morisonansa.com
3  KAREN G. LEVY (State Bar No. 213172)
   Karen.Levy@morisonansa.com
4  MORISON ANSA HOLDEN ASSUNCAO
       & PROUGH, LLP
5  500 Ygnacio Valley Rd., Suite 450
   Walnut Creek, CA  94596
6  Telephone:  (925) 937-9990
   Facsimile:  (925) 937-3272
7
   Attorneys for Defendant
8  RLI INSURANCE COMPANY

9

10                UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13  CROWLEY MARITIME              )   Case No. CV 08-00830 SI
    CORPORATION,                  )
14                                )
              Plaintiff,          )   REQUEST FOR LEAVE TO FILE
15                                )   BRIEF RE NEW AUTHORITY IN
         v.                       )   SUPPORT OF DEFENDANT RLI
16                                )   INSURANCE COMPANY'S
    FEDERAL INSURANCE COMPANY;    )   MOTION TO DISMISS
17  TWIN CITY FIRE INSURANCE      )
    COMPANY; RLI INSURANCE        )
18  COMPANY; and DOES 1-20, inclusive, )   Date:       April 7, 2008
                                  )   Time:       9:00 a.m.
19            Defendants.         )   Judge:      Susan Illston
                                  )   Courtroom:  10, 19th Floor
20

21

22

23

24

25

26

27

28

1    Defendant RLI Insurance Company ("RLI") hereby requests leave to file its Brief Re New

2   Authority In Support Of Motion To Dismiss (a copy of which is attached herewith) pursuant to

3   Local Rule 7-3(d).  The brief advises the Court of a case published on March 25, 2008, entitled

4   Qualcomm, Inc. v. Certain Underwriters at Lloyd's, 2008 Cal.App. LEXIS 394, 1-2 (March 25,

5   2008), which directly bears on a central issue presented in RLI's motion to dismiss plaintiff

6   Crowley Maritime Corporation's complaint.

7   Dated:  March 26, 2008                          Respectfully submitted,

8                                                    MORISON ANSA HOLDEN ASSUNCAO
                                                      & PROUGH, LLP
9

10

11                                                   By:___/s/ Michael D. Prough_____

12                                                      Attorneys for Defendant
                                                         RLI Insurance Company
13    127790

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WILLIAM C. MORISON (State Bar No. 99981)
William.Morison@morisonansa.com
MICHAEL D. PROUGH (State Bar No. 168741)
Michael.Prough@morisonansa.com
KAREN G. LEVY (State Bar No. 213172)
Karen.Levy@morisonansa.com
MORISON ANSA HOLDEN ASSUNCAO
   & PROUGH, LLP
500 Ygnacio Valley Rd., Suite 450
Walnut Creek, CA 94596
Telephone: (925) 937-9990
Facsimile: (925) 937-3272

Attorneys for Defendant
RLI INSURANCE COMPANY

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CROWLEY MARITIME CORPORATION,<br><br>    Plaintiff,<br><br>    v.<br><br>FEDERAL INSURANCE COMPANY; TWIN CITY FIRE INSURANCE COMPANY; RLI INSURANCE COMPANY; and DOES 1-20, inclusive,<br><br>    Defendants. | Case No. CV 08-00830 SI<br><br>BRIEF RE NEW AUTHORITY IN SUPPORT OF DEFENDANT RLI INSURANCE COMPANY'S MOTION TO DISMISS<br><br>Date:        April 7, 2008<br>Time:        9:00 a.m.<br>Judge:      Susan Illston<br>Courtroom: 10, 19th Floor |

Defendant RLI Insurance Company ("RLI") hereby advises the Court of a case published on March 25, 2008, entitled <u>Qualcomm, Inc. v. Certain Underwriters at Lloyd's</u>, 2008 Cal.App. LEXIS 394, 1-2 (March 25, 2008) (attached hereto as Exhibit A), directly bearing on a central issue presented in RLI's motion to dismiss plaintiff Crowley Maritime Corporation's ("Crowley") complaint.

The California Court of Appeal held in <u>Qualcomm</u> that an insurance provision in an excess liability insurance policy requiring exhaustion by payment of underlying insurance is "clear and explicit" and that the trial court properly granted the insurer's demurrer on the insured's complaint alleging breach of contract and declaratory relief where the pleadings establish that the underlying insurer did not pay the "full amount" of its limits. <u>Qualcomm</u>, 2008 Cal.App. LEXIS 394, at *2-3. Qualcomm, the insured in the <u>Qualcomm</u> case, had entered into a primary liability insurance contract with National Union Fire Insurance Company ("National") with a limit of $20 million and an excess liability insurance with Certain Underwriters at Lloyd's, London ("Underwriters") with a limit of $20 million for losses in excess of the underlying $20 million primary policy limit. <u>Id.</u> at *4-5. Qualcomm had settled third-party lawsuits filed by Qualcomm's employees against it, incurring approximately $ 3.6 million in unreimbursed defense expenses and unreimbursed expenses in connection with the settlement of the other litigation in an estimated amount of over $9 million. <u>Id.</u> at 3-4. Qualcomm tendered the third-party lawsuits to its primary and excess insurers, and subsequently engaged in a mediation with the insurers after which Qualcomm settled with National under an agreement providing it would release National from all future obligations under the National policy in exchange for National's commitment to reimburse Qualcomm for settlement payments and defense expenses, a total of $16 million - $4 million below National's $20 million policy limits. <u>Id.</u> at 6. Qualcomm then sued Underwriters for breach of contract and declaratory relief, alleging that Underwriters was obligated to indemnify Qualcomm under the excess policy for more than $9 million in unreimbursed expenses Qualcomm had incurred in connection with the defense and settlement of the third-party litigation. <u>Id.</u> at 7.

///

Brf. Re New Authority re RLI's MTD
Case No. CV 08-00830 SI

1    The Underwriters excess policy contained an exhaustion clause providing that

2    "Underwriters shall be liable only after the insurers under each of the Underlying Policies [the

3    National policy] have paid or have been held liable to pay the full amount of the Underlying

4    Limit of Liability." Id. at *5. The Court of Appeal agreed with the excess insurer that the phrase

5    "have paid . . . the full amount of [$20 million]" is "clear and explicit" and "cannot have any other

6    reasonable meaning than actual payment of no less than the $20 million underlying limit." Id. at

7    *20-21. The court explained that is so "particularly when [the phrase is] read in the context of the

8    entire excess policy and its function as arising upon exhaustion of primary insurance." Id.

9    The Qualcomm court held that:  "The exhaustion clause here compels us to conclude that

10    the parties expressly agreed that National was required to pay [ ] no less than $20 million as a

11    condition of Underwriters' liability.  Because National did not so pay, Underwriters obligations

12    did not arise." Id. at 27.  The court explained that its conclusion is supported by non-California

13    authorities applying a plain language meaning of the word "payment," such as Comerica Inc. v.

14    Zurich American Ins. Co., 498 F. Supp. 2d 1019 – also cited in RLI's motion – where the court

15    (following Danbeck v. Am. Family Mut. Ins. Co. 629 N.W.2d 150 (Wis. 2001), also cited with

16    approval by the Qualcomm court) held that excess policy language providing that "[c]overage

17    hereunder shall attach only after all such 'Underlying Insurance' has been reduced or exhausted by

18    payments for losses . . . ." unambiguously required the primary insurance be exhausted or

19    depleted by the actual payment of losses by the underlying insurer, and the insured's payment to

20    make up the difference was not sufficient to trigger excess coverage. Id. 28-30.

21    The Qualcomm court rejected the insured's arguments that the Second Circuit's 1928

22    holding in Zeig v. Massachusetts Bonding & Ins. Co., 23 F.2d 665 (2d Cir. 1928) (also cited by

23    Crowley, Opp. at 15, 18, 20) – that the word "payment" does not only relate to payment in cash,

24    but also the satisfaction of a claim by compromise or in other ways – applies. The Qualcomm

25    court expressed its disagreement with the Zeig court's placement of policy considerations (i.e., the

26    promotion of settlement) above the plain meaning of the terms of the excess policy as well as

27    with the Zeig court's "strained" interpretation of the word "payment." Id. at *26. The Qualcomm

28    court pointed out that Zeig acknowledged that parties may include excess policy language

1    explicitly requiring actual payment as a condition precedent to coverage and that a court may

2    reach a contrary result "when the terms of the contract demand it." Id. (citing Zeig, 23 F.2d at p.

3    666.) Such express language was indeed included in the excess policy in Qualcomm, as it is in

4    RLI's excess policy – in fact, RLI's policy further includes the requirement that all underlying

5    limits be paid "in legal currency" – so there is no question that Zeig would not apply here.

6          Under Qualcomm, the RLI contract language providing that RLI has no coverage

7    obligation unless "the insurers of the **Underlying Insurance** shall have paid in legal currency the

8    full amount of the **Underlying Limit**" is clear and explicit and requires "actual payment" in legal

9    currency of all underlying insurance ($10 million by Federal Insurance Company and another $10

10   million by Twin Cities Fire Insurance Company) before RLI's coverage obligation can attach. No

11   such payment occurred here, so no possible obligation of RLI under its contract has arisen, and

12   Crowley cannot state a breach of contract or bad faith claim against RLI. Nor can Crowley

13   amend its complaint to allege a declaratory relief cause of action.

14   Dated: March 26, 2008                    Respectfully submitted,

15                                            MORISON ANSA HOLDEN ASSUNCAO
                                              & PROUGH, LLP
16

17

18                                           By:    /s/ Michael D. Prough

19                                           Attorneys for Defendant
                                             RLI Insurance Company
20   127769

21

22

23

24

25

26

27

28

EXHIBIT A

1 of 1 DOCUMENT

**QUALCOMM, INCORPORATED, Plaintiff and Appellant, v. CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, Defendants and Respondents.**

**D050433**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION ONE**

*2008 Cal. App. LEXIS 394*

**March 25, 2008, Filed**

**PRIOR HISTORY: [*1]**
Superior Court of San Diego County, No. GIC873829, Jay M. Bloom, Judge.

**DISPOSITION:** Affirmed.

**COUNSEL:** Heller Ehrman, David B. Goodwin, Barry S. Levin, Naomi B. Spector and Daniel S. Silverman for Plaintiff and Appellant.

Edelman & Dicker, Daniel Tranen, Wilson Elser Moskowitz, Soltera L. Anderson and William S. Roberts for Defendants and Respondents.

**JUDGES:** Opinion by O'Rourke, J., with Huffman, Acting P. J., and Aaron, J., concurring.

**OPINION BY:** O'Rourke

**OPINION**

O'ROURKE, J.--In this insurance coverage dispute, plaintiff Qualcomm, Incorporated (Qualcomm) appeals from a judgment entered after the court sustained without leave to amend the demurrer of defendants Certain Underwriters at Lloyd's, London (Underwriters) to Qualcomm's complaint for declaratory relief and breach of contract. Underwriters, who had issued an excess director and officer insurance policy to Qualcomm, refused to pay under that policy after Qualcomm settled a coverage dispute with its primary insurer for an amount less than the primary insurer's policy limit and released its primary insurer. In its complaint, Qualcomm sought a judicial declaration that Underwriters was obligated to indemnify Qualcomm for unreimbursed litigation defense expenses and settlement costs [*2] incurred by Qualcomm in excess of the primary policy limit. In sustaining Underwriters' demurrer, the trial court ruled excess coverage had not been triggered as a matter of law and Qualcomm's causes of action failed in part under a provision requiring Qualcomm to maintain the primary policy, in view of the complaint's allegations that Qualcomm had settled with the primary insurer in exchange for a release.

On appeal, Qualcomm asks us to hold that when an insured settles with its primary insurer for an amount below the primary policy limits but absorbs the resulting gap between the settlement amount and the primary policy limit, primary coverage should be deemed exhausted and excess coverage triggered, obligating the excess insurer to provide coverage under its policy. It maintains this result does not require the excess carrier to pay any more than it would pay had the primary insurer paid its full policy limits, and furthers public policy of encouraging civil settlements. We decline to reach a broad holding based on public policy considerations, and instead conclude that the literal policy language in this case governs. Our interpretation of the excess policy compels us to conclude [*3] that Underwriters' coverage obligation did not arise because Qualcomm's pleadings establish the primary insurer neither paid the "full amount" of its liability limit nor had it become legally obligated to pay the full amount of the primary liability limit in the parties' settlement agreement. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND [1]

1 In reviewing the trial court's order sustaining Underwriters' demurrer, we accept as true the properly pleaded material factual allegations of Qualcomm's complaint. (*Blank v. Kirwan (1985) 39 Cal.3d 311, 318.*) We base our factual recitation on those allegations, the primary and excess insurance policies attached to and incorporated by reference in the complaint, and matters of

which we may properly take judicial notice. (Ibid.; Crowley v. Katleman (1994) 8 Cal.4th 666, 672; Blatty v. New York Times Co. (1986) 42 Cal.3d 1033, 1040-1041; Kong v. City of Hawaiian Gardens Redevelopment Agency (2002) 108 Cal.App.4th 1028, 1033, fn. 2.)

In May 1999, certain Qualcomm employees filed a class action lawsuit related to their asserted right to unvested company stock options. Other Qualcomm employees and former employees followed with separate lawsuits [*4] (some of which were consolidated) in part seeking accelerated vesting of stock options. With one apparent exception in which it prevailed on summary judgment, Qualcomm settled these lawsuits, incurring approximately $ 3.6 million in unreimbursed defense expenses for the class action and unreimbursed expenses in connection with settlement of the other litigation in an estimated amount of over $ 9 million.

Qualcomm tendered the above referenced litigation matters to its director and officer (D&O) liability insurers, including National Union Fire Insurance Company of Pittsburgh, P.A. (National) and Underwriters. National had issued Qualcomm a primary D&O insurance policy for the period of March 15, 1999, to March 15, 2000, with a liability limit of $ 20 million (the National policy or primary policy). The National policy insured Qualcomm and its directors and officers for a "'Loss'" including "'damages, judgments, settlements and Defense Costs,' arising from a 'Claim'" including a civil lawsuit. Underwriters had issued Qualcomm a first layer excess "following form" [2] D&O reimbursement policy for the same time period (the excess policy), providing $ 20 million in coverage for losses in [*5] excess of the underlying $ 20 million primary policy limit. The excess policy contains a "Maintenance of Underlying Policies" clause (the maintenance clause). Incorporating its definitions, that clause provides: "This Policy provides excess coverage only. It is a condition precedent to the coverage afforded under this Policy that [Qualcomm] maintain [the National policy] with retentions/deductibles, and limits of liability (subject to reduction or exhaustion as a result of loss payments), as set forth in Items F. and G. of the Declarations. This Policy does not provide coverage for any loss not covered by the [National policy] except and to the extent that such loss is not paid under the [National policy] solely by reason of the reduction or exhaustion of the Underlying Limit of Liability through payments of loss thereunder. In the event [National] fails to pay loss in connection with any claim as a result of the insolvency, bankruptcy or liquidation of said insurer, then those insured hereunder shall be deemed self-insured for the amount of the Limit of Liability of said insurer which is not paid as a result of such insolvency, bankruptcy or liquidation." In a "Limit of Liability" [*6]

section, the excess policy also contains a clause (referred to by the parties as the exhaustion clause) providing that "Underwriters shall be liable only after the insurers under each of the Underlying Policies [the National policy] have paid or have been held liable to pay the full amount of the Underlying Limit of Liability."

> 2     "A 'following form' policy incorporates the terms and conditions of another carrier's policy and provides the same scope of coverage as the underlying policy." (Wells Fargo Bank v. California Ins. Guarantee Assn. (1995) 38 Cal.App.4th 936, 940.)

In April 2004, Qualcomm, National and Underwriters participated in a mediation concerning coverage for the litigation. Qualcomm thereafter settled with National under an agreement providing it would release National from all future obligations under the National policy in exchange for National's commitment to reimburse Qualcomm for additional settlement payments and defense expenses for the nonclass action litigation, bringing National's total payment under its policy to $ 16 million.

In October 2006, Qualcomm sued Underwriters for breach of contract and declaratory relief. It sought compensatory damages as well as a [*7] judicial declaration that Underwriters were obligated to indemnify Qualcomm under the excess policy for more than $ 9 million in unreimbursed expenses Qualcomm had incurred in connection with the defense and settlement of the nonclass action litigation, "provided that Qualcomm, [National], or other third parties paid at least $ 20 million in defense and indemnity of Qualcomm for [the litigation matters]." Qualcomm also alleged it had "paid the required premiums in full and has satisfied all other conditions to coverage, or is otherwise excused from doing so."

Underwriters demurred on grounds Qualcomm's complaint failed to state sufficient facts constituting a cause of action. They argued coverage under the excess policy had not been triggered because Qualcomm did not, and could not, meet two conditions precedent to coverage: first, under the maintenance clause, that Qualcomm refrain from compromising the underlying National policy, and second, under the exhaustion clause, that underlying policy limits is exhausted by virtue of National having "'paid'" its $ 20 million policy limit or having been "'held liable'" to pay that amount. In opposition, Qualcomm argued the coverage question [*8] raised by Underwriters was squarely decided in its favor in Home Indem. Co. v. Mission Ins. Co. (1967) 251 Cal. App. 2d 942, 966 as well as out-of-state authorities adopting the reasoning of Zeig v. Massachusetts Bonding & Ins. Co. (2d Cir. 1928) 23 F.2d 665 (Zeig), in which the court held primary insurance was exhausted and an

excess carrier was liable for losses exceeding the actual limits of underlying primary insurance, even where the primary insurer settled for less than the actual policy limits. Qualcomm also argued Underwriters had misconstrued the maintenance clause; that the clause was ambiguous and should be construed in Qualcomm's favor to increase insurance coverage. Qualcomm maintained that while its position was supported by the excess policy's language, denying excess coverage in the circumstances presented would be contrary to public policy because such denial would work a forfeiture, provide a windfall to the excess carrier, and encourage litigation by discouraging settlements between insureds and their primary carriers.

The trial court sustained Underwriters' demurrer without leave to amend on grounds the excess policy had not been triggered. Based on the complaint's [*9] allegation that Qualcomm had settled with its primary insurer for $ 16 million in exchange for a release, the court ruled Qualcomm could not meet a condition precedent of the policy to maintain the primary policy with $ 20 million limits of liability. The court further ruled that in the absence of facts showing the primary insurer did not pay due to insolvency, bankruptcy or liquidation, Qualcomm could not plead circumstances permitting it to be deemed self-insured. It entered judgment in Underwriters' favor. This appeal followed.

## DISCUSSION

### I. *Standard of Review*

"In determining whether plaintiffs properly stated a claim for relief, our standard of review is clear: '"We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, [*10] we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.'" (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.) "Where written documents are the foundation of an action and are attached to the complaint and incorporated therein by reference, they become a part of the complaint and may be considered on demurrer." (*City of Pomona v. Superior Court* (2001) 89 Cal.App.4th 793, 800.)

### II. *Principles of Insurance Policy Interpretation*

This court summarized settled contract interpretation principles applicable to insurance policies in *Palacin v. Allstate Ins. Co.* (2004) 119 Cal.App.4th 855, 861 (*Palacin*): "The fundamental rule [of contract interpretation] is that a court must give effect to the mutual intention of the parties when they formed the contract. [Citation.] This intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] 'The "clear and explicit" meaning of these provisions, [*11] interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage"' . . ., controls judicial interpretation.'" (*Id., at p.* 861, quoting *E.M.M.I., Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470 (*E.M.M.I.*); see also *Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390 (*Powerine II*).)

"'A policy provision is ambiguous when it is susceptible of two or more reasonable constructions. . . . Language in an insurance policy is "interpreted as a whole and in the circumstances of the case, and cannot be found to be ambiguous in the abstract."' [Citation.] When the relevant provisions of an insurance policy are ambiguous, extrinsic evidence may be admitted to determine the proper interpretation. [Citations.] If there is no relevant extrinsic evidence or the extrinsic evidence does not resolve the ambiguity, the court must interpret '"""the ambiguous provisions in the sense the [insurer] believed the [insured] understood them at the time of formation. [Citation.] If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty [*12] to exist. [Citation.]'" "'This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable expectations of the insured.'"""' (*Palacin, supra,* 119 Cal.App.4th at p. 861; see also *Powerine II, supra,* 37 Cal.4th at pp. 390-391.)

Like here, *Palacin* involved a case resolved in the insurer's favor at the pleading stage. Thus, *Palacin* explained how the above principles operate on an appeal from a judgment after an insurer's demurrer was sustained without leave to amend: "[A]n insurer . . . [demurring] based on insurance policy language must establish conclusively that this language unambiguously negates beyond reasonable controversy the construction alleged in the body of the complaint. [Citation.] To meet this burden, an insurer is required to demonstrate that the policy language supporting its position is so clear that parol evidence would be inadmissible to refute it. [Citation.] Absent this showing, the court must overrule the demurrer and permit the parties to litigate the issue in a context that permits the development and presentation of

a factual record, e.g., summary judgment or trial." [*13] (*Palacin, supra, 119 Cal.App.4th at p. 862.*)

Neither party in this case challenges the trial court's resolution of the issues raised by Underwriters' demurrer as a matter of law. Absent an argument that extrinsic evidence is needed to interpret the policy language, interpretation of the excess policy is a pure question of law for our independent review. (*E.M.M.I., supra, 32 Cal.4th at p. 470; Garcia v. Truck Ins. Exchange (1984) 36 Cal.3d 426, 439;* see *Herzberg v. County of Plumas (2005) 133 Cal.App.4th 1, 24.*)

III. *Analysis*

Urging us to interpret ambiguity in Underwriters' excess policy in its favor, and pointing to *Zeig, supra, 23 F.2d 665* and cases following it, Qualcomm contends we must interpret the excess policy's language in this case so as not to forfeit excess insurance in the event of its below-limits settlement with the primary insurer. Qualcomm reasons Underwriters is "chargable" with knowing that its policy language -- specifically the "have paid or have been held liable to pay" portion of the exhaustion clause -- has been widely interpreted to permit an insured to exhaust primary policy limits by entering into a below-limits settlement with the primary insurer, and such [*14] judicial construction should be read into the excess policy. Qualcomm maintains the parties' economic bargain and reasonable expectations were shaped by *Zeig* and its progeny.

Qualcomm further asks us to reject Underwriters' arguments that the excess policy's maintenance clause imposed a duty upon it not to "compromise" the primary policy limits by settling with the primary insurer for an amount below policy limits. Pointing to secondary authorities stating that the purpose of a maintenance clause is to preclude any "drop down" obligation by the excess insurer to provide coverage to primary coverage, Qualcomm contends the maintenance clause does no more than require it to pay the premiums as they came due to maintain the underlying policy, which it did. Finally, relying on the proposition that insurance policy exclusions must be plain, conspicuous and clear, Qualcomm asserts that the last sentence of the maintenance clause cannot be interpreted by negative implication to prohibit Qualcomm from self-insuring in the event of a below-limits settlement with the primary insurer.

A. *The Exhaustion Clause Unambiguously Precludes Underwriters' Liability*

Qualcomm provides little analysis for a major premise [*15] of the above arguments: that the excess policy language is ambiguous in that it is susceptible to two or more reasonable constructions in view of the policy as a whole. Indeed, Qualcomm appears to argue ambiguity

arises *because of* cases such as *Zeig* and others, and that its reasonable expectation for excess coverage was premised on the existence of these cases. But "[a]n expectation of coverage . . . cannot *create* an ambiguity; it is merely an interpretive tool used to resolve an ambiguity once it is found to exist." (*Fire Ins. Exchange v. Superior Court (2004) 116 Cal.App.4th 446, 456-457;* see e.g., *Pardee Construction Co. v. Insurance Co. of the West (2000) 77 Cal.App.4th 1340, 1352.*) An insured's subjective expectations do not dictate our analysis of the presence or absence of ambiguity in the excess policy language.

As to the exhaustion clause, we cannot detect ambiguity. Our assessment of the policy language must be made in the context of the nature of Underwriters' policy as an excess insurance policy. (Accord, *MacKinnon v. Truck Ins. Exchange (2003) 31 Cal.4th 635, 654* [interpreting scope of pollution exclusion in light of historical purposes of pollution exclusion and comprehensive [*16] general liability policies generally]; *County of San Diego v. Ace Property and Casualty Ins. Co. (2005) 37 Cal.4th 406, 415 (Ace Property).*) Under these circumstances, Qualcomm's objectively reasonable expectations as the insured were that primary insurance would have to be exhausted before excess coverage would attach. "'Excess' or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted." [Citation.] [ P] The "excess" insurance referred to in this definition is that secondary insurance which provides coverage after other identified insurance is no longer on the risk. The identification of the underlying primary insurance may be as to (1) a particular policy or policies that are specifically described or (2) underlying coverage provided by a particular and specifically described insurer. In short, excess insurance is insurance that is expressly understood by both the insurer and insured to be secondary to specific underlying coverage which will not begin until after that underlying coverage is exhausted and which does not broaden that underlying coverage." (*Century Surety Co. v. United Pacific Ins. Co. (2003) 109 Cal.App.4th 1246, 1255,* [*17] italics omitted; see also *Ace Property, at p. 416, fn. 4;* Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2007) PP8:177, 8:180, p. 8-45; *Community Redevelopment Agency v. Aetna Casualty & Surety Co. (1996) 50 Cal.App.4th 329, 338, 339.*) "California case law has consistently protected the limited and shielded position of the excess carrier when the obligations of the excess carrier are set in clear phrases." (*Ticor Title Ins. Co. v. Employers Ins. of Wausau (1995) 40 Cal.App.4th 1699, 1708.*) [3]

3 Further, in assessing the policy language, we keep in mind that the Underwriters excess policy

is a "reimbursement" policy only, requiring Underwriters to indemnify Qualcomm for specified losses. As one court recently explained: "'The obligation to indemnify must be distinguished from the duty to defend. . . . 'The obligation to indemnify . . . arises when the insured's underlying liability is established. . . . Although an insurer may have a duty to defend, it ultimately may have no obligation to indemnify, either because no damages were awarded in the underlying action against the insured, or because the actual judgment was for damages not covered under the policy.' [*18] [Citation.] 'Whether coverage is ultimately established in any given case may [also] depend on . . . the existence of express conditions or exclusions in the particular contract of insurance under scrutiny, the availability of certain defenses that might defeat coverage, and a determination of whether the facts of the case will support a finding of coverage.'" (*Safeco Ins. Co. of America v. Fireman's Fund Ins. Co.* (2007) 148 *Cal.App.4th* 620, 630, quoting *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 *Cal.4th* 645, 655, fn. 2.) "'The insurer's duty to indemnify runs to claims that are actually covered, in light of the facts proved. . . . By definition, it entails the payment of money in order to resolve liability.'" [Citation.] 'Both the duty to indemnify and the duty to defend are in fact dependent on coverage -- the former on actual coverage, the latter on at least potential coverage.'" (*Safeco Ins. Co. of America v. Fireman's Fund Ins. Co., at p.* 630, quoting *Buss v. Superior Court* (1997) 16 *Cal.4th* 35, 46.)

With that reminder of the context in which we assess the policy language and Qualcomm's objectively reasonable expectations as an insured with primary and excess layers [*19] of insurance, we repeat the language of the exhaustion clause appearing within the "Limit of Liability" section: "Underwriters shall be liable *only after* the insurers under each of the Underlying policies *have paid* or *have been held liable to pay* the *full amount* of the Underlying Limit of Liability." (Italics added.) There is no dispute that the "Underlying Limit of Liability" is $20 million under National's primary policy.

Our threshold inquiry is whether, interpreting these words in their ordinary and popular sense and not as an attorney or insurance expert, their meaning is clear and explicit. (*MacKinnon v. Truck Ins. Exchange, supra,* 31 *Cal.4th at pp.* 647-648; *E.M.M.I., supra,* 32 *Cal.4th at p.* 471; *Garamendi v. Mission Ins. Co.* (2005) 131 *Cal.App.4th* 30, 41-42.) "If the meaning a layperson would ascribe to insurance contract language is not ambiguous, courts will apply that meaning." (*Vandenberg v.*

*Superior Court* (1999) 21 *Cal.4th* 815, 839-840; *E.M.M.I., at p.* 471.) "Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." (*Reserve Insurance Co. v. Pisciotta* (1982) 30 *Cal.3d* 800, 807.)

In our view, the phrase "have paid . . . [*20] the full amount of [$ 20 million]," particularly when read in the context of the entire excess policy and its function as arising upon exhaustion of primary insurance, cannot have any other reasonable meaning than actual payment of no less than the $ 20 million underlying limit. (See e.g., *Powerine II, supra,* 37 *Cal.4th at pp.* 402-403 & fn. 10 [interpreting language in excess policy: "Liability under this policy with respect to any occurrence shall not attach unless and until the Insured, or the Insured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence" to provide that the "insurer's indemnification obligation under the policy does not commence until any underlying policy limits have been exhausted by *actual payment of a covered loss*" (italics added) and that the "'excess' coverage afforded under these policies was not invoked because the limits of the underlying primary CGL policy were neither paid nor exhausted"]; *Denny's Inc. v. Chicago Ins. Co.* (1991) 234 *Cal. App. 3d* 1786, 1790, 1793 [involving third level excess policies that provided, "'It is expressly agreed that liability shall attach to the [excess insurer] only after [*21] the Underlying Umbrella Insurer(s) have paid or have been held liable to pay the full amount of the respective ultimate net loss liability as follows . . .'"; court held this language "unequivocally" provided that third level liability would "attach only after the underlying insurer has paid or has been held liable to pay *the full amount* of the underlying coverage, i.e., the policy limit . . . ."].) Qualcomm criticizes reliance upon so-called "drop down" cases in which courts decided whether an excess carrier had assumed the risk of the primary insurer's insolvency. However the courts in those cases analyzed similar excess policy language and we see no reason (and Qualcomm does not explain) why their interpretation of the words used is unpersuasive in the present context. (Accord, *Ticor Title Ins. Co. v. Employers Ins. of Wausau, supra,* 40 *Cal.App.4th at p.* 1708 ["We see no reason not to treat refusal to defend cases like insolvency 'drop down' cases"].) We conclude that under the referenced portion of the exhaustion clause, Underwriters' liability -- its reimbursement obligation -- did not arise until National actually paid the *full $ 20 million amount* of its underlying limit.

We turn [*22] to the excess policy's language that Underwriters shall be liable only after the primary insurers "have been held liable to pay the full amount of [$ 20 million]." We agree with one remark from a non-California court assessing similar policy language; that

"it would be senselessly redundant for this phrase to also connote the idea of payment in full, in cash." (*Rummel v. Lexington Ins. Co.* (N.M. 1997) 945 P.2d 970, 978.) Black's Law Dictionary defines the word "liable" as "[r]esponsible or answerable in law; legally obligated." (Black's Law Dict. (7th ed. 1999) p. 927, col. 1.) We need not decide whether the phrase "held liable to pay" is susceptible of more than one reasonable meaning, because even assuming arguendo the phrase is ambiguous and we interpret it in Qualcomm's favor to include responsibility for payment under a settlement agreement, Qualcomm's complaint does not indicate (nor does Qualcomm argue) that the settlement between it and National required National to accept responsibility or liability for the *full amount* of the $ 20 million limits on the underlying policy. [4] Nor does the complaint plead that National was obligated to pay $ 20 million pursuant to a court order [*23] or judgment, which would plainly fall within such policy language. By the term of the excess policy requiring National be "held liable to pay" the "full amount" of the underlying limit before Underwriters' liability attaches (even if it does not *actually* pay, see *Denny's Inc. v. Chicago Ins. Co.*, supra, 234 Cal. App. 3d at pp. 1793-1794), Underwriters is under no obligation to provide excess coverage.

> 4  Paragraph 18 of Qualcomm's complaint reads: "Following the mediation, Qualcomm reached a settlement with National Union providing, in part, that Qualcomm would agree to release National Union from all future obligations under the National Union Policy in exchange for National Union's commitment to reimburse Qualcomm for additional settlement payments and defense expenses for the Stock Option Cases, bringing National Union's total payment under the primary policy to $ 16 million. Even with those payments, Qualcomm remains out of pocket $ 3,641,921.32 in defense expenses for the *Sprague* action and over $ 9 million for the Stock Option Cases." The settlement agreement between Qualcomm and National is not attached to the complaint as an exhibit nor does it appear anywhere else in the record. [*24]

Qualcomm does not point to any dictionary meaning or other reasonable alternative construction of the term "paid" (or the related words "pay" or "payment") or the phrases "full amount" or "held liable" that convinces us otherwise. Rather, it argues we should adopt the interpretation advanced by *Zeig, supra, 23 F.2d 665*, in which the court declined to interpret the word "payment" in an excess policy as only relating to payment in cash. Citing no authority, the court said, "[The word payment] is often used as meaning the satisfaction of a claim by compromise, or in other ways." (*Id. at p. 666.*)

In *Zeig*, the insured held primary burglary insurance policies with a $ 15,000 liability limit but settled claims under the primary policies for $ 6,000. (*Zeig, 23 F.2d at p. 665.*) The language of the excess policy in *Zeig* provided that the excess policy "shall apply and cover only after all other insurance herein referred to shall have been exhausted in the payment of claims to the full amount of the expressed limits of such other insurance." (*Ibid.*) The excess insurer argued the insured was required actually to collect the full amount of underlying insurance as a prerequisite to coverage under [*25] the excess policy. (*Id. at p. 666.*) The *Zeig* court rejected the argument as "unnecessarily stringent," stating, "It is doubtless true that the parties could impose such a condition precedent to liability upon the policy, if they chose to do so. But the defendant [excess insurer] had no rational interest in whether the insured collected the full amount of the primary policies, so long as it was only called upon to pay such portion of the loss as was in excess of the limits of those policies. To require an absolute collection of the primary insurance to its full limit would in many, if not most, cases involve delay, promote litigation, and prevent an adjustment of disputes which is both convenient and commendable. A result harmful to the insured, and of no rational interest to the insurer, ought only to be reached when the terms of the contract demand it." (*Ibid.;* see also *Stargett v. Fidelity & Casualty of New York* (D.Del. 1975) 67 F.R.D. 689, 690-691 [adopting and quoting *Zeig* in case where excess policy language limited coverage to when the primary insurance was "exhausted"].) *Zeig* reasoned that the excess policy language did not include the word "'collection,'" and absent such a [*26] term it would not construe the policy in a "burdensome" way to the insured. (*Zieg, supra, 23 F.2d at p. 666.*) The court asserted that "claims are paid to the full amount of the policies, if they are settled and discharged, and the primary insurance is thereby exhausted." (*Ibid.*)

We are not persuaded that *Zeig* compels excess coverage in this case for several reasons. First, the court appeared to place policy considerations (i.e., the promotion of convenient settlement or adjustment of disputes) above the plain meaning of the terms of the excess policy, and for that reason (as we explain more fully below in part III(C) *post*), we reject its reasoning. Second, we disagree with its strained interpretation of the word "payment." (*Reserve Insurance Co. v. Pisciotta, supra, 30 Cal.3d at p. 807.*) Third, the *Zeig* court acknowledged that parties in these circumstances may include excess policy language explicitly requiring actual payment as a condition precedent to coverage and that a court may reach a contrary result "when the terms of the contract demand it." (*Zeig, supra, 23 F.2d at p. 666.*) The exhaustion clause here compels us to conclude that the parties expressly agreed that National was [*27] required to pay

(or be legally obligated to pay) no less than $ 20 million as a condition of Underwriters' liability. Because National did not so pay, Underwriters' obligations did not arise.

Our conclusion is supported by non-California authorities applying a plain language meaning of the word "payment," such as the Wisconsin Supreme Court in *Danbeck v. Am. Family Mut. Ins. Co.* (Wis 2001) 629 N.W.2d 150. There, an underinsured motorist (UIM) policy "specifie[d] that only one manner of exhaustion would trigger the obligation to pay UIM benefits: exhaustion by payment of judgements [*sic*] or settlements.'" (*Id. at p.* 155.) Declining to allow a generalized public policy to supercede unambiguous policy language (*id. at p.* 156), the court rejected the argument that a reasonable insured would understand that phrase to mean a below-limits settlement giving a credit for full payment of liability limits would "effectively 'exhaust'" those limits: "[A] 'settlement plus credit' does not constitute 'payment' of liability limits as that term is commonly and ordinarily understood. It is true that a settlement of this nature bars further claim against the tortfeasor's insurer and protects the UIM [*28] carrier against liability of the difference between the settlement amount and the tortfeasor's full policy limits. But it plainly does not exhaust the tortfeasor's policy limits *by payment* of those limits, as required by the UIM policy." (*Id. at p.* 155.) The court utilized a dictionary definition for word "payment" as "'something that is paid; an amount paid; compensation; recompense . . . [or] the act of paying . . . .'" (*Ibid.,* citing Random House Unabridged Dictionary 1424 (2d ed. 1993).) It agreed with the appellate court's conclusion that "in the context of this UIM exhaustion clause, the term 'payment' is susceptible of only one reasonable meaning: 'compensation paid by the liability insurer and received by the insured.'" (*Danbeck,* 629 N.W.2d at p. 155; see also *Comerica Inc. v. Zurich American Ins. Co.* (E.D. Mich. 2007) 498 F. Supp. 2d 1019.)

In *Comerica Inc. v. Zurich American Ins. Co., supra,* 498 F. Supp. 2d 1019, the district court in the Eastern District of Michigan followed *Danbeck* in underlying factual circumstances almost identical to those present in this case. There, the insured corporation, Comerica, settled securities fraud class actions lawsuits for $ 21 million. [*29] Its primary insurer, whose policy carried a $ 20 million liability limit and who had disputed coverage of some of the claims, agreed to pay $ 14 million toward the settlement and it and Comerica agreed the primary policy would be deemed fully exhausted. (*Comerica,* 498 F. Supp. 2d at pp. 1020, 1025-1026.) Comerica had a following form excess insurance policy providing (in an "Insuring Agreement" section) that "[c]overage hereunder shall attach only after all such 'Underlying Insurance' has been reduced or exhausted by payments for

losses . . . ." [5] (*Id. at p.* 1022.) Comerica sued to compel the excess insurer to pay $ 2.6 million ($ 1 million plus costs of defense) in connection with the settlement. (*Id. at pp.* 1020, 1026.) On cross motions for summary judgment, the district court held the excess policy language unambiguously required primary insurance to be exhausted or depleted by the *actual payment* of losses by the underlying insurer, and Comerica's payment to make up the difference was not sufficient to trigger excess coverage: "Payments by the insured to fill the gap, settlements that extinguish liability up to the primary insurer's limits, and agreements to give the excess insurer [*30] 'credit' against a judgment or settlement up to the primary insurer's liability limit are not the same as actual payment." (*Id. at p.* 1032.)

> 5  The excess policy also had a clause, titled, "DEPLETION OF UNDERLYING LIMITS(S)" providing: "In the event of the depletion of the limit(s) of liability of the 'Underlying Insurance' solely as a result of actual payment of loss thereunder by the applicable insurers, this Policy shall . . . continue to apply to loss as excess over the amount of insurance remaining. . . . In the event of the exhaustion of the limit(s) of liability of such 'Underlying Insurance' solely as a result of payment of loss thereunder, the remaining limits available under this Policy shall . . . continue for subsequent loss as primary insurance . . . [ P] This Policy only provides coverage excess of the 'Underlying Insurance.' This policy does not provide coverage for any loss not covered by the 'Underlying Insurance' except and to the extent that such loss is not paid under the 'Underlying Insurance' solely by reason of the reduction or exhaustion of the available 'Underlying Insurance' through payments of loss thereunder . . .'" (*Comerica Inc. v. Zurich American Ins. Co., supra,* 498 F. Supp. 2d at p. 1022.) [*31]

Qualcomm's reliance upon numerous other non-California authorities following *Zeig* does not persuade us to change our analysis of the policy language at issue here. Qualcomm itself observes that most of these decisions have as a "common thread" the policy rationale favoring the efficient settlement of disputes between insurers and insureds (e.g., *Drake v. Ryan* (Minn. 1994) 514 N.W.2d 785, 789; *Rummel v. Lexington Ins. Co., supra,* 945 P.2d at p. 981; *Elliot Co. v. Liberty Mut. Ins. Co.* (2006) 434 F. Supp. 2d 483, 500; *Reliance Ins. Co. v. Transamerica Ins. Co.* (2001) 826 So. 2d 998, 999-1000), a rationale that in our view cannot supersede plain and unambiguous policy language. Even the *Rummel* court conceded that parties could agree that an excess insurer's liability would not arise absent full payment by primary insurer under policy terms if they are clear and

explicit. (*Rummel, at p. 979.*) As we do here, *Rummel* emphasized that resolution of the issues there turned on the language of the excess insurer's policy, and "must be resolved on the facts of this particular case and on the language of the individual insurance contract." (*Id. at p. 977.*) Because we are bound by the policy language [*32] before us, Qualcomm's citation to the numerous authorities for their results as opposed to their analysis is unpersuasive. As Qualcomm admits, these cases were decided under differing circumstances and clauses "phrased in a multiplicity of ways." (E.g., *Rummel, at pp. 978-979* [court reached its holding in part given definition of "loss" as "*sums paid or payable* in settlement of claims for which the Insured is liable after making deductions for all other recoveries, salvages or other insurance (other than recoveries under underlying insurance, *whether recoverable or not*) and shall exclude all expenses and costs"]; *Reliance Ins. Co. v. Transamerica Ins. Co., 826 So. 2d at pp. 999-1000* [excess policy provided coverage "'only after all primary insurance is exhausted'"]; *Pereira v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.* (S.D.N.Y., July 12, 2006, No. 04 Civ. 1134) *2007 U.S. Dist. LEXIS 65369* [plaintiff sought recovery from an excess insurer due to an intermediate insurer's insolvency; court found ambiguity not based upon policy language, but on *Zeig's* reasoning and notion that "[i]nterpreting the policy to excuse the excess insurers from providing coverage on account of the unrelated [*33] insolvency of an intermediary insurer would work a . . . hardship on the insureds and provide a windfall to the excess insurers"].) The National policy here is unlike the policy in *Rummel* as it provides: "'Loss' means damages, judgments, settlements and Defense Costs . . .''

We cannot agree with Qualcomm's reasonable expectation of coverage argument, which is premised on the notion Underwriters should be deemed to have knowledge of *Zeig* and numerous authorities following *Zeig*. But there was authority contrary to *Zeig* before the parties entered into their insurance contract in 1999. (See, e.g., *Wright v. Newman* (1984) 598 F. Supp. 1178, 1197 [expressly rejecting *Zeig's* rationale as contrary to the Colorado rule that an insurance policy "must generally be enforced as written"]; *United States Fire Ins. Co. v. Lay (7th Cir. 1978) 577 F.2d 421, 423* [excess insurer's liability was extinguished by a settlement agreement between tort claimant and primary insurer for less than the amount of the primary insurer's policy limits; court held excess carrier was not obligated to indemnify the primary insurer because the settlement agreement "effectively released" the primary insurer from all liability [*34] in excess of $ 70,000, and thus the excess carrier's obligation to indemnify the primary carrier "never arose"]; *Johnson v. Milgo Indus., Inc.* (D.C. Minn. 1978) 458 F. Supp. 297, 301-302 & fn. 3 [observing *Zeig* interpreted the term "exhausted" in an ambiguous context and

that recent courts had rejected its reasoning; court distinguished the situation before it as involving unambiguous policy language and it declined to disregard the plain meaning of the language before it].) We perceive no compelling reason why, for purposes of our interpretation of the excess insurance policy here, Underwriters should be imputed with knowledge of only *Zeig's* line of cases and not the contrary authority. Qualcomm relies on the principle that "if 'a term in an insurance policy has been judicially construed, it is not ambiguous and the judicial construction of the term should be read into the policy unless the parties express a contrary intent.'" (*CDM Investors v. Travelers Casualty & Surety Co.* (2006) 139 Cal.App.4th 1251, 1256-1257.) However, courts must apply that rule "with caution, first determining whether the context in which the construed term appears is analogous to the context of the term before [*35] [it]." (*Lockheed Corp. v. Continental Ins. Co.* (2005) 134 Cal.App.4th 187, 197.) For several reasons Qualcomm is not assisted by this rule. First, as we have noted, the authorities are mixed on *Zeig* and its rationale. Second, we are not persuaded that the circumstances in those cases following *Zeig* are analogous. Regardless, we decide this case based on the particular excess policy language involved here, the analysis adopted by the California Supreme Court in coverage disputes.

Nor are we convinced to reach a different result by the California authorities cited by Qualcomm: *Home Indemnity Co. v. Mission Ins. Co., supra, 251 Cal. App. 2d 942 (Home Indemnity)* and *Phoenix Ins. Co. v. United States Fire Ins. Co.* (1987) 189 Cal. App. 3d 1511 *(Phoenix)*, superseded by statute on other grounds as stated in *California Ins. Guarantee Ass'n v. Workers' Comp. Appeals Bd.* (2005) 128 Cal.App.4th 307, 315. *Home Indemnity* was a declaratory relief action filed by insurer Home Indemnity Company (Home) and its insured, a leasing company, to determine their rights as against Mission Insurance Company (Mission), who was found to have provided excess insurance for a lessee of Home's insured. (*Home Indemnity, supra, at pp. 944-945, 949.*) [*36] The lessee had been sued as a result of an automobile accident. Before trial, the plaintiffs negotiated a settlement in which Home paid $ 31,000, and Tower Indemnity Company (Tower) paid $ 9,000 under its policy, which had a $ 10,000 limit. (*Id. at p. 945.*) Misson's excess policy provided that it "'agrees to indemnify the Insured . . ., in accordance with the applicable insuring agreements of the Primary Insurance [Tower], against *excess loss* subject to the limits stated . . . and as fully and to all intents and purposes as though the Primary Insurance had been issued for the limits set forth . . . . This policy shall apply . . . only in excess of the amount as set forth . . ., provided always that it is expressly agreed that liability shall attach to the Company [Mission] only after the Primary insurers have paid

or have been held liable to pay the full amount of their respective underlying limits as stated [$ 10,000/$ 20,000], the Company shall then be liable to pay only such additional amount as will provide the Insured with the total limits as stated [$ 100,000/$ 300,000].'" (*Id. at p. 962.*)

In Home's ensuing declaratory relief action, the trial court found (among other findings) [*37] that Mission had incurred no obligation under the terms of its excess policy because Tower's $ 10,000 primary insurance policy was not exhausted by its $ 9,000 payment. (*Home Indemnity, supra, 251 Cal. App. 2d at p. 965.*) The Court of Appeal held the trial court correctly concluded that Mission would incur no obligation under its policy "'unless and until the primary policy of Tower had paid or had been held to pay the sum of $ 10,000.'" (*Ibid.*) However, the appellate court rejected the trial court's conclusion as to exhaustion, finding it "fails to consider that the respective rights and obligations of the parties and the insurers became fixed at the time of the accident. The present action was commenced to determine those rights. The court in this action has the power to determine whether Tower should be 'held liable' to pay the full amount of its liability. The fact that Tower elected to compromise that issue with Home does not change the fact that it either was or was not so liable at the time of the accident. Nor does it preclude plaintiffs from adjudicating that issue with Mission, unless Mission has been prejudiced because of the subsequent settlement." (*Id. at pp. 965-966.*) [*38] The Court of Appeal held Mission did not demonstrate prejudice; its counsel had been advised of the settlement and on Mission's behalf he agreed the settlement was reasonable and that it would be without prejudice to the respective theories of Home and Mission in Home's declaratory relief action. (*Id. at p. 966.*) It further noted that plaintiffs' rights were not derivative but arose directly against Mission, and that the compromise did not preclude a determination of the rights and obligations of the dismissed parties to the extent those rights were material. (*Ibid.*) The court reversed the judgment as to Mission and directed the trial court to enter judgment declaring the respective rights and obligations of plaintiffs and Mission. (*Id. at p. 967.*)

*Home Indemnity* is consistent with our reasoning because the Court of Appeal there acknowledged that by reason of the clause attaching excess liability "only after the Primary insurers have paid or have been held liable to pay the full amount of their respective underlying limits" the excess insurer would not incur any obligation until the primary insurer had been adjudged liable to pay the full amount of its liability limit. (*Home Indemnity, supra, 251 Cal. App. 2d at pp. 965-966.*) [*39] However, *Home Indemnity's* result is based on disparate facts and circumstances rendering it inapposite here, including

the fact that National is not a party to this action and the trial court cannot determine its liability, particularly where it has received a release from Qualcomm. Underwriters further points out it did not agree to the reasonableness of Qualcomm's settlement, and thus *Home Indemnity's* outcome cannot apply under these circumstances, where it would be prejudiced in having to litigate coverage under the primary policy. Because these assertions are matters outside the pleadings, we do not address them on our review of the trial court's demurrer ruling. We do not find *Home Indemnity* persuasive in any event in view of the differing procedural contexts.

Finally, we are not persuaded by *Phoenix, supra, 189 Cal. App. 3d 1511*, a case with complex and distinguishable facts, and whose cursory holding is not based on insurance policy interpretation. There, multiple malpractice insurers, including excess insurer United States Fire Insurance Company (USFIC) and primary carriers Olympic and Central, faced with a malpractice action and Phoenix Insurance Company's declaratory relief [*40] action, had agreed to let a referee apportion their respective contributions to a $ 1.8 million settlement reached with their attorney insureds in connection with the malpractice action. (*Id. at pp. 1518-1520.*) The referee formulated a payment schedule requiring USFIC to pay $ 370,000, and Olympic and Central to pay $ 80,000 and $ 400,000 respectively. (*Id. at p. 1520.*) Olympic and Central paid in exchange for a dismissal from Phoenix's declaratory relief action. (*Ibid.*) Phoenix's declaratory relief action, and USFIC's cross-complaint for reimbursement from Phoenix, was tried in part to a jury and part to the court, after which the trial court found USFIC liable for excess coverage in the amount of $ 870,000. The court entered judgment ordering USFIC to pay $ 500,000 to Phoenix for money advanced by it to satisfy the malpractice settlement. (*Id. at pp. 1521-1522.*)

On appeal, USFIC challenged the judgment on numerous grounds, including that it obligated it beyond its contractual agreement since under its policies it could become liable for indemnification only after the insureds had exhausted the $ 1.8 million of Olympic's and Central's combined primary coverage. (*Phoenix, supra, 189 Cal. App. 3d at p. 1529.*) [*41] In a cursory statement, the Court of Appeal rejected the assertion: "In effect, the primary coverage was 'exhausted' when Central and Olympic paid their share of the settlement and were dismissed from the declaratory relief action. Had USFIC wanted to raise this issue, it could simply have named Olympic and Central as defendants in its cross-complaint thereby assuring that all the parties were before the court when the reapportionment was determined." (*Id. at p. 1529.*) We agree with Underwriters' observation that ultimately, the *Phoenix* court focused on USFIC's failure to seek relief in its cross-complaint from the underlying

primary carriers in the face of the referee's ordered allocation, which permitted them to be released from their obligation without paying their full limits. Absent meaningful excess policy interpretation or analysis, we decline to rely upon *Phoenix*.

### B. *Maintenance Clause*

Because our review is de novo and we are not bound by the trial court's reasoning, we need not decide whether the excess policy's maintenance clause independently compels a conclusion that excess coverage is precluded because Qualcomm did not comply with it as an express condition precedent to  [*42] coverage. In reviewing the judgment on Qualcomm's demurrer, we are not required to accept the trial court's legal reasons or conclusions of law; we review its ruling, not its reasoning. (*ASP Properties Group. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1268; *City of Pomona v. Superior Court, supra,* 89 Cal.App.4th at p. 800.) "'If right upon any theory of the law applicable to the case, [the judgment] must be sustained regardless of the considerations which may have moved the trial court to its conclusion.'" (*ASP Properties, at p. 1268,* quoting *Davey v. Southern Pacific Co. (1897) 116 Cal. 325, 329.*)

### C. *Public Policy*

Qualcomm argues that if we conclude the excess policy language is unambiguous in Underwriters' favor, public policies of promoting settlement and risk-spreading by insurance should compel us to obligate Underwriters to pay even if the obligation contravenes the policy language. We decline to do so.

"Whatever merit there may be to conflicting social and economic considerations, they have nothing whatso-ever to do with our interpretation of the unambiguous contractual terms. [Citation.] If contractual language in an insurance contract is clear and unambiguous, it governs, and  [*43] we do not rewrite it 'for any purpose.'" (*Aerojet-General Corp. v. Commercial Union Ins. Co.* (2007) 155 Cal.App.4th 132, 145-146, quoting *Certain Underwriters at Lloyd's of London v. Superior Court (Powerine I)* (2001) 24 Cal.4th 945, 967; see also *Rosen v. State Farm General Inc. Co. (2003) 30 Cal.4th 1070, 1077-1078; Foster-Gardner, Inc. v. National Union Fire Ins. Co. (1998) 18 Cal.4th 857, 888; AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 818.*) Our conclusion is consistent with the authority on which Qualcomm relies, *Signal Companies, Inc. v. Harbor Ins. Co. (1980) 27 Cal.3d 359,* in which the California Supreme Court found no "compelling equitable consideration" to impose an obligation on an excess carrier, contrary to the language of its excess policy, to reimburse a primary carrier for defense costs where those costs were incurred before exhaustion of the primary policy limits. (*Id. at pp. 365-367.*) The court "expressly decline[d] to formulate a definitive rule applicable in every case in light of varying equitable considerations which may arise, and which may affect the insured and the primary and excess carriers, and which depend upon the particular policies of insurance,  [*44] the nature of the claim made, and the relation of the insured to the insurers." (*Id. at p.* 369.) Taking *Signal's* lead, we affirm the judgment based on the excess policy language and underlying circumstances of this particular case.

### DISPOSITION

The judgment is affirmed.

Huffman, Acting P. J., and Aaron, J., concurred.