1  STROOCK & STROOCK & LAVAN LLP
   MICHAEL F. PERLIS (State Bar No. 95992)
2  mperlis@stroock.com
   RICHARD R. JOHNSON (State Bar No. 198117)
3  rjohnson@stroock.com
   RACHAEL SHOOK (State Bar No. 251628)
4  rshook@stroock.com
   2029 Century Park East, Suite 1800
5  Los Angeles, California 90067-3086
   Telephone: 310-556-5800
6  Facsimile: 310-556-5959
   lacalendar@stroock.com
7
   Attorneys for Defendant and Counterclaimant
8    TWIN CITY FIRE INSURANCE COMPANY

9

10                    **UNITED STATES DISTRICT COURT**

11                    **NORTHERN DISTRICT OF CALIFORNIA**

12                    **SAN FRANCISCO DIVISION**

13

14  CROWLEY MARITIME CORPORATION,          )   **Case No. CV-08-00830 SI**
                                           )
15            Plaintiff,                   )   [Hon. Susan Illston]
                                           )
16       vs.                               )   **NOTICE OF MOTION AND MOTION OF**
                                           )   **DEFENDANT AND**
17  FEDERAL INSURANCE COMPANY; TWIN        )   **COUNTERCLAIMANT TWIN CITY**
    CITY FIRE INSURANCE COMPANY; RLI       )   **FIRE INSURANCE COMPANY'S**
18  INSURANCE COMPANY; and DOES 1-20,      )   **MOTION TO DISQUALIFY RICHARD**
    inclusive,                             )   **SHIVELY AND PHILIP PILLSBURY, OF**
19                                         )   **THE FIRM OF PILLSBURY &**
                                           )   **LEVINSON, LLP, AS TRIAL COUNSEL**
20            Defendants.                  )   **FOR PLAINTIFF; MEMORANDUM OF**
                                           )   **POINTS AND AUTHORITIES IN**
21                                         )   **SUPPORT THEREOF**
                                           )
22                                         )   DATE:      August 22, 2008
                                           )   TIME:      9:00 a.m.
23                                         )   PLACE:     Courtroom 10
                                           )
24                                         )   [Declaration of Michael F. Perlis and
                                           )   [Proposed] Order filed concurrently]
25  _____ )

26

27

28

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S
MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF
PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

1    PLEASE TAKE NOTICE that, on August 22, 2008, at 9:00 a.m., or as soon thereafter as

2 the matter may be heard, before the Honorable Judge Illston of the above-entitled court, located at -

3 450 Golden Gate Avenue, San Francisco, California, 94102, Courtroom 10, Defendant and

4 Counterclaimant Twin City Fire Insurance Company ("Defendant" or "Twin City") will, and

5 hereby does, move this Court to disqualify Richard D. Shively and Philip L. Pillsbury, Jr., of the

6 law firm of Pillsbury & Levinson, LLP, from acting as trial counsel to Plaintiff Crowley Maritime

7 Corporation ("Crowley") in this action.  This Motion is made on the grounds that Messrs. Shively

8 and Pillsbury (and likely other attorneys at their firm) will serve as material, percipient witnesses to

9 critical and contested matters in the instant action such that their representation as trial counsel to

10 Plaintiff would undermine the judicial process and seriously prejudice Twin City and the other

11 defendants.

12    This Motion is and will be based upon this Notice of Motion and Motion, the accompanying

13 Memorandum of Points and Authorities, evidence in support of the motion, pleadings and papers

14 on file herein and upon such other evidence as the Court may entertain at the hearing of this matter.

15 This Motion is made pursuant to the Court's May 21, 2008 Pretrial Preparation Order that a motion

16 to disqualify shall be filed by June 13, 2008.

17

18 DATED:  June 13, 2008                          STROOCK & STROOCK & LAVAN LLP

19                                                Michael F. Perlis
                                                 Richard R. Johnson
20                                               Rachael Shook

21                                               By:    /s/ Michael F. Perlis

22                                                      Michael F. Perlis
                                                 Attorneys for Defendant/Counterclaimant
23                                               TWIN CITY FIRE INSURANCE
                                                 COMPANY
24

25

26

27

28
                                                  1

# TABLE OF CONTENTS

Page

I.      INTRODUCTION .................................................................................................1

II.     BACKGROUND ..................................................................................................5

        A.      The Underlying Action .............................................................................5

        B.      The Settlement Negotiations and the Settlement........................................6

        C.      Subsequent Request for Consent ..............................................................7

        D.      The Instant Action ...................................................................................8

III.    ARGUMENT
        THE COURT SHOULD DISQUALIFY SHIVELY, PILLSBURY, AND
        POSSIBLY OTHERS FROM THE FIRM OF PILLSBURY & LEVINSON, LLP
        FROM ACTING AS TRIAL COUNSEL TO CROWLEY BECAUSE SHIVELY
        AND PILLSBURY AND POSSIBLY OTHERS FROM THE FIRM MAY BE
        CALLED AS PERCIPIENT WITNESSES IN THE INSTANT ACTION SUCH
        THAT THEIR REPRESENTATION WOULD UNDERMINE THE INTEGRITY
        OF THE JUDICIAL PROCESS AND POSE A SUBSTANTIAL DETRIMENT TO
        TWIN CITY ......................................................................................................10

        A.      This Disqualification Motion Is Governed Both By The California Rules Of
                Professional Conduct, and By The Federal Law Vesting This Court With
                Inherent Authority To Control The Proceedings Before It..........................10

        B.      Pillsbury, Shively, and Possibly Others at the Firm Should be Disqualified
                Because They will be Called to Testify on Contested, Material Matters. ................11

        C.      Even if Crowley Gave Informed, Written Consent to Counsel's
                Representation, the Court Should Recuse Counsel from Acting as Trial
                Counsel Because Any Right Client Has in Selecting its Own Representation
                is Outweighed by the Substantial Detriment Such Representation Would
                Have on the Integrity of the Judicial Process and on Twin City. ............................12

                1.      The Court Should Disqualify Counsel Because Counsel's
                        Representation as Trial Advocate Would Undermine the Integrity of
                        the Judicial Process........................................................................13

                2.      The Court Should Disqualify Counsel Because Counsel's
                        Representation as Trial Advocate Would Pose a Substantial
                        Detriment to Twin City. ...............................................................15

                3.      The Court Should Disqualify Counsel Because Crowley Will Not
                        Face Substantial Hardship if Substitute Counsel Were Required. .................16

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S
MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF
PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

# TABLE OF AUTHORITIES

Page(s)

## CASES

1776 Associates, Inc. v. Lazrus,
    99 Misc 2d 370, 416 N.Y.S. 2d 162 (1979) ........................................................3

Acme Analgesics, Ltd. v. Lemmon Co.,
    602 F Supp 306 (S.D. N.Y. 1985) .....................................................................3

Banque Worms, S.A. v. Messrs. Worms et Cie.,
    687 F Supp 909 (S.D. N.Y. 1988) .....................................................................3

Beaver Falls Thrift Corp. v Commercial Credit Business Loans, Inc.,
    563 F Supp 68, 36 F.R. Serv 2d 1240l (W. D. Pa. 1983) ...............................3

Cardwell v. Russo,
    40 Conn Supp 162, 484 A. 2d 487 (1984) .......................................................3

Chronister v. Sam Tanksley Trucking Inc.,
    109 F.R.D. 1, 4 F.R. Serv. 3d 1245 (N.D. Ill. 1983) ......................................3

Comden v. Superior Court,
    20 Cal. 3d 906 (1978) ......................................................................................17

Concat LP v. Unilever, PLC,
    350 F. Supp. 2d 796 (N.D. Cal. 2004) ...........................................................10

In re County of Los Angeles,
    223 F.3d 990 (9th Cir. 2000) ..........................................................................10

Courtney v. Edelschick,
    157 A.D. 2d 818, 550 N.Y.S. 2d 415 (2d Dep't 1990) .....................................3

Dynasty Apparel Industries, Inc. v. Rentz,
    206 F.R.D. 596 (S.D. Ohio 2001) ....................................................................3

EXDS v. Devcon Construction,
    No. C05-0787 PVT, 2005 WL 2043020, *2n2 (N.D.)
    Cal. Aug. 24, 2005 ..........................................................................................17

Eurocom, S. A. v. Mahoney, Cohen & Co.,
    522 F Supp 1179 (S.D. N.Y. 1981) ...................................................................3

In re Hampton Hotel Investors, L.P.,
    289 B.R. 563 (Bankr. S.D. N.Y. 2003) .............................................................3

Haynes v. R.H. Dyck, Inc.,
    No. 2:06-CV-02944-MCE-EFB, 2008 WL 80749 (E.D. Cal. Jan. 7, 2008) ...............10, 13

Healthcrest, Inc. v. American Medical International, Inc.,
    605 F Supp 1507 (N.D. Ga. 1985)....................................................................3

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

ii

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

Henriksen v. Great American Sav. & Loan,
    11 Cal. App. 4th 109 (1992) ........................................................................... 15

Hitzig v. Borough-Tel Service, Inc.,
    108 A.D. 2d 677, 485 N.Y.S. 2d 541 (1st Dep't 1985) ........................................ 3

Hoerger v. Board of Educ. of Great Neck Union Free School Dist.,
    129 A.D. 2d 659, 514 N.Y.S. 2d 641 (2d Dep't 1987) ....................................... 3

Jackson v. Russell,
    498 N.E. 2d 22 (Ind. Ct. App. 1st Dist. 1986) .................................................. 3

Jones v. City of Chicago,
    610 F. Supp. 350 (N.D. Ill. 1984) .................................................................... 3

Liess v. General Electric Co.,
    659 F Supp 979 (N.D. Ill. 1987) ...................................................................... 3

Live and Let Live, Inc. v. Carlsberg Mobile Home Properties, Ltd.-'73,
    388 So. 2d 629 (Fla. Dist. Ct. App. 1st Dist. 1980) ......................................... 3

Lowe v. Experian,
    328 F. Supp. 2d 1122 (D. Kan. 2004) ............................................................. 1

Lyle v. Superior Court,
    122 Cal. App. 3d 470 (1981) .................................................. 11, 12, 13, 16, 17

M.K.B. v. Eggleston,
    414 F. Supp. 2d 469 (S.D.N.Y. 2006) ............................................................ 15

MacArthur v. Bank of New York,
    524 F Supp 1205 (S.D. N.Y. 1981) .................................................................. 3

Munk v. Goldome Nat. Corp.,
    697 F Supp 784 (S.D. N.Y. 1988) ................................................................... 3

North Shore Neurosurgical Group, P.C. v. Leivy,
    72 App Div 2d 598, 421 N.Y.S. 2d 100 (2d Dept. 1979) ................................... 3

People v. Donaldson,
    93 Cal. App. 4th 916 (2001) ..................................................................... 10, 15

Price v. Price,
    289 A.D. 2d 11, 733 N.Y.S. 2d 420 (1st Dept. 2001) ....................................... 3

Re Estate of Bartoli,
    143 App Div 2d 830, 533 N.Y.S. 2d 324 (2d Dept. 1988) ................................. 3

Reed Elsevier, Inc. v. Thelaw.Net Corp.,
    197 F. Supp. 2d 1025 (S.D. Ohio 2002) .......................................................... 3

iii

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

Smith, Smith & Kring v. Superior Court,
 60 Cal App. 4th 573 (1997) ........................................................ 11, 12, 13, 15

Sokolow, Dunaud, Mercadier & Carreras LLP v. Lacher,
 747 N.Y.S. 2d 441 (App. Div. 1st Dept. 2002) ................................... 3

Stewart v. Bank of America, N.A.,
 203 F.R.D. 585 (M.D. Ga. 2001) ........................................................ 3

Supreme Beef Processors, Inc. v. American Consumer Industries, Inc.,
 441 F. Supp. 1064 (N.D. Tex. 1977) ................................................. 3

Teleprompter of Erie, Inc. v. Erie,
 573 F Supp 963 (W.D. Pa. 1983) ........................................................ 3

Tru-Bite Labs, Inc. v. Ashman,
 54 A.D. 2d 345, 388 N.Y.S. 2d 279 (1st Dep't 1976)...................... 3

Two's Co., Inc. v. Transamerica Ins. Co.,
 653 F. Supp. 255 (S.D. N.Y. 1986) ................................................... 3

U. S. ex rel. Sheldon Elec. Co., Inc. v. Blackhawk Heating & Plumbing Co., Inc.,
 423 F. Supp. 486 (S.D. N.Y. 1976) ................................................... 3

Ulster Scientific, Inc. v. Guest Elchrom Scientific AG,
 181 F. Supp. 2d 95 (N.D. N.Y. 2001)................................................ 3

United States v. Kwang Fu Peng,
 602 F Supp 298 (S.D. N.Y. 1985), aff'd, 766 F. 2d 82 (2d Cir.) ...... 3

Wickes v. Ward,
 706 F Supp 290 (S.D. N.Y. 1989) ..................................................... 3

Yee v. Ventus Capital Svcs.,
 No. 05-03097 .................................................................................... 13

**STATUTES**

California Rule of Professional Conduct 1-100A ................................................ 10

California Rule of Professional Conduct 5-210 ......................................... 10, 11, 12

Fed. R. Civ. P. 26(a)(1) ..................................................................................... 8

**MISCELLANEOUS**

ABA Ann. Model Rules Prof. Conduct (4th ed. 1999)
 Legal Background, rule 3.7(1)         .................................................... 15

iv

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendant Twin City Fire Insurance Company ("Twin City") seeks to disqualify Plaintiff Crowley Maritime Corporation's ("Crowley['s]") trial counsel in this case, Richard Shively and Philip Pillsbury, of the law firm of Pillsbury & Levinson, LLP, because Messrs. Shively and Pillsbury have represented to this Court that they will be material fact witnesses whose testimony (and hence credibility) will be, according to them, critical to Crowley's case.  As shown below, it would be prejudicial to the defendants, and would undermine the integrity of the judicial process, to permit Messrs. Shively and Pillsbury both to place their credibility at issue by testifying as percipient witnesses on one of the central issues of the case, and then to attempt to rehabilitate themselves by arguing their own credibility to the Jury.  Accordingly, Messrs. Shively and Pillsbury must be disqualified from arguing to the jury, or from participating in pre-trial activities (such as the taking of depositions) that will result in materials ultimately presented to the jury.[1]  However, Twin City does not seek to bar Messrs. Shively and Pillsbury from continuing to represent their clients in this case with respect to matters (such as motion practice and consulting) that will not place them before the jury in the role of advocate.

In this action, Crowley seeks, *inter alia*, a judicial declaration that it is entitled to insurance coverage for a settlement payment for which it neither sought nor obtained the defendant Insurers' prior, written consent, which was an indispensable condition precedent to coverage.  When Twin City proposed, at the recent Case Management Conference, that it be permitted to file an early motion for summary judgment regarding the consent issue, Crowley's trial counsel objected that summary judgment on the consent issue was inappropriate, because they would be offering critical

---

[1] *See*, *Lowe v. Experian*, 328 F. Supp. 2d 1122, 1127 (D. Kan. 2004) (ruling that an attorney-witness would be barred, not only from serving as trial attorney, but also from participating in any evidentiary hearing held in this case, and from taking and defending depositions, on the ground that the dual role would confuse the jury and prejudice the opposing party; also permitting opposing party to invoke the rule prohibiting witnesses from being present in the courtroom during the testimony of other witnesses).

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

testimony that they represented would create a genuine dispute of material fact on the issue of consent. There is no doubt that Messrs. Shively and Pillsbury (and likely others in their firm) will be called as percipient witnesses in this case, as they authored the March 28, 2007 letter in which Crowley purported to seek the Insurers' prior consent for a settlement that, in actuality, had already been disclosed in public filings, and memorialized in a binding, signed *Stipulation of Compromise, Settlement and Release*, which had already been filed with the court in the underlying action.

Despite the fact that the settlement terms had already been agreed to, Messrs. Shively and Pillsbury falsely represented to the insurers in the March 28, 2007 letter that "an opportunity has arisen to settle the action on favorable terms, and to seek your consent to pursue such a settlement." Although Crowley had already entered into the enforceable *Stipulation of Compromise, Settlement and Release*, which was not conditioned upon insurer approval and had already been submitted for court approval, Messrs. Shively and Pillsbury falsely asserted that "before unequivocally accepting the plaintiffs' settlement offer and proceeding to complete the settlement, Crowley is asking its carriers to consent to the proposed settlement." Messrs. Shively and Pillsbury misrepresented to the insurers not only the fact that the settlement had already been agreed to; they also offered materially false purported excuses (including purported "applicable SEC disclosure rules" which do not exist) for why Crowley had failed to seek the insurers' prior written consent, even though settlement negotiations had (unbeknownst to the insurers) been ongoing since the prior December.[2] Given the fact that Messrs. Shively and Pillsbury made demonstrably false statements in the March 28, 2007 letter to the insurers, it is virtually certain that their credibility (or rather lack thereof) will feature prominently in any trial of this action. (Moreover, it cannot even be predicted at this point

---

[2] Twin City sent a Rule 11 letter to Messrs. Shively and Pillsbury on May 16, 2008 setting forth the evidence demonstrating that their March 28, 2007 letter (and hence Crowley's entire claim for coverage) is fraudulent, and giving them an opportunity either to withdraw Crowley's fraudulent pleadings or if they believed that anything Twin City said in the letter was in any way factually inaccurate, to call it to Twin City's attention. However, Messrs. Shively and Pillsbury, in a May 30, 2008 response letter, declined to take issue with Twin City's account of the facts or otherwise substantively address the merits of Twin City's concerns. Instead, they merely argued, incorrectly, that any Rule 11 or disqualification motion would constitute an improper early summary judgment motion regarding consent.

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

what other facts regarding the role of Messrs. Shively and Pillsbury or others in their firm in the underlying insurance claim will come to light in discovery.)  Given that fact, it would be fundamentally unfair to Defendants, and would compromise the integrity of the fact-finding process, to permit Messrs. Shively and Pillsbury to argue their own credibility to the jury.

In virtually every State of the United States, this situation would without doubt necessitate the immediate disqualification of Messrs. Shively and Pillsbury.[3]  In California, however, such disqualification is not automatic, because the applicable California Rule of Professional Conduct 5-210, which, subject to certain limited exceptions, generally prohibits lawyers from occupying the dual role of witness and attorney, does (when appropriate) sometimes permit a lawyer to act as a witness as long as the client gives informed written consent.  But as courts have recognized, informed written consent is ineffective where, as here, counsel's dual role as witness and attorney

---

[3]  *See, e.g., Jones v. City of Chicago*, 610 F. Supp. 350 (N.D. Ill. 1984); *Two's Co., Inc. v. Transamerica Ins. Co.*, 653 F. Supp. 255 (S.D. N.Y. 1986); *U. S. ex rel. Sheldon Elec. Co., Inc. v. Blackhawk Heating & Plumbing Co., Inc.*, 423 F. Supp. 486 (S.D. N.Y. 1976); *Supreme Beef Processors, Inc. v. American Consumer Industries, Inc.*, 441 F. Supp. 1064 (N.D. Tex. 1977); *Live and Let Live, Inc. v. Carlsberg Mobile Home Properties, Ltd.-'73*, 388 So. 2d 629 (Fla. Dist. Ct. App. 1st Dist. 1980); *Jackson v. Russell*, 498 N.E. 2d 22 (Ind. Ct. App. 1st Dist. 1986); *Courtney v. Edelschick*, 157 A.D. 2d 818, 550 N.Y.S. 2d 415 (2d Dep't 1990); *Hoerger v. Board of Educ. of Great Neck Union Free School Dist.*, 129 A.D. 2d 659, 514 N.Y.S. 2d 641 (2d Dep't 1987); *Hitzig v. Borough-Tel Service, Inc.*, 108 A.D. 2d 677, 485 N.Y.S. 2d 541 (1st Dep't 1985); *Tru-Bite Labs, Inc. v. Ashman*, 54 A.D. 2d 345, 388 N.Y.S. 2d 279 (1st Dep't 1976); *North Shore Neurosurgical Group, P.C. v. Leivy*, 72 App Div 2d 598, 421 N.Y.S. 2d 100 (2d Dept. 1979); *1776 Associates, Inc. v. Lazrus*, 99 Misc 2d 370, 416 N.Y.S. 2d 162 (1979); *Ulster Scientific, Inc. v. Guest Elchrom Scientific AG*, 181 F. Supp. 2d 95 (N.D. N.Y. 2001); *Wickes v. Ward*, 706 F Supp 290 (S.D. N.Y. 1989); *Banque Worms, S.A. v. Messrs. Worms et Cie.*, 687 F Supp 909 (S.D. N.Y. 1988); *United States v. Kwang Fu Peng*, 602 F Supp 298 (S.D. N.Y. 1985), *aff'd, 766 F. 2d 82* (2d Cir.); *In re Hampton Hotel Investors, L.P.*, 289 B.R. 563 (Bankr. S.D. N.Y. 2003); *Teleprompter of Erie, Inc. v. Erie*, 573 F Supp 963 (W.D. Pa. 1983); *Beaver Falls Thrift Corp. v Commercial Credit Business Loans, Inc.*, 563 F Supp 68, 36 F.R. Serv 2d 1240l (W. D. Pa. 1983); *Reed Elsevier, Inc. v. Thelaw.Net Corp.*, 197 F. Supp. 2d 1025 (S.D. Ohio 2002); *Dynasty Apparel Industries, Inc. v. Rentz*, 206 F.R.D. 596 (S.D. Ohio 2001); *Liess v. General Electric Co.*, 659 F Supp 979 (N.D. Ill. 1987); *Chronister v. Sam Tanksley Trucking Inc.*, 109 F.R.D. 1, 4 F.R. Serv. 3d 1245 (N.D. Ill. 1983); *Stewart v. Bank of America, N.A.*, 203 F.R.D. 585 (M.D. Ga. 2001); *Healthcrest, Inc. v. American Medical International, Inc.*, 605 F Supp 1507 (N.D. Ga. 1985); *Cardwell v. Russo*, 40 Conn Supp 162, 484 A. 2d 487 (1984); *Munk v. Goldome Nat. Corp.*, 697 F Supp 784 (S.D. N.Y. 1988); *Acme Analgesics, Ltd. v. Lemmon Co.*, 602 F Supp 306 (S.D. N.Y. 1985); *MacArthur v. Bank of New York*, 524 F Supp 1205 (S.D. N.Y. 1981); *Eurocom, S. A. v. Mahoney, Cohen & Co.*, 522 F Supp 1179 (S.D. N.Y. 1981); *Sokolow, Dunaud, Mercadier & Carreras LLP v. Lacher*, 747 N.Y.S. 2d 441 (App. Div. 1st Dept. 2002); *Price v. Price*, 289 A.D. 2d 11, 733 N.Y.S. 2d 420 (1st Dept. 2001); *Re Estate of Bartoli*, 143 App Div 2d 830, 533 N.Y.S. 2d 324 (2d Dept. 1988).

---

3

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1   would prejudice the opposing parties and injure the integrity of the judicial process.  In other

2   words, any consent by Crowley would be an insufficient basis on which to permit the fundamental

3   unfairness to defendants and the obvious impairment to the integrity of the fact-finding process that

4   would be caused by Messrs Shively's and Pillsbury's dual roles as attorneys and witnesses in any

5   trial.  Twin City and the other defendants should not be subjected to a fundamentally unfair trial in

6   which Messrs. Shively and Pillsbury are permitted to place their own thumbs on the scales by, in

7   effect, both arguing from the witness stand and testifying from the counsel table about an issue

8   which they say is central to their client's case.  Likewise, this Court, which has the inherent

9   authority to control its proceedings (including, when appropriate, by rejecting counsel's efforts to

10  occupy the dual role, even with the client's consent), should not countenance such a fundamentally

11  unfair and substantively flawed fact-finding process.[4]

12          While Messrs. Shively and Pillsbury will no doubt attempt to mischaracterize this

13  disqualification motion as a mere litigation tactic (which it is not), it is they themselves, not Twin

14  City, who necessitated this course of action by: (1) involving themselves in Crowley's efforts to

15  escape or obscure its breach of the consent provision by drafting and sending to the insurers a

16  demonstrably false letter purporting to seek the insurers' prior consent for a settlement to which

17  Crowley had already committed; (2) nevertheless representing Crowley in this case despite their

18  previous involvement in the underlying events; and (3) representing to this Court, at the Case

19  Management Conference, that Mr. Shively would be offering critical percipient witness testimony

20  that should preclude summary judgment on the consent issue.[5]  Given this situation, which was

21

22  ────────────────────
    [4] Moreover, to the extent that other attorneys in the Pillsbury firm (which apparently has only nine

23  lawyers) are revealed through discovery to have been involved in the underlying events and
    therefore cannot serve as trial counsel without posing the same problems, the entire firm should be

24  disqualified from serving as advocates at any trial in this action.  However, the entire firm,
    including Messrs. Shively and Pillsbury, should be permitted to continue to represent Crowley in
    non-jury-related functions such as motion practice and consulting.

25
    [5] Any attempted characterization of this motion to disqualify as a litigation tactic is belied by the
26  fact that Crowley, itself, has indicated that it plans to call its own trial counsel to testify as a
    percipient witness concerning what it characterizes as a central issue of this case, a fact that
27  distinguishes this case from those in which an opposing party proposes to call the other party's trial

28                                                  4
    ────────────────────────────────────────────────────────────
    NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S
    MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF
    PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND
    AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

entirely foreseeable to Crowley and its counsel (and entirely of their own making), disqualification is the only conceivable means of preventing unfair prejudice to Defendants, and the only way to guarantee the integrity of the fact-finding process at trial.

Indeed, Twin City has done whatever it can to minimize the impact on Crowley of the necessary disqualification by: (1) moving for disqualification as early in the case as is practicable, almost a year and a half before trial is scheduled; and (2) seeking to disqualify Messrs. Shively and Pillsbury, and anyone else at their firm who would testify as a percipient witness, only from acting as advocates before the jury (thus permitting them, behind the scenes, to continue to provide Crowley with any guidance and expertise they might have to offer in a manner that will not compromise or confuse the jury).  In light of the fact that disqualification will, for these reasons, not result in any prejudice to Crowley, whereas the failure to disqualify will have a profoundly prejudicial impact on Defendants, and on the very judicial process itself, Twin City respectfully requests that the Court grant this Motion to Disqualify.

## II.    BACKGROUND

A.    The Underlying Action

CMC's claim for coverage arises from a putative derivative and class action filed in Delaware Chancery Court (the "Franklin Action") against Crowley Chairman, CEO, and controlling shareholder Thomas B. Crowley, Jr. and other Crowley directors.  The plaintiffs in the Franklin Action sought to recover premiums and related expenses that Crowley paid for life insurance policies which allegedly were intended to benefit Mr. Crowley and his family.  (First Amended Complaint ["FAC"], ¶ 7.)

As a result, Crowley requested coverage for the Franklin Action under a primary directors and officers liability insurance policy issued by Federal Insurance Company ("Federal") and excess policies issued by Twin City and RLI Insurance Company ("RLI") (collectively, the "Insurers").

counsel as a witness on some peripheral issue, merely as a means of disqualifying the other party's chosen trial counsel.

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1  Twin City's policy, subject to its terms and conditions, generally applies in conformance with the

2  terms of the Federal policy, which provides that "[t]he Insureds agree not to settle or offer to settle

3  any Claim…without [Federal's] prior written consent," and that Federal "shall be consulted in

4  advance by the Insureds, regarding…the settlement of such Claim, including but not limited

5  to…negotiating any settlement."  (Twin City Policy [FAC Ex. B], ¶ IV.A.; Federal Policy [FAC

6  Ex. A], ¶ 16(b).)

7  **B.    The Settlement Negotiations and the Settlement**

8       On March 19, 2007, without prior notice to or consent by the Insurers, the Franklin Action

9  parties executed a *Stipulation of Compromise, Settlement and Release* (the "Settlement"), which

10 was filed with the Delaware Court on March 19, 2007, nine days before Crowley and counsel

11 represented to the Insurers that Crowley was seeking to obtain the Insurers' consent.   (Perlis Dec.,

12 Ex. B; Twin City's Answer and Counterclaim ["Answer"], p. 10, ¶ 12.)   The Delaware Court

13 approved the Settlement on April 28, 2007. (Joint Case Management Statement ["JCMS"] [Perlis

14 Dec., Ex. E], p. 11.)

15      The Settlement signed by Crowley reveals that it was in no way conditioned upon the

16 consent of the Insurers.  Additionally, pursuant to the terms of the Settlement, Crowley was already

17 obligated: (1) to "jointly apply to the Court for an Order . . . with respect to notice and the

18 settlement hearing" (Perlis Dec., Ex. B., ¶ 3), and (2) "to cooperate fully with [plaintiffs and their

19 counsel] in seeking Court approval of this Stipulation and the Settlement, and to use their best

20 efforts to effect, as promptly as practicable, the consummation of this Stipulation and the

21 Settlement provided for hereunder (including any amendments thereto) and the dismissal of the

22 Action . . ." (*Id*., Ex. B., ¶ 22).  Moreover, the Settlement indicates that Crowley's counsel had

23 engaged in extensive settlement negotiations with plaintiffs' counsel since December 2006, months

24 before Crowley sought "consent" from Insurers, and that it was Crowley, not the underlying

25 plaintiffs, who initiated the buyout idea.  (*Id.*, Ex. B., p. 3, ¶ F.)

26      Furthermore, before notifying the Insurers of the Settlement or requesting their consent,

27 Crowley issued a press release on or around March 19, 2007, entitled "Crowley Settles Stockholder

28

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S
MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF
PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

1  Lawsuit," which states that a majority of the Board of Directors has "recommended that the

2  unaffiliated stockholders accept the tender offer and tender their shares of common stock." (Press

3  Release [Perlis Dec., Ex. C.].)  The press release also states that the offer is conditioned upon the

4  Delaware Chancery Court approving the Settlement and upon the tender of a majority of the

5  outstanding shares of common stock held by Crowley's unaffiliated stockholders.   (*Id.*)   In

6  addition, Crowley attached the Settlement as an exhibit to its March 19, 2007 Form 14d-9, in which

7  it indicated that Crowley Newco was making an offer to purchase all outstanding shares of

8  common stock of Crowley "in part to settle [the Franklin Action]." (Form 14d-9 [Perlis Dec. Ex.

9  D.], Introduction ¶ 3.)

10  **C.    Subsequent Request for Consent**

11      Nine days after the Settlement was executed and after the Press Release was issued and the

12  Form 14d-9 was filed, Messrs. Shively and Pillsbury, by letter dated March 28, 2007, requested

13  Insurers' consent to a "proposed settlement." (March 28, 2007 Letter [Perlis Dec., Ex. A.].)   The

14  letter, which was signed by Mr. Shively on behalf of himself and Mr. Pillsbury, stated that Crowley

15  "was constrained by significant confidentiality issues that prevented it, as a practical matter, from

16  immediately inviting its D&O carriers to join in the negotiations" due to "applicable SEC

17  disclosure rules" and "financing arrangements necessary to fund the proposed purchase of the

18  plaintiffs' shares." (*Id.*)

19      Crowley also alleges that that Mr. Shively was involved in a telephone conversation with

20  Federal's claims examiner, Henry Nichols, in which Mr. Nichols allegedly told Mr. Shively that

21  Federal "ha[d] no problem consenting" to the "proposed settlement," subject to the receipt of

22  additional information. (*See*, JCMS [Perlis Dec., Ex. E], pp. 4, 11.)  To Twin City's knowledge,

23  Mr. Shively is the only witness who will support Crowley's account regarding Federal's purported

24  consent (a key coverage issue), as Mr. Nichols apparently disputes Crowley's characterization of

25  the telephone conversation. (*Id.*)  Mr. Shively, and perhaps others at his firm, would also appear to

26  be the only witnesses regarding what, if anything, they told their client, Crowley, about the

27

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S
MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF
PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

1    purported statements of Mr. Nichols during this telephone call, on which purported statements

2    Crowley claims to have detrimentally relied.

3    **D.    The Instant Action**

4         Crowley seeks reimbursement of defense costs and amounts allegedly paid in settlement of

5    the Franklin Action.  (*See*, FAC, *passim*.)   Crowley filed the FAC on or about April 18, 2008,

6    alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing

7    against Defendants Federal, RLI, and Twin City.  (*Id*.)  After Insurers timely removed the action on

8    diversity grounds, Twin City, on May 2, 2008, filed its answer and counterclaim to the FAC.  In its

9    answer, Twin City, *inter alia*, (1) denies Crowley's allegation that "plaintiff's notification sought

10   the Insurers' consent to the proposed settlement; (2) "avers that settlement negotiations were

11   secretly ongoing approximately three months prior to the signing of the [Settlement];" and (3) avers

12   that in the March 19, 2007 letter sent to Twin City from Shively and Pillsbury, Plaintiff knowingly

13   made false and fraudulent misrepresentations regarding various constraints that Crowley alleged

14   required settlement negotiations to be kept confidential.  (Answer, p. 2, ¶ 8.)  Twin City reiterated

15   similar averments in its counterclaim.  (Answer, pp. 10 -11.)

16        Twin City filed its initial disclosures, on or around May 9, 2008, pursuant to Fed. R. Civ. P.

17   26(a)(1) ("Initial Disclosures"), in which it indicated that it believes, based on information

18   reasonably available to it, that "Richard D. Shively, Philip L. Pillsbury, Jr., and all other attorneys

19   and paralegals from Pillsbury & Levinson, LLP" may have discoverable information that Twin

20   City may use in support of its claim against Crowley and in support of its defense against

21   Crowley's claims.  (Initial Disclosures, ¶ 4.)  According to the Initial Disclosures, Twin City

22   believes that "Messrs. Shively, Pillsbury, and other paralegals and attorneys from Pillsbury &

23   Levinson, LLP may have knowledge of the [Franklin Action], the reporting of and/or notice given

24   of the [Franklin Action] and settlement to Twin City and Federal, and other facts relevant to

25   Crowley's claims for coverage under the Federal and Twin City Policies and Twin City's

26   counterclaim for breach of contract."  (*Id*.)

27

28

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S
MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF
PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1    Then, on May 15, 2008, Insurers and Crowley filed the JCMS in which each side provided

2  its own statement of facts.   While Twin City's counsel stated, during a case management

3  conference, that it wished to file a summary judgment motion solely based on Plaintiff's failure to

4  obtain the consent of Insurers, Crowley's counsel objected and argued that the issue of Insurers'

5  consent would be a hotly contested issue at trial and not a pure issue of law that could be decided

6  on summary judgment.   (Declaration of Michael Perlis in Support of twin City's Motion to

7  Disqualify ["Perlis Dec."], ¶ 2.)   Crowley alleged that the settlement reached with underlying

8  plaintiffs in March 2007 was a "proposed settlement" – approval of which was subject to the

9  board's discretion.  (JCMS, p.3-4.)   Additionally, Crowley alleges that it sought Insurers' consent

10 to the proposed settlement and that "On April 5, 2007 Federal's attorney Henry Nichols responded

11 by telephone, advising that Federal, "had no problem with consenting" to the proposed settlement

12 but wished to obtain additional information relating to the proposed settlement."  (JCMS, p.4; FAC,

13 ¶ 8.)

14    However, as stated in the Insurers' statement of facts and in Federal's Answer, Federal

15 "disputes [Crowley]'s characterization of this conversation." (JCMS [Perlis Dec., Ex.. E], p. 11.)

16 Additionally, in the JCMS, Insurers provided that the following issues, *inter alia*, are disputed:

17 "(1) whether [Crowley] settled, offered to settle, or entered into a legally binding stipulation of

18 settlement of the Franklin Action prior to notifying the Insurers or seeking their consent;

19 (2) whether [Crowley] failed to consult the Insurers in advance with respect to negotiating the

20 settlement of the Franklin Action; (3) whether Crowley's March 28, 2007 letter concerning the

21 settlement of the Franklin Action contained false statements as to the terms or status of the

22 settlement or as to Crowley's stated explanation for its delay in disclosing the settlement to the

23 Insurers."  (*Id.*, p.12-13.)

24    On or around May 21, 2008, the Court, in its pretrial preparation order, ordered that a

25 motion to disqualify shall be filed by June 13, 2008.

26

27

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

9

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.    ARGUMENT
**THE COURT SHOULD DISQUALIFY SHIVELY, PILLSBURY, AND POSSIBLY OTHERS FROM THE FIRM OF PILLSBURY& LEVINSON, LLP FROM ACTING AS TRIAL COUNSEL TO CROWLEY BECAUSE SHIVELY AND PILLSBURY AND POSSIBLY OTHERS FROM THE FIRM MAY BE CALLED AS PERCIPIENT WITNESSES IN THE INSTANT ACTION SUCH THAT THEIR REPRESENTATION WOULD UNDERMINE THE INTEGRITY OF THE JUDICIAL PROCESS AND POSE A SUBSTANTIAL DETRIMENT TO TWIN CITY.**

**A.    This Disqualification Motion Is Governed Both By The California Rules Of Professional Conduct, and By The Federal Law Vesting This Court With Inherent Authority To Control The Proceedings Before It.**

Because this Federal Court is exercising diversity jurisdiction in a forum located in California, California law provides the basic standards of attorney conduct at issue in the instant motion. *In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000); *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 814 (N.D. Cal. 2004). Moreover, the Local Rules of the Northern District of California provide that all attorneys appearing before the Court must be familiar with and comply with "the standards of professional conduct required of members of the State Bar of California," contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California ("California Rules of Professional Conduct"), and decisions of any court applicable thereto. (L.R. 11-4 and commentary).

Pursuant to California Rule of Professional Conduct 5-210 ("Rule 5-210"), an attorney may not represent a client in a jury trial in which the attorney will testify as a witness unless: "(a) the testimony relates to an uncontested matter; (b) the testimony relates to the nature and value of legal services rendered in the case; or (c) the client gives informed written consent." Rule 5–210 applies to situations in which the attorney "knows or should know that he or she ought to be called as a witness in litigation in which there is a jury." *See* Commentary to Rule 5-210. Additionally, Rule 5-210 does not apply to situations where a lawyer in the advocate's firm will testify and does not apply to pretrial preparation of a case – only to testimony at trial. *Id.*; *Haynes v. R.H. Dyck, Inc.*, No. 2:06-CV-02944-MCE-EFB, 2008 WL 80749, *2 (E.D. Cal. Jan. 7, 2008).[6]

---

[6] Additionally, although California has not adopted the ABA Model Rules of Professional Conduct ("Model Rules"), California Rule of Professional Conduct 1-100(A) expressly permits consideration of ethical rules adopted by other jurisdictions and bar associations. *People v.*

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1   Here, because Pillsbury, Shively, and any other attorneys and paralegals from Pillsbury &

2   Levinson, LLP who were involved in the underlying insurance claim should know that they have

3   "discoverable information" and perhaps "will be called as percipient witnesses to this action," as

4   Twin City's initial disclosures and Twin City's May 16, 2008 letter to Pillsbury and Shively

5   indicate, they should not represent Plaintiff, unless one of the exceptions to Rule 5-210 apply.

6   As noted above, California is somewhat of an outlier to the extent that it ever permits

7   lawyers to serve in the dual role of attorney and witness with the informed consent of the client,

8   since, in most jurisdictions, disqualification in such circumstances is virtually automatic.  However,

9   while the informed consent of the client is in California considered sufficient, in certain

10  circumstances, to permit counsel to occupy the dual role, this Court is not constrained, by Rule 5-

11  210 or any other authority, to permit a lawyer to serve as both witness and advocate, merely on the

12  ground that the client has consented.

13  To the contrary, the Court "has discretion to order withdrawal of counsel in instances where

14  an attorney or a member of the attorney's law firm ought to testify on behalf of his client" when the

15  party seeking disqualification makes "a convincing demonstration of detriment to the opponent or

16  injury to the integrity of the judicial process."  *Smith, Smith & Kring v. Superior Court,* 60 Cal

17  App. 4th 573, 579 (1997), *quoting*, *Lyle v. Superior Court*, 122 Cal. App. 3d 470, 482 (1981).

18  **B.    Pillsbury, Shively, and Possibly Others at the Firm Should be Disqualified Because
         They will be Called to Testify on Contested, Material Matters.**

19

20  Because Counsel will not be testifying on the nature and value of legal services rendered in

21  this case and because their testimony will be on contested matters, Counsel should be disqualified,

22  unless the third exception to Rule 5-210 applies.  The first two exceptions to Rule 5-210, however,

23  are inapplicable here.  As evident from Twin City's Answer and Counterclaim, the Initial

24  
---

25  *Donaldson*, 93 Cal. App. 4th 916, 928 (2001).  "Especially where there is no conflict with the
    public policy of California, the Model Rules serve as a collateral source for guidance on proper

26  professional conduct in California."  *Id.* (relying on Model Rule 3.7(a) for the proposition that the
    prohibition against a lawyer serving as advocate and testifying as witness in the same matter is

27  aimed at eliminating confusion).

28  

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S
MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF
PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

Disclosures, the Case Management Conference, and the JCMS, it is clear that the following issues for which Shively and Pillsbury will be requested to testify are contested: (1) the issue of whether Crowley settled with plaintiffs prior to notifying the Insurers or seeking their consent; (2) the issue of whether Crowley failed to consult the Insurers prior to negotiating the settlement with underlying plaintiffs; and (3) the issue of whether Crowley's March 28, 2007 letter concerning the settlement of the Franklin Action contained false statements. For instance, while Crowley claims it sought Insurers' consent prior to settlement, Twin City will argue – based on evidence such as the Settlement itself, the Form 14d-9, and the Crowley press release – that the Settlement entered into by Crowley was binding and not conditioned on the Insurers' approval. Even Crowley has admitted that the issue of consent will be a highly contested issue that will be critical to the outcome of the case. While Twin City wanted to file a motion for summary judgment solely based on Plaintiff's failure to obtain consent, Crowley objected on the basis that the issue of consent was not a matter of law, but of fact. Although Twin City disagrees, and believes that Crowley as a matter of law breached the consent to settle provision by executing the March 19, 2007 Settlement Agreement, to the extent the case were to proceed to trial, Crowley's counsel would be testifying on contested, material matters, such that the first two exceptions to Rule 5-210 would not apply in the instant case. Accordingly, Counsel should be disqualified from representing Crowley as trial counsel, unless the final exception to Rule 5-210, discussed below, is applicable.

**C.  Even if Crowley Gave Informed, Written Consent to Counsel's Representation, the Court Should Recuse Counsel from Acting as Trial Counsel Because Any Right Client Has in Selecting its Own Representation is Outweighed by the Substantial Detriment Such Representation Would Have on the Integrity of the Judicial Process and on Twin City.**

Even if Crowley were to obtain the "informed written consent of the client," thus triggering the third exception to Rule 5-210, the Court still has discretion to recuse Counsel from trial advocacy if Counsel is expected to testify. *Smith, Smith & Kring v. Superior Court,* 60 Cal App. 4th 573, 578-579 (1997). In determining whether to disqualify counsel, the trial court should balance competing interests. *Lyle v. Superior Court*, 122 Cal. App. 3d 470, 482 (1981); *Smith,* 60 Cal. App. 4th at 579 (extending this test to rule 5-210, which is substantially identical to the rule

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

considered in *Lyle*). Although close cases should be decided in favor of a client's right to choose an attorney of his or her choice, a court may disqualify counsel "where it is confronted with manifest interests which it must protect from palpable prejudice." *Lyle*, 122 Cal. App. 3d at 482 (vacating trial court's order to disqualify plaintiff's law firm where trial court failed to weigh the conflicting interests involved). Thus, where there is convincing evidence that an attorney's representation causes injury to the integrity of the judicial process or detriment to the moving party, the Court may disqualify the attorney from acting as a trial advocate. *Id.* at 482; *Haynes*, 2008 WL 80749 at *2.

> **1.     The Court Should Disqualify Counsel Because Counsel's Representation as Trial Advocate Would Undermine the Integrity of the Judicial Process.**

Even if a client gives informed written consent to its attorney's dual role as trial advocate and witness, a court may, nevertheless, disqualify the attorney as trial counsel if the attorney's representation will cause injury to the integrity of the judicial process. *Smith*, 60 Cal. App. 4th at 579 (citing *Lyle*, 122 Cal. App. 3d at 482); *Yee v. Ventus Capital Svcs.*, No. 05-03097 RS, 2006 Westlaw 305087 at *1 (N.D. Cal. Oct. 26, 2006) (denying motion to disqualify where only potential harm was to plaintiff who had consented to its counsel's dual role as witness and advocate and where there was no showing of particular harm to the process' integrity). Relevant factors to consider include: (1) the combined effects of the strong interest parties have in representation by counsel of their choice and in avoiding the duplicate expense and time-consuming effort involved in replacing counsel; (2) the possibility counsel is using the motion to disqualify for purely tactical reasons; (3) whether counsel's testimony is, in fact, genuinely needed; and (4) whether it is the trial attorney or another member of his/her firm who will be the witness. *Smith*, 60 Cal. App. 4th at 580-581 (vacating trial court's order recusing firm because moving party failed to provide adequate evidence showing why the firm must testify or how testimony would be harmful to the integrity of the judicial process).

Here, because permitting Counsel to act as trial counsel to Crowley will seriously undermine the judicial process, the aforementioned factors weigh in favor of disqualification.

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

13

1  Although Crowley may prefer to have Counsel as its trial advocate, replacing Counsel with new

2  trial counsel should not duplicate expenses or add much time-consuming effort because Crowley

3  may still retain Counsel for all pretrial and non-jury related matters and need only find alternative

4  trial counsel who can easily be brought up to speed on matters with the help of Counsel.

5  Additionally, trial has not yet started and this action was brought to this court only around four

6  months ago, on or around February 6, 2008, such that there will not be much for new trial counsel

7  to learn.  Furthermore, the fact that the Motion to Disqualify is being brought early in the action

8  and after Twin City has already tried to resolve the problem with Counsel's representation outside

9  of court suggests that Twin City is not moving to disqualify for purely tactical reasons.

10       Moreover, Counsel's testimony, particularly that of Shively, is genuinely needed. For

11  instance, a major issue in this case is whether Crowley's March 28, 2007 letter concerning the

12  settlement of the Franklin Action contained false statements.  Because Shively signed the March

13  28, 2007 letter, Shively's testimony will be essential in determining whether such statements were

14  false.  Also, Shively alleges that Federal's attorney made particular statements to Shively regarding

15  consent and of which Twin City challenges the validity.  Moreover, Twin City will allege that

16  Shively and Pillsbury misrepresented and made false statements about settlement negotiations and

17  about whether there was a condition in the Settlement permitting the Crowley board to back away

18  from the Settlement.  Thus, Shively and Pillsbury's testimony will be critical in establishing the

19  veracity of the March 28, 2007 letter and other material statements necessary to determine whether

20  Twin City was notified of and consented to the Settlement.  As conceded by Crowley itself, the

21  consent issue is especially critical to establishing and defending the causes of action in the instant

22  case because consent is a condition to Twin City's obligations under its policy.  Thus, Twin City

23  genuinely needs Shively and Pillsbury's testimony regarding the March 2007 letter and other

24  statements alleged to be false such that depriving Twin City of such testimony would undermine

25  the integrity of the judicial process.

26       This, however, does not mean that other attorneys at the Firm should be permitted to act as

27  trial counsel, particularly to the extent that they had any involvement in the underlying claim for

28

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S
MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF
PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

insurance coverage.  Because the Firm is small (reported on its website[7] as having nine attorneys, all of whom appear to specialize in insurance law), it seems probable, although unclear to Twin City, that other attorneys at the firm (1) would have been involved in material matters in the instant case; (2) could be called as material witnesses; (3) and also have biases in favor of Shively and Pillsbury such that their representation as trial counsel would also be compromised and confusing. Moreover, where an attorney is disqualified from representation, the entire law firm is vicariously disqualified. *See Henriksen v. Great American Sav. & Loan*, 11 Cal. App. 4th 109, 114 (1992) ("[a]s a general rule in California, where an attorney is disqualified from representation, the entire law firm is vicariously disqualified as well").[8]  Nevertheless, other attorneys at the Firm, including Shively and Pillsbury, could still remain as counsel in pre-trial matters as well as any other matter that would not be in front of the jury – thus, eliminating any significant prejudice to Crowley.

### 2. The Court Should Disqualify Counsel Because Counsel's Representation as Trial Advocate Would Pose a Substantial Detriment to Twin City.

Additionally, the Court may disqualify Counsel on the basis that Counsel's representation as trial advocate will pose a clear detriment to Twin City.  *Smith*, 60 Cal. App. 4th at 579-580.  A party may be prejudiced where a lawyer's service as both advocate and witness in the same matter causes confusion over the lawyer's role.  *See, e.g., People v. Donaldson*, 93 Cal. App. 4th at 928 (referring to ABA Ann. Model Rules Prof. Conduct (4th ed. 1999), Legal Background, rule 3.7(a)); *M.K.B. v. Eggleston*, 414 F. Supp. 2d 469, 470 (S.D.N.Y. 2006) (advocate-witness rule "seeks to avoid the confusion and prejudice that may result where a testifying lawyer may have to offer arguments about his own credibility. . . or where there may be an implication that the testifying lawyer is lying to benefit his client").

---

[7] http://www.pillsburylevinson.com/

[8] Accordingly, the Court should either disqualify the firm in its entirety from acting as Crowley's trial advocates or devise some procedure by which to determine which other attorneys at the firm, in addition to Messrs. Shively and Pillsbury, should be disqualified from trial advocacy on the basis of the likelihood that they will be testifying as percipient witnesses.

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

Here, because counsel's testimony will according to Crowley be critical to the contested issue of consent, the veracity of such statements will be highly debated and the credibility of these witnesses will be vigorously attacked. Thus, allowing Counsel both to testify as a witness (whose testimony will likely be impeached) and to act as trial counsel would permit Counsel unfairly, whether intentionally or not, to bolster Counsel's testimony at the detriment of Twin City. Counsel would have an unfair opportunity to rehabilitate its testimony – a benefit unavailable to most witnesses and to Twin City. Moreover, Counsel's representation as trial advocate could also confuse the jury and possibly give more credibility to Counsel as witness. Because Crowley would have the benefit of having a witness also advocate its case, Twin City will face an uphill battle in arguing the falsity of certain representations made by Counsel – arguments that are critical to the material consent issue. Thus, as material, percipient witnesses, Shively and Pillsbury would not only seriously undermine the integrity of the judicial process, but would also detrimentally impact Twin City if they were to interact with the jury.

> **3.     The Court Should Disqualify Counsel Because Crowley Will Not Face Substantial Hardship if Substitute Counsel Were Required.**

Other factors a court should consider in determining whether an attorney should be disqualified are: (1) whether the client may face substantial hardship if substitute counsel were required; (2) whether attorney's services are of a distinctive value; and (3) whether the client attempted to ameliorate any possible appearances of impropriety. *Lyle*, 122 Cal. App. 3d at 482-83 (finding that the trial court erred in disqualifying attorneys where plaintiff, who was a long-term employee of the law firm representing her, had reasonable opportunity to seek advice of independent counsel, was aware of possible problems of the dual role of her attorneys, and would suffer financial hardship because the firm was not charging her a fee; where attorney-witnesses were not trial advocates before jury; and where no legal fees were involved).

Here, the fact that disqualification will not impose substantial harm on Crowley is another factor weighing in favor of disqualification. Unlike in *Lyle*, where the client was being represented free of charge by the law firm that employed her, Crowley, a large corporation with offices around

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

the world which is presumably already playing legal fees, should be able to find equally competent trial counsel charging comparable fee rates.  The issues presented before the court are not novel or very complex, but fall under common causes of action, such as breach of contract and breach of good faith and fair dealing.  Also, this litigation is taking place in San Francisco, a large metropolitan area with a myriad of attorneys experienced in insurance matters.  Moreover, Twin City merely requests recusal of Counsel from being trial advocates and does not seek their recusal entirely.  Shively and others may still participate in legal matters related to the instant action, as long as they do not interact with the jury, just as the attorneys in *Lyle* did not participate as trial advocates before the jury.  Because Counsel may still advise Crowley and its new trial counsel, Crowley will not face a substantial detriment if Shively and others at the Firm do not act as its trial counsel.

Additionally, while California has loosened the rule prohibiting witnesses to also be advocates by allowing for a client consent exception, the concerns underlying the former rule remain – "an attorney who attempts to be both advocate and witness impairs his credibility as witness and diminishes his effectiveness as advocate." *EXDS v. Devcon Construction*, No. C05-0787 PVT, 2005 WL 2043020, *2n2 (N.D. Cal. Aug. 24, 2005)(quoting *Comden v. Superior Court*, 20 Cal. 3d 906, 912 (1978)).

///
///
///
///
///
///
///
///
///
///

17

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

1

### IV.    CONCLUSION

2        For the foregoing reasons, Defendant and Counterclaimant Twin City Fire Insurance

3 Company respectfully requests that the Court enter an Order granting the instant Motion to

4 Disqualify.

5 DATED:   June 13 2008                            Respectfully submitted,

6                                                  STROOCK & STROOCK & LAVAN LLP

7                                                  Michael F. Perlis
                                                   Richard R. Johnson
                                                   Rachael Shook
8

9                                          By:    /s/ Michael F. Perlis

10                                                     Michael F. Perlis
                                                   Attorneys for Defendant/Counterclaimant
11                                                 TWIN CITY FIRE INSURANCE
                                                   COMPANY
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

18

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

**CERTIFICATION**

I hereby certify that, on June 13, 2008, a copy of the foregoing ***NOTICE OF MOTION AND MOTION OF DEFENDANT AND COUNTERCLAIMANT TWIN CITY FIRE INSURANCE COMPANY'S MOTION TO DISQUALIFY RICHARD SHIVELY AND PHILIP PILLSBURY, OF THE FIRM OF PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL FOR PLAINTIFF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF*** was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's EM/ECF System.

By:    /s/ Michael F. Perlis
       Michael F. Perlis

NOTICE OF MOT. & MOT. OF DEFENDANT & COUNTERCLAIMANT TWIN CITY FIRE INS. CO.'S MOT. TO DISQUALIFY RICHARD SHIVELY & PHILIP PILLSBURY, OF THE LAW FIRM OF PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - Case No. 08-0830 SI

1   STROOCK & STROOCK & LAVAN LLP
    MICHAEL F. PERLIS (State Bar No. 95992)
2   mperlis@stroock.com
    RICHARD R. JOHNSON (State Bar No. 198117)
3   rjohnson@stroock.com
    RACHAEL SHOOK (State Bar No. 251628)
4   rshook@stroock.com
    2029 Century Park East, Suite 1800
5   Los Angeles, California  90067-3086
    Telephone: 310-556-5800
6   Facsimile: 310-556-5959
    lacalendar@stroock.com
7
    Attorneys for Defendant and Counterclaimant
8     TWIN CITY FIRE INSURANCE COMPANY

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                    SAN FRANCISCO DIVISION

12

13

14   CROWLEY MARITIME CORPORATION,          )   Case No. CV-08-00830 SI
                                            )
15              Plaintiff,                   )   [Hon. Susan Illston]
                                            )
16        vs.                                )   DECLARATION OF MICHAEL F.
                                            )   PERLIS IN SUPPORT OF MOTION OF
17   FEDERAL INSURANCE COMPANY; TWIN        )   DEFENDANT AND
     CITY FIRE INSURANCE COMPANY; RLI       )   COUNTERCLAIMANT TWIN CITY
18   INSURANCE COMPANY; and DOES 1-20,      )   FIRE INSURANCE COMPANY'S
     inclusive,                              )   MOTION TO DISQUALIFY RICHARD
19                                           )   SHIVELY AND PHILIP PILLSBURY, OF
                Defendants.                   )   THE FIRM OF PILLSBURY &
20                                           )   LEVINSON, LLP, AS TRIAL COUNSEL
                                            )   FOR PLAINTIFF
21                                           )
                                            )   [PART 1 OF 2; PAGES 1-54]
22                                           )
                                            )   DATE:      August 22, 2008
23                                           )   TIME:      9:00 a.m.
                                            )   PLACE:     Courtroom 10
24                                           )
                                            )   [Notice of Motion and Motion to Disqualify,
25   _____)   Memorandum of Points and Authorities and
                                                 [Proposed] Order filed concurrently herewith]
26

27

28   DECLARATION OF MICHAEL F. PERLIS IN SUPPORT OF MOTION OF DEFENDANT
     AND COUNTERCLAIMANT TWIN CITY FIRE INSURANCE COMPANY'S MOTION TO
     DISQUALIFY RICHARD SHIVELY AND PHILIP PILLSBURY, OF THE LAW FIRM OF
     PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL – Case No. 08-0830 SI

## DECLARATION OF MICHAEL F. PERLIS

I, Michael F. Perlis, hereby declare:

1.     I am a partner in the law firm of Stroock & Stroock & Lavan LLP, lead counsel for Defendant Twin City Fire Insurance Company ("Twin City") in this litigation. I submit this declaration in support of Twin City's Motion to Disqualify Richard Shively and Philip Pillsbury, of the law firm of Pillsbury & Levinson, LLP, from acting as trial counsel to Plaintiff Crowley Maritime Corporation ("Crowley"). The facts set forth herein are true of my own personal knowledge, except where based upon my review of the pleadings and files in this action. If called as a witness, I could and would competently testify thereto.

2.     I attended, on behalf of Twin City, the case management conference ("CMC") held in this action on May 16, 2008. Messrs. Shively and Pillsbury attended the CMC on behalf of Crowley. During the CMC, I proposed, on behalf of Twin City, that the Court modify its one-summary-judgment-only rule to permit Twin City to file an early summary judgment motion limited to the sole issue that coverage is barred by Crowley's failure to seek or obtain its insurers' prior written consent. Crowley's attorneys objected to the proposal on the ground, they claimed, that consent was purportedly a hotly contested "factual" issue.

3.     This so-called hotly contested issue is set forth in the Joint Case Management Conference Statement (at pp. 4, 11), according to which Crowley alleges that Mr. Shively was involved in a telephone conversation with Federal Insurance Company's ("Federal['s]") claims examiner, Henry Nichols, in which Mr. Nichols allegedly told Mr. Shively that Federal "ha[d] no problem consenting" to the "proposed settlement," subject to the receipt of additional information. To my knowledge, Mr. Shively is the only witness who will support Crowley's account regarding Federal's purported consent (a key coverage issue), as Mr. Nichols apparently disputes Crowley's characterization of the telephone conversation. Permitting Mr. Shively both to testify and to argue his own credibility to the jury would be prejudicial to Twin City. Moreover, by opposing early summary judgment on the ground that its counsel's testimony will create a factual dispute

1

DECLARATION OF MICHAEL F. PERLIS IN SUPPORT OF MOTION OF DEFENDANT AND COUNTERCLAIMANT TWIN CITY FIRE INSURANCE COMPANY'S MOTION TO DISQUALIFY RICHARD SHIVELY AND PHILIP PILLSBURY, OF THE LAW FIRM OF PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL – Case No. 08-0830 SI

1   regarding Federal's consent, Crowley has already prejudiced Twin City in its efforts to obtain a

2   prompt resolution of this action.

3       4.      Attached hereto as Exhibit "A" is a true and correct copy of a March 28, 2007 letter

4   from Messrs. Shively and Pillsbury, on behalf of Crowley, to Crowley's insurers, Federal, Twin

5   City, and RLI Insurance Company, which letter will constitute another critical aspect of this case.

6       5.      Attached hereto as Exhibit "B" is a true and correct copy of the *Stipulation of*

7   *Compromise, Settlement and Release*, which was filed with the Delaware Chancery Court in the

8   underlying *Franklin Balance Sheet Investment Fund* case, Civil Action No. 888-VCP ([Docket

9   Entry No. 125]).

10      6.      Attached hereto as Exhibit "C" is a true and correct copy of a March 19, 2007 press

11   release by Crowley.

12      7.      Attached hereto as Exhibit "D" is a Form 14d-9 filed by Crowley with the Securities

13   Exchange Commission on March 19, 2007.

14      8.      Attached hereto as Exhibit "E" is a copy of the Joint Case Management Statement in

15   this case.

16      9.      I declare under penalty of perjury under the laws of the United States of America

17   that the foregoing is true and correct.

18      Executed this 13th day of June 2008 at Los Angeles, California.

19

20                   Michael F. Perlis

21

22

23

24

25

26

27

28   DECLARATION OF MICHAEL F. PERLIS IN SUPPORT OF MOTION OF DEFENDANT AND COUNTERCLAIMANT TWIN CITY FIRE INSURANCE COMPANY'S MOTION TO DISQUALIFY RICHARD SHIVELY AND PHILIP PILLSBURY, OF THE LAW FIRM OF PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL - Case No. 08-00830 SI

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

# Exhibit A

PILLSBURY & LEVINSON, LLP

ATTORNEYS AT LAW

RICHARD D. SHIVELY

March 28, 2007

*Via Fedex Overnite*

Chubb Group of Insurance Companies
12 VREELAND ROAD
FLORHAM PARK, NJ 07932-9095
ATTN: HENRY NICHOLLS, ESQ.

RLI INSURANCE COMPANY
525 W. VAN BUREN STREET, SUITE 350
CHICAGO, IL 60607
ATTN: AMY E. JOHNSON

Hartford/Twin City
2 Park Avenue
New York, NY 10016
Attn: Jeremy Salzman, Esq.

COVERAGE

CLAIM

Executive Protection Portfolio (D&O, Fiduciary,
Crime & EPL)

CIVIL PROCEEDING: FRANKLIN BALANCE
SHEET INVESTMENT
FUND, ET AL.
v.
CROWLEY MARITIME
CORPORATION BOARD
OF DIRECTORS
v.
CROWLEY MARITIME
CORPORATION
(NOMINAL DERIVATIVE
DEFENDANT)

Primary D&O
Insured: Crowley Maritime Corporation
Policy Period: 11/1/2004-11/1/2005
Insurer: Federal Insurance Company (Chubb)
Limit: $10M Term Aggregate XS $500K
retention, each loss
Policy Number: 8120-0792

First XS D&O
Insured: Crowley Maritime Corporation
Policy Period: 11/1/2004-11/1/2005
Insurer: Hartford/Twin City
Limit: $10M Aggregate XS $10M Underlying
Limits
Policy Number: 00 DA 0100967 04

DATE OF CLAIM/SERVICE: 12/1/04
DESCRIPTION: STATUS REPORT
EXPENSE TO DATE: $574,911.87
OUR REF# 04DO0001
CHUBB REF#: 100304
HARTFORD REF#: 05360917
RLI REF#: 00176418

Second XS D&O
Insured: Crowley Maritime Corporation
Policy Period: 11/1/2004-11/1/2005
Insurer: RLI Insurance Company
Limit: $5M Aggregate XS $20M Underlying
Limit
Policy Number: EPG0002704A

**EXHIBIT A**

EXHIBIT A PAGE 3

March 28, 2007
Page 2 of 3

Interested Underwriters:

This firm has been retained to represent your insured, Crowley Maritime Corporation ("Crowley"), in connection with its claim for insurance coverage for the referenced action (the "Franklin Fund Action"). We are writing to inform you that an opportunity has arisen to settle the action on favorable terms, and to seek your consent to pursue such a settlement.

The settlement opportunity arose when the plaintiffs in the Franklin Fund Action offered to dismiss their lawsuit if they and the other unaffiliated holders of Crowley common stock were given an opportunity, through a tender offer, to sell their common stock for $2,990 per share in cash. A proposed settlement on those terms has not yet been consummated, and is subject to three contingencies. First, the tender offer must be accepted by a prescribed proportion of the unaffiliated common stock holders. Second, the proposed settlement must be approved by the Delaware Chancery Court. Third, the lawsuit must be dismissed and the time for an appeal must expire.

The proposed settlement would be in the best interest of both Crowley and its D&O insurers for two reasons. First, it would eliminate the potential for a large judgment against Crowley that might well be covered under the policies referenced above. Second, it would result in Crowley no longer being a public company -- which, in turn, would reduce the potential for future claims that might trigger coverage under the referenced policies.

After the plaintiffs had initiated the idea of a buyout to settle the Franklin Fund Action, Crowley was constrained by significant confidentiality issues that prevented it, as a practical matter, from immediately inviting its D&O carriers to join in the negotiations. Those issues related not only to applicable SEC disclosure rules, but also to financing arrangements necessary to fund the proposed purchase of the plaintiffs' shares.

The proposed settlement includes a provision that would require Crowley to pay attorneys' fees and costs incurred by the plaintiffs in prosecuting the Franklin Fund Action. Crowley would be looking to its carriers to cover -- among other costs of the settlement -- those fees and costs, as well as Crowley's own defense costs in excess of its self insured retention. However, before unequivocally accepting the plaintiffs' settlement offer and proceeding to complete the settlement, Crowley is asking its carriers to consent to the proposed settlement.

PILLSBURY & LEVINSON, LLP·
ATTORNEYS    AT    LAW

EXHIBIT ___ PAGE 31

EXHIBIT ___ PAGE 4

March 28, 2007
Page 3 of 3


There is a court hearing on the proposed settlement set for April 27, 2007. We would appreciate hearing from you as soon as possible, so that Crowley can proceed, if possible, to seize this opportunity to obtain a favorable settlement.

Very truly yours,

PILLSBURY & LEVINSON, LLP

Philip L. Pillsbury, Jr.
Richard D. Shively

By _____
Richard D. Shively

EXHIBIT D PAGE 35

EXHIBIT A PAGE 5

bcc:  Art Mead, Esq.
      Steven Ficon
      Philip L. Pillsbury, Jr.

EXHIBIT __D__ PAGE __36__

EXHIBIT __A__ PAGE __6__

# Exhibit B

EFiled: Mar 19 2007 2:28PM EDT
Transaction ID 14171332
Case No. 888-VCP

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| Franklin Balance Sheet Investment Fund and Franklin Microcap Value Fund, Oppenheimer Investment Partnership LP and Oppenheimer Close International Ltd., Wynnefield Partners Smallcap Value LP I, Wynnefield Partners Smallcap Value LP, Wynnefield Smallcap Value Off-Shore Fund LPD and Channell Partnership II, LP, and John H. Norberg, Jr., Individually, derivatively and on behalf of a Class of similarly situated stockholders, ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Civil Action No. 888-VCP |
| Thomas B. Crowley, Jr., Molly M. Crowley, Phillip E. Bowles, Gary L. Depolo, Earl T. Kivett, William A. Pennella, Leland S. Prussia, Cameron W. Wolfe, Jr., ) ) ) ) ) ) | |
| Defendants, ) ) ) | |
| v. ) ) | |
| Crowley Maritime Corporation, ) ) ) | |
| Nominal Derivative Defendant. | |

## STIPULATION AND AGREEMENT OF
## COMPROMISE, SETTLEMENT AND RELEASE

The parties to the above-captioned action (the "Action"), by and through their

attorneys, have entered into the following Stipulation and Agreement of Compromise, Settlement

and Release (the "Stipulation"), subject to the approval of the Court:

1
**EXHIBIT B**

EXHIBIT B  PAGE 1

WHEREAS:

A.      On November 30, 2004, Franklin Balance Sheet Investment Fund and Franklin Microcap Value Fund, Oppenheimer Investment Partnership LP and Oppenheimer Close International Ltd., Wynnefield Partners Smallcap Value LP I, Wynnefield Partners Smallcap Value LP, Wynnefield Smallcap Value Off-Shore Fund LPD and Channell Partnership II, LP ("Initial Plaintiffs"), filed a complaint in the Court of Chancery of the State of Delaware in and for New Castle County (the "Complaint"), which was styled to include both a derivative claim, putatively brought on behalf of the Crowley Maritime Corporation (the "Company") and class claims, putatively brought on behalf of the Initial Plaintiffs and all other holders of the Company's common stock (other than defendants and any of their affiliates). Among other things, the Complaint alleged that the directors breached their fiduciary duties by putting in place a "policy" to ensure that the Crowley family maintained control of the Company, including by entering into split-dollar life insurance agreements (the "Split-Dollar Agreements"). The Complaint alleged that by entering into and authorizing the Company to make payments under the Split-Dollar Agreements, the directors breached their fiduciary duties and injured the stockholders of the Company. The Initial Plaintiffs asked the Court to certify a class, grant declaratory relief, and order the disgorgement of profits and damages in an amount equal to the premiums, cost and expenses paid with respect to the Split-Dollar Agreements.

B.      On February 25, 2005, the defendants moved to dismiss the Complaint. The Court heard oral argument on the motion on August 3, 2005, and, pursuant to the Court's direction at the conclusion of the argument, on October 24, 2005, defendants filed a supplemental brief.

2

EXHIBIT ___ PAGE ___

C.    In response, on December 27, 2005, Initial Plaintiffs, in lieu of filing a responsive supplemental brief, sought leave to amend their complaint and to add another plaintiff to address the issues raised by the motion to dismiss.

D.    On October 19, 2006, the Court granted Initial Plaintiffs leave to amend the Complaint and add another plaintiff. On October 24, 2006, the Initial Plaintiffs filed an amended complaint (the "Amended Complaint"), which added Norberg as a plaintiff, and made new allegations (together with all named Initial Plaintiffs, the "Plaintiffs").

E.    On November 7, 2006, the defendants moved to dismiss the Amended Complaint. On November 27, 2006, the parties entered into a briefing schedule on defendants' motion to dismiss the Amended Complaint, with argument to be heard on February 22, 2007.

F.    In December 2006, counsel for the defendants and counsel for the Plaintiffs engaged in extensive arm's-length negotiations concerning a possible settlement of the claims alleged in the Amended Complaint. The parties discussed settling those claims by providing Plaintiffs an opportunity to sell their shares for cash to liquidate their minority position in the Company. After numerous discussions, Plaintiffs agreed to consider a tender offer for their shares, but insisted that their valuation of the Company indicated that the price to be offered would have to substantially exceed the bid price for the shares (which at the time was approximately $1800.00 per share). Following extended negotiations between counsel for the parties, Plaintiffs indicated that they would favorably consider an offer of $2,990.00 per share for their stock in the context of a tender offer for all shares, conditioned on at least 95% of the shares being tendered and a majority of the unaffiliated shares being tendered.

G.    In evaluating the settlement proposed herein (the "Settlement"), Plaintiffs and their counsel considered, among other things: (i) the benefit to the Plaintiffs and the class

3

EXHIBIT B PAGE 9

provided by the Settlement, particularly the opportunity to liquidate their minority position for cash at a substantial premium to the bid price of the shares; (ii) the attendant risks of continued litigation and the uncertainty of the outcome of the litigation; (iii) the probability of recovery and nature of a judgment thereon; and (iv) the conclusion reached by the Plaintiffs and their counsel after investigation and consideration sufficient to inform themselves of the merits of the Settlement, that the terms of the Settlement are fair and reasonable and in the best interest of the Plaintiffs and the class.

H.    Defendants have vigorously denied, and continue to deny, any wrongdoing or liability with respect to all claims, events and transactions complained of in the Amended Complaint, deny that they engaged in any wrongdoing, deny that they committed any violation of law, deny that they breached any fiduciary duties, deny that they acted improperly in any way and deny liability of any kind to Plaintiffs or the potential class, but consider it desirable that the Action be settled and dismissed on the merits and with prejudice in order to: (i) avoid the substantial expense, inconvenience and distraction of continued litigation; (ii) dispose of potentially burdensome and protracted litigation; and (iii) finally put to rest and terminate the claims asserted in the Action.

**NOW, THEREFORE, IT IS STIPULATED AND AGREED**, subject to the approval of the Court, and pursuant to Delaware Court of Chancery Rules 23(e) and 23.1, that all claims, rights, demands, suits, matters, issues or causes of action, whether known or unknown, of the Plaintiffs and all class members (as herein defined) against all defendants and any of their present or former officers, directors, employees, stockholders, agents, attorneys, advisors, insurers, accountants, trustees, financial advisors, commercial bank lenders, persons who provided fairness opinions, investment bankers, associates, representatives, affiliates, parents,

4

EXHIBIT B PAGE 10

subsidiaries (including the directors and officers of such affiliates, parents, and subsidiaries), general partners, limited partners, partnerships, heirs, executors, personal representatives, estates, administrators, successors and assigns (collectively, "Defendants' Affiliates"), whether such claims arise or could have arisen under state or federal law, including the federal securities laws (except for claims for appraisal pursuant to Section 262 of the Delaware General Corporation Law of stockholders who properly demand appraisal and have not otherwise waived their appraisal rights), and whether directly, derivatively, representatively or arising in any other capacity, that arise out of or in connection with, any claim that was or could have been brought in the Amended Complaint, or that arises now or hereafter out of, or that relates in any way to, the acts, facts or the events alleged in the Amended Complaint including, without limitation, the Life Insurance Agreements and the Settlement Agreement (as those terms are defined in the Amended Complaint), any premiums, expenses, costs or other monies paid or forgiven by the Company relating thereto, and any agreements and disclosures relating thereto, and any acts, facts, matters, transactions, occurrences, conduct or representations relating to or arising out of the subject matter referred to in the Amended Complaint, and the fiduciary and disclosure obligations of any of the defendants (or other persons to be released) with respect to any of the foregoing (whether or not such claim could have been asserted in the Amended Complaint), shall be forever compromised, settled, released and dismissed with prejudice (the "Settled Claims"), upon and subject to the following terms and conditions:

1.      Crowley Newco Corporation, (the "Purchaser") a corporation formed by Thomas B. Crowley Jr., will make a cash tender offer to acquire all of the outstanding public shares of common stock of the Company, including all shares currently held by Plaintiffs and the members of the putative class (the "Public Shares"), for $2990.00 per share in cash (the "Offer").

5

EXHIBIT ___ PAGE ___

The Offer will include conditions requiring that there be validly delivered and not withdrawn prior to the expiration date of the Offer a number of shares of common stock of the Company that constitute: (a) a majority of the Public Shares (the "Majority of the Minority Condition"); and (b) together with the shares beneficially owned by the Purchaser, at least 95% of the total number of shares outstanding on the expiration date of the Offer (the "Minimum Condition"). The Offer will also include conditions that this Court shall have approved the settlement of this litigation and entered its final order (and the time for any appeal shall have expired) prior to the closing of the Offer, that there be no material adverse change in the business or assets of the Company prior to the closing of the Offer, that there be no pending governmental or legal action challenging or delaying the consummation of the Offer or the Merger (as defined below), and that the Crowley Board of Directors shall not have determined to oppose the Offer or Merger. Plaintiffs hereby agree to tender all of the shares they own or control and will not oppose the Offer or Merger, withdraw such shares, transfer or dispose or such shares or exercise appraisal rights in the Merger. Under the terms of the Offer, the Purchaser may waive certain conditions.

        2.    Immediately following expiration of the Offer and at the same time as it accepts for payment and purchases the tendered Public Shares, the Purchaser will complete the acquisition of all of the shares beneficially owned or held by Thomas B. Crowley, Jr., Christine S. Crowley and Molly M. Crowley (other than 278 shares held by the Crowley Foundation), as well as those shares held by the Company's Retirement Stock Plan, Stock Savings Plan and Employee Stock Ownership Plan, then will merge with and into the Company, with the Company continuing as the surviving Company following the merger (the "Merger"). The Purchaser will complete the Merger at the same price to be paid in the Offer ($2990.00 per share), following consummation of the Offer according to its terms.

6

3.    As soon as practicable after the Stipulation has been executed, the parties hereto shall jointly apply to the Court for an Order (in the form attached hereto as Exhibit A), with respect to notice and the settlement hearing (the "Scheduling Order"):

(a.)    Provisionally certifying this Action as a class action pursuant to Delaware Court of Chancery Rules 23(a), 23(b)(1) and 23(b)(2) on behalf of the class to include all record and beneficial owners of shares of common stock of the Company on any day during the period from December 23, 2003 to and including the effective date of the consummation of the Merger (other than Defendants and their "affiliates" and "associates" (as those terms are defined in Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934)), including the legal representatives, heirs, successors-in-interest, transferees or assigns of all such foregoing holders, immediate and remote ("the Class");

(b.)    Providing that the Plaintiffs in the Action are designated as the class and derivative representatives (the "Representatives"), and designating their counsel as Class and Derivative Counsel;

(c.)    Directing that a hearing be held by the Court (the "Settlement Hearing") to determine, among other things (i) whether the Court should approve the Settlement and enter the Order and Final Judgment dismissing the Amended Complaint pursuant to Rules 23(e) and 23.1 of the Court of Chancery with prejudice and on the merits, each party to bear its own costs (except as expressly provided herein) and extinguishing and releasing any and all Settled Claims; (ii) whether, in the event that the Court approves the Settlement, to grant Plaintiffs' application for an award of attorneys' fees and for the reimbursement of expenses incurred that they may make in accordance with the Stipulation; and (iii) such other matters as the Court may deem necessary and appropriate;

7

(d.) Providing that a copy of the Notice of Pendency of Class Action, Proposed Settlement of Class and Derivative Action, Settlement Hearing; and Right to Appear (the "Notice"), substantially in the form attached hereto as Exhibit B, be mailed by or on behalf of the Company by first-class mail within ten (10) business days of the date of the Scheduling Order, in the name of the Register in Chancery or by the direction of the Court, to all record holders and beneficial owners of shares of common stock of the Crowley Maritime Corporation (other than the defendants and Defendants' Affiliates) who held common stock on any day during the period from December 23, 2003 to the present at their last known addresses appearing in the stockholders' records of the Company; and

(e.) Requesting that record holders in the Class who are not also the beneficial owners of the shares of the Company's common stock held by them of record forward the Notice to the Class to such beneficial owners of those shares. Additional copies of the Notice to the Class will be made available to the record holders for this purpose upon request.

4. If the Settlement (including any modification thereto made with the consent of the parties as provided for herein) and all transactions preparatory or incident thereto shall be approved by the Court following a hearing as fair, reasonable and adequate and in the best interest of the Class, the parties shall jointly request the Court to enter an Order and Final Judgment (substantially in the form attached hereto as Exhibit C) (the "Final Judgment"). The Final Judgment shall, among other things:

(a.) Certify this Action as a class action pursuant to Delaware Court of Chancery Rules 23(a) and 23(b)(1) on behalf of the Class;

(b.) Certify the Plaintiffs in the Action as the Class and Derivative Representatives;

8

EXHIBIT B PAGE 14

(c.)    Certify the Representative's counsel as Class and Derivative Counsel;

(d.)    Approve the Settlement, and all transactions preparatory or incident thereto, as fair, reasonable, adequate and in the best interest of the Class, pursuant to Chancery Court Rule 23(e) and the Corporation pursuant to Chancery Court Rule 23.1;

(e.)    Authorize performance of the Settlement in accordance with its terms and conditions;

(f.)    Dismiss the Action with prejudice including with prejudice against all Plaintiffs and members of the Class, without costs except as hereinafter provided and release defendants, Defendants' Affiliates, and each of them, from the Settled Claims upon consummation of the Offer and Merger in accordance with the terms and conditions of the Offer and this Stipulation.

5.    The Effective Date of the Settlement proposed by this Stipulation shall be five (5) days after the latter of: (i) consummation of the Merger and (ii) entry by the Court of a Final Order and Judgment approving the Settlement that is no longer subject to further appeal or reargument, either because the time for an appeal or reargument has expired with no appeal or reargument being taken, or an appeal has been taken but has been dismissed with no further right of appeal or reargument, or the Order and Final Judgment approving the Settlement has been finally affirmed with no further right of appeal or reargument, or the Final Order and Judgment approving the Settlement has otherwise become final.

6.    If the Settlement provided herein is approved by the Court, the Representative's counsel will apply to the Court for an award of attorneys' fees and expenses. The Company shall pay on behalf of all defendants only the fees and expenses as the Court

9

directs. Neither Crowley, nor any individual defendant, nor any of the Defendants' Affiliates shall be liable for any other fees or expenses of the Class. Any fees or expenses that are awarded pursuant to the terms of this Stipulation shall be paid within ten (10) business days after the Effective Date (defined above); provided however, that no such fees or expenses shall be paid until all proceedings described in paragraph 11 hereof have been dismissed or withdrawn.

7.     The procedure for and the allowance or disallowance by the Court of any application by Class Counsel for attorneys' fees are not part of the Settlement set forth in this Stipulation and may be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the Settlement set forth in this Stipulation. Any order or proceedings relating to the fee application, or any appeal from any order relating thereto or reversal or modification thereof, are not intended to operate to terminate or cancel this Stipulation, or affect or delay the finality of the Order and Final Judgment approving this Stipulation and the Settlement of the Action. Further, it is the intention of the parties that any order, proceedings or appeal relating to the application for fees not affect or delay the finality of the judgment approving this Stipulation or the Settlement.

8.     Except as provided in this Stipulation, defendants and Defendants' Affiliates shall bear no other expenses, costs, damages or fees incurred by the Representative, or any member of the Class, or by any attorney, expert, adviser, agent or representative of any of the foregoing persons.

9.     The Company shall assume the administrative responsibility of providing the Notice to the Class and its stockholders in accordance with the Scheduling Order, and shall bear the expense of mailing the Notice. Prior to or at the Settlement Hearing, counsel for the

EXHIBIT *B* PAGE *16*

Company shall file with the Court an appropriate affidavit with respect to the initial mailing of the Notice.

10.     The release contemplated by this Stipulation extends to claims that the Representatives, on behalf of themselves, the Class, and the Company do not know or suspect to exist at the time of the release, which if known, might have affected the decision to enter into this release. Each of the named Representatives and each member of the Class shall be deemed to waive any and all provisions, rights and benefits conferred by any law of the United States or any state or territory of the United States, or principle of common law, which governs or limits a person's release of unknown claims including, without limitation, Section 1542 of the California Civil Code (any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code § 1542) which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING
> THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE
> MATERIALLY AFFECTED HIS SETTLEMENT WITH THE
> DEBTOR

The Representatives, on behalf themselves, the Class, and the Company further acknowledge that members of the Class may discover facts in addition to or different to those that they now know or believe to be true with respect to the subject matter of this release, but that it is their intention, on behalf of the Class, to fully, finally and forever settle and release any and all claims released hereby known or unknown, suspected or unsuspected, which now exist, or heretofore existed, or may hereafter exist, and without regard to the subsequent discovery or existence of such additional or different facts.

11

11.     If any claims which are or would be subject to the release and discharge contemplated by the Settlement are asserted against any person in any court prior to the Effective Date of the Settlement, Plaintiffs shall join in any motion to dismiss or stay such proceedings and shall otherwise use their best efforts to effect a withdrawal or dismissal of the claims. If, following a motion to dismiss, such claims are not dismissed or the action or actions in which such claims are asserted are not stayed in contemplation of dismissal subject only to approval of this proposed Settlement, any of the defendants may, at their sole discretion, withdraw from the Settlement. Any party electing to withdraw from the Settlement must provide all counsel with a notice of such withdrawal within ten (10) business days of any decision or decisions denying the dismissal or stay of such claims.

12.     If, for any reason, this Stipulation (including any amendment made thereto) in whole or in part, is not approved by the Court, or the Court approves the Settlement but such approval is reversed or vacated on appeal and such order reversing or vacating the Settlement becomes final or any of the conditions to this Settlement are not fulfilled, or the Offer or Merger cannot be consummated for any reason, then the Settlement proposed herein shall be of no further force or effect and the Settlement and any amendment thereto and all orders relating to it shall be null and void and of no force and effect. In any such event, neither this Stipulation nor any of the orders contemplated by it shall prejudice in any way the respective positions of the parties with respect to the Action or their rights relating to it.

13.     No Provision contained in this Stipulation shall be deemed an admission by any party as to any claim alleged or asserted in the Action, and neither this Stipulation nor the negotiations or proceedings in connection with this Stipulation shall be offered or received into

12

evidence at a trial or any other proceeding of any kind whatsoever, except in an action or proceeding to enforce the terms and conditions of this Stipulation.

14.     Each of the attorneys executing this Stipulation on behalf of one or more parties hereto warrants and represents that he or she has been duly authorized and empowered to execute this Stipulation on behalf of each such respective party.

15.     Counsel for the Representatives and defendants are expressly authorized to enter into changes, modifications, or amendments of the Stipulation and the attached Exhibits which they mutually deem appropriate without further notice as long as such changes are in writing and are approved by the Court and the Court does not requires such notice; provided however, Court approval is not necessary and shall not be sought for purely ministerial and non-substantive changes, modifications or amendments as counsel may determine are necessary and appropriate in connection with administration of the Settlement including, but not limited to reasonable extensions of time to carry out any of the provisions of this Stipulation.

16.     Any failure by any party to insist upon the strict performance by any other party of any of the provisions of the Settlement Agreement or this Stipulation shall not be deemed a waiver of any such provisions, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the strict performance of any and all of the provisions of the Settlement Agreement and this Stipulation to be performed by such other party.

17.     This Stipulation and all Exhibits hereto and any related settlement document shall be governed and interpreted in accordance with the laws of the State of Delaware, without regard to the conflict of law provisions thereof.

18.     In the event of any dispute or disagreement with respect to the meaning, effect or interpretation of the Stipulation or an attached exhibit or in the event of a claimed

13

breach of the Stipulation or an attached exhibit, the parties hereto agree that such dispute will be adjudicated only in the Delaware Court of Chancery.

19.    The Stipulation shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns, and upon any corporation or other entity with which any party hereto may merge or consolidate.

20.    The Exhibits to the Stipulation are incorporated in and constitute an integral part of the Stipulation.

21.    The Stipulation, together with any Exhibits, shall be deemed to have been mutually prepared by the settling parties and shall not be construed against any of them by reason of authorship.

22.    The parties and their attorneys agree to cooperate fully with one another in seeking Court approval of this Stipulation and the Settlement, and to use their best efforts to effect, as promptly as practicable, the consummation of this Stipulation and the Settlement provided for hereunder (including any amendments thereto) and the dismissal of the Action, including the Amended Complaint filed in the Action, with prejudice and without costs to any party (except as provided herein).

23.    This Stipulation may be executed by facsimile or electronic signature in two or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when such counterparts have been signed by each of the parties and delivered to the other parties.

WHEREFORE, the parties enter into this Stipulation as of the 19th day of March, 2007.

14

TAYLOR & MCNEW, LLP

R. Bruce McNew (#967)
2710 Centerville Road, Suite 210
Greenville, DE 19808
(302) 655-9200
*Attorney for Plaintiffs*

MORRIS NICHOLS ARSHT & TUNNELL, LLP

Jon E. Abramczyk (#2432)
John P. DiTomo (#4850)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
*Attorneys for Defendants*

OF COUNSEL:

Michael D. Torpey
James N. Kramer
Erin L. Bansal
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
(415) 773-5900

549006

15

Exhibit C



**CROWLEY**®

 Home | Documents & Forms | Applications | Glossary

About Us         Media Room         Environment & Safety         Careers

LINER SHIPPING SERVICES

LOGISTICS

ENERGY SUPPORT

PROJECT MANAGEMENT

OCEAN TOWING & TRANSPORTATION

PETROLEUM & CHEMICAL TRANSPORTATION

ALASKA FUEL SALES & DISTRIBUTION

SHIP ASSIST & ESCORT

SALVAGE & EMERGENCY RESPONSE

MARINE TECHNICAL CONSULTING

SHIP MANAGEMENT

HOME > MEDIA ROOM > AWARDS >

## Crowley Settles Stockholder Lawsuit

*Going-Private Tender Offer Commences Pursuant to Settlement*

(JACKSONVILLE, Fla.; March 19, 2007) Crowley Maritime Corporation (? Crowley?) today announced that it had reached a proposed settlement in the pending Franklin Balance Sheet Investment Fund v Crowley (?Franklin?) litigation, a purported class action and derivative complaint filed in November 2004 against certain members of the board of directors and Crowley. The plaintiffs in that lawsuit have agreed to its dismissal if they and the other unaffiliated holders of Crowley common stock have the opportunity, through a tender offer, to sell their common stock for $2,990 per share in cash.

To this end, Crowley Newco Corporation (the ?Purchaser?), a company formed by Thomas B. Crowley, Jr., Chairman and President of Crowley, today announced that it has commenced a tender offer to purchase all of the Crowley common stock that it does not beneficially own for $2,990 per share in cash, net to the seller. The Purchaser is also making the tender offer as part of its goal of acquiring the entire equity interest in Crowley not beneficially owned by it.

If the tender offer is successful, the Purchaser intends to merge with and into Crowley as soon as practicable. In the merger, each issued and outstanding share of capital stock of Crowley (other than shares held by the Purchaser and shares held by stockholders who have properly exercised appraisal rights) would be converted into the right to receive, in the case of common stock, cash in the amount of $2,990 per share and, in the case of Series A Convertible Junior Subordinated Preferred Stock, cash in the amount of $249.16 per share (plus all unpaid cumulative dividends thereon to the date of the merger). Crowley will be the surviving entity in the merger. After the merger, Crowley will be owned of record and/or beneficially exclusively by the persons who have committed to contribute their capital stock of Crowley to the Purchaser in exchange for capital stock in the Purchaser and would no longer be a public company.

Based upon a recommendation of a Special Committee of independent directors of the Crowley Board of Directors, a majority of the Board of Directors has (i) determined that the tender offer is fair to and in the best interests of, the unaffiliated stockholders, and (ii) recommended that the unaffiliated stockholders accept the tender offer and tender their shares of common stock.

In addition to other conditions, the tender offer is conditioned upon the Delaware Chancery Court approving the settlement of Franklin, dismissing the lawsuit and the time for appeal of the Court?s approval having expired and the Purchaser owning after the tender offer at least 95% of the outstanding Crowley common stock. It is also conditioned upon the tender of a majority of the outstanding shares of common stock held by Crowley?s unaffiliated stockholders. The Purchaser will not waive this condition. As a result of binding agreements with certain stockholders, the Purchaser currently beneficially owns approximately 65.2% of the outstanding common stock.

While the tender offer is proceeding, the putative class and the Crowley stockholders will be provided notice of the proposed settlement and a hearing will be held by the Delaware Chancery Court to determine whether the Franklin settlement will be approved.

The tender offer and withdrawal rights will expire at 5:00 p.m., New York City time, on Friday, April 20, 2007, unless extended to accommodate the Franklin settlement process or for other reasons.

**EXHIBIT C**

EXHIBIT  C  PAGE  22

The complete terms and conditions of the tender offer are set forth in an Offer to Purchase, a letter of transmittal and other related materials which are being filed with the Securities and Exchange Commission (the ?SEC?) and distributed to Crowley stockholders. Crowley will file a solicitation/recommendation statement relating to the tender offer with the SEC and the position expressed in such statement is being distributed to Crowley stockholders in the tender offer documents. Crowley stockholders and other interested parties are urged to read the Offer to Purchase and related materials, and the solicitation/recommendation statement because they will contain important information. Investors will be able to receive such documents free of charge at the SEC?s web site, www.sec.gov, or by contacting the Information Agent for the transaction, D.F. King & Co., Inc. Banks and brokers can call collect: (212) 269-5550; all others can call toll free: (800) 487-4870. This press release is not an offer to purchase, a solicitation of an offer to purchase or an offer to sell securities. Such an offer or solicitation is only made pursuant to the Offer to Purchase filed with the SEC.

Jacksonville, Fla.-based Crowley Maritime Corporation, founded in San Francisco in 1892, is primarily a family and employee-owned company that provides diversified transportation and logistics services in domestic and international markets by means of four operating lines of business: Liner Services; Logistics Services; Petroleum Services and Marine Services. Other services provided within these business lines include contract towing and transportation; ship assist and escort; energy support; salvage and emergency response; vessel management, and petroleum and chemical transportation, distribution and sales. Additional information about Crowley its subsidiaries and business units may be found on the Internet at www.crowley.com.

# # #

EXHIBIT  C  PAGE 23

# Exhibit D

SC 14D9 1 sc14d9.htm SCHEDULE 14-D9

**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

---

# SCHEDULE 14D-9

(RULE 14d-101)

SOLICITATION/RECOMMENDATION STATEMENT
UNDER SECTION 14(d)(4) OF THE
SECURITIES EXCHANGE ACT OF 1934

# CROWLEY MARITIME CORPORATION

(Name of Subject Company)

# CROWLEY MARITIME CORPORATION

(Name of Person(s) Filing Statement)

Common Stock, par value $0.01 per share
(Title of Class of Securities)

228090106
(CUSIP Number of Class of Securities)

**Gary L. Depolo**
**Chairman of the Special Committee of the Board of Directors**
**Crowley Maritime Corporation**
**9487 Regency Square**
**Jacksonville, Florida 32225**
**(904) 727-2200**
(Name, Address and Telephone Number of Person Authorized to Receive
Notices and Communications on Behalf of the Person(s) Filing Statement)

With a Copy to:

**Bruce Alan Mann**
**Michael O'Bryan**
**Morrison & Foerster LLP**
**425 Market Street**
**San Francisco, California 94105**
**(415) 268-7000**

☐    Check the box if the filing relates solely to preliminary communications made before the commencement of a tender offer.

## EXHIBIT D

EXHIBIT D PAGE 25

## INTRODUCTION

This Solicitation/Recommendation Statement on Schedule 14D-9 relates to an offer (the "Offer") by Crowley Newco Corporation, a Delaware corporation ("Purchaser"), to purchase all the outstanding shares of common stock, par value $.01 (the "Common Stock") (other than those beneficially owned by Purchaser), of Crowley Maritime Corporation, a Delaware corporation (the "Company"). Purchaser is a newly formed Delaware entity created to effectuate the Offer and the Merger (as defined below). All equity interests of Purchaser are currently held by Thomas B. Crowley, Jr., the Chairman of the Board of Directors, President and Chief Executive Officer of the Company.

Purchaser has binding agreements with certain directors of the Company and certain persons and entities they control, and, separately, with the Crowley Maritime Corporation Retirement Stock Plan, the Crowley Maritime Corporation Stock Savings Plan and the Crowley Maritime Corporation Employee Stock Ownership Plan (collectively, the "Continuing Stockholders"), requiring each of them to contribute all their shares of capital stock of the Company to Purchaser in exchange for capital stock in Purchaser at the same time Purchaser accepts for payment the shares of Common Stock in the Offer.

Purchaser is making the Offer in part to settle a pending lawsuit, Franklin Balance Sheet Investment Fund v. Crowley ("Franklin"). Franklin is a purported class action and a derivative complaint that was filed on November 30, 2004, in the Court of Chancery in the State of Delaware (the "Delaware Chancery Court") against the Company and certain members of its board of directors (the "Board of Directors") alleging breaches of fiduciary duties owed by the director defendants to the Company and certain members of its stockholders. The plaintiffs have agreed to dismiss the lawsuit if they and the other holders of Common Stock (other than the Continuing Stockholders) have the opportunity, through a tender offer, to sell their Common Stock for $2,990 per share in cash. In addition, the plaintiffs have agreed to tender all of the shares they own or control and will not oppose the Offer or the Merger, withdraw shares tendered, transfer or dispose of such shares or exercise appraisal rights in the Merger.

Purchaser is also making this Offer as part of its goal of acquiring the entire equity interest in the Company not beneficially owned by Purchaser. The Offer is the first step in both a plan to settle Franklin and to take the Company private.

If the Offer is consummated, Purchaser intends to cause itself to merge with and into the Company through a "short-form" merger (the "Merger") in accordance with the applicable provisions of the Delaware General Corporation Law (the "DGCL"), without a vote of the stockholders of the Company. Pursuant to the Merger, each issued and outstanding share of capital stock of the Company (other than shares held by Purchaser and shares held by stockholders who have properly exercised appraisal rights under the DGCL) will be converted into and represent the right to receive, in the case of Common Stock, cash in the amount of $2,990 per share and, in the case of Series A Junior Convertible Preferred Stock, par value $100 per share, of the Company ("Series A Preferred"), cash in the amount of $249.16 per share (plus all unpaid cumulative dividends thereon to the date of the Merger). The Company will be the surviving entity in the Merger.

After the Merger, the Company will be owned of record and/or beneficially exclusively by the Continuing Stockholders, which consist of Thomas B. Crowley, Jr., Molly M. Crowley, Christine S. Crowley, Crowley Asset Management L.P., The Non-Exempt Trust FBO Adrienne Crowley, The Thomas B. Crowley Jr. Separate Property Trust, The Annual Exclusion Trust FBO Adrienne Crowley, The Crowley Family Generation-Skipping Trust U/T/A Dated 12/04/91, and The Marital Trust Under The Thomas B. Crowley Trust (collectively, the "Crowley Group"), and by the Crowley Maritime Corporation Retirement Stock Plan, the Crowley Maritime Corporation Stock Savings Plan and the Crowley Maritime Corporation Employee Stock Ownership Plan Employee (collectively, the "Plans").

All information contained in this Schedule 14D-9 or incorporated by reference herein regarding Purchaser, the Crowleys (as defined below) or any of the other Continuing Stockholders was provided for inclusion herein by Purchaser or the Continuing Stockholders or was obtained from reports or statements filed by Purchaser or the Continuing Stockholders with the Securities and Exchange Commission (the "SEC"), and neither the Special Committee nor the Company takes any responsibility for such information.

EXHIBIT D PAGE 26

Item 1.    Subject Company Information.

(a)    Name and Address. The name of the subject company is Crowley Maritime Corporation. The principal executive offices of the subject company are located at 9487 Regency Square Boulevard, Jacksonville, Florida 32225 and its telephone number is (904) 727-2200.

(b)    Securities. This Schedule 14D-9 relates to the Company's Common Stock. As of the close of business on March 16, 2007, there were 89,851 shares of Common Stock outstanding.

Item 2.    Identity and Background of Filing Person.

(a)    Name and Address. This Schedule 14D-9 is being filed in the name of the Company by a special committee (the "Special Committee"). The name, business address and business telephone number of the Company filing this statement are set forth in Item 1(a) above, which information is incorporated herein by reference.

1

EXHIBIT D PAGE 27

The Special Committee consists of Gary L. Depolo, Earl T. Kivett and Leland S. Prussia, each of whom is neither employed by the Company nor affiliated with Purchaser. The members of the Special Committee are not Continuing Stockholders and have no financial interest in the Offer and the Merger.

(b)    Tender Offer. This Schedule 14D-9 relates to the tender offer made by Purchaser disclosed in a Tender Offer Statement on Schedule TO, dated March 19, 2007 (as amended or supplemented from time to time, the "Schedule TO"), to purchase all outstanding shares of Common Stock (other than those shares held by the Continuing Stockholders) at a price of $2,990 per share (the "Offer Price"), net to the seller in cash, without interest, upon the terms and subject to the conditions set forth in the Offer to Purchase, dated March 19, 2007 (as amended or supplemented from time to time, the "Offer to Purchase"), and the related Letter of Transmittal, filed as Exhibits (a)(1)(i) and (a)(1)(ii) hereto, respectively, and incorporated herein by reference.

The Offer is conditioned upon, among other things:

(1)    the Delaware Chancery Court approving the settlement of Franklin, dismissing the lawsuit and the time for appeal of the Court's approval having expired;

(2)    there being validly tendered and not withdrawn prior to the expiration date of the Offer, a number of shares of Common Stock that constitute both:

    (A)    a majority of the shares of Common Stock outstanding on the expiration date of the Offer that are beneficially owned by all the Company's stockholders other than Purchaser, the directors and officers of the Company and persons and entities they control, and the Plans (the "Unaffiliated Stockholders") (the "Majority of the Minority Condition") and

    (B)    together with shares of Common Stock beneficially owned by Purchaser, at least ninety-five percent (95%) of the total number of shares of Common Stock outstanding on the expiration date of the Offer (the "Minimum Condition");

(3)    Purchaser owning at the expiration date of the Offer at least ninety-five percent (95%) of the shares of Series A Preferred outstanding and ninety-five percent (95%) of the non-voting Class N Common Shares, par value $.01 per share, of the Company (the "Class N") outstanding; and

(4)    the Board of Directors or the Special Committee shall not have determined to oppose the Offer and/or the Merger.

The Offer is also subject to other important terms and conditions as set forth in the Offer to Purchase. Purchaser has reserved the right (subject to the applicable rules and regulations of the SEC) to amend or waive any one or more of the terms and conditions of the Offer. However, Purchaser has stated in the Offer to Purchase that it will not waive the Majority of the Minority Condition.

As of the date hereof, the minimum number of shares of Common Stock required to be tendered in order to satisfy the Majority of the Minority Condition is approximately 13,805, and the minimum number of shares of Common Stock required to be tendered in order to satisfy the Minimum Condition is approximately 26,797. As a result of the agreements with the Continuing Stockholders, as of the date hereof, Purchaser beneficially owned an aggregate of 58,562 shares of Common Stock, 314,794 shares of Series A Preferred, and 46,138 shares of Class N, which represented approximately 65.2%, 99.9% and 100% of the then issued and outstanding shares of Common Stock, Series A Preferred and Class N, respectively. A Schedule 13D filed with the SEC on November 30, 2004, as amended by Amendment No. 1 filed on December 27, 2005, reports holdings by the Franklin plaintiffs of 9,386 shares of Common Stock.

EXHIBIT D PAGE 28

As set forth in the Schedule TO, the business address of Purchaser is 555 12th Street, Suite 2130, Oakland, California 94607 and its telephone number is (510) 251-7500.

### Item 3.    Past Contacts, Transactions, Negotiations and Agreements.

Except as described in this Schedule 14D-9 (including exhibits and any information incorporated into it by reference), to the Special Committee's knowledge, there are no material agreements, arrangements or understandings or any actual or potential conflicts of interest between the Company or its affiliates and (a) any of its executive officers, directors or affiliates or (b) Purchaser or any of its executive officers, directors or affiliates.

### Related Party Transactions.

Thomas B. Crowley, Jr., the Chairman of the Board of Directors, President and Chief Executive Officer of the Company, and certain trusts for the benefit of his descendants, who are all Continuing Stockholders, are parties to certain split-dollar life insurance agreements. These agreements were created for estate planning purposes intended to promote the long-term stability of the Company and generally provide for: (a) the Company to pay the annual premiums for certain life insurance policies owned by Mr. Crowley or the trusts; and (b) Mr. Crowley, or the trusts, to reimburse the Company in an amount equal to the annual term cost of the insurance coverage. The policies are pledged to the Company as security for the obligation of Mr. Crowley, or the trusts, as the case may be, to pay to the Company, upon termination of the split-dollar life insurance agreements, an amount equal to the aggregate amounts of premiums paid by the Company as such amounts may have been reduced by certain payments made by or on behalf of Mr. Crowley or the trusts prior to the date upon which the split-dollar life insurance agreements terminate, except that if the agreements are terminated prior to the death of the insureds the amount owed by Mr. Crowley and the trusts is limited to the cash surrender value of the policies. During the last fiscal year, the largest aggregate amount owed by Mr. Crowley and the trusts based upon the cash surrender value of these policies was $12.0 million. As of December 31, 2006, the amount owed by Mr. Crowley and the trusts based upon the cash surrender value of these insurance policies was $12.0 million. No interest is charged by the Company for any and all amounts which may be outstanding under these arrangements.

2

EXHIBIT D PAGE 29

It is currently uncertain whether the Sarbanes-Oxley Act of 2002 ("Sarbanes Oxley") prohibits the Company from continuing to pay the annual premiums for these life insurance policies owned by Mr. Crowley and the trusts. While Sarbanes Oxley does not specifically address these types of insurance arrangements, it generally makes it unlawful for an issuer to extend or maintain credit, to arrange for the extension of credit, or to renew an extension of credit, in the form of a personal loan to or for any director or executive officer (or equivalent thereof) of that issuer. Since it is possible that Sarbanes Oxley might be construed as treating annual premium payments made after July 30, 2002 under the split-dollar life insurance agreements as new extensions of credit which would be prohibited by Sarbanes Oxley, the Company has suspended making any annual premium payments for the life insurance policies owned by Mr. Crowley and the trusts. While the Company may decide in the future to resume making such payments, Mr. Crowley has advised the Company that he will continue, in the meantime, to pay the term cost of the insurance coverage.

On December 23, 2003, the Company and Mr. Crowley entered into a settlement agreement (the "Insurance Agreement") terminating one of the split dollar life insurance agreements. Pursuant to the Insurance Agreement, Mr. Crowley paid the Company approximately $7.5 million, an amount representing premiums paid by the Company for the insurance policies subject to the terminated split dollar life insurance agreement. The Insurance Agreement also provides that the Company pay Mr. Crowley annually an amount, on an after-tax basis, equal to the interest payable by Mr. Crowley on financing he arranged to make this payment to the Company. This obligation terminates: (a) upon surrender or termination of the polices subject to the Insurance Agreement, unless Mr. Crowley rolls over or reinvests the entire amount received upon surrender or termination into one or more new policies on the life of Mrs. Molly Crowley; (b) at the Company's option if Mr. Crowley ceases to be employed by the Company; (c) upon the death of Mrs. Molly Crowley; or (d) upon the bankruptcy, insolvency or dissolution of the Company. In the Insurance Agreement, Mr. Crowley released any claims that he might have against the Company due to the Company having ceased making premium payments as required by the terminated split dollar life insurance agreement.

William P. Verdon, a member of the Board of Directors, and the Company are party to an Agreement for Contract Services (the "Consulting Agreement") entered into on October 12, 2005 at which time Mr. Verdon was employed as the Company's Senior Vice President and General Counsel. Under the terms of the Consulting Agreement: (a) Mr. Verdon agreed to serve as a consultant for a term of three years after his employment as Senior Vice President and General Counsel ended on December 31, 2005, thereby providing the Company with the continued benefit of his knowledge and expertise; and (b) the Company agreed to pay Mr. Verdon a monthly retainer of $16,667 plus the cost of term life insurance in the amount of $550,000 during the term of the Consulting Agreement.

### Interests of Certain Persons in the Offer and the Merger.

The Unaffiliated Stockholders also should be aware that the Crowleys (as defined below) and Purchaser have certain interests that present actual or potential conflicts of interest in connection with the Offer and the Merger. Similarly, the current officers and directors of the Company may have certain interests that present actual or potential conflicts of interest in connection with the Offer and the Merger.

*Control.* Thomas B. Crowley, Jr. is and after the Offer and the Merger will continue to be the controlling stockholder of the Company.

*Directors and Officers.* Immediately following the Merger, the officers and directors of the Company will continue to serve in their respective roles as officers and directors of the Company. In addition, Thomas B. Crowley, Jr. is the Chairman of the Board of Directors, and after the Merger he will continue to be the Chairman of the Board of Directors. As a result of the settlement of Franklin, which is one of the purposes of the Offer, Thomas B. Crowley, Jr., Molly M. Crowley, Phillip E. Bowles, Gary L. Depolo, Earl T. Kivett, William A. Pennella, Leland S. Prussia and Cameron W. Wolfe, Jr., all directors and/or officers of the Company, would no longer be defendants in such action.

It is expected that the shares of Common Stock beneficially owned by Philip E. Bowles, one of the Company's

EXHIBIT D PAGE 30

directors, will be tendered in the Offer, as well as 278 shares of Common Stock held of record by the Crowley Foundation, but controlled by Thomas B. Crowley, Jr. Other than Thomas B. Crowley, Jr., Molly M. Crowley and Christine S. Crowley (collectively, the "Crowleys"), Purchaser, Philip E. Bowles and the Crowley Foundation, no other executive officer, director or affiliate of the Company beneficially owns any shares of Common Stock (other than as a participant in one or more of the Plans), and thus will not tender any shares of Common Stock pursuant to the Offer.

3

*Continuing Equity Interest.* Unlike the Unaffiliated Stockholders, the Continuing Stockholders will own, directly or indirectly, all of the outstanding shares of Common Stock following the Merger.

*Indemnification.* Article VIII of the Company's by-laws requires the Company to indemnify any person who was or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative by reason of the fact that such person is or was a director or officer of the Company or of a subsidiary of the Company or by reason of the fact that such director or officer is or was serving at the request of the Company as a director, officer, employee, trustee, fiduciary, advisor or agent of another company, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding, to the fullest extent permitted by the DGCL. In addition, such right to indemnification shall continue as to a person who has ceased to be a director, officer, employee, trustee, fiduciary, advisor or agent and shall inure to the benefit of the heirs, executors and administrators of such person. Furthermore, the Company may indemnify any other person who was or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative by reason of the fact that such person is or was an employee or agent of the Company or a subsidiary of the Company or is or was serving at the request of the Company as a director, officer, employee, trustee, fiduciary, advisor or agent of another company, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding, to the fullest extent permitted by the DGCL.

Section 145 of the DGCL provides that a corporation has the power to indemnify its directors, officers, employees or agents against expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in non-derivative actions, suits or proceedings if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful, as determined in accordance with the DGCL. Section 145 also provides that a corporation has the power to indemnify directors, officers, employees or agents against such expenses incurred by the person in connection with the defense or settlement of derivative actions or suits actually and reasonably incurred by the person if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation, except that no indemnification may be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Delaware Chancery Court or the court in which such action or suit was brought determines upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Delaware Chancery Court or such other court shall deem proper. To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to above, or in defense of any claim, issue or matter therein, such person must be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

*Special Committee.* Each member of the Special Committee receives additional director's fees of $1,500 per in-person meeting and $650 per telephonic meeting to compensate for his service on the Special Committee. In addition, Mr. Depolo, as chair of the Special Committee, has been or will be paid $2,000 per month, and each of Messrs. Kivett and Prussia has been or will be paid $1,000 per month, for each month served on the Special Committee. These fees are not dependent on the success of the Offer or on the Special Committee's recommendations with respect to the Offer.

Item 4.     The Solicitation or Recommendation.

(a)     Recommendation.

For the reasons set forth below, the Special Committee has unanimously (i) determined that the Offer is fair to and in the best interests of the Unaffiliated Stockholders, and (ii) recommended to the Board of Directors that it recommend that

EXHIBIT *D* PAGE 32

the Unaffiliated Stockholders accept the Offer and tender their shares of Common Stock pursuant thereto. As of the date hereof, the members of the Special Committee held no shares of Common Stock and no options to purchase any shares of Common Stock.

Following the meeting of the Special Committee at which the foregoing action was taken, a majority of the Board of Directors of the Company, based upon the recommendation of the Special Committee, (i) determined that the Offer is fair to and in the best interests of, the Unaffiliated Stockholders, and (ii) recommended that the Unaffiliated Stockholders accept the Offer and tender their shares of Common Stock pursuant thereto.

(b)    Reasons.

**Background of the Offer.**

Set out below is a summary of certain events related to the Offer.

4

EXHIBIT D PAGE 33

During December 2006, counsel for the defendants and counsel for the plaintiffs in Franklin, acting at the direction of their clients, held discussions concerning possible settlement of that action by providing plaintiffs an opportunity to sell their shares for cash to liquidate their positions in the Company. Plaintiffs agreed to consider a tender offer for their shares, but insisted that the purchase price substantially exceed the bid price for the Common Stock (which at the time was approximately $1,800 per share). Following further negotiations, plaintiffs indicated through their counsel that they would favorably consider an offer of $2,990 per share in cash for their Common Stock in the context of a tender offer made at the direction of Thomas B. Crowley, Jr. for all outstanding shares of Common Stock other than those shares beneficially owned by the Continuing Stockholders.

On January 16, 2007, the Board of Directors formed the Special Committee. The Board of Directors authorized and directed the Special Committee to review, evaluate and recommend to the Board of Directors what action should be taken with respect to any tender offer extended to the Company's stockholders pursuant to a settlement of Franklin, including recommending to the Board of Directors the position the Board of Directors should take in response to any such tender offer. The Special Committee was also authorized and empowered to retain such advisors as it deemed necessary or appropriate to discharge its responsibilities.

In the weeks following this meeting of the Board of Directors, counsel for the defendants and counsel for the plaintiffs in Franklin, acting at the direction of their clients, negotiated a Stipulation and Agreement of Compromise, Settlement and Release (the "Stipulation"), which provides, among other things, for the Offer and dismissal of the Franklin complaint, subject to completion of the Offer and approval by the Delaware Chancery Court.

In addition, counsel for Purchaser negotiated an agreement (the "Plan Contribution Agreement") with the independent fiduciary for the Plans, which provides for the contribution to Purchaser of the shares of Common Stock held by the Plans. In connection with the negotiations with respect to the Plan Contribution Agreement, the independent fiduciary sought and obtained amendments to the then-existing Plan documents as a condition to the Plans entering into the Plan Contribution Agreement. An agreement (the "Crowley Contribution Agreement") was also prepared pursuant to which the Crowleys and the other entities in the Crowley Group would contribute to Purchaser the shares of capital stock of the Company beneficially owned by the Crowleys and the other entities in the Crowley Group. (The Plan Contribution Agreement and the Crowley Contribution Agreement are sometimes referred to herein collectively as the "Contribution Agreements.") The Contribution Agreements and the amendments to the Plan documents were executed on March 16, 2007.

On January 18, 2007, the Special Committee held a meeting to consider engaging independent legal counsel. The Special Committee invited the law firm of Morrison & Foerster LLP ("Morrison & Foerster") to discuss with the Special Committee its experience in transactions such as the Offer and whether it had any material conflicts with respect to the Offer and the Merger. Following such discussion the Special Committee determined to engage Morrison & Foerster as its independent legal counsel. The Special Committee asked Morrison & Foerster to discuss the anticipated schedule for the Offer and the Merger and to discuss the fiduciary obligations of the Special Committee to the Unaffiliated Stockholders. The Special Committee also discussed with Morrison and Foerster whether it would be in the interests of the Unaffiliated Stockholders to retain additional advisors, such as a financial advisor or special Delaware counsel.

On January 31, 2007, the Special Committee met with Morrison & Foerster to discuss the potential Offer. The Special Committee discussed its fiduciary duties with respect to the Offer and determined to retain special Delaware counsel for purposes of providing independent advice to the Special Committee. The Special Committee also discussed further whether it would be in the interests of the Unaffiliated Stockholders to retain an independent financial advisor.

On February 22, 2007, the Special Committee met with Morrison & Foerster to discuss the potential Offer. The Special Committee discussed their fiduciary duties and the Company's disclosure obligations in connection with the Offer. The Special Committee also discussed the financial status of the Company and the information potentially available to them regarding the Company. The Special Committee requested from the Company a copy of certain valuation reports provided to the administrative committee of the Company (the "Administrative Committee") by the Administrative Committee's

D PAGE 34

independent financial advisor in connection with the Plans relating to the fair market value of the Common Stock as of June 30, 2006 and December 31, 2005. The Special Committee discussed the role of the valuation reports and the possible changes to the fair market value of the Common Stock since their preparation. The Special Committee also discussed the appropriateness of utilizing a marketability discount in determining the fair market value of the Common Stock held by minority holders, given the extremely limited trading volume of the Common Stock. The Special Committee determined to request a meeting with that financial advisor and also to consider further whether to retain a separate financial advisor.

Following the meeting, at the direction of the Special Committee, representatives of Morrison & Foerster contacted the independent financial advisor to the Administrative Committee to request a copy of a more recent valuation report. The financial advisor declined to provide copies of valuation reports to the Special Committee, noting that it had been engaged to provide the valuation reports solely for the use and benefit of the Administrative Committee, that the reports had been prepared in connection with operation of the Plans and not in contemplation of the Offer or the Merger or any similar transaction; and that the valuations had not been prepared as of recent dates and had not been updated. Morrison & Foerster reported this result to the Special Committee. The Special Committee then determined that it would be in the best interests of the Unaffiliated Stockholders for the Special Committee to engage an independent financial advisor.

On February 25, 2007, Mr. Depolo, called Thomas B. Crowley, Jr. to inform him that the Special Committee had decided to engage a financial advisor and that the financial advisor would review the financial status of the Company in connection with its engagement. The following day Morrison & Foerster, on behalf of the Special Committee, contacted counsel for Purchaser to inform them of the Special Committee's decision to engage an independent financial advisor.

On February 27, 2007, the Special Committee held a meeting with Morrison & Foerster. The Special Committee discussed with Morrison & Foerster the securities filings required in connection with the proposed Offer and the role of the Special Committee in connection with such filings. The Special Committee also discussed the potential advantages of engaging an investment bank to assist them with their review of the Offer, and confirmed their intent to engage an independent financial advisor. The Special Committee determined to contact several potential financial advisors regarding this engagement. Following the meeting the Special Committee and its advisors attempted to contact potential financial advisors. Of the six financial advisors approached, two agreed to meet with the Special Committee. At a meeting of the Board of Directors later that day, the Special Committee reported to the Board of Directors their decision to engage an independent financial advisor.

On February 28, 2007, Mr. Depolo and Mr. Prussia, on behalf of the Special Committee, met with representatives of two financial advisors that had agreed to meet with them. Each firm discussed its relevant experience and responded to questions on various matters, including whether the firm had any involvement with the Company or the Crowleys. Later that day, the Special Committee met to review the presentations made by the two financial advisors. The Special Committee then selected JMP Securities LLC ("JMP") as its financial advisor.

Following the Special Committee's selection of JMP as its financial advisor, JMP, at the direction of the Special Committee, contacted representatives of the Company and began reviewing financial information of the Company. Such discussions and review continued through the delivery of their report to the Special Committee.

On March 6, 2007, counsel to Purchaser provided to the Special Committee a revised draft of the Offer to Purchase. The draft Offer to Purchase included language confirming that the Crowleys had no interest in selling their shares of Common Stock and that they then intended to reject in the future acquisition proposals made by third parties.

After the Special Committee received from counsel to Purchaser updated drafts of the Offer to Purchase since March 6, 2007, the Special Committee, with its legal counsel and financial advisor, met on March 14, 2007 to discuss the potential Offer. JMP provided an overview of the financial terms of the Offer and gave a presentation to the Special Committee on the methodologies, assumptions and limitations underlying JMP's analysis of the financial aspects of the Offer. (For a summary of those methodologies, assumptions and limitations, see "Analyses by JMP Securities LLC" below.) JMP then informed the Special Committee that, based on its analyses and subject to those limitations and assumptions, it was JMP's opinion that, as of March 14, 2007, the consideration to be paid in the Offer was fair to the Unaffiliated Stockholders from a financial point of view. The Special Committee asked questions of JMP and discussed their analyses and opinion. The foregoing summary is subject to the assumptions, limitations and qualifications contained in the written opinion dated as of March 14, 2007, of JMP, which is attached hereto as Annex A. Morrison & Foerster then reviewed with the Special Committee the terms of the potential Offer and the Merger and Purchaser's draft of the Offer to Purchase, copies of which had been distributed to the Special Committee prior to the meeting. The Special Committee also discussed with Morrison & Foerster their fiduciary duties with respect to the Offer.

After discussing the Offer at length and considering certain matters described below, the Special Committee concluded that the Offer Price was fair to the Unaffiliated Stockholders. The Special Committee, by unanimous vote, then (i) determined that the Offer is fair to, and in the best interests of, the Unaffiliated Stockholders, and (ii) recommended to the Board of Directors that it recommend that the Unaffiliated Stockholders accept the Offer and tender their shares of Common Stock pursuant thereto.

At a meeting of the Board of Directors held later that day to consider the proposed settlement of the Franklin lawsuit

EXHIBIT D PAGE 36

and the Offer and to take certain related actions, the Special Committee reported to the Board of Directors its determination and recommendation. Following deliberation, a majority of the Board of Directors (i) determined that the Offer is fair to, and in the best interests of, the Unaffiliated Stockholders, and (ii) recommended that the Unaffiliated Stockholders accept the Offer and tender their shares of Common Stock pursuant thereto. Directors Thomas B. Crowley, Jr. and Molly Crowley abstained from voting on this determination and recommendation of the Board of Directors. Director Cameron W. Wolfe, Jr. was absent from the meeting at which this vote was taken. At the meeting, the Board of Directors also approved the terms of the Franklin settlement and the final form of the Stipulation.

The Stipulation was executed as of March 19, 2007. While the Offer is proceeding, the Stipulation will be provided to the Delaware Chancery Court for approval of the form of notice to be sent to the putative class and the Company's stockholders informing them of the principal terms of the proposed settlement, the hearing to be held by the Delaware Chancery Court to determine whether to approve the settlement, and the stockholders' right to appear at that hearing. If the Delaware Chancery Court approves the settlement, the parties will ask the Delaware Chancery Court at the settlement hearing to enter an Order and Final Judgment dismissing the action with prejudice on the merits in accordance with the terms of the Stipulation.

6

The Stipulation has been incorporated by reference as an exhibit to the Schedule TO.

Considerations.

In connection with reaching the recommendation described above, the Special Committee determined that the Offer is substantively and procedurally fair to the Unaffiliated Stockholders. In reaching this determination, the Special Committee considered a number of factors.

The following is a summary of the material factors that the Special Committee considered:

1.      *Settlement by Franklin Plaintiffs.* The Offer Price was negotiated at arm's length between Purchaser and the Franklin plaintiffs and, in the Stipulation, the Franklin plaintiffs have agreed to tender in the Offer and not withdraw all of the shares of Common Stock they own or control. The Special Committee also considered that it had not negotiated the Offer Price with Purchaser and that the Special Committee was not able to confirm whether the Franklin plaintiffs had any additional motives that might influence their decision to accept the Offer Price.

2.      *Financial Analyses by JMP.* JMP discussed with the Special Committee JMP's financial analyses of the Company and the Offer, using various methodologies, including comparable public company analysis, comparable precedent transaction analysis, discounted cash flow analysis and premiums paid analysis. The financial analyses of JMP are described in more detail later in this Schedule 14D-9.

3.      *Fairness Opinion of JMP.* The Special Committee considered the opinion of JMP, to the effect that, as of March 14, 2007, and based on and subject to the matters stated therein, the Offer Price was fair, from a financial point of view, to the Unaffiliated Stockholders. The opinion of JMP is described below and is included in its entirety as Annex A hereto.

4.      *Lack of Liquidity, Trading Volume and Analyst Coverage.* The Offer and the Merger will provide cash consideration to, and immediate liquidity for, the Unaffiliated Stockholders whose ability to sell their shares of Common Stock is adversely affected by the nearly complete lack of liquidity for the shares of Common Stock. Since the Company registered the Common Stock under the Exchange Act of 1934 in April 2002, the "pink sheets" have reported only eight trades in the Common Stock for a total of approximately 2,100 shares. In the last twelve months only one trade has been reported - for 356 shares on May 17, 2006.

5.      *Premium and Historical Market Prices of Company Stock.* The Offer Price represents a substantial premium compared to the range of daily closing bid prices per share of Common Stock reported in the "pink sheets." The Company's last closing trading price was $1,805 per share as of May 17, 2006. When the $2,990 price was negotiated with the Franklin plaintiffs, the bid price was approximately $1,800 per share.

6.      *Majority of the Minority Condition; Minimum Condition.* The Offer is conditioned on the Majority of the Minority Condition, which Purchaser has indicated in the Offer to Purchase it will not waive. Accordingly, the Offer is conditioned on there being validly tendered and not withdrawn at least that number of shares of Common Stock that represent a majority of the shares held by the Unaffiliated Stockholders. The Offer also is subject to the Minimum Condition, which would require an even higher number of shares of Common Stock to be validly tendered and not withdrawn. Purchaser has not indicated that it will not waive the Minimum Condition, but any waiver of the Minimum Condition would be disclosed by Purchaser prior to consummation of the Offer. Because of the structure of the Offer as a tender offer each stockholder may make his, her or its own decision as to whether or not to tender.

7.      *Dividends.* The Common Stock has never paid any dividends and, at least so long as the Series A Preferred is outstanding, would not be expected to pay any dividends.

    8.    *Crowleys' Unwillingness to Sell the Company.* The Crowleys informed the Special Committee and confirmed in the Offer to Purchase that they have no interest in selling the shares of Common Stock that they hold and that they presently intend to reject in the future acquisition proposals made by third parties. The Crowleys also have indicated that they are unwilling to liquidate the Company.

    9.    *No Opportunity to Participate in Future Growth; Certainty of Value.* Stockholders who tender their shares of Common Stock in the Offer or whose shares of Common Stock are converted in the Merger will not have the opportunity to participate in any future growth in the value of the Company. However, such stockholders also would receive the cash Offer Price and would not be exposed to the possibility of future declines in the price at which the shares of Common Stock trade.

7

---

EXHIBIT D PAGE 39

10.      *Possible Decline in the Market Price of the Shares of Common Stock if Purchaser Withdraws the Offer.* The possibility that, if a transaction with Purchaser is not consummated or Purchaser were to withdraw the Offer, the market price for the shares of Common Stock could decline to pre-Offer market prices.

11.      *Availability of Appraisal Rights for Holders who do not Tender Shares.* Stockholders who do not tender shares of Common Stock, or who tender but then withdraw shares of Common Stock, may exercise statutory rights for an appraisal of the "fair value" of their shares of Common Stock if Purchaser completes the Offer and proceeds with the Merger as described in the Offer to Purchase. Those rights, including the procedures stockholders must follow in order to effectively demand and perfect such rights, are summarized under Item 8 in this Schedule 14D-9 The DGCL statute governing appraisal rights is attached as Annex B.

12.      *Timing of Completion.* Stockholders who tender shares of Common Stock will receive the Offer Price promptly after consummation of the Offer. Stockholders who do not tender their shares are expected to receive the same consideration in the Merger as that received by the stockholders who do tender their shares in the Offer.

13.      *Conflicts of Interest.* The conflicts of interest of certain Company officers and directors, as described elsewhere in this Schedule 14D-9.

14.      *Taxable Transaction.* The consideration received by the stockholders in the Offer and the Merger would be taxable to the stockholders for federal income tax purposes, as discussed in the Offer to Purchase in the section entitled "The Tender Offer—Section 5. Certain U.S. Federal Income Tax Consequences."

The foregoing discussion of the information and factors considered by the Special Committee is not intended to be exhaustive but includes all material factors considered by the Special Committee. The Special Committee did not assign any relative or specific weights to the foregoing factors, and individual members of the Special Committee may have given differing weights to different factors. In making its determination and recommendation, the Special Committee considered all of these factors, taken as a whole. Throughout its deliberations, the Special Committee received the advice of its legal and financial advisors who were retained to advise the Special Committee in connection with the Offer and related matters.

On at least an annual basis, the Administrative Committee appointed by the Company to administer the Plans has obtained a valuation of the Common Stock from an independent financial advisor upon which it has based its determination of the fair market value of the Common Stock to use in the operation and administration of each Plan. Based on such valuation, the Administrative Committee determined that the fair market value per share of Common Stock as of June 15, 2006, expressed on a nonmarketable, minority interest basis, was $1,913 and that the fair market value per share of Common Stock, as of December 31, 2005, expressed on a nonmarketable, minority interest basis, was $1,641, and, without the nonmarketable discount, was $2,525. No opinion was expressed, and the Administrative Committee was not required to and did not determine a fair market value per share of Common Stock on a marketable minority basis at June 15, 2006. However, in the text of the valuation that expresses an opinion as to the per-share value on a nonmarketable minority interest basis, reference is made to a per-share value on a marketable minority basis as of that date of $2,943.

These valuations were determined in connection with the operation and administration of the Plans and not in contemplation of, or in connection with, the Offer or the Merger. The Plan valuations were based on a number of assumptions, qualifications and limitations deemed appropriate for purposes of the Plan valuations, which may not be appropriate for purposes of evaluating the value of shares of Common Stock in connection with the Offer and the Merger. In addition, the Plan valuations are not as of recent dates and do not take into account subsequent events or changes affecting the global and U.S. economies and financial markets generally, the Company's industry or lines of business specifically or the business, results of operations, condition (financial and other) or prospects of the Company. Stockholders are urged to consult their own advisors with respect to the current values of shares of Common Stock. Additionally, the Plan valuations do not purport to analyze or address the fairness of the consideration to be received by stockholders of the Company in the Offer and the Merger.

EXHIBIT *D* PAGE *40*

The Special Committee did not believe that the book value per share of Common Stock or the liquidation value of the Company's assets would be meaningful measures of the fair value of the shares of Common Stock. Moreover, given that the Crowleys have stated that they are unwilling to liquidate the Company or sell their shares of Common Stock, the Special Committee did not believe that liquidation was a realistic alternative for their analysis.

The recommendation of the Company's Board of Directors was based on (i) the recommendation of the Special Committee and (ii) the Special Committee having received the opinion of JMP to the effect that, as of March 14, 2007, and based on and subject to the matters stated therein, the Offer Price was fair, from a financial point of view, to the Unaffiliated Stockholders.

**Analyses by JMP Securities LLC.**

JMP was asked by the Special Committee to render an opinion to the Special Committee as to as to whether the Offer Price to be received by the Unaffiliated Stockholders with respect to the Offer is fair from a financial point of view to such holders. On March 14, 2007, JMP delivered to the Special Committee its oral opinion, subsequently confirmed in writing, that, as of the date of its opinion, based upon and subject to the assumptions, limitations and qualifications contained in its opinion, the Offer Price to be received by the Unaffiliated Stockholders pursuant to the Offer is fair from a financial point of view to such holders.

8

EXHIBIT D PAGE 44

The full text of the written opinion of JMP is attached to this Schedule 14D-9 as Annex A and incorporated herein by reference. We urge you to read that opinion carefully and in its entirety for the assumptions made, procedures followed, other matters considered and limits of the review undertaken in arriving at that opinion.

JMP was retained to serve as an advisor to the Special Committee and not as an advisor to or agent of any stockholder of the Company. JMP's opinion was prepared for confidential use by the Special Committee and is directed only to the fairness to the Unaffiliated Stockholders from a financial point of view, as of the date of the opinion, of the Offer Price to be received by such holders pursuant to the Offer. JMP was not asked to consider, and its opinion does not address, the non-financial terms of the Offer or the terms of any of the related agreements to be entered into by the parties. Moreover, JMP did not attempt to independently determine the value of the outstanding Series A Preferred or Class N or the appropriateness of the amounts to be received by the holders thereof in connection with the Offer. JMP was not requested to, and did not, initiate any discussions with, or solicit any indications of interest from, third parties with respect to the Offer or any alternatives to the Offer, negotiate the terms of the Offer, or advise the Special Committee or any other party with respect to the form of the transaction, the underlying business decision to the effect the Merger, or alternatives to the Offer. JMP expressed no opinion or recommendation as to how the Unaffiliated Stockholders should act with respect to the Offer. No restrictions or limitations were imposed by the Special Committee on JMP with respect to the investigations made or the procedures followed by JMP in rendering its opinion.

For purposes of rendering its opinion, JMP:

- reviewed certain publicly available financial statements and other business and financial information of the Company;

- reviewed certain internal financial statements and other financial and operating data concerning the Company prepared by the management of the Company;

- reviewed certain financial forecasts (utilizing different management assumptions) prepared by the management of the Company;

- reviewed the reported prices and trading activity for the Common Stock;

- compared the financial performance of the Company and the prices and trading activity of the Common Stock with that of certain other publicly traded companies that JMP believes are generally comparable to the Company;

- reviewed the financial terms, to the extent publicly available, of certain acquisition transactions involving companies in lines of business that JMP believes are generally comparable to the Company;

- reviewed the draft Offer to Purchase dated March 13, 2007 and certain related documents; and

- considered such other factors and performed such other analyses as JMP deemed appropriate.

JMP also met with certain officers and employees of the Company to discuss its business and prospects and considered such other information, financial studies, analyses and investigations and financial, economic and market criteria which JMP deemed relevant to the preparation of its opinion.

You should note that in conducting its review and arriving at its opinion, JMP, with the consent of the Special Committee, assumed and relied upon, without independent verification, the accuracy and completeness of the information supplied or otherwise made available to JMP by the Company for the purposes of JMP's opinion. JMP further relied upon the

EXHIBIT D PAGE 42

assurance of Company management that they were not aware of any facts that would make any of such information, in the light of the circumstances in which it was provided or obtained, inaccurate or misleading. With respect to the financial forecasts furnished by Company management, JMP assumed that they were reasonably prepared on bases reflecting the best then-available estimates and judgments of the future financial performance of the Company. JMP was not engaged to assess the reasonableness or achievability of such forecasts or the assumptions on which they were based and expressed no view as to such forecasts or assumptions.

JMP also assumed that the transactions contemplated by the Offer to Purchase would be completed and that the conditions set forth by the Offer to Purchase would be satisfied, including, among other things: (1) the Delaware Chancery Court approving the settlement of Franklin, dismissing the lawsuit and the time for appeal of the Court's approval having expired, (2) the Majority of the Minority Condition and (3) the Minimum Condition.

Further, JMP assumed completion of the Merger and of the Purchaser's binding agreements with certain directors of the Company and certain persons and entities they control and, separately, with the Plans requiring them to contribute all their shares of capital stock of the Company in exchange for its capital stock at the same time the Purchaser accepts for payment the shares of Common Stock Purchaser is seeking in the Offer.

9

EXHIBIT D PAGE 43

Moreover, JMP assumed that in connection with the receipt of all the necessary governmental, regulatory or other approvals and consents required for the Offer, no delays, limitations, conditions or restrictions would be imposed that would have an adverse effect on the Offer Price. JMP also assumed that the terms and conditions of the Offer to Purchase dated March 13, 2007 and reviewed by JMP, would not be changed in any material respects and that all conditions to the consummation of the Offer would be satisfied without waiver thereof.

JMP did not act as legal, tax or regulatory advisors and relied upon, without independent verification, the assessment of the Company and their legal, tax or regulatory advisors with respect to legal, tax or regulatory matters. JMP is not in the business of appraising tangible assets and did not make any independent valuation or appraisal of any or all of the assets or liabilities of the Company. JMP's opinion was necessarily based on financial, economic, market and other conditions as in effect on, and the information made available to it as of, the date of its opinion. Events occurring after the date of JMP's opinion may have affected the opinion and the assumptions used in preparing it, and JMP did not have any obligation to, nor did it, update, revise or reaffirm its opinion.

The following is a brief summary of the analyses performed by JMP in connection with its opinion. This summary is not intended to be an exhaustive description of the analyses performed by JMP but includes all material factors considered by JMP in rendering its opinion. JMP drew no specific conclusions from any individual analysis, but subjectively factored its observations from all of these analyses into its qualitative assessment of the Offer Price.

Each analysis performed by JMP is a common methodology utilized in determining valuations. Although other valuation techniques may exist, JMP believes that the analyses described below, when taken as a whole, provide the most appropriate analyses for JMP to arrive at its opinion.

In each case where JMP relied on management forecasts or estimates, JMP evaluated both the Company's "upside scenario" and its "downside scenario." While the Company's upside projections are deemed its "base case" projections, the Company has a history of not meeting these projections and as such, JMP analyzed the Company's downside scenario as well.

### Comparable Public Company Analysis

JMP reviewed and compared publicly available selected financial data and stock trading prices for eight publicly traded maritime shipping services companies, chosen by JMP, that it deemed to be comparable to the Company. The comparable companies chosen by JMP included:

| | |
|---|---|
| Alexander & Baldwin Inc. | Overseas Shipholding Group Inc. |
| Horizon Lines, Inc. | Seacor Holdings Inc. |
| International Shipholding Corp. | Tidewater Inc. |
| Kirby Corp. | Trico Marine Services Inc. |

For the Company and each of these comparable companies, JMP initially calculated the applicable company's ratios of the total enterprise value as of March 13, 2007, calculated as the applicable company's market capitalization, plus total debt, minus cash and cash equivalents (except that for the Company, the product of the number of Common Stock outstanding multiplied by the Offer Price was substituted for market capitalization), to (1) that company's actual or estimated earnings before interest, taxes, depreciation and amortization, or EBITDA, for each of fiscal years 2006 and 2007, (2) that company's actual EBITDA minus capital expenditures, net of gains on sale of assets) for fiscal year 2006, and (3) that company's actual or estimated earnings before interest and taxes, or EBIT, for each of fiscal years 2006 and 2007. Fiscal year 2006 EBITDA, EBIT and capital expenditures were actual figures available in publicly-filed SEC reporting documents for

EXHIBIT D PAGE 44

the twelve months representing each company's fiscal year 2006. Fiscal year 2007 estimates for the comparable companies were based on analyst estimates and excluded extraordinary items; corresponding estimates for the Company were based on the Company management's "upside scenario" projections.

JMP also calculated the ratios of the equity value of the Company as of March 13, 2007 (calculated by multiplying the number of Common Stock outstanding multiplied by the Offer Price), to the Company's actual or estimated net income for the Company's fiscal years 2006 and 2007, and compared that to the comparable companies' actual or estimated price to earnings ratios (calculated as the applicable company's stock price divided by its actual or estimated earnings for the calendar years 2006 and 2007). Earnings estimates for the comparable companies were based on analyst estimates and excluded extraordinary items; corresponding estimates for the Company were based on Company management's "upside scenario" projections.

10

JMP next calculated the average, median, high, and low values among the comparable companies for each ratio described above, and compared each resulting value to the corresponding ratio for the Company. The chart below summarizes such comparisons:

| Ratio | Enterprise Value / EBITDA | | | EBITDA CAPEX | Enterprise Value / EBIT | | | Price / Earnings | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2006A | | 2007E | 2006A | 2006A | | 2007E | 2006A | | 2007E |
| Comp. Companies Multiple | | | | | | | | | | |
| Mean: | 7.6 x | - | 6.5 x | 11.8 x | 10.6 x | - | 10.1 x | 13.6 x | - | 14.3 x |
| Median: | 7.6 | - | 6.4 | 9.0 | 8.6 | - | 9.9 | 10.9 | - | 15.0 |
| High: | 10.7 | - | 8.1 | 23.4 | 16.9 | - | 14.8 | 22.0 | - | 18.6 |
| Low: | 4.1 | - | 4.5 | 4.8 | 5.1 | - | 5.9 | 6.6 | - | 9.1 |

| Ratio | | | | | | | | Equity Value / Net Income | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 2006A | | 2007E |
| Company Implied Transaction Multiple | 6.0 x | - | 4.1 x | 24.6 x | 11.7 x | - | 7.4 x | 15.2 x | - | 9.7 x |

JMP also conducted a sensitivity analysis using 20% lower "downside scenario" financial projections provided by Company management, in light of management's disclosure that the Company has historically not met its base case projections.

Based on a review of Company management's downside scenario financial projections, JMP calculated the average, median, high, and low values among the comparable companies for each ratio described above, and compared each resulting value to the corresponding ratio for the Company. The chart below summarizes such comparisons:

| Ratio | Enterprise Value / EBITDA | | | EBITDA CAPEX | Enterprise Value / EBIT | | | Price / Earnings | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2006A | | 2007E | 2006A | 2006A | | 2007E | 2006A | | 2007E |
| Comp. Companies Multiple | | | | | | | | | | |
| Mean: | 7.6 x | - | 6.5 x | 11.8 x | 10.6 x | - | 10.1 x | 13.6 x | - | 14.3 x |
| Median: | 7.6 | - | 6.4 | 9.0 | 8.6 | - | 9.9 | 10.9 | - | 15.0 |
| High: | 10.7 | - | 8.1 | 23.4 | 16.9 | - | 14.8 | 22.0 | - | 18.6 |
| Low: | 4.1 | - | 4.5 | 4.8 | 5.1 | - | 5.9 | 6.6 | - | 9.1 |

| Ratio | | | | | | | | Equity Value / Net Income | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 2006A | | 2007E |
| Company Implied Transaction Multiple | 6.0 x | - | 4.4 x | 24.6 x | 11.7 x | - | 8.6 x | 15.2 x | - | 12.3 x |

EXHIBIT D PAGE 46

No company utilized in the comparable public company analysis is identical to the Company. Mathematical analysis of comparable public companies (such as determining means and medians) in isolation from other analyses is not an effective method of evaluating transactions.

11

EXHIBIT D PAGE 47

Precedent Transaction Analysis

JMP selected for review 13 other recent, comparable merger and acquisition transactions in the maritime shipping services industry and conducted an analysis of these transactions based on certain publicly available financial data and the purchase prices paid.

### Comparable Transactions

| Announcement Date | Buyer Name | Seller Name |
|---|---|---|
| September 25, 2006 | Overseas Shipholding Group, Inc. | Maritrans, Inc. |
| September 18, 2006 | Teekay Shipping Corp. | Petrojarl ASA |
| August 14, 2006 | World Wide Shipping Agency, Inc. | General Maritime Corp. |
| December 9, 2005 | Babcock & Brown Infrastructure Group | PD Ports PLC |
| August 22, 2005 | Navalmar UK Ltd. | MC Shipping, Inc. |
| August 21, 2005 | TUI AG | CP Ships Ltd. |
| June 20, 2005 | Wilh. Wilhelmsen ASA | Unitor ASA |
| March 31, 2005 | Auckland Regional Council | Ports of Auckland Ltd. |
| March 16, 2005 | SEACOR Holdings, Inc. | Seabulk International, Inc. |
| December 13, 2004 | Overseas Shipholding Group, Inc. | Stelmar Shipping Ltd. |
| September 10, 2004 | Sime Darby Bhd. | Jaya Holdings Ltd. |
| August 24, 2004 | Siem Industries | Star Reefers Inc. |
| May 4, 2004 | Navalmar UK Ltd. | MC Shipping, Inc. |

For the Offer and each comparable transaction, JMP initially calculated the total enterprise value of the transaction (the market value of the target company's equity securities, plus its debt, minus its cash and cash equivalents; where the transaction involved an acquisition of less than 100% of the seller's equity securities, transaction values were adjusted to assume a 100% acquisition) as multiples of (1) the target company's actual EBIT, EBITDA, EBITDA minus capital expenditures, net of gains on sale of assets), and net income for the latest twelve month period ("LTM") ended on the last day of the period covered by the target company's Form 10-K, Form 10-Q, or equivalent foreign securities report, as applicable, last filed prior to the announcement of the relevant transaction, and (2) the target company's estimated EBIT, EBITDA, and net income for the next twelve month period ("NTM") beginning immediately after the last day of the period covered by the target company's Form 10-K, Form 10-Q, or equivalent foreign securities report, as applicable, last filed prior to the announcement of the relevant transaction.

JMP next calculated the average, median, high, and low multiples among the comparable companies for each ratio described above, and compared each resulting multiple to the corresponding Company multiple implied in the Offer:

| | EBITDA Multiple | | EBITDA - CAPEX Multiple | EBIT Multiple | | Net Income Multiple | |
|---|---|---|---|---|---|---|---|
| | LTM | NTM | LTM | LTM | NTM | LTM | NTM |
| *Comparable Transaction Multiples* | | | | | | | |
| Mean: | 10.8 x - | 9.6 x | 17.2 x | 16.2 x - | 14.6 x | 20.6 x - | 15.4 x |
| Median: | 10.7 - | 8.5 | 14.2 | 16.6 - | 13.2 | 19.1 - | 12.7 |
| High: | 18.3 - | 13.5 | 36.3 | 25.3 - | 20.6 | 32.4 - | 29.6 |
| Low: | 4.1 - | 7.0 | 7.5 | 8.3 - | 10.1 | 13.4 - | 5.6 |

EXHIBIT D PAGE 48

| | | | | | | |
|---|---|---|---|---|---|---|
| *Company Implied*<br>*Transaction Multiple* | 6.0 x | – | 4.1 x | 24.6 x | 11.7 x – 7.4 x | 15.2 x – 9.7 x |

JMP also conducted a sensitivity analysis using 20% lower "downside scenario" NTM financial projections provided by Company management, in light of management's disclosure that the Company has historically not met its base case projections.

12

EXHIBIT D PAGE 49

Based on a review of the Company management's downside scenario financial projections, JMP calculated the average, median, high, and low values among the comparable companies for each ratio described above, and compared each resulting value to the corresponding ratio for the Company. The chart below summarizes such comparisons:

|  | EBITDA Multiple | | EBITDA - CAPEX Multiple | EBIT Multiple | | Net Income Multiple | |
|---|---|---|---|---|---|---|---|
|  | LTM | NTM | LTM | LTM | NTM | LTM | NTM |
| *Comparable Transaction Multiples* | | | | | | | |
| Mean: | 10.8 x - | 9.6 x | 17.2 x | 16.2 x - | 14.6 x | 20.6 x - | 15.4 x |
| Median: | 10.7 - | 8.5 | 14.2 | 16.6 - | 13.2 | 19.1 - | 12.7 |
| High: | 18.3 - | 13.5 | 36.3 | 25.3 - | 20.6 | 32.4 - | 29.6 |
| Low: | 4.1 - | 7.0 | 7.5 | 8.3 - | 10.1 | 13.4 - | 5.6 |
| *Company Implied Transaction Multiple* | 6.0 x - | 4.4 x | 24.6 x | 11.7 x - | 8.6 x | 15.2 x - | 12.3 x |

No transaction utilized in the precedent transaction analysis is identical to the Offer. Mathematical analysis of comparable transaction data (such as determining means and medians) in isolation from other analyses is not an effective method of evaluating transactions.

### Discounted Cash Flow Analysis

JMP performed discounted cash flow analyses using Company management's "upside scenario" projections, net of asset recoveries, for each of the years ended 2007 through 2015. For purposes of estimating unlevered free cash flows, capital expenditures were calculated net of proceeds from asset dispositions, and a 35% Company tax rate was assumed.

To generate a range of enterprise values for the Company, JMP first estimated the Company's cost of debt at 5.2%, cost of equity at 18.5%, and weighted average cost of capital, or WACC, at 11.5%. JMP then estimated a set of WACCs (9.5%, 10.5%, 11.5%, 12.5%, and 13.5%) around that 11.5% figure and a set of terminal growth rates after 2015 ranging from 1% to 5%. To calculate a set of enterprise values, JMP then took the net present value of estimated unlevered free cash flows under various WACC and terminal growth rate assumptions, and presented the results on a per share of Common Stock basis:

|  |  | Terminal Growth Rate (After 2015) | | | | |
|---|---|---|---|---|---|---|
|  |  | 1% | 2% | 3% | 4% | 5% |
| | 9.5% | 2,064.1 | 2,216.8 | 2,437.1 | 2,782.4 | 3,401.6 |
| Discount | 10.5% | 1,696.9 | 1,784.3 | 1,898.5 | 2,054.1 | 2,278.4 |
| Rate | 11.5% | 1,412.4 | 1,469.3 | 1,539.6 | 1,628.6 | 1,744.9 |
| (WACC) | 12.5% | 1,175.8 | 1,216.1 | 1,264.0 | 1,321.9 | 1,393.5 |
| | 13.5% | 971.1 | 1,001.1 | 1,036.0 | 1,077.0 | 1,125.7 |

JMP noted that the Offer Price exceeded the implied per share of Common Stock prices under its discounted cash flow analysis, except when a discount rate of 9.5% and terminal growth rate of 5% are assumed.

EXHIBIT D PAGE 50

JMP also performed discounted cash flow analyses using Company management's "downside scenario" projections, net of asset recoveries, for each of the years ended 2007 through 2015. For purposes of estimating unlevered free cash flows, capital expenditures were calculated net of proceeds from asset dispositions, and a 35% Company tax rate was assumed.

13

EXHIBIT D PAGE 51

To calculate a set of enterprise values, JMP then took the net present value of estimated unlevered free cash flows under various WACC and terminal growth rate assumptions, and presented the results on a per share of Common Stock basis:

|  |  | Terminal Growth Rate (After 2015) | | | | |
|---|---|---|---|---|---|---|
|  |  | 1% | 2% | 3% | 4% | 5% |
|  | 9.5% | 1,142.4 | 1,295.1 | 1,515.3 | 1,860.7 | 2,479.9 |
| Discount | 10.5% | 808.0 | 895.4 | 1,009.6 | 1,165.1 | 1,389.5 |
| Rate | 11.5% | 554.4 | 611.4 | 681.7 | 770.6 | 886.9 |
| (WACC) | 12.5% | 347.0 | 387.3 | 435.2 | 493.1 | 564.7 |
|  | 13.5% | 169.9 | 199.9 | 234.8 | 275.8 | 324.5 |

While discounted cash flow analysis is a widely accepted and practiced valuation methodology, it relies on a number of assumptions, including growth rates and discount rates. The valuation derived from the discounted cash flow analysis is not necessarily indicative of the Company's present or future value or results.

Historical Stock Trading Analysis and Premiums Paid Analysis

JMP reviewed the high, low and closing prices and trading volumes of the Common Stock over the period April 15, 2002 through March 13, 2007. JMP noted that although the Common Stock never closed above the Offer Price of $2,990 per share within this period, only eight trades of an aggregate 2,076 shares were executed during this period. JMP noted that historical performance of the thinly-traded Common Stock may be a less reliable indicator of the underlying value of the Common Stock than the other analyses discussed herein.

JMP then reviewed the 13 comparable merger and acquisition transactions described above under the heading "Precedent Transaction Analysis," examining the closing stock price of each at one, five, ten, twenty, thirty and sixty days prior to the announcement dates of such transactions. JMP calculated the stock price acquisition premium over each such pre-announcement closing price and compared the average of all such comparable companies' premiums to the premium (65.7%) of the Offer Price of $2,990 over the last closing trading price per share of Common Stock ($1,805 on May 17, 2006). JMP also calculated the price per share of Common Stock implied in the Offer based on the May 17, 2006 closing price of $1,805 per share and the comparable companies' average acquisition premiums. A summary of the results of the transaction premium analysis for comparable transactions on a per share basis is set forth in the table below:

|  | Days Prior to Transaction Announcement Date | | | | | |
|---|---|---|---|---|---|---|
|  | 1 Day | 5 Days | 10 Days | 20 Days | 30 Days | 60 Days |
| Average Comparison Set Acquisition Premium | 14.6% | 15.7% | 14.2% | 21.6% | 30.4% | 26.0% |
| Implied Company Price per Common Share | $ 2,069.35 | $ 2,088.76 | $ 2,061.90 | $ 2,195.23 | $ 2,353.46 | $ 2,274.67 |

JMP noted that the Offer Price exceeds each such implied price per share of Common Stock.

14

EXHIBIT D PAGE 52

JMP conducted the same premiums paid analyses using the following recent going-private transactions across multiple industries:

| Announcement Date | Buyer Name | Seller Name |
|---|---|---|
| August 23, 2006 | CP Newco, Inc | Case Pomeroy & Co, Inc. |
| April 20, 2006 | PX Holding Corp. | Panavision, Inc. |
| January 30, 2006 | Central Freight Lines Inc /Moyes/ | Central Freight Lines, Inc. |
| December 13, 2005 | Virbac SA | Virbac Corp. |
| December 2, 2005 | The Saker Family Corp. | Foodarama Supermarkets, Inc. |
| July 8, 2005 | V&S Vin & Sprit AB | Cruzan International, Inc. |
| January 27, 2005 | Danisco A/S | Genencor International, Inc. |
| August 6, 2004 | ERI Acquisition Corp | Elmer's Restaurants, Inc |
| June 25, 2004 | Investor Group (management-led) | Edelbrock Corp |
| April 5, 2004 | Hako-Werke International GmbH | Minuteman International Inc |
| January 27, 2004 | Lawrence Weissberg Revocable | Dover Investments Corp |
| December 31, 2003 | Investor Group (management-led) | Boyd Bros Transportation Inc |
| December 2, 2003 | Zimmer Family | Reeds Jewelers, Inc |
| November 21, 2003 | Lombardi Restaurant Group Inc | Chefs International, Inc |
| November 21, 2003 | Investor Group (management-led) | Integrity Media, Inc |
| November 7, 2003 | Barnes & Noble, Inc | barnesandnoble.com, Inc. |
| May 5, 2003 | Westerbeke Acquisition Corp | Westerbeke Corp |
| March 14, 2002 | Prometheus Southeast Retail Trust | Konover Property Trust |

A summary of JMP's premiums paid analysis involving going private transactions is set forth below:

|  | Days Prior to Transaction Announcement Date | | | | | |
|---|---|---|---|---|---|---|
|  | 1 Day | 5 Days | 10 Days | 20 Days | 30 Days | 60 Days |
| Average Comparison Set Acquisition Premium | 33.1% | 30.5% | 29.2% | 30.3% | 39.9% | 36.2% |
| Implied Company Price per Common Share | $ 2,401.98 | $ 2,356.04 | $ 2,332.74 | $ 2,352.25 | $ 2,524.51 | $ 2,459.03 |

The above premiums paid analyses are based on historical performance of the Common Stock, which is thinly traded, and thus may be less reliable indicators of the underlying value of such stock than the other analyses discussed herein.

Conclusion

The summary set forth above describes the principal analyses performed by JMP in connection with its opinion delivered to the Special Committee on March 14, 2007. The preparation of a fairness opinion involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods to particular circumstances and, therefore, the analyses underlying the opinion are not readily susceptible to summary description. Each of the analyses conducted by JMP was carried out in order to provide a different perspective on the Offer and add to the total mix of information available. JMP did not form a conclusion as to whether any individual analysis, considered in isolation, supported or failed to support an opinion as to fairness from a financial point of view. Rather, in reaching its conclusion, JMP considered the results of the analyses in light of each other and ultimately reached its opinion based upon the results of all analyses taken as a whole. Except as indicated above, JMP did not place particular reliance or weight on any individual

EXHIBIT D PAGE 53

analysis, but instead concluded that its analyses, taken as a whole, support its determination. Accordingly, notwithstanding the separate factors summarized above, JMP believes that its analyses must be considered as a whole and that selecting portions of its analysis and the factors considered by it, without considering all analyses and factors, could create an incomplete or misleading view of the evaluation process underlying its opinion. In performing its analyses, JMP made numerous assumptions with respect to industry performance, business and economic conditions and other matters. The analyses performed by JMP are not necessarily indicative of actual value or future results, which may be significantly more or less favorable than suggested by the analyses.

### Fees and Expenses

Pursuant to the terms of an engagement letter dated February 28, 2007, the Company agreed to pay JMP a $500,000 fee for rendering its opinion to the Special Committee, without regard to the conclusion stated in such opinion and without regard to whether any shares of Common Stock are purchased pursuant to the Offer. The Company also agreed in the letter agreement to reimburse JMP for all reasonable travel and out-of-pocket expenses and to indemnify JMP and its employees, agents, officers, stockholders and persons who control JMP against certain liabilities, including liabilities under the federal securities laws, relating to or arising out of JMP's engagement.

15

EXHIBIT D PAGE 54

STROOCK & STROOCK & LAVAN LLP
MICHAEL F. PERLIS (State Bar No. 95992)
mperlis@stroock.com
RICHARD R. JOHNSON (State Bar No. 198117)
rjohnson@stroock.com
RACHAEL SHOOK (State Bar No. 251628)
rshook@stroock.com
2029 Century Park East, Suite 1800
Los Angeles, California  90067-3086
Telephone: 310-556-5800
Facsimile: 310-556-5959
lacalendar@stroock.com

Attorneys for Defendant and Counterclaimant
  TWIN CITY FIRE INSURANCE COMPANY

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| CROWLEY MARITIME CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>FEDERAL INSURANCE COMPANY; TWIN CITY FIRE INSURANCE COMPANY; RLI INSURANCE COMPANY; and DOES 1-20, inclusive,<br><br>Defendants. | **Case No. CV-08-00830 SI**<br><br>[Hon. Susan Illston]<br><br>**DECLARATION OF MICHAEL F. PERLIS IN SUPPORT OF MOTION OF DEFENDANT AND COUNTERCLAIMANT TWIN CITY FIRE INSURANCE COMPANY'S MOTION TO DISQUALIFY RICHARD SHIVELY AND PHILIP PILLSBURY, OF THE FIRM OF PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL FOR PLAINTIFF**<br><br>**[PART 2 OF 2; PAGES 55-103]**<br><br>DATE:      August 22, 2008<br>TIME:       9:00 a.m.<br>PLACE:    Courtroom 10<br><br>[Notice of Motion and Motion to Disqualify, Memorandum of Points and Authorities and [Proposed] Order filed concurrently herewith] |

DECLARATION OF MICHAEL F. PERLIS IN SUPPORT OF MOTION OF DEFENDANT AND COUNTERCLAIMANT TWIN CITY FIRE INSURANCE COMPANY'S MOTION TO DISQUALIFY RICHARD SHIVELY AND PHILIP PILLSBURY, OF THE LAW FIRM OF PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL – Case No. 08-0830 SI

JMP has not previously provided investment banking or other services to the Company. However, in the ordinary course of JMP's trading, brokerage, investment management and financing activities, JMP or its affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for their own account or the accounts of their customers, in debt or equity securities of the Company or any other company or any currency that may be involved in this transaction.

     (c)    <u>Intent to Tender.</u>

To the Special Committee's knowledge after reasonable inquiry, it is expected that the shares of Common Stock beneficially owned by Philip E. Bowles, one of the Company's directors, will be tendered in the Offer, as well as 278 shares of Common Stock held of record by the Crowley Foundation, but controlled by Thomas B. Crowley, Jr., the Company's and Purchaser's Chairman of the Board.

Other than the Crowleys, Purchaser, Philip E. Bowles and the Crowley Foundation, no executive officer, director or affiliate of the Company beneficially owns any shares of Common Stock (other than as a participant in one or more of the Plans), and thus will not tender any shares of Common Stock pursuant to the Offer.

Item 5.    Persons/Assets Retained, Employed, Compensated or Used.

The Special Committee retained JMP pursuant to a letter agreement, dated February 28, 2007. This letter agreement is summarized in the section of Item 4(b) above, entitled "Analyses of JMP Securities LLC—Fees and Expenses," and such summary is incorporated herein by reference.

The Special Committee also retained Morrison & Foerster LLP to act as legal advisor to the Special Committee in connection with the Offer.

Neither the Company nor any person acting on its behalf currently intends to employ, retain or compensate any person to make solicitations or recommendations to stockholders on its behalf concerning the Offer.

Item 6.    Interest in Securities of the Subject Company.

Except for the transactions described herein, no transactions involving any shares of Common Stock have been effected during the past 60 days by the Company, or to the best of the Special Committee's knowledge, by any executive officer, director, affiliate or subsidiary of the Company.

Crowleys.

Immediately prior to executing the Crowley Contribution Agreement:

- Thomas B. Crowley, Jr. was deemed to beneficially own 44,270 shares of Common Stock (49.3% of the outstanding shares of that class), 314,794 shares of Series A Preferred (99.9% of the outstanding shares of that class), and 46,138 shares of Class N (100% of the outstanding shares of that class);

- Molly M. Crowley was deemed to beneficially own 32,601 shares of Common Stock (36.3% of the outstanding shares of that class), 225,848 shares of Series A Preferred (71.7% of the outstanding shares of that class); and 46,138 shares of Class N (100% of the outstanding shares of that class), and

- Christine S. Crowley was deemed to beneficially own 5,039 shares of Common Stock (5.6% of the outstanding shares of that class) and 15,211 shares of Series A Preferred (4.8% of the outstanding shares of that class).

EXHIBIT D PAGE 55

(Thomas B. Crowley, Jr. is deemed the beneficial owner of all the shares attributable to Molly M. Crowley and Christine S. Crowley.)

Under the Crowley Contribution Agreement dated as of March 16, 2007, each owner of record in the Crowley Group has agreed that, subject to the satisfaction of the conditions of the Offer or the waiver of those conditions, at the time Purchaser accepts for payment the shares of Common Stock validly tendered and not withdrawn, such persons will contribute all of the shares of Common Stock (43,992 shares), Series A Preferred (314,794 shares) and Class N (46,138 shares) that they own in exchange for Purchaser Common Stock (as defined below) and Purchaser Class N (as defined below). At the contribution, except as set forth below, each share of Common Stock will be exchanged for one share of the voting common stock of Purchaser ("Purchaser Common Stock") and each share of Class N will be exchanged for one share of non-voting Class N Common Shares of Purchaser ("Purchaser Class N"). Each share of Series A Preferred will be exchanged for one-twelfth (1/12) of a share of Purchaser Common Stock. Holders of Series A Preferred will also receive additional Purchaser Common Stock equal to the number of whole shares determined by dividing (i) the amount of the accrued but unpaid dividends on the Series A Preferred on the date that Purchaser accepts for payment the shares of Common Stock validly tendered and not withdrawn, by (ii) $1,200. The Marital Trust Under The Thomas B. Crowley Trust will receive a total of 31,478 shares of Purchaser Common Stock (plus such other additional shares of Common Stock as are due as a result of unpaid dividends on the Series A Preferred) and 66,282 shares of Purchaser Class N. These totals reflect an exchange by The Marital Trust Under The Thomas B. Crowley Trust of 19,943 shares of Common Stock for 20,144 shares of Purchaser Class N based on a valuation discount of shares of Purchaser Class N from Purchaser Common Stock of one percent.

16

EXHIBIT D PAGE 56

Under the Crowley Contribution Agreement, each owner covenants and agrees, among other things, not to (i) directly or indirectly, offer for sale, sell, transfer, tender, pledge, encumber, assign or otherwise dispose of, or enter into any contract, option or other arrangement or understanding with respect to or consent to the offer for sale, transfer, tender, pledge, encumbrance, assignment or other disposition of, any or all of its capital stock in the Company or any interest therein; (ii) grant any proxies or powers of attorney, deposit any of its capital stock in the Company into a voting trust or enter into a voting agreement with respect to any of its capital stock in the Company; or (iii) take any action that would make any representation or warranty of such owner contained in the Crowley Contribution Agreement untrue or incorrect or have the effect of preventing or disabling such owner from performing its obligations under the Crowley Contribution Agreement. The Crowley Contribution Agreement extends to the expiration or termination of the Offer.

Plans.

Under the Plan Contribution Agreement dated as of March 16, 2007, each Plan has agreed that, subject to the satisfaction of the conditions of the Offer or the waiver of those conditions, at the time Purchaser accepts for payment the shares of Common Stock validly tendered and not withdrawn, the Plans will contribute all of the shares of Common Stock that they own in exchange for Purchaser Common Stock. As of the date of the Plan Contribution Agreement, the Plans owned an aggregate of 14,570 shares of Common Stock. This number will increase by 25 shares of Common Stock if the Offer is consummated as a result of additional contributions to the Plans by the Company in such event, as described below. The number of shares of Common Stock contributed to Purchaser by the Plans is also subject to reduction to the extent that in connection with distributions to participants upon termination or for other reasons, the shares of Common Stock distributed are thereafter repurchased by the Company. In the contribution, each share of Common Stock will be exchanged for one share of Purchaser Common Stock.

Under the Plan Contribution Agreement, each Plan covenants and agrees, among other things, not (i) directly or indirectly, offer for sale, sell, transfer, tender, pledge, encumber, assign or otherwise dispose of, or enter into any contract, option or other arrangement or understanding with respect to or consent to the offer for sale, transfer, tender, pledge, encumbrance, assignment or other disposition of, any or all of its Common Stock or any interest therein; (ii) grant any proxies or powers of attorney, deposit any of its Common Stock into a voting trust or enter into a voting agreement with respect to any of its Common Stock; or (iii) take any action that would make any representation or warranty of such Plan contained in the Plan Contribution Agreement untrue or incorrect or have the effect of preventing or disabling such Plan from performing such Plan's obligations under the Plan Contribution Agreement; except, in each case, for any of such actions necessary to consummate repurchases of Common Stock by the Company in accordance with the terms of such Plan's governing documents. Purchaser is not, however, entitled to enforce any provision of the Plan Contribution Agreement against a Plan if it would cause that Plan to violate its Plan documents or, in the opinion of the Plan's counsel, the Employee Retirement Security Act of 1974, as amended ("ERISA"). The Plan Contribution Agreement extends until the earlier of the expiration or termination of the Offer and August 15, 2007.

Prior to and in connection with the Plans' execution of the Plan Contribution Agreement, certain administrative and substantive provisions of each Plan's documents were amended with a view to the contribution, the Offer and the Merger (the "Plan Amendments"). The significant substantive amendments provide that after the Merger:

(1)     the valuation of shares of Common Stock held by the Crowley Maritime Corporation Retirement Stock Plan and the Crowley Maritime Corporation Employee Stock Ownership Plan will no longer be valued on a nonmarketable minority interest basis but, like the Crowley Maritime Corporation Stock Savings Plan, will be valued on a marketable minority interest basis, and

(2)     for distributions made under each Plan during the fiscal years ending December 31, 2007, 2008, 2009 and 2010, "fair market value" will mean the higher of (a) a marketable minority interest basis fair market value as of the valuation date immediately preceding the date of distribution or (b) $2,990 per share in the case of Common Stock (or the amount determined by converting any convertible preferred stock into Common

EXHIBIT  D  PAGE  57

Stock and multiplying the result by $2,990).

The Plan Amendments also provide for a special contribution of shares of Common Stock to each Plan by the Company immediately prior to the time Purchaser accepts for payment the shares of Common Stock validly tendered and not withdrawn, in the amounts of 14 shares to the Crowley Maritime Corporation Retirement Stock Plan, six shares to the Crowley Maritime Corporation Stock Savings Plan and five shares to the Crowley Maritime Corporation Employee Stock Ownership Plan.

In addition, the Plan Amendments provide for indemnification of each Plan by the Company for any losses (x) caused by any untrue statements or omissions in any documents (the "Offer Documents") filed with the SEC or distributed to the Company's stockholders in connection with the Offer and the Merger (except losses caused by any untrue statement or omission based upon information as to which the Company was not the source that is furnished by or on behalf of the Plan in writing expressly for use in the Offer Documents); (y) related to or arising out of any filings made by the Plan with the SEC in connection with the Offer; or (z) related to or arising out of any alleged or actual violation of law resulting from the Offer or the Merger. The Company, however, is not required to indemnify a Plan against any losses resulting from or arising out of any breach of any representation or warranty by the Plan in the Plan Contribution Agreement or, except where such failure to perform is based upon a determination by a fiduciary of and/or for the Plan that such performance would cause the Plan to violate its Plan documents or, in the opinion of the Plan's counsel, ERISA, or any willful failure to perform any covenant or agreement of the Plans in the Plan Contribution Agreement.

17

EXHIBIT D PAGE 58

### Franklin Plaintiffs.

As part of the settlement, the Franklin plaintiffs have agreed to tender all of the shares of Common Stock they own or control and will not oppose the Offer or the Merger, withdraw shares tendered, transfer or dispose of such shares or exercise appraisal rights in the Merger. A Schedule 13D filed with the SEC on November 30, 2004, as amended by Amendment No. 1 filed on December 27, 2005, reports holdings by the plaintiffs of 9,386 shares of Common Stock.

### Item 7.    Purposes of the Transaction and Plans or Proposals.

Other than as set forth in this Schedule 14D-9, no negotiation is being undertaken or is underway by the Company in response to the Offer that relates to (a) a tender offer for or other acquisition of the Company's securities by the Company, any subsidiary of the Company or any other person; (b) an extraordinary transaction, such as a merger, reorganization or liquidation, involving the Company or any subsidiary of the Company; (c) a purchase, sale or transfer of a material amount of assets by the Company or any subsidiary of the Company; or (d) any material change in the present dividend rate or policy of the Company, or indebtedness or capitalization of the Company.

Other than as set forth in this Schedule 14D 9, there are no transactions, board resolutions, agreements in principle or signed contracts in response to the Offer which relate to, or would result in, one or more of the matters referred to in this Item 7.

### Item 8.    Additional Information.

#### Recent Closing Bid Price.

On March 16, 2007, the closing bid price per share of Common Stock as reported in the "pink sheets" was $2,400.

#### State Takeover Laws.

Section 203 of the DGCL in general prohibits a Delaware corporation such as the Company from engaging in a "Business Combination" (defined to include a variety of transactions, including tender offers and mergers, with an "Interested Stockholder" (defined generally as a person that beneficially owns at least 15% of the voting stock of the subject corporation)) for three years after that person becomes an Interested Stockholder, unless, before that, the board of directors of the corporation approved either the Business Combination or the transaction that resulted in the stockholder becoming an Interested Stockholder. Section 203 does not apply to any Delaware corporation that does not have a class of voting stock (a) listed on a national securities exchange, (b) authorized for quotation on the NASDAQ Stock Market or (c) held of record by more than 2,000 stockholders. Since the Company does not have a class of voting stock meeting any of these criteria, the Crowleys and Purchaser do not believe that Section 203 would apply to the Offer or the Merger.

#### Section 253 of the DGCL.

Under Section 253 of the DGCL, if Purchaser acquires, pursuant to the Offer or otherwise, at least 90% of each class of the outstanding shares of capital stock of the Company, Purchaser will be able to effect the Merger after consummation of the Offer without a vote by the Company's stockholders. However, if Purchaser does not acquire at least 90% of each class of the outstanding shares of capital stock of the Company pursuant to the Offer or otherwise, a vote by the Company's stockholders will be required under the DGCL to effect the Merger.

#### Regulatory Approvals.

Neither the Company nor Purchaser is aware of any license or regulatory permit that appears to be material to the

EXHIBIT D PAGE 59

business of the Company and its subsidiaries, taken as a whole, that might be adversely affected by the acquisition of the shares of Common Stock by Purchaser pursuant to the Offer, the Merger or otherwise, or, except as set forth above, of any approval or other action by any governmental, administrative or regulatory agency or authority, domestic or foreign, that would be required prior to the acquisition of the shares of Common Stock by Purchaser pursuant to the Offer, the Merger or otherwise.

18

EXHIBIT D  PAGE 60

Should any such approval or other action be required, the Company presently contemplates that such approval or other action will be sought. While, except as otherwise described in the Offer, Purchaser does not presently intend to delay the acceptance for payment of, or payment for, the shares of Common Stock tendered pursuant to the Offer pending the outcome of any such matter, there can be no assurance that any such approval or other action, if needed, would be obtained or would be obtained without substantial conditions or that failure to obtain any such approval or other action might not result in consequences adverse to the Company's business or that certain parts of the Company's business might not have to be disposed of, or other substantial conditions complied with, in the event that such approvals were not obtained or such other actions were not taken or in order to obtain any such approval or other action. If certain types of adverse action are taken with respect to the matters discussed below, Purchaser could decline to accept for payment, or pay for, any shares of Common Stock tendered.

*Antitrust Compliance.* Under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules promulgated thereunder (collectively, the "HSR Act"), certain acquisitions of assets and/or voting securities may not be consummated unless certain information has been furnished to the Antitrust Division of the Department of Justice (the "Antitrust Division") and to the Federal Trade Commission (the "FTC"), and a waiting period observed. The purchase of shares of Common Stock pursuant to the Offer is not subject to such requirements because the exemptions set forth under 16 CFR sections 802.10 and 802.30 apply.

The Antitrust Division and the FTC from time to time scrutinize the legality under the antitrust laws of transactions such as the acquisition of shares of Common Stock by Purchaser pursuant to the Offer. At any time before or after the consummation of any such transactions, the Antitrust Division or the FTC could take such action under the antitrust laws of the United States as it deems necessary or desirable in the public interest, including seeking to enjoin the purchase of shares of Common Stock pursuant to the Offer or seeking divestiture of the shares of Common Stock so acquired or divestiture of substantial assets of the Crowleys or the Company. Private parties (including individual States) may also bring legal actions under the antitrust laws of the United States. There can be no assurance that a challenge to the Offer on antitrust grounds will not be made, or if such a challenge is made, what the result will be.

Appraisal Rights.

Holders of shares of Common Stock do not have appraisal rights in connection with the Offer. However, if the Merger is consummated following completion of the Offer, each holder of shares of Common Stock who has not tendered his or her shares of Common Stock in the Offer and who properly demands an appraisal of his or her shares under Section 262 of the DGCL ("Section 262") will be entitled, in lieu of receiving the Merger consideration, to an appraisal by the Delaware Chancery Court of the fair value of his or her shares of Common Stock, exclusive of any element of value arising from the accomplishment or expectation of the Merger, together with a fair rate of interest, if any, to be paid from the date of the Merger.

The fair value determined by the court for the shares of Common Stock could be more than, less than or the same as the consideration paid in the Merger, but the form of the consideration payable as a result of the appraisal proceeding would be cash. Any judicial determination of the fair value could be based upon considerations other than or in addition to the market value of the shares of Common Stock, including, among other things, asset values and earning capacity. The Delaware Supreme Court discussed in Weinberger v. UOP, Inc. the factors that could be considered in determining fair value in an appraisal proceeding, stating that "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court" should be considered and that "fair price obviously requires consideration of all relevant factors involving the value of a company." The Delaware Supreme Court stated that, in making this determination of fair value, the court must consider "market value, asset value, dividends, earnings prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of the merger and which throw any light on future prospects of the merged corporation." Furthermore, the court may consider "elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation."

EXHIBIT D PAGE 61

Schedule 14-D9

The court may determine the costs of the appraisal proceeding and allocate them to the parties as the court determines to be equitable under the circumstances. The court may also order that all or a portion of any stockholder's expense incurred in connection with an appraisal proceeding, including reasonable attorneys' fees and expenses and reasonable fees and expenses of experts utilized in the appraisal proceeding, be charged, on a pro rata basis, against the value of all shares of Common Stock entitled to appraisal.

Since holders of shares of Common Stock do not have appraisal rights in connection with the Offer, no demand for appraisal under Section 262 should be made at this time. Not later than 10 days following the effective date of the Merger, the surviving corporation in the Merger will notify the record holders of shares of Common Stock as of the effective date of the Merger of the consummation of the Merger and of the availability of and procedure for demanding appraisal rights.

If any holder of shares of Common Stock who demands appraisal under Section 262 fails to perfect, or effectively withdraws or loses his or her right to appraisal as provided in the DGCL, the shares of Common Stock of such stockholder will be converted into the Merger consideration, without interest thereon. None of the Company, Purchaser or the Crowleys intend to make their files available to or obtain counsel or appraisal services for the Unaffiliated Stockholders.

19

EXHIBIT D PAGE 62

The foregoing discussion is not a complete statement of the law pertaining to appraisal rights under the DGCL and is qualified in its entirety by the full text of Section 262, which is attached as Annex B to this Schedule 14D-9.

**Item 9.       Material to be Filed as Exhibits.**

EXHIBIT NO.        DESCRIPTION

(a)(1)(i)          Offer to Purchase, dated March 19, 2007 (incorporated by reference to Exhibit (a)(1)(i) of the Schedule TO, filed with the SEC on March 19, 2007)

(a)(1)(ii)         Letter of Transmittal (incorporated by reference to Exhibit (a)(1)(ii) of the Schedule TO, filed with the SEC on March 19, 2007)

(a)(1)(iii)        Notice of Guaranteed Delivery (incorporated by reference to Exhibit (a)(1)(iii) of the Schedule TO, filed with the SEC on March 19, 2007)

(a)(1)(iv)         Letter to Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees (incorporated by reference to Exhibit (a)(1)(iv) of the Schedule TO, filed with the SEC on March 19, 2007)

(a)(1)(v)          Letter to Clients for use by Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees (incorporated by reference to Exhibit (a)(1)(v) of the Schedule TO, filed with the SEC on March 19, 2007)

(a)(1)(vi)         Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9 (incorporated by reference to Exhibit (a)(1)(vi) of the Schedule TO, filed with the SEC on March 19, 2007)

(a)(1)(vii)        Letter to Stockholders of Crowley Maritime Corporation from Crowley Newco Corporation (incorporated by reference to Exhibit (a)(1)(vii) of the Schedule TO, filed with the SEC on March 19, 2007)

(a)(1)(viii)       Opinion of JMP Securities LLC, dated March 14, 2007 (included as Annex A to this Schedule 14D-9)*

(a)(1)(ix)         Presentation to the Special Committee of the Board of Directors of Crowley Maritime Corporation by JMP Securities LLC, dated March 14, 2007 (filed herewith electronically)

(e)(i)             Contribution Agreement by and among Crowley Newco Corporation and Christine S. Crowley, Crowley Asset Management, L.P., The Non-Exempt Trust FBO Adrienne Crowley, The Thomas B. Crowley Jr. Separate Property Trust, The Annual Exclusion Trust FBO Adrienne Crowley, The Crowley Family Generation Skipping Trust U/T/A Dtd. 12/04/91, and The Marital Trust Under The Thomas B. Crowley Trust, dated March 16, 2007 (incorporated by reference to Exhibit (d)(ii) of the Schedule TO, filed with the SEC on March 19, 2007)

(e)(ii)            Contribution Agreement by and among Crowley Newco Corporation and the Crowley Maritime Corporation Retirement Stock Plan, the Crowley Maritime Corporation Stock Savings Plan and the Crowley Maritime Corporation Employee Stock Ownership Plan, dated March 16, 2007 (incorporated by reference to Exhibit (d)(iii) of the Schedule TO, filed with the SEC on March 19, 2007)

(e)(iii)(A)        Second Amendment to Split Dollar Life Insurance Agreement between Crowley Maritime Corporation and Thomas B. Crowley, Jr., as Trustee of the Thomas B. Crowley, Jr. Revocable Trust u/t/a dtd. July 1, 1998 by and between Thomas B. Crowley, Jr., as trustor and as trustee, dated as of July 20, 1998 (incorporated by reference to Exhibit No. 10.8 to the Company's Registration Statement on Form 10-12G filed on April 1, 2002, File No. 000-49717)

EXHIBIT D PAGE 63

Schedule 14-D9                                                                                    Page 41 of 58

(e)(iii)(B)    Split Dollar Life Insurance Agreement (1035 Exchange Policy) between Crowley Maritime Corporation
               and Thomas B. Crowley, Jr. dated as of July 20, 1998 (incorporated by reference to Exhibit No. 10.9 to the
               Company's Registration Statement on Form 10-12G filed on April 1, 2002, File No. 000-49717)

(e)(iii)(C)    Split Dollar Life Insurance Agreement (New Policies) between Crowley Maritime Corporation and
               Thomas B. Crowley, Jr. dated as of July 20, 1998 (incorporated by reference to Exhibit No. 10.10 to the
               Company's Registration Statement on Form 10-12G filed on April 1, 2002, File No. 000-49717)

(e)(iii)(D)    Split Dollar Life Insurance Agreement between Crowley Maritime Corporation, Thomas B. Crowley, Jr.
               and Christine S. Crowley, as Distributing Trustee of the 1998 Crowley Family Generation — Skipping
               Trust u/t/d dtd/ November 12, 1998 by and between Thomas B. Crowley, Jr., as trustor and as trustee,
               dated as of November 24, 1998 (incorporated by reference to Exhibit No. 10.11 to the Company's
               Registration Statement on Form 10-12G filed on April 1, 2002, File No. 000-49717)

20


EXHIBIT D PAGE 64

(e)(iv)        Settlement Agreement, dated as of December 23, 2003, between Crowley Maritime Corporation and Thomas B. Crowley, Jr. (incorporated by reference to Exhibit No. 10.14 to the Company's Form 10-K Annual Report for the fiscal year ended December 31, 2003, File No. 000-49717)

(e)(v)         Agreement for Contract Services between Crowley Maritime Corporation and William P. Verdon (incorporated by reference to Exhibit No. 10.1 to the Company's Form 10-K Annual Report for the fiscal year ended December 31, 2005, File No. 000-49717)

(e)(vi)        Amendment No.8 to the Crowley Maritime Corporation Retirement Stock Plan, effective as of March 16, 2007 (incorporated by reference to Exhibit 99.2 to the Company's Form 8-K, filed with the SEC on March 19, 2007)

(e)(vii)       Crowley Maritime Corporation Employee Stock Ownership Plan, Amendment No. 3 to the 2005 Plan, effective as of March 16, 2007 (incorporated by reference to Exhibit 99.4 to the Company's Form 8-K, filed with the SEC on March 19, 2007)

(e)(viii)      Amendment No. 3 to the Crowley Maritime Corporation Stock Savings Plan, effective as of March 16, 2007 (incorporated by reference to Exhibit 99.3 to the Company's Form 8-K, filed with the SEC on March 19, 2007)

(e)(ix)        Stipulation and Agreement of Compromise, Settlement, and Release, dated March 16, 2007, Franklin Balance Sheet Investment Fund v. Crowley, Civil Action No. 888-N (incorporated by reference to Exhibit 99.1 to the Company's Form 8-K, filed with the SEC on March 19, 2007)

(g)            None.

---

* Included in materials being distributed by the Company to stockholders of the Company.

21

EXHIBIT D PAGE 65

SIGNATURE

After due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Dated: March 19, 2007

By:    /s/ Gary L. Depolo

Name:  Gary L. Depolo

Title:  Chairman of the Special Committee of the Board of Directors

22

EXHIBIT D PAGE 66

Schedule 14-D9

[This page left blank intentionally]

EXHIBIT D PAGE 67

ANNEX A

**OPINION OF JMP SECURITIES LLC**

March 14, 2007

The Special Committee of the Board of Directors
Crowley Maritime Corporation
555 12th Street, Suite 2130
Oakland, California 94607

Members of the Special Committee of the Board of Directors:

We understand that the Special Committee has been formed to respond to a potential offer from Crowley Newco Corporation, a Delaware corporation (the "Purchaser"), to purchase all the outstanding shares of common stock, par value $.01 per share (the "Common Stock"), of Crowley Maritime Corporation, a Delaware corporation ("Crowley Maritime"), for $2,990 per share, in cash (the "Offer"), upon the terms and subject to the conditions set forth in the Offer to Purchase to be delivered by the Purchaser to the stockholders of Crowley Maritime (the "Offer to Purchase"). If the Offer is consummated, the Purchaser intends to merge with and into Crowley Maritime through a "short-form" merger (the "Merger").

We understand that in order to complete the Offer to Purchase, the following conditions must be met, among other things, (1) the Delaware Chancery Court approving the settlement of Franklin Balance Sheet Investment Fund v. Crowley, dismissing the lawsuit and the time for appeal having expired and (2) there being validly tendered and not withdrawn prior to the expiration date of the Offer a number of shares of Common Stock that constitute (a) a majority of the shares of Common Stock outstanding on the expiration date of the Offer that are beneficially owned by the unaffiliated stockholders of Crowley Maritime (consisting of all Crowley Maritime stockholders other than the Purchaser, the directors and officers of Crowley Maritime and persons and entities they control, and the Crowley Maritime Corporation Retirement Stock Plan, the Crowley Maritime Corporation Stock Savings Plan and the Crowley Maritime Corporation Employee Stock Ownership Plan (collectively, the "Plans")) (the "majority of the minority condition") and (b) together with the shares of common stock beneficially owned by the Purchaser, at least ninety-five percent (95%) of the total number of shares of Common Stock outstanding on the expiration date of the Offer (the "minimum condition").

Additionally, we understand that the Purchaser has binding agreements, with certain directors of Crowley Maritime and certain persons and entities they control and, separately, with the Plans requiring them to contribute all of their shares of capital stock of Crowley Maritime to the Purchaser in exchange for its capital stock at the same time the Purchaser accepts for payment the shares of Common Stock it is seeking in the Offer.

You have asked for our opinion as to whether the consideration (the "Consideration") to be received by the unaffiliated stockholders of Crowley Maritime with respect to the Offer is fair from a financial point of view to such holders. For purposes of the opinion set forth herein, we have:

(i)     reviewed certain publicly available financial statements and other business and financial information of Crowley Maritime;

(ii)    reviewed certain internal financial statements and other financial and operating data concerning Crowley Maritime prepared by the management of Crowley Maritime;

EXHIBIT D  PAGE 68

(iii)    reviewed certain financial forecasts (utilizing different management assumptions) prepared by the management of Crowley Maritime;

(iv)    reviewed the reported prices and trading activity for the Common Stock;

(v)    compared the financial performance of Crowley Maritime and the prices and trading activity of the Common Stock with that of certain other publicly?traded companies that we believe are generally comparable to Crowley Maritime;

A-1

EXHIBIT  D  PAGE  69

(vi)     reviewed the financial terms, to the extent publicly available, of certain acquisition transactions involving companies in lines of business that we believe are generally comparable to Crowley Maritime;

(vii)    reviewed the draft Offer to Purchase dated March 13, 2007 and certain related documents; and

(viii)   considered such other factors and performed such other analyses as we have deemed appropriate.

We have also met with certain officers and employees of Crowley Maritime to discuss its business and prospects and considered such other information, financial studies, analyses and investigations and financial, economic and market criteria which we deemed relevant to the preparation of this opinion.

We, as part of our investment banking business, are customarily engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, competitive biddings, secondary distributions of securities, private placements and valuations for estate, corporate and other purposes.

In conducting our review and arriving at our opinion, we have, with your consent, assumed and relied upon without independent verification the accuracy and completeness of the information supplied or otherwise made available to us by Crowley Maritime for the purposes of this opinion. We have further relied upon the assurance of the management of Crowley Maritime that they are not aware of any facts that would make any of such information, in the light of the circumstances in which it was provided or obtained, inaccurate or misleading. With respect to the financial forecasts we have assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the future financial performance of Crowley Maritime. We have not been engaged to assess the reasonableness or achievability of such forecasts or the assumptions on which they were based and express no view as to such forecasts or assumptions.

We have assumed that the transactions contemplated by the Offer to Purchase will be completed, including that the conditions set forth in the Offer to Purchase will be satisfied. Further, we have assumed that the Purchaser's binding agreements, with certain directors of Crowley Maritime and certain persons and entities they control and, separately, with the Plans will be completed and the Merger will take place. We have assumed that in connection with the receipt of all the necessary governmental, regulatory or other approvals and consents required for the Offer to Purchase, no delays, limitations, conditions or restrictions will be imposed that would have an adverse effect on the Consideration. We have also assumed that the terms and conditions of the Offer to Purchase, dated March 13, 2007 and reviewed by us, will not be changed in any material respects and that all conditions to the consummation of the Offer to Purchase will be satisfied without waiver thereof.

We are not legal, tax or regulatory advisors and have relied upon, without independent verification, the assessment of Crowley Maritime and their legal, tax or regulatory advisors with respect to legal, tax or regulatory matters. We are not in the business of appraising tangible assets and have not made any independent valuation or appraisal of any or all of the assets or liabilities of Crowley Maritime. Our opinion is necessarily based on financial, economic, market and other conditions as in effect on, and the information made available to us as of, the date hereof. Events occurring after the date hereof may affect this opinion and the assumptions used in preparing it, and we do not assume any obligation to update, revise or reaffirm this opinion.

We were not requested to consider, and our opinion does not address, the non-financial terms of the Offer to Purchase, nor does it address the terms of any of the related agreements to be entered into by the parties. Additionally, we did not attempt to independently determine the value of the outstanding Series A Junior Convertible Preferred Stock or Class N Common Shares or the appropriateness of the amounts to be received by the holders thereof pursuant to the Offer to Purchase. We have not been requested to, and did not (a) initiate any discussions with, or solicit any indications of interest from, third parties with respect to the Offer to Purchase or any alternatives to the Offer to Purchase, (b) negotiate the terms of the Offer to Purchase, or (c) advise the Special Committee of the Board of Directors or any other party with respect to the form of the

EXHIBIT D PAGE 70

transaction, the underlying business decision to the effect the Merger, or alternatives to the Offer to Purchase.

We will receive a fee for providing this opinion, no portion of which is contingent upon the successful completion of the Offer to Purchase. We have not previously provided investment banking or other services to Crowley Maritime. Crowley Maritime has agreed to indemnify us against certain liabilities arising out of our engagement. In the ordinary course of our trading, brokerage, investment management and financing activities, JMP or its affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for our own account or the accounts of customers, in debt or equity securities of Crowley Maritime or any other company or any currency that may be involved in this transaction.

It is understood that this letter is for the information of the Special Committee of the Board of Directors of Crowley Maritime only and may not be used for any other purpose or be reproduced, quoted from or referred to at any time, in whole or part, without our prior written consent, except that this opinion may be included in its entirety in any filing required to be made by Crowley Maritime in respect of the transactions identified in this opinion with the Securities and Exchange Commission if such inclusion is required by applicable law. In addition, JMP expresses no opinion or recommendation as to how the unaffiliated stockholders of Crowley Maritime should act with respect to the Offer to Purchase.

A-2

EXHIBIT D PAGE 71

Based upon and subject to the foregoing, we are of the opinion on the date hereof that the Consideration to be received by the unaffiliated stockholders of the Common Stock pursuant to the Offer is fair from a financial point of view to such holders.

> Very truly yours,
> /s/ JMP SECURITIES LLC
> JMP SECURITIES LLC

A-3

EXHIBIT D PAGE 72

Schedule 14-D9

[This page left blank intentionally]

EXHIBIT D PAGE 73

ANNEX B

## SECTION 262 OF THE GENERAL CORPORATION LAW
## OF THE STATE OF DELAWARE

(a) Any stockholder of a corporation of this State who holds shares of stock on the date of the making of a demand pursuant to subsection (d) of this section with respect to such shares, who continuously holds such shares through the effective date of the merger or consolidation, who has otherwise complied with subsection (d) of this section and who has neither voted in favor of the merger or consolidation nor consented thereto in writing pursuant to Section 228 of this title shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock under the circumstances described in subsections (b) and (c) of this section. As used in this section, the word "stockholder" means a holder of record of stock in a stock corporation and also a member of record of a nonstock corporation; the words "stock" and "share" mean and include what is ordinarily meant by those words and also membership or membership interest of a member of a nonstock corporation; and the words "depository receipt" mean a receipt or other instrument issued by a depository representing an interest in one or more shares, or fractions thereof, solely of stock of a corporation, which stock is deposited with the depository.

(b) Appraisal rights shall be available for the shares of any class or series of stock of a constituent corporation in a merger or consolidation to be effected pursuant to Section 251 (other than a merger effected pursuant to Section 251(g) of this title), Section 252, Section 254, Section 257, Section 258, Section 263 or Section 264 of this title:

(1) Provided, however, that no appraisal rights under this section shall be available for the shares of any class or series of stock, which stock, or depository receipts in respect thereof, at the record date fixed to determine the stockholders entitled to receive notice of and to vote at the meeting of stockholders to act upon the agreement of merger or consolidation, were either (i) listed on a national securities exchange or designated as a national market system security on an interdealer quotation system by the National Association of Securities Dealers, Inc. or (ii) held of record by more than 2,000 holders; and further provided that no appraisal rights shall be available for any shares of stock of the constituent corporation surviving a merger if the merger did not require for its approval the vote of the stockholders of the surviving corporation as provided in subsection (f) of Section 251 of this title.

(1) Notwithstanding paragraph (1) of this subsection, appraisal rights under this section shall be available for the shares of any class or series of stock of a constituent corporation if the holders thereof are required by the terms of an agreement of merger or consolidation pursuant to Sections 251, 252, 254, 257, 258, 263 and 264 of this title to accept for such stock anything except:

a. Shares of stock of the corporation surviving or resulting from such merger or consolidation, or depository receipts in respect thereof;

b. Shares of stock of any other corporation, or depository receipts in respect thereof, which shares of stock (or depository receipts in respect thereof) or depository receipts at the effective date of the merger or consolidation will be either listed on a national securities exchange or designated as a national market system security on an interdealer quotation system by the National Association of Securities Dealers, Inc. or held of record by more than 2,000 holders;

c. Cash in lieu of fractional shares or fractional depository receipts described in the foregoing subparagraphs a. and b. of this paragraph; or

d. Any combination of the shares of stock, depository receipts and cash in lieu of fractional shares or fractional depository receipts described in the foregoing subparagraphs a., b. and c. of this paragraph.

EXHIBIT D    PAGE 74

(2) In the event all of the stock of a subsidiary Delaware corporation party to a merger effected under Section 253 of this title is not owned by the parent corporation immediately prior to the merger, appraisal rights shall be available for the shares of the subsidiary Delaware corporation.

(c)    Any corporation may provide in its certificate of incorporation that appraisal rights under this section shall be available for the shares of any class or series of its stock as a result of an amendment to its certificate of incorporation, any merger or consolidation in which the corporation is a constituent corporation or the sale of all or substantially all of the assets of the corporation. If the certificate of incorporation contains such a provision, the procedures of this section, including those set forth in subsections (d) and (e) of this section, shall apply as nearly as is practicable.

(d)    Appraisal rights shall be perfected as follows:

(1) If a proposed merger or consolidation for which appraisal rights are provided under this section is to be submitted for approval at a meeting of stockholders, the corporation, not less than 20 days prior to the meeting, shall notify each of its stockholders who was such on the record date for such meeting with respect to shares for which appraisal rights are available pursuant to subsection (b) or (c) hereof that appraisal rights are available for any or all of the shares of the constituent corporations, and shall include in such notice a copy of this section. Each stockholder electing to demand the appraisal of such stockholder's shares shall deliver to the corporation, before the taking of the vote on the merger or consolidation, a written demand for appraisal of such stockholder's shares. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such stockholder's shares. A proxy or vote against the merger or consolidation shall not constitute such a demand. A stockholder electing to take such action must do so by a separate written demand as herein provided. Within 10 days after the effective date of such merger or consolidation, the surviving or resulting corporation shall notify each stockholder of each constituent corporation who has complied with this subsection and has not voted in favor of or consented to the merger or consolidation of the date that the merger or consolidation has become effective; or

B-1

EXHIBIT D PAGE 75

(2) If the merger or consolidation was approved pursuant to Section 228 or Section 253 of this title, then either a constituent corporation before the effective date of the merger or consolidation or the surviving or resulting corporation within 10 days thereafter shall notify each of the holders of any class or series of stock of such constituent corporation who are entitled to appraisal rights of the approval of the merger or consolidation and that appraisal rights are available for any or all shares of such class or series of stock of such constituent corporation, and shall include in such notice a copy of this section. Such notice may, and, if given on or after the effective date of the merger or consolidation, shall, also notify such stockholders of the effective date of the merger or consolidation. Any stockholder entitled to appraisal rights may, within 20 days after the date of mailing of such notice, demand in writing from the surviving or resulting corporation the appraisal of such holder's shares. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such holder's shares. If such notice did not notify stockholders of the effective date of the merger or consolidation, either (i) each such constituent corporation shall send a second notice before the effective date of the merger or consolidation notifying each of the holders of any class or series of stock of such constituent corporation that are entitled to appraisal rights of the effective date of the merger or consolidation or (ii) the surviving or resulting corporation shall send such a second notice to all such holders on or within 10 days after such effective date; provided, however, that if such second notice is sent more than 20 days following the sending of the first notice, such second notice need only be sent to each stockholder who is entitled to appraisal rights and who has demanded appraisal of such holder's shares in accordance with this subsection. An affidavit of the secretary or assistant secretary or of the transfer agent of the corporation that is required to give either notice that such notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein. For purposes of determining the stockholders entitled to receive either notice, each constituent corporation may fix, in advance, a record date that shall be not more than 10 days prior to the date the notice is given, provided, that if the notice is given on or after the effective date of the merger or consolidation, the record date shall be such effective date. If no record date is fixed and the notice is given prior to the effective date, the record date shall be the close of business on the day next preceding the day on which the notice is given.

(e)     Within 120 days after the effective date of the merger or consolidation, the surviving or resulting corporation or any stockholder who has complied with subsections (a) and (d) hereof and who is otherwise entitled to appraisal rights, may file a petition in the Court of Chancery demanding a determination of the value of the stock of all such stockholders. Notwithstanding the foregoing, at any time within 60 days after the effective date of the merger or consolidation, any stockholder shall have the right to withdraw such stockholder's demand for appraisal and to accept the terms offered upon the merger or consolidation. Within 120 days after the effective date of the merger or consolidation, any stockholder who has complied with the requirements of subsections (a) and (d) hereof, upon written request, shall be entitled to receive from the corporation surviving the merger or resulting from the consolidation a statement setting forth the aggregate number of shares not voted in favor of the merger or consolidation and with respect to which demands for appraisal have been received and the aggregate number of holders of such shares. Such written statement shall be mailed to the stockholder within 10 days after such stockholder's written request for such a statement is received by the surviving or resulting corporation or within 10 days after expiration of the period for delivery of demands for appraisal under subsection (d) hereof, whichever is later.

(f)     Upon the filing of any such petition by a stockholder, service of a copy thereof shall be made upon the surviving or resulting corporation, which shall within 20 days after such service file in the office of the Register in Chancery in which the petition was filed a duly verified list containing the names and addresses of all stockholders who have demanded payment for their shares and with whom agreements as to the value of their shares have not been reached by the surviving or resulting corporation. If the petition shall be filed by the surviving or resulting corporation, the petition shall be accompanied by such a duly verified list. The Register in Chancery, if so ordered by the Court, shall give notice of the time and place fixed for the hearing of such petition by registered or certified mail to the surviving or resulting corporation and to the stockholders shown on the list at the addresses therein stated. Such notice shall also be given by 1 or more publications at least 1 week before the day of the hearing, in a newspaper of general circulation published in the City of Wilmington, Delaware or such publication as the Court deems advisable. The forms of the notices by mail and by publication shall be approved by the Court, and the costs thereof shall be borne by the surviving or resulting corporation.

Schedule 14-D9

B-2

EXHIBIT D PAGE 77

(g)     At the hearing on such petition, the Court shall determine the stockholders who have complied with this section and who have become entitled to appraisal rights. The Court may require the stockholders who have demanded an appraisal for their shares and who hold stock represented by certificates to submit their certificates of stock to the Register in Chancery for notation thereon of the pendency of the appraisal proceedings; and if any stockholder fails to comply with such direction, the Court may dismiss the proceedings as to such stockholder.

(h)     After determining the stockholders entitled to an appraisal, the Court shall appraise the shares, determining their fair value exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with a fair rate of interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors. In determining the fair rate of interest, the Court may consider all relevant factors, including the rate of interest which the surviving or resulting corporation would have had to pay to borrow money during the pendency of the proceeding. Upon application by the surviving or resulting corporation or by any stockholder entitled to participate in the appraisal proceeding, the Court may, in its discretion, permit discovery or other pretrial proceedings and may proceed to trial upon the appraisal prior to the final determination of the stockholder entitled to an appraisal. Any stockholder whose name appears on the list filed by the surviving or resulting corporation pursuant to subsection (f) of this section and who has submitted such stockholder's certificates of stock to the Register in Chancery, if such is required, may participate fully in all proceedings until it is finally determined that such stockholder is not entitled to appraisal rights under this section.

(i)     The Court shall direct the payment of the fair value of the shares, together with interest, if any, by the surviving or resulting corporation to the stockholders entitled thereto. Interest may be simple or compound, as the Court may direct. Payment shall be so made to each stockholder, in the case of holders of uncertificated stock forthwith, and the case of holders of shares represented by certificates upon the surrender to the corporation of the certificates representing such stock. The Court's decree may be enforced as other decrees in the Court of Chancery may be enforced, whether such surviving or resulting corporation be a corporation of this State or of any state.

(j)     The costs of the proceeding may be determined by the Court and taxed upon the parties as the Court deems equitable in the circumstances. Upon application of a stockholder, the Court may order all or a portion of the expenses incurred by any stockholder in connection with the appraisal proceeding, including, without limitation, reasonable attorney's fees and the fees and expenses of experts, to be charged pro rata against the value of all the shares entitled to an appraisal.

(k)     From and after the effective date of the merger or consolidation, no stockholder who has demanded appraisal rights as provided in subsection (d) of this section shall be entitled to vote such stock for any purpose or to receive payment of dividends or other distributions on the stock (except dividends or other distributions payable to stockholders of record at a date which is prior to the effective date of the merger or consolidation); provided, however, that if no petition for an appraisal shall be filed within the time provided in subsection (e) of this section, or if such stockholder shall deliver to the surviving or resulting corporation a written withdrawal of such stockholder's demand for an appraisal and an acceptance of the merger or consolidation, either within 60 days after the effective date of the merger or consolidation as provided in subsection (e) of this section or thereafter with the written approval of the corporation, then the right of such stockholder to an appraisal shall cease. Notwithstanding the foregoing, no appraisal proceeding in the Court of Chancery shall be dismissed as to any stockholder without the approval of the Court, and such approval may be conditioned upon such terms as the Court deems just.

(l)     The shares of the surviving or resulting corporation to which the shares of such objecting stockholders would have been converted had they assented to the merger or consolidation shall have the status of authorized and unissued shares of the surviving or resulting corporation.

EXHIBIT D PAGE 78

B-3

EXHIBIT D PAGE 79

**Exhibit Index**

EXHIBIT NO.    DESCRIPTION

(a)(1)(i)    Offer to Purchase, dated March 19, 2007 (incorporated by reference to Exhibit (a)(1)(i) of the Schedule TO, filed with the SEC on March 19, 2007)

(a)(1)(ii)    Letter of Transmittal (incorporated by reference to Exhibit (a)(1)(ii) of the Schedule TO, filed with the SEC on March 19, 2007)

(a)(1)(iii)    Notice of Guaranteed Delivery (incorporated by reference to Exhibit (a)(1)(iii) of the Schedule TO, filed with the SEC on March 19, 2007)

(a)(1)(iv)    Letter to Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees (incorporated by reference to Exhibit (a)(1)(iv) of the Schedule TO, filed with the SEC on March 19, 2007)

(a)(1)(v)    Letter to Clients for use by Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees (incorporated by reference to Exhibit (a)(1)(v) of the Schedule TO, filed with the SEC on March 19, 2007)

(a)(1)(vi)    Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9 (incorporated by reference to Exhibit (a)(1)(vi) of the Schedule TO, filed with the SEC on March 19, 2007)

(a)(1)(vii)    Letter to Stockholders of Crowley Maritime Corporation from Crowley Newco Corporation (incorporated by reference to Exhibit (a)(1)(vii) of the Schedule TO, filed with the SEC on March 19, 2007)

(a)(1)(viii)    Opinion of JMP Securities LLC, dated March 14, 2007 (included as Annex A to this Schedule 14D-9)

(a)(1)(ix)    Presentation to the Special Committee of the Board of Directors of Crowley Maritime Corporation by JMP Securities LLC, dated March 14, 2007 (filed herewith electronically)

(e)(i)    Contribution Agreement by and among Crowley Newco Corporation and Christine S. Crowley, Crowley Asset Management, L.P., The Non-Exempt Trust FBO Adrienne Crowley, The Thomas B. Crowley Jr. Separate Property Trust, The Annual Exclusion Trust FBO Adrienne Crowley, The Crowley Family Generation Skipping Trust U/T/A Dtd. 12/04/91, and The Marital Trust Under The Thomas B. Crowley Trust, dated March 16, 2007 (incorporated by reference to Exhibit (d)(ii) of the Schedule TO, filed with the SEC on March 19, 2007)

(e)(ii)    Contribution Agreement by and among Crowley Newco Corporation and the Crowley Maritime Corporation Retirement Stock Plan, the Crowley Maritime Corporation Stock Savings Plan and the Crowley Maritime Corporation Employee Stock Ownership Plan, dated March 16, 2007 (incorporated by reference to Exhibit (d)(iii) of the Schedule TO, filed with the SEC on March 19, 2007)

(e)(iii)(A)    Second Amendment to Split Dollar Life Insurance Agreement between Crowley Maritime Corporation and Thomas B. Crowley, Jr., as Trustee of the Thomas B. Crowley, Jr. Revocable Trust u/t/a dtd. July 1, 1998 by and between Thomas B. Crowley, Jr., as trustor and as trustee, dated as of July 20, 1998 (incorporated by reference to Exhibit No. 10.8 to the Company's Registration Statement on Form 10-12G filed on April 1, 2002, File No. 000-49717)

(e)(iii)(B)    Split Dollar Life Insurance Agreement (1035 Exchange Policy) between Crowley Maritime Corporation and Thomas B. Crowley, Jr. dated as of July 20, 1998 (incorporated by reference to Exhibit No. 10.9 to the

Company's Registration Statement on Form 10-12G filed on April 1, 2002, File No. 000-49717)

(e)(iii)(C)     Split Dollar Life Insurance Agreement (New Policies) between Crowley Maritime Corporation and Thomas B. Crowley, Jr. dated as of July 20, 1998 (incorporated by reference to Exhibit No. 10.10 to the Company's Registration Statement on Form 10-12G filed on April 1, 2002, File No. 000-49717)

(e)(iii)(D)     Split Dollar Life Insurance Agreement between Crowley Maritime Corporation, Thomas B. Crowley, Jr. and Christine S. Crowley, as Distributing Trustee of the 1998 Crowley Family Generation — Skipping Trust u/t/d dtd/ November 12, 1998 by and between Thomas B. Crowley, Jr., as trustor and as trustee, dated as of November 24, 1998 (incorporated by reference to Exhibit No. 10.11 to the Company's Registration Statement on Form 10-12G filed on April 1, 2002, File No. 000-49717)

(e)(iv)     Settlement Agreement, dated as of December 23, 2003, between Crowley Maritime Corporation and Thomas B. Crowley, Jr. (incorporated by reference to Exhibit No. 10.14 to the Company's Form 10-K Annual Report for the fiscal year ended December 31, 2003, File No. 000-49717)

(e)(v)     Agreement for Contract Services between Crowley Maritime Corporation and William P. Verdon (incorporated by reference to Exhibit No. 10.1 to the Company's Form 10-K Annual Report for the fiscal year ended December 31, 2005, File No. 000-49717)

(e)(vi)     Amendment No.8 to the Crowley Maritime Corporation Retirement Stock Plan, effective as of March 16, 2007 (incorporated by reference to Exhibit 99.2 to the Company's Form 8-K, filed with the SEC on March 19, 2007)

(e)(vii)     Crowley Maritime Corporation Employee Stock Ownership Plan, Amendment No. 3 to the 2005 Plan, effective as of March 16, 2007 (incorporated by reference to Exhibit 99.4 to the Company's Form 8-K, filed with the SEC on March 19, 2007)

(e)(viii)     Amendment No. 3 to the Crowley Maritime Corporation Stock Savings Plan, effective as of March 16, 2007 (incorporated by reference to Exhibit 99.3 to the Company's Form 8-K, filed with the SEC on March 19, 2007)

(e)(ix)     Stipulation and Agreement of Compromise, Settlement, and Release, dated March 16, 2007, Franklin Balance Sheet Investment Fund v. Crowley, Civil Action No. 888-N (incorporated by reference to Exhibit 99.1 to the Company's Form 8-K, filed with the SEC on March 19, 2007)

EXHIBIT D PAGE 81

# Exhibit E

*PURSUANT TO LOCAL RULE 3-4(a),*
*SEE SIGNATURE PAGE FOR*
*LIST OF PARTIES AND COUNSEL*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| CROWLEY MARITIME CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>FEDERAL INSURANCE COMPANY; TWIN CITY FIRE INSURANCE COMPANY; and RLI INSURANCE COMPANY,<br><br>Defendants. | Case No. CV-08-00830 SI<br>**[Hon. Susan Illston]**<br><br>**JOINT CASE MANAGEMENT STATEMENT AND RULE 26(f) REPORT**<br><br>**Action Filed: January 7, 2008**<br>**Removal Date: February 6, 2008**<br>**Trial Date:    None Set** |

**JOINT CASE MANAGEMENT STATEMENT**

In accordance with the Court's February 6, 2008 Order, Plaintiff Crowley Maritime Corporation ("CMC") and Defendants Federal Insurance Company ("Federal"), Twin City Fire Insurance Company ("Twin City"), and RLI Insurance Company ("RLI") (the "Parties") hereby jointly submit this statement pursuant to Civil Local Rule 16-9 and Rules 16 and 26(f) of the Federal Rules of Civil Procedure.

1.    Jurisdiction and Service

The Court has original jurisdiction here pursuant to 28 U.S.C. § 1332 because the Parties are citizens of different states and the amount in controversy exceeds $75,000,

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

EXHIBIT *E* PAGE *82*

1  exclusive of interest and costs, in light of the amounts which CMC is seeking.  No issues exist

2  regarding personal jurisdiction or venue.  CMC has effected service on Federal, Twin City and

3  RLI (the "Insurers").

4      2.    Facts[1]

5          a.    CMC's Statement of Facts

6          (1)    The Underlying Action

7      This case arises from a class action/shareholder derivative action filed in the Court of

8  Chancery in the State of Delaware (the "Franklin Action") against CMC and certain members

9  of its board of directors.  The Franklin Action challenged the propriety of certain expenditures

10  by CMC for life insurance policies which allegedly were intended to benefit CMC's

11  controlling shareholder, Thomas B. Crowley, Jr.  Breaches of fiduciary duties were alleged,

12  and damages and other relief were sought.

13      CMC requested coverage for the Franklin Action under three directors and officers

14  liability insurance policies (a primary policy, first level excess policy, and second level excess

15  policy) issued by Federal, Twin City and RLI, respectively.  The policy limits are $10 million,

16  $10 million, and $5 million, respectively, subject to a single $500,000 retention.  The claims

17  asserted in the Franklin Action fell directly within the coverage of the Insurer's three policies.

18      CMC notified the Insurers of the Franklin Action in December 2004, and shortly

19  thereafter Federal assigned an adjuster to monitor the claim.  Federal also approved CMC's

20  retention of Delaware counsel (the Morris, Nichols firm) to defend the suit.

21      None of the Insurers had any duty, under their policies, to provide a defense to the

22  Franklin Action, and none of the Insurers provided a defense.  In addition, each of the Insurers

23  fully reserved its rights to deny coverage.

24  / / /

25

26  [1]  This factual discussion is included solely for general background and is not intended to
constitute an admission of any fact or characterization of fact.  Discovery has not yet begun in
27  this case and the Parties reserve their rights accordingly.  Because the Parties were unable to
agree on a statement of facts, two separate statements are being provided -- the first by CMC,
28  and the second by the Insurers.  The same is true with respect to the Parties' specification of
the factual and legal issues presented.

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

-2-


EXHIBIT E PAGE 83

1    (2)    The Consent-To-Settlement Policy Provisions

2    The Federal policy includes provisions that purport to require CMC to obtain Federal's

3    prior written consent before settling any claim, and to require CMC to consult with Federal

4    before negotiating any settlement, but those provisions are not enforceable under applicable

5    California law where -- as here -- the insurer had no duty to defend, did not defend, and

6    reserved its right to deny coverage. That is because an insurer's right to control the defense

7    and settlement of an action against its insured is an adjunct to the insurer's duty to defend, and

8    only where the insurer provides a defense and no conflict of interest exists does the insurer

9    have the exclusive right to control defense and settlement. Such was not the case here, because

10    Federal did not defend and its reservation of rights created a conflict.

11    Under applicable California law, CMC was not obligated to obtain the Insurers'

12    consent before negotiating with the Franklin Action plaintiffs and settling the case. Its only

13    obligations were to act in good faith in reaching a reasonable settlement, and to respond

14    reasonably to any requests by the Insurers for further information. CMC met those obligations.

15    (3)    The Proposed Settlement

16    In March 2007 CMC reached a tentative agreement to settle the Franklin Action on

17    favorable terms that involved both a settlement of the plaintiffs' claims and the purchase of the

18    plaintiffs' CMC shares through a tender offer, which was to be followed by a merger. The

19    tentative settlement agreement was subject to certain conditions. One such condition was that

20    if the proposed tender offer or the subsequent merger "cannot be consummated for any reason,

21    then the Settlement proposed herein shall be of no further force or effect and the Settlement

22    and any amendment thereto and all orders relating to it shall be null and void and of no force

23    and effect."

24    Furthermore, the proposed tender offer was to include a number of conditions,

25    including the conditions (a) that the Delaware court's approval of the proposed settlement had

26    to be obtained, and (b) that the CMC board of directors must not have determined to oppose

27    the offer or merger. Significantly, the CMC board of directors' discretion, in determining

28    whether to oppose the offer or merger, was not limited in any way. Thus, the board could, for

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

1   example, have decided to oppose the offer and merger if the Insurers had informed CMC that

2   they would not consent to the proposed settlement. In such event, CMC would have been

3   entitled to cancel the offer and merger, and the proposed settlement could have been scuttled.

4   Thus, the proposed settlement agreement provided that the effective date of the proposed

5   settlement would not occur until five days after the latter of (a) the consummation of the offer

6   and merger, or (b) the entry by the Delaware court of a final order and judgment approving the

7   settlement.

8          (4)    CMC Seeks The Insurers' Consent To A Reasonable Settlement

9          In March 2007, after reaching the tentative settlement with the Franklin Action

10  plaintiffs, CMC notified the Insurers and sought their consent to the proposed settlement.

11  CMC also notified the Insurers that a hearing had been set in the Delaware court for April 27,

12  2007 -- at which time court approval of the proposed settlement would be sought. On April 5,

13  2007 Federal's attorney Henry Nichols responded by telephone, advising that Federal "ha[d]

14  no problem with consenting" to the proposed settlement but wished to obtain additional

15  information relating to the proposed settlement.[2] The requested information was promptly

16  supplied by CMC, but no further response was ever received from Federal, and CMC never

17  received any response at all from either Twin City or RLI. The CMC board ultimately

18  determined that the proposed settlement was reasonable and in the best interests of the

19  Company, so CMC proceeded to complete the proposed settlement, which was thereafter

20  approved by the Delaware court as being "fair, reasonable and adequate and in the best

21  interests of the Company, its shareholders and the Class."

22         As part of the settlement, $17.625 million was paid to the plaintiffs for a release of their

23  claims. That was a reasonable amount, given the probability that the plaintiffs would have

24  recovered a greater amount had the action gone to trial. As a result, the Insurers should have

25  consented to the settlement -- whether or not they also reserved their rights to contest coverage.

26

27  _____

28  [2]   In their Statement of Facts, the Insurers claim that Federal "disputes CMC's characterization of this conversation," but no alternative characterization of the conversation is provided, nor is it disputed that the conversation occurred.

-4-

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

1   It also was agreed as part of the settlement that Crowley would pay, on behalf of the director

2   defendants, the plaintiffs' attorneys' fees and expenses in an amount to be determined by the

3   Delaware court. The court ultimately issued an order awarding the plaintiffs their attorneys'

4   fees and expenses in the amount of $4,219,458.26, and Crowley paid those fees and expenses

5   as ordered by the court. The court specifically concluded that this amount "represents a

6   reasonable attorney's fee under the circumstances of this case." The fee award amount does

7   not detract from the conclusion that the settlement was reasonable, since the plaintiffs likely

8   would have obtained a higher fee award in addition to their recoverable damages had there

9   been no settlement.

10      In determining whether the proposed settlement was reasonable and should be

11   consented to, the Insurers were obligated[3] to consider the amount proposed to be paid for a

12   release of the plaintiffs' claims, the likely extent of the plaintiffs' recoverable damages should

13   they prevail, and the probability that the plaintiffs would prevail. Under applicable California

14   law, the Insurers were not permitted to consider coverage issues. However, the Insurers failed

15   to conduct any reasonable investigation sufficient to enable them to determine whether the

16   proposed settlement was a reasonable one that ought to be consented to.

17      (5)    Federal Wrongly Invokes Its Policy's Consent Provisions

18      On June 14, 2007 -- after the settlement was finalized -- Federal took the position that

19   there was no coverage for the Franklin Action settlement because Crowley had not obtained

20   Federal's consent in writing before consummating it.[4]  Federal's argument is incorrect for three

21   separate and independent reasons.

22

23

---

24   [3] The Insurers' obligation to give good faith consideration to the proposed settlement, and not

25   to unreasonably withhold their consent, derived not only from the express provisions of the
     insurance policies involved, but also from the covenant of good faith and fair dealing that is

26   implied by law into every insurance contract.

27   [4]  Federal has never reimbursed CMC for any portion of the settlement, and has failed to
     reimburse almost all the defense costs incurred by CMC. However, without providing any

28   explanation or any supporting calculation, Federal did pay approximately $77,000 -- which
     amounted to a little more than 10% of CMC's defense costs.

-5-

EXHIBIT E PAGE 86

1    First, as discussed above, the Federal policy's consent provisions were rendered

2    inoperative (or waived or forfeited) under applicable California law by the circumstances that

3    Federal (a) had no duty to defend and did not defend the Franklin Action, and (b) reserved its

4    right to deny coverage.

5    Second, Federal's breach of the implied covenant freed Crowley from compliance with

6    the Federal policy's consent provisions. That is because an insurer cannot deprive the insured

7    of the benefits of the contract while, at the same time, insisting on the enforcement of its own

8    rights under the agreement. Federal breached the implied covenant by its failure to promptly

9    respond substantively in writing to Crowley's notice of the proposed settlement and request for

10   consent; by its deceptive conduct in misleading Crowley into believing that Federal "had no

11   problem with consenting" to the proposed settlement; by failing to warn Crowley that, if it

12   proceeded to consummate the proposed settlement, Federal would deny coverage; and by

13   waiting until after the settlement had been finalized to first raise the issue. Federal also

14   breached the implied covenant by failing to conduct an adequate investigation of the

15   reasonableness of the proposed settlement, by failing to give it good faith consideration, and --

16   ultimately -- by refusing to consent to the settlement and then denying coverage on that basis.

17   Federal failed to give as much consideration to Crowley's interests as it gave to its own.

18   Essentially, Federal treated the proposed settlement as nothing more than an opportunity to

19   avoid coverage.

20   Third, Federal's conduct gives rise to a waiver (or a forfeiture or estoppel) which

21   prevents Federal from enforcing the Federal policy's consent provisions.

22   (6)    CMC's Covered Loss Exceeds $22 Million

23   The attorney fees and expenses incurred by Crowley defending the Franklin Action

24   constitute a covered "Loss" as defined by the Federal policy. So, too, do the amounts paid to

25   settle that Action, since a covered "Loss" is defined as expressly including "settlements."

26   Those amounts also constitute covered losses under the Twin City and RLI policies, which

27   follow form with the Federal policy. Crowley incurred covered defense costs, in an amount to

28   be proven at trial, that exceed $600,000.00. The amount paid to settle the Franklin Action

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

-6-

EXHIBIT E  PAGE 87

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

1   includes the $17.625 million paid directly to the plaintiffs for a release of their claims, as well

2   as the $4,219,458.26 that was paid to their attorneys, for a total of $21,844,458.26.  Crowley

3   was obligated to, and did, pay the defense costs and settlement amounts on behalf of the

4   director defendants.  After deducting the $500,000.00 retention provided by the Federal policy,

5   Crowley's total covered loss exceeds $22 million.

6
7              (7)    The Federal Policy's "Illegal Profit" Exclusion Does Not Bar
                      Coverage For Any Portion Of The Settlement

8              The Insurers' contention that coverage is barred by Exclusions 7(c) or 8(a)(ii),

9   which bar coverage for the restitution of illegal profits obtained by insureds, is incorrect.

10  There is no basis for concluding that any insured person or organization gained any profit or

11  remuneration to which he or it was not legally entitled.  First, neither the terms of the

12  settlement approved by the Delaware court nor the court's opinion approving the settlement

13  determined in any way that any insured received any profit, remuneration or advantage to

14  which that insured was not legally entitled.  Second, the court did not determine (or suggest)

15  that the settlement payment represented a "return" to the Company of the amounts previously

16  paid for the split dollar policies.  The court never characterized, or treated, any portion of the

17  settlement as a recovery of money by or for the Company.

18             The damages sought in the underlying action consisted of "the premiums, costs and

19  expenses paid with respect to the Split-Dollar Agreements."  Plaintiffs' theory was that the

20  Company had wrongly paid to third parties, including insurers and attorneys, amounts (in the

21  form of premiums, costs and expenses) that benefited Mr. Crowley, since he was the

22  beneficiary of the life insurance policies at issue.  There was no allegation, or any evidence,

23  that any defendant other than Mr. Crowley was a beneficiary of the split dollar policies, or

24  otherwise received any "illegal profit" that ought to be restored to the Company.  The other

25  defendants were sued for alleged negligence and breach of fiduciary duty based on the

26

27

28

 EXHIBIT E PAGE 88

1    contention that they had wrongly approved the corporate expenditures involved in purchasing

2    the split dollar policies.[5]

3       Since there was no contention that the other defendants received an illegal profit, the

4    exclusions at issue do not bar coverage for that portion of the settlement which is allocable to

5    the release of claims against the defendants other than Mr. Crowley.[6]   That is because --

6    pursuant to Section 9(a) of the policy -- no facts pertaining to Mr. Crowley are imputed to any

7    other defendant for purposes of applying the subject exclusions. Thus, without conceding that

8    coverage for the portion of the settlement allocable to the release of claims against

9    Mr. Crowley is barred, the most that could be said is that resort must be had to the policy's

10    allocation clause to determine whether coverage is barred for any part of the settlement.

11       Section 17 governs the allocation of losses that are covered in part, and not covered in

12    part. Section 17(a), which applies to Securities Claims such as those that were settled in the

13    Franklin Action, states that if the insured "incur[s] both loss that is covered . . . and loss that is

14    not covered," then "such amount" shall be allocated "between covered Loss and non-covered

15    loss as follows: (i) The portion, if any, of such amount that is in part covered and in part not

16    covered under Insuring Clause 2 shall be allocated in its entirety to covered Loss . . . ." Under

17    §17(a), the entire settlement payment is allocated to covered Loss if part of it is covered and

18    part is not covered. As a result, coverage is not barred for any portion of the settlement.

19       (8)     The Settlement Payment And Fee Award Both Constitute Covered "Loss"

20

21    [5] Even if a director acted negligently (for example, by not making sure he was fully informed before authorizing the challenged transactions), that would not be sufficient to invoke the

22    illegal profit exclusion. *See Bistricer v. Federal Ins. Co.*, 2003 WL 22251290, *4 (S.D.N.Y. 2003) ("Since neither dishonesty nor personal profit are elements of the alleged negligence,

23    plaintiffs would be entitled to coverage with respect to this claim"); *see also Federal Ins. Co. v. Kozlowski*, 18 A.D.3d 33, 41 (N.Y.App.Div. 2005) (the "Supreme Court properly rejected

24    the applicability of the personal profit exclusion . . . [where] the indictment charges Kozlowski not only with crimes involving personal profit, but [also] those, such as making false entries to

25    facilitate loans for other Tyco employees, from which he did not directly profit").

26

27    [6] The settlement payment was undifferentiated -- the settlement agreement did not purport to allocate particular portions of the total amount paid to the release of claims against particular

28    defendants.

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

-8-

EXHIBIT E PAGE 89

1    The Insurers have advanced two arguments why the settlement costs supposedly do not

2    fall within the policy's definition of a covered loss. First, because they were paid by "Crowley

3    Newco Corp.," which allegedly is not an insured under the Federal policy. Second, because

4    they were "substantially equivalent to an increase in the consideration paid (or proposed to be

5    paid) by an [Insured] Organization in connection with its purchase of any securities." The first

6    argument contends that Crowley Newco Corp. ("CNC") is not the same as Crowley Maritime

7    Corporation ("CMC"); the second argument assumes that, in essence, it *is* the same -- that

8    CNC was a mere instrumentality or funding mechanism through which CMC met its

9    obligation, under the settlement, to purchase the plaintiffs' shares through a tender offer.

10    The Stipulation Re Settlement and Offer to Purchase show that CNC was, in fact, a

11    funding mechanism employed by the Company to effectuate the share purchase obligation

12    included in the settlement. The Stipulation provided that CNC would be formed by Mr.

13    Crowley (CMC's majority shareholder at all relevant times) and then, after it made a cash

14    tender offer -- that was to be funded by CMC -- to acquire plaintiffs' shares and completed the

15    acquisition of the shares, CNC would "merge with and into the Company, with the Company

16    continuing as the surviving Company following the merger." CNC never existed before the

17    settlement, was created solely to effectuate the settlement, then promptly merged into CMC

18    and ceased to exist as soon as the settlement was completed. The settlement was actually paid

19    by CMC, through CNC.

20    Thus, the Insurers' first argument -- that the settlement payment is not "Loss" because

21    CMC did not pay it -- is incorrect. The second argument -- that the settlement payment is not

22    "Loss" because it amounts to an increased price paid for securities -- is also incorrect. A

23    portion of the amounts paid to the plaintiffs represented consideration for the release of their

24    claims; that amount was a settlement payment, rather than a payment for securities. The other

25    amounts paid to the plaintiffs *did* represent a price paid for securities -- securities that were

26    purchased in order to facilitate a going-private transaction. However, Crowley is only

27    claiming coverage for that portion of the amounts paid to the plaintiffs that is attributable to the

28    release of their claims; it is *not* claiming the remaining portion, which is attributable to the

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

-9-

1 | going-private transaction. The former portion fits within the policy's definition of covered

2 | "Loss," which expressly includes "settlements."

3 |        Finally, the fee award also constitutes a covered loss. That was the Ninth Circuit's

4 | holding in *Safeway Stores, Inc. v. National Union Fire Ins. Co.*, 64 F.3d 1282 (1995). There,

5 | as here, a corporation that had defended and settled a shareholders class action against

6 | directors and officers sought reimbursement of settlement costs from its D&O carrier. As here,

7 | the settlement in *Safeway* obligated the company to pay the plaintiffs' attorneys' fees. The

8 | court ruled that, because "the settlement costs [including the attorneys' fees] were an actual

9 | out-of-pocket loss to Safeway incurred in defense of its directors and officers . . . the

10 | settlement costs, and the defense costs as well, are covered by the D&O policy." 64 F.3d at

11 | 1287. The same is true here.

12 |        b.    The Insurers' Statement of Facts

13 |        The Insurers object to CMC's inclusion of extended legal argument in CMC's

14 | "Statement of Facts," and have not attempted to respond in kind herein because to do so would

15 | be improper under local rules and the Court's Standing Orders. This case arises from a

16 | putative derivative and class action filed in Delaware Chancery Court (the "Franklin Action")

17 | against CMC's Chairman, CEO and controlling shareholder Thomas B. Crowley, Jr. ("Mr.

18 | Crowley") and other CMC directors. CMC was a nominal defendant. The plaintiffs in the

19 | Franklin Action sought to recover premiums and related expenses that CMC paid for life

20 | insurance policies which allegedly were intended to benefit Mr. Crowley and his family.

21 |        CMC requested coverage for the Franklin Action under a primary directors and officers

22 | liability insurance policy issued by Federal and excess policies issued by Twin City and RLI.

23 | The Federal policy has a $10 million limit of liability, subject to a $500,000 retention. The

24 | Twin City policy has a $10 million limit excess of the limit of the Federal Policy, and the RLI

25 | policy has a $5 million limit excess of the limits of the Federal and Twin City policies. The

26 | Twin City policy, subject to its terms and conditions, generally applies in conformance with

27 | the terms of the Federal policy. The RLI insurance contract follows form to, and affords

28 |

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

-10-

E  PAGE  91

1   coverage in conformance with, certain sections of the Federal policy, and also contains various

2   of its own provisions, terms and conditions.

3          The Federal policy provides that "[t]he Insureds agree not to settle or offer to settle any

4   **Claim** . . . without [Federal's] prior written consent," and that Federal "shall be consulted in

5   advance by the Insureds, regarding . . . the settlement of such **Claim**, including but not limited

6   to . . . negotiating any settlement."

7          Starting no later than December 2006, the Franklin Action parties held settlement

8   negotiations without notice to the Insurers. On March 19, 2007, without prior notice to or

9   consent by the Insurers, the Franklin Action parties executed a Stipulation and Agreement of

10  Compromise, Settlement and Release (the "Agreement"). The Agreement provided that,

11  subject to approval by the Delaware Court, Mr. Crowley would take CMC private by using a

12  separate entity, Crowley Newco Corp. ("Newco"), to make a cash tender offer for CMC's

13  outstanding public stock, including that held by the Franklin Action plaintiffs. The tender

14  offer would be followed by a short-form merger between Newco and CMC. The Agreement

15  also provided that CMC would pay the Franklin Action plaintiffs' attorneys' fees in an amount

16  to be determined by the Delaware Court.

17         By letter dated March 28, 2007, Richard Shively, counsel for CMC, requested the

18  Insurers' consent to a "proposed settlement." CMC alleges that Federal's claims examiner told

19  Mr. Shively in a subsequent telephone call that Federal "ha[d] no problem consenting" to the

20  "proposed settlement," subject to the receipt of certain additional information. Federal

21  disputes CMC's characterization of this conversation. CMC does not contend that any of the

22  Insurers gave written consent to the settlement.

23         On April 28, 2007, the Delaware Court approved the Agreement. Newco subsequently

24  completed the tender offer and short-form merger. CMC contends that $17.625 million of the

25  amounts paid in connection with the tender offer represented the cost of obtaining a release of

26  the claims asserted in the Franklin Action. The Insurers dispute CMC's contention. The

27  Insurers further contend that neither CMC nor any other Insured suffered any Loss (as defined

28  by the policy and the applicable law) in connection with the tender offer.

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

-11-


EXHIBIT *E* PAGE 92

1    On August 30, 2007, the Delaware Court awarded $4,219,458.26 in attorney's fees and

2    expenses to the Franklin Action plaintiffs. The court awarded fees based on a percentage of

3    the difference between the tender offer price for CMC stock and the trading price prior to

4    disclosure of the tender offer. The court found that CMC had agreed to pay the plaintiffs'

5    attorney's fees because doing so would allow CMC to complete the merger more easily.

6                c.    Factual Issues According to CMC

7         Disputed issues of fact include but are not limited to:

8         (1)    Was the settlement of the Franklin Action a reasonable settlement?

9         (2)    Did CMC pay the settlement?

10        (3)    Were the Franklin Action plaintiffs' "illegal profits" allegations asserted only

11   against Mr. Crowley (*i.e.*, did those allegations not extend to the other director and officer

12   defendants)?

13        (4)    Did Mr. Crowley receive an "illegal profit"?

14        (5)    Did any defendant other than Mr. Crowley receive an "illegal profit"?

15        (6)    Did the Insurers fail to perform an adequate investigation into the

16   reasonableness of the proposed settlement?

17        (7)    Did the Insurers fail to give good faith consideration to the proposed

18   settlement?

19        (8)    Do the Insurers have a pattern and practice of unreasonably withholding their

20   consent to proposed settlements in circumstances such as those present here (*i.e.*, where they

21   have no duty to defend, have not defended, and have reserved their right to deny coverage)?

22        (9)    Did the Insurers act with malice, fraud and/or oppression?

23                d.    Factual Issues According To The Insurers

24        Disputed issues of fact include but are not limited to:

25        **Consent issues:** (1) whether CMC settled, offered to settle, or entered into a legally

26   binding stipulation of settlement of the Franklin Action prior to notifying the Insurers or

27   seeking their consent; (2) whether CMC failed to consult the Insurers in advance with respect

28   to negotiating the settlement of the Franklin Action; (3) whether CMC's March 28, 2007 letter

-12-


EXHIBIT *E* PAGE 93

1  concerning the settlement of the Franklin Action contained false statements as to the terms or

2  status of the settlement or as to CMC's stated explanation for its delay in disclosing the

3  settlement to the Insurers.

4      **Loss issues:** (4) whether the Newco tender offer and merger included a release

5  payment; (5) whether the value of the CMC stock and other consideration that Newco received

6  through the tender offer was equal to or greater than the cost of the tender offer; (6) whether

7  any Insureds incurred any loss in connection with the tender offer; (7) whether any Insured

8  reaped any profits or benefits in connection with the tender offer; (8) whether CMC or any

9  Insured was legally obligated to pay any amount in connection with the tender offer; (9)

10  whether any amounts paid in connection with the settlement of the Franklin Action represented

11  the disgorgement or restitution of life insurance premiums or other benefits that Mr. Crowley

12  and his family were not entitled to receive or retain; (10) whether CMC agreed to pay the

13  attorney's fee award in order to facilitate completion of the tender offer; (11) whether CMC or

14  any Insured demanded any payment prior to the commencement of this litigation.

15      **Exclusion issues:**  (12) whether the Franklin Action was based on, arising from, or in

16  consequence of Mr. Crowley or other CMC directors having gained in fact any profit,

17  remuneration or advantage to which they were not legally entitled.

18      3.    Legal Issues

19          a.    Legal Issues According to CMC

20      Legal issues include but are not limited to:

21      (1)    Are the Insurers legally not entitled (because of waiver, estoppel, forfeiture,

22  etc.) to enforce the policy provisions which purport to require CMC to obtain prior consent

23  before negotiating or completing any settlement?

24      (2)    Would CMC have been legally entitled to cancel and abandon the proposed

25  settlement (and tender offer and merger) if the Insurers had promptly advised CMC that they

26  would not consent to the proposed settlement?

27      (3)    Do the amounts paid for a release of the Franklin Action plaintiffs' claims fall

28  within the Federal policy's definition of a covered "loss"?

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

-13-

1    (4)    What is the impact of the Federal policy's allocation clause?

2        b.    Legal Issues According To The Insurers

3    Legal issues include but are not limited to:

4    **Consent issues:** (1) whether CMC's failure to obtain the Insurers' prior written

5    consent to settlement bars coverage for any amounts incurred in connection with the settlement

6    of the Franklin Action; (2) whether CMC's failure to consult the Insurers in advance with

7    respect to settlement negotiation bars coverage for any amounts incurred in connection with

8    the settlement of the Franklin Action; (3) whether CMC's stated explanation in its March 28,

9    2007 letter for its delay in disclosing the settlement to the Insurers excused CMC's failure to

10    obtain the Insurers' prior written consent.

11    **Loss issues:** (4) whether amounts paid by a non-insured entity, Newco, constitute Loss

12    under the Policy; (5) whether amounts paid in exchange for corporate stock and other

13    consideration constitute Loss; (6) whether any payment in connection with the tender offer is

14    excluded from Loss under the Federal policy because it "represents or is substantially

15    equivalent to an increase in the consideration paid (or proposed to be paid) by an Organization

16    in connection with its purchase of any securities or assets"; (7) whether amounts representing

17    the disgorgement or restitution of amounts or benefits that Mr. Crowley and his family were

18    not entitled to receive or retain constitute Loss; (8) whether the amounts in question were paid

19    to resolve liability for an insured's willful acts under Cal. Ins. Code § 533 and the applicable

20    law; (9) whether the relief Franklin plaintiffs obtained pursuant to the settlement agreement is

21    something they sought, and could have obtained, by prevailing in the litigation; (10) whether

22    the fee award in the Franklin Action represented Loss that CMC was legally obligated to pay

23    on account of a Claim, or whether CMC voluntarily agreed to pay that award for its own

24    business purposes; (11) whether the plaintiffs in the Franklin Action would have been entitled

25    to the amount of fees awarded if they had prevailed in the litigation.

26    **Exclusion issues:** (12) whether coverage for the Franklin Action is barred by

27    Exclusions 7(c) or 8(a)(ii) of the Federal policy's Executive Liability and Entity Securities

28    Liability Coverage Section.

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

-14-



1    **Exhaustion issues (as to Twin City and RLI):** (13) whether the underlying limits of

2    their respective policies have been exhausted; (14) whether the amount of any covered portion

3    of the settlement exceeded the limit of liability and retention of the primary policy and, with

4    respect to RLI, the limit of liability of Twin City's policy.

5        4.    Motions

6        On April 14, 2008, the Court ruled on Twin City's and RLI's motions to dismiss. No

7    motions are presently pending.

8        Twin City anticipates filing a Rule 11 Motion and a motion to disqualify CMC's

9    counsel. Twin City also anticipates requesting leave of court to file an early Rule 56 motion

10   on limited issues, to be followed by a more comprehensive Rule 56 motion after sufficient

11   discovery, if necessary. The other Parties do not presently anticipate filing any motions in the

12   immediate future, but reserve their rights to do so, and expect to file Rule 56 motions after

13   sufficient discovery.

14       5.    Amendment of Pleadings

15       CMC filed a First Amended Complaint on April 18, 2008. Federal and Twin City filed

16   Answers to that Complaint and Twin City filed a counterclaim. CMC will file a reply to that

17   counterclaim. RLI will file its Answer on May 9, 2008. Based on the presently available

18   information, the Parties do not intend to file further amended pleadings. The Insurers propose

19   a deadline of September 30, 2008 for amending pleadings; CMC proposes that the Parties be

20   permitted to amend their pleadings only if good cause is shown.

21       6.    Evidence Preservation

22       At the Rule 26(f) meet-and-confer conducted on April 24, 2008, the parties affirmed

23   that all potentially relevant evidence shall be preserved.

24       7.    Disclosures

25       Pursuant to the Court's February 6, 2008 Order, FED. R. CIV. P. 26(a) disclosures

26   have been or will be completed no later than May 9, 2008.

27   / / /

28   / / /

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

-15-

EXHIBIT E PAGE 96

8.    Discovery

    a.    Discovery Taken To Date

None.

    b.    Scope of Anticipated Discovery

    One or more of the Parties expect to take discovery regarding CMC's requests for coverage and consent, the Insurers' response thereto, the events leading up to the Franklin Action, the events and claims at issue in that Action, the conduct and settlement of that Action, the tender offer and short form merger, and certain matters relating to these topics.  CMC also expects to take discovery regarding:  the Insurers' investigation of the reasonableness of the proposed settlement; whether the Insurers gave good faith consideration to the proposed settlement; whether the Insurers have a pattern and practice of withholding consent to proposed settlements by their insureds under circumstances where the Insurers have no duty to defend, do not defend, and have reserved their rights to deny coverage; and whether the Insurers acted with malice, fraud and/or oppression.

    c.    Proposed Limitations / Modification of Discovery Rules

    The Insurers request that 30 depositions be allowed per side without leave of Court.  CMC believes that no more than 10 depositions for each side are warranted absent a showing of good cause.

    d.    Proposed Discovery Plan

    The Parties propose a fact discovery deadline of February 16, 2009.  The Parties do not presently anticipate a need to conduct discovery in phases.  Twin City requests the Court to appoint a special master to sit in on attorney depositions that Twin City will notice; CMC believes no such order should be issued absent a showing of good cause.

9.    Class Actions

Not applicable.

10.    Related Cases

    The Parties are not aware of any related cases or proceedings pending before another judge of this court, or before another court or administrative body.

-16-

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor ~ San Francisco, CA 94111

EXHIBIT *E*  PAGE 97

1    11.    Relief

2        CMC's First Amended Complaint seeks the following types of relief against Federal:

3    compensatory damages, exemplary damages, attorneys' fees and costs in the present action,

4    and prejudgment interest.  CMC also seeks declaratory relief against Twin City and RLI.

5    CMC asserts that a total of over $22 million is covered under the Insurers' policies, including

6    $17.625 million that CMC asserts it paid to the plaintiffs in the Franklin Action for a release of

7    their claims, $4,219,458.26 that CMC asserts it paid to the Franklin Action plaintiffs' counsel

8    in fees and costs as part of the settlement, and the costs (including attorneys' fees) incurred by

9    CMC defending the Franklin Action.

10    12.    Settlement and ADR

11        Settlement does not appear likely before the end of discovery, but the Parties are

12    willing to explore a possible amicable resolution.  To this end, the Parties filed an ADR

13    Certification on April 25, 2008, agreeing to hold a private mediation with a JAMS neutral

14    before January 5, 2009.

15    13.    Magistrate Judge

16        The Parties do not consent to proceed before a magistrate judge.

17    14.    Other References

18        The Parties agree that the case is not suitable for reference to binding arbitration, a

19    special master, or the Judicial Panel on Multidistrict Litigation.

20    15.    Narrowing of Issues

21        One or more of the Insurers believe that the issues in this litigation can be greatly

22    narrowed or entirely resolved if the Court permits one or more of the Insurers to file early

23    summary judgment motions on limited issues, followed by more comprehensive motions if

24    necessary following sufficient discovery.  CMC expects that the coverage issues raised by the

25    Insurers may be susceptible to being resolved in CMC's favor by way of summary judgment.

26    16.    Expedited Schedule

27        This case is not suitable for expedited handling.

28    / / /

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

-17-

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

1    17.    Scheduling

2    The Parties propose the following deadlines:  (a) February 16, 2009 for fact discovery;

3    (b) March 3, 2009 for initial expert disclosures and reports; (c) March 24, 2009 for rebuttal

4    expert disclosures and reports; (d) April 9, 2009 for expert depositions; (e) May 1, 2009 for

5    filing dispositive motions; (f) June 1, 2009 for filing oppositions to dispositive motions; and

6    (g) June 15, 2009 for filing replies in support of dispositive motions.  The Parties anticipate

7    that the case should be ready to proceed to trial on September 14, 2009, with a final pretrial

8    conference to be scheduled accordingly.

9    18.    Trial

10   The case will be tried to a jury.  The Insurers will request the bifurcation of trial on

11   CMC's first and third counts (breach of contract and declaratory relief) from trial of CMC's

12   second count (bad faith).  The Parties expect that a trial, if necessary, will run between two and

13   three weeks.

14   19.    Disclosure of Non-Party Interested Entities or Persons

15   Federal filed its Certification of Interested Entities or Persons on February 6, 2008.

16   That Certification provides that Federal is a wholly owned subsidiary of The Chubb

17   Corporation, that no other publicly held corporation owns 10% or more of the stock of Federal,

18   that The Chubb Corporation is a holding company whose common stock is listed and

19   principally traded on the New York Stock Exchange under the trading symbol "CB," and that

20   no publicly held entity owns 10% or more of the common stock of The Chubb Corporation.

21   Twin City filed its Certification of Interested Entities or Persons on February 6, 2008.

22   That Certification provides that Twin City is a wholly owned subsidiary of Hartford Fire

23   Insurance Company, that no other publicly held corporation owns 10% or more of the stock of

24   Twin City, that Hartford Fire Insurance Company is a wholly owned subsidiary of the Hartford

25   Financial Services Group, Inc., that no other publicly held corporation owns 10% or more of

26   the stock of Hartford Fire Insurance Company, that Hartford Financial Services Group, Inc. is

27   a publicly traded corporation whose common stock is listed and principally traded on the New

28

-18-

1    York Stock Exchange under the trading symbol "HIG," and that no publicly held entity owns

2    10% or more of the common stock of Hartford Financial Services Group, Inc.

3        RLI filed its Certification of Interested Entities or Persons on April 24, 2008. That

4    Certification provides that RLI is a wholly owned subsidiary of RLI Corp., that no other

5    publicly held corporation owns 10% or more of the stock of RLI, that RLI Corp. is a publicly

6    traded corporation whose common stock is listed and principally traded on the New York

7    Stock Exchange under the trading symbol "RLI," and that no publicly held entity owns 10% or

8    more of the common stock of RLI Corp.

9        CMC filed its Certification of Interested Entities or Persons on March 7, 2008. That

10    Certification provides that CMC is a wholly-owned subsidiary of Crowley Holdings, Inc. No

11    publicly held corporation owns 10% or more of the stock of Crowley. Crowley Holdings, Inc.

12    is a closely held Delaware corporation. No publicly held entity owns 10% or more of its

13    common stock.

14        20.    Other Matters

15        The Parties are not presently aware of any other matters that may facilitate the just,

16    speedy and inexpensive disposition of this matter.

17

18    Date: May 12, 2008        Respectfully submitted,

19

20        /s/ Richard D. Shively
       PHILIP L. PILLSBURY, JR. (State Bar No. 72261)

21        RICHARD D. SHIVELY (State Bar No. 104895)
       ERIC K. LARSON (State Bar No. 142791)

22        **PILLSBURY & LEVINSON, LLP**
       The Transamerica Pyramid

23        600 Montgomery Street, 31st Floor
       San Francisco, California 94111

24        Telephone:    (415) 433-8000
       Facsimile:     (415) 433-4816

25        E-Mail:       ppillsbury@pillsburylevinson.com
                     rshively@pillsburylevinson.com

26                      rlarson@pillsburylevinson.com
       Attorneys for Plaintiff

27        CROWLEY MARITIME CORPORATION

28

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

-19-

1

2      /s/ Joseph A. Bailey III, Esq.
       G. EDWARD RUDLOFF, JR. (State Bar No. 56058)
3      KEVIN A. NORRIS (State Bar No. 206022)
       **RUDLOFF WOOD & BARROWS LLP**
4      2000 Powell Street, Suite 900
       Emeryville, California  94608
5      Telephone:  (510) 740-1500
       Facsimile:  (510) 740-1501
6      E-Mail:        erudloff@rwblaw.com
                      knorris@rwblaw.com
7
       David Newmann, Esq.  (admitted *pro hac vice*)
8      Joseph A. Bailey III, Esq.  (admitted *pro hac vice*)
       **HOGAN & HARTSON LLP**
9      555 Thirteenth Street NW
       Washington DC 20004
10     Telephone:       (202) 637-5600
       Facsimile:       (202) 637-5910
11     E-Mail:          dnewmann@hhlaw.com
                        jabaileyIII@hhlaw.com
12     Attorneys for Defendant
       FEDERAL INSURANCE COMPANY
13

14

15      /s/  Michael F. Perlis
       MICHAEL F. PERLIS (State Bar No. 95992)
16     RICHARD R. JOHNSON (State Bar No. 198117)
       RACHAEL SHOOK (State Bar No. 251628)
17     **STROOCK & STROOCK & LAVAN LLP**
       2029 Century Park East, Suite 1800
18     Los Angeles, California  90067-3086
       Telephone:  (310) 556-5800
19     Facsimile:  (310) 556-5959
       E-Mail:        mperlis@stroock.com
20                    rjohnson@stroock.com
                      rshook@stroock.com
21     Attorneys for Defendant
       TWIN CITY FIRE INSURANCE COMPANY
22

23

24

25

26

27

28

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

1

2    _____/s/ Karen G. Levy_____
     WILLIAM C. MORISON (State Bar No. 99981)
3    MICHAEL D. PROUGH (State Bar No. 168741)
     KAREN G. LEVY (State Bar No. 213172)
4    **MORISON ANSA HOLDEN ASSUNCAO & PROUGH LLP**
     500 Ygnacio Valley Rd., Suite 450
5    Walnut Creek, California 94596
     Telephone: (925) 937-9990
6    Facsimile: (925) 937-3272
     E-Mail:      William.Morison@morisonansa.com
7                 Michael.Prough@morisonansa.com
                  Karen.Levy@morisonansa.com
8    Attorneys for Defendant
     RLI INSURANCE COMPANY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-21-

EXHIBIT E PAGE 102

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1

### CERTIFICATION

2  I hereby certify that, on June 13, 2008, a copy of the foregoing *DECLARATION OF MICHAEL*

3  *F. PERLIS IN SUPPORT OF MOTION OF DEFENDANT AND COUNTERCLAIMANT*

4  *TWIN CITY FIRE INSURANCE COMPANY'S MOTION TO DISQUALIFY RICHARD*

5  *SHIVELY AND PHILIP PILLSBURY, OF THE FIRM OF PILLSBURY & LEVINSON, LLP,*

6  *AS TRIAL COUNSEL FOR PLAINTIFF* was filed electronically and served by mail on anyone

7  unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by

8  operation of the Court's electronic filing system or by mail to anyone unable to accept electronic

9  filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the

10  Court's EM/ECF System.

11

12  By:    /s/ Michael F. Perlis
       Michael F. Perlis

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  *103*

28
DECLARATION OF MICHAEL F. PERLIS IN SUPPORT OF MOTION OF DEFENDANT
AND COUNTERCLAIMANT TWIN CITY FIRE INSURANCE COMPANY'S MOTION TO
DISQUALIFY RICHARD SHIVELY AND PHILIP PILLSBURY, OF THE LAW FIRM OF
PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL - Case No. 08-00830 SI

1  STROOCK & STROOCK & LAVAN LLP
2  MICHAEL F. PERLIS (State Bar No. 95992)
   mperlis@stroock.com
3  RICHARD R. JOHNSON (State Bar No. 198117)
   rjohnson@stroock.com
4  RACHAEL SHOOK (State Bar No. 251628)
   rshook@stroock.com
5  2029 Century Park East, Suite 1800
   Los Angeles, California  90067-3086
6  Telephone: 310-556-5800
7  Facsimile: 310-556-5959
   lacalendar@stroock.com
8

9  Attorneys for Defendant and Counterclaimant
     TWIN CITY FIRE INSURANCE COMPANY

10            **UNITED STATES DISTRICT COURT**

11           **NORTHERN DISTRICT OF CALIFORNIA**

12              **SAN FRANCISCO DIVISION**

13

14 CROWLEY MARITIME CORPORATION,          )  **Case No. CV-08-00830 SI**
                                           )
15          Plaintiff and Counterdefendant, )  [Hon. Susan Illston]
                                           )
16                                         )
      vs.                                  )  **[PROPOSED] ORDER**
17                                         )  **GRANTING DEFENDANT AND**
                                           )  **COUNTERCLAIMANT TWIN CITY**
18 FEDERAL INSURANCE COMPANY; TWIN         )  **FIRE INSURANCE COMPANY'S**
   CITY FIRE INSURANCE COMPANY; RLI        )  **MOTION TO DISQUALIFY RICHARD**
19 INSURANCE COMPANY; and DOES 1-20,       )  **SHIVELY AND PHILIP PILLSBURY, OF**
   inclusive,                              )  **THE FIRM OF PILLSBURY &**
20                                         )  **LEVINSON, LLP, AS TRIAL COUNSEL**
            Defendants.                    )  **FOR PLAINTIFF CROWLEY**
21                                         )  **MARITIME CORPORATION**
                                           )
22                                         )
                                           )  DATE:      August 22, 2008
23                                         )  TIME:      9:00 a.m.
                                           )  PLACE:     Courtroom 10, 19th Floor
24                                         )
                                           )  [Notice of Motion and Motion filed
25                                         )  concurrently]
                                           )
26 _____ )

27

28

---

[PROPOSED] ORDER GRANTING DEFENDANT AND COUNTERCLAIMANT TWIN CITY FIRE
INSURANCE COMPANY'S MOTION TO DISQUALIFY COUNSEL – Case No. CV-08-00830 SI

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

The Motion of Defendant and Counterclaimant Twin City Fire Insurance Company to Disqualify Richard Shively, Philip Pillsbury, of the Firm of Pillsbury & Levinson, LLP, as trial counsel for Plaintiff Crowley Maritime Corporation (the "Motion") came on regularly for hearing on August 22, 2008 at 9:00 a.m. in Courtroom 10 of the above-entitled Court, the Honorable Susan Illston presiding.

The matter having been fully argued and considered, IT IS HEREBY ORDERED that the Motion is GRANTED.

Richard D. Shively and Phillip L. Pillsbury, Jr. are hereby disqualified from: (1) arguing, advocating, or presenting any matters to the jury in this action; (2) taking or defending depositions in this action; (3) attending the trial in this action (other than for and during their own respective testimony) before other witness testimony is completed; and (4) any such other participation in this action as this Court, on a continuing basis, shall deem necessary to protect the integrity of this action and/or to prevent prejudice to any party.

IT IS SO ORDERED.

DATED: _____, 2008      _____
                                             The Honorable Susan Illston
                                             United States District Judge

Respectfully Submitted by,                    June 13, 2008

STROOCK & STROOCK & LAVAN LLP
MICHAEL F. PERLIS
RICHARD R. JOHNSON
RACHAEL SHOOK


By:    /s/ Michael F. Perlis_____
         Michael F. Perlis

       Attorneys for Defendant
       TWIN CITY FIRE INSURANCE
       COMPANY

**CERTIFICATION**

I hereby certify that, on June 13, 2008, a copy of the foregoing ***[PROPOSED] ORDER GRANTING DEFENDANT AND COUNTERCLAIMANT TWIN CITY FIRE INSURANCE COMPANY'S MOTION TO DISQUALIFY RICHARD SHIVELY AND PHILIP PILLSBURY, OF THE FIRM OF PILLSBURY & LEVINSON, LLP, AS TRIAL COUNSEL FOR PLAINTIFF CROWLEY MARITIME CORPORATION*** was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's EM/ECF System.

By:   /s/ Michael F. Perlis
      Michael F. Perlis

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

[PROPOSED] ORDER GRANTING DEFENDANT AND COUNTERCLAIMANT TWIN CITY FIRE INSURANCE COMPANY'S MOTION TO DISQUALIFY COUNSEL – Case No. CV-08-00830 SI