1  Philip L. Pillsbury, Jr. (SBN 72261)
2  Richard D. Shively (SBN 104895)
   PILLSBURY & LEVINSON, LLP
3  The Transamerica Pyramid
4  600 Montgomery Street, 31st Floor
   San Francisco, CA 94111
5  Telephone: (415) 433-8000
   Facsimile: (415) 433-4816
6  Email: ppillsbury@pillsburylevinson.com
7         rshively@pillsburylevinson.com

8  David B. Goodwin (SBN 104469)
9  Deepa Varadarajan (SBN 250845)
   COVINGTON & BURLING LLP
10 One Front Street, 35th Floor
   San Francisco California 94111-5356
11 Telephone: (415) 591-7074
12 Facsimile: (415) 955-6574
   Email: DGoodwin@cov.com
13        Dvaradarajan@cov.com

14
   Attorneys for Plaintiff
15 CROWLEY MARITIME CORPORATION

16
           UNITED STATES DISTRICT COURT
17 NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

18

19 CROWLEY MARITIME                    )  Case No. CV-08-00830 SI
20 CORPORATION,                        )  [Hon. Susan Illston]
                                       )
21         Plaintiff,                  )  DECLARATION OF JON E.
                                       )  ABRAMCZYK IN OPPOSITION TO
22    vs.                             )  MOTION BY TWIN CITY AND
                                       )  FEDERAL TO DISQUALIFY
23 FEDERAL INSURANCE COMPANY;          )  CROWLEY'S COUNSEL OF
24 TWIN CITY FIRE INSURANCE            )  RECORD
   COMPANY; RLI INSURANCE              )
25 COMPANY; and DOES 1-20, inclusive,  )  Date:    August 22, 2008
                                       )  Time:    9:00 a.m.
26         Defendants.                 )  Place:   Courtroom 10
                                       )
27                                     )
28                                     )

*(left margin, vertical)* PILLSBURY & LEVINSON, LLP / The Transamerica Pyramid / 600 Montgomery Street, 31st Floor - San Francisco, CA 94111

1

Action Filed:    **January 7, 2008**
Removal Date:  **February 6, 2008**
Trial Date:    **September 14, 2009**

I, Jon E. Abramczyk, declare as follows:

    1.    I am an attorney admitted to practice before all the courts of the State of Delaware and the Supreme Court of the United States. I am a partner in the Delaware firm Morris, Nichols, Arsht & Tunnell LLP. I was lead defense counsel for all defendants, including Crowley Maritime Corporation ("Crowley" or the "Company"), in the underlying Franklin Fund Action.[1] The statements in this Declaration are made on the basis of my own personal knowledge. I affirm that the statements made herein are true and correct. This Declaration is submitted in conjunction with Crowley's opposition to the motion, by defendants Twin City Fire Insurance Company ("Twin City") and Federal Insurance Company ("Federal") (together, collectively, with defendant RLI Insurance Company, the "Insurers"), to disqualify Crowley's attorneys of record, Philip L. Pillsbury, Jr. and Richard D. Shively.

    2.    The Franklin Fund Action was a class action/shareholder derivative action filed in the Delaware Court of Chancery against Crowley and several members of its Board of Directors. The Action challenged the propriety of "split-dollar" life insurance policies that were approved by the Crowley Board of Directors in 1992 and 1998. The Action alleged that those directors' approval of the policies breached their fiduciary duties, and sought damages. Attached as **Exhibit A** is the amended complaint, which was the operative pleading at the time the Franklin Fund Action was settled and dismissed last year.

    3.    The Company's President, Chief Executive Officer and controlling shareholder, Thomas B. Crowley, Jr. ("Mr. Crowley"), was the owner and a passive

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

---

[1] *Franklin Balance Sheet Investment Fund et al. v. Thomas B. Crowley, Jr. et al.*, Civil Action No. 888-VCP, Delaware Chancery Court for New Castle County (the "Franklin Fund Action," the "Action" or the "underlying action").

1    beneficiary of the challenged split-dollar life insurance policies.  Since no one ever

2    called upon the policies to pay any benefits and no benefits were ever paid, the amounts

3    at issue in the Action were the Company's expenditures in connection with the

4    maintenance of the split-dollar insurance program.

5         4.    Specifically, the damages sought in the underlying action consisted of the

6    premiums, interest, costs and expenses (including attorneys' fees) paid by the Company

7    in connection with the split-dollar life insurance policies and certain related split-dollar

8    agreements.

9    **A.    The Proposed Settlement Of The Underlying Action**

10        5.    In December 2006 and the first quarter of 2007, the parties discussed

11   whether the Action could be settled in conjunction with a possible buyout of the

12   minority shareholders' interest in the Company.  In March 2007 the parties stipulated to

13   a proposed structure for a settlement that was subject to a number of significant

14   conditions, including the Court of Chancery's review of the notice to the class of

15   stockholders and, later, the Court's review and approval of any settlement following a

16   hearing on the proposed settlement.  The purchase of the minority stockholders' shares

17   was to be accomplished through a tender offer that was to be immediately followed by

18   a short form merger.  Attached as **Exhibit B** is the Stipulation and Agreement of

19   Compromise, Settlement and Release (the "Stipulation") that was entered into on

20   March 19, 2007, which sets forth the terms to be proposed, to the class and to the court,

21   for settling the Franklin Fund Action and completing the tender offer.

22        6.    The Crowley Board of Directors ultimately determined that the proposed

23   settlement was reasonable and in the best interests of the Company, so Crowley

24   proceeded to obtain the Court of Chancery's approval to notify the stockholders of the

25   terms of the proposed settlement, including its conditions and the date on which a

26   hearing would be held to consider any objections to the proposed settlement.

27   Following notice to the class and a hearing, the Delaware Court of Chancery approved

28

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

DECLARATION OF JON E. ABRAMCZYK OPPOSING MOTION TO DISQUALIFY          Case No. CV-08-00830 SI

the settlement as being "fair, reasonable and adequate and in the best interests of the Company, its shareholders and the Class."[2] Ex. C [Order and Final Judgment] at p. 3, ¶ 6. The court reserved decision on the attorneys' fees to be awarded to class counsel.

7.    As is customary in the settlement of class actions, the Company agreed, as part of the proposed settlement, that it would pay, on behalf of the director and officer defendants, the plaintiffs' attorneys' fees and expenses in an amount to be determined by the Delaware court. Ex. B [Stipulation] at pp. 9-10, ¶6. The court ultimately issued an order awarding the plaintiffs fees and expenses in the amount of $4,219,458.26, and Crowley paid the award as ordered by the court.[3] Ex. D [Fee Order] at p. 35. The Delaware Court of Chancery calculated that award by granting plaintiffs' counsel 15% of "the portion of the benefit fairly attributable to the total damages alleged in the Complaint, which sought a total of approximately $23,500,000" plus 5% of the remaining benefit to plaintiffs under the settlement, which the court calculated as amounting to an additional $13,744,620. In awarding fees and expenses of $4,219,458.26 to plaintiffs' counsel, the Court of Chancery specifically concluded that this amount "represents a reasonable attorney's fee under the circumstances of this case." *Id.* at p. 32.

**B.    The Insurers Failed To Investigate The Reasonableness Of The Proposed Settlement**

8.    Neither before nor after the Insurers were informed -- in March 2007 -- about the structure of the proposed settlement with the class, did any representative of any of the Insurers contact me or anyone else at my firm to ask any of the following questions: (a) how much was proposed to be paid, as part of the proposed settlement,

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

---

[2]    A copy of the Order and Final Judgment of the Delaware Court of Chancery is attached as **Exhibit C**.

[3]    Attached as **Exhibit D** is the Delaware court's fee award order issued on August 30, 2007.

DECLARATION OF JON E. ABRAMCZYK OPPOSING MOTION TO DISQUALIFY        Case No. CV-08-00830 SI

1    in exchange for a release of the plaintiffs' claims on behalf of the entire class; (b) what

2    was the probability that the plaintiffs would have prevailed, had there been no

3    settlement; or (c) how much would the plaintiffs likely have recovered, had there been

4    no settlement?  From beginning to end, the Insurers were never actively involved in the

5    defense or settlement of the case, and, to my knowledge, they never took any action to

6    initiate settlement discussions with the Franklin Fund plaintiffs.

7

8    I declare under penalty of perjury, under the laws of the United States of

9    America, that the foregoing is true and correct, and that this Declaration was executed

10    on July 31, 2008 in Wilmington, Delaware.

11

12    *Jon E. Abramczyk*

    Jon E. Abramczyk

DECLARATION OF JON E. ABRAMCZYK OPPOSING MOTION TO DISQUALIFY        Case No. CV-08-00830 SI

PILLSBURY & LEVINSON, LLP
The Transamerica Pyramid
600 Montgomery Street, 31st Floor · San Francisco, CA 94111

# EXHIBIT A

## IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

Franklin Balance Sheet Investment Fund and     :
Franklin Microcap Value Fund, P. Oppenheimer   :
Investment Partnership LP and Oppenheimer      :
Close International Ltd., Wynnefield Partners    :
Smallcap Value LP I, Wynnefield Partners        :
Smallcap Value LP, Wynnefield Smallcap Value    :
Off-Shore Fund Ltd.. Channell Partnership II, LP,    :        Civil Action No. 888-N
and John H. Norberg, Jr.                        :
Individually. derivatively and on behalf of a Class  :
of similarly situated stockholders.             :
                                                :
            Plaintiffs,                         :
                                                :
                                                :
    v.                                          :
                                                :
                                                :
Thomas B. Crowley, Jr., Molly M. Crowley,       :
Phillip E. Bowles, Gary L. Depolo, Earl T.      :
Kivett, William A. Pennella. Leland S. Prussia,  :
Cameron W. Wolfe. Jr.,                          :
                                                :
            Defendants,                         :
                                                :
    v.                                          :
                                                :
Crowley Maritime Corporation,                   :
                                                :
        Nominal Derivative Defendant.           :

## AMENDED CLASS ACTION AND DERIVATIVE COMPLAINT

Plaintiffs, by and through their attorneys for their complaint hereby allege as follows:

# TABLE OF CONTENTS

Page

I.   SUMMARY OF THE ACTION ........................................................................ 3

II.  THE PARTIES .......................................................................................... 4

III. DEMAND EXCUSED ALLEGATIONS ............................................................ 5

IV.  CLASS ACTION ALLEGATIONS ................................................................ 10

V.   OPERATIVE FACTS ................................................................................ 11

   A.   Overview Of The Challenged Transactions ........................................... 11

   B.   Background Facts ............................................................................. 13

      1.   The Company ............................................................................ 13

      2.   The 1992 Restructuring ............................................................... 14

      3.   The 1995 Self-Tender ................................................................. 15

      4.   The 2001 Self-Tender ................................................................. 16

      5.   Disclosure of the Insurance Agreements and Entrenchment Policy ...... 17

   C.   The Details of the Challenged Transactions .......................................... 19

   D.   Damages .......................................................................................... 35

## I.    SUMMARY OF THE ACTION

1.    This is an action by owners of common stock of Crowley Maritime Corporation ("Crowley" or "the Company") challenging the conduct of the Board of Directors of Crowley in taking actions for the purpose of effecting a policy of perpetuating the control of the Crowley family over the Company in violation of their duties to the Company and all of its stockholders. Over the years the Company's Board of Directors, which is dominated and controlled by the Crowley family (who collectively own or control approximately 65% of the voting stock of the Company), have engaged in a series of transactions designed to perpetuate and/or to enhance the Crowley family's control, to limit the information available to the Company's public stockholders and to operate the Company in a manner reflective of a closely-held family corporation and not a corporation with unaffiliated public stockholders.

2.    The Board under the policy of perpetuating control of the Crowley family has abandoned all pretense of fairness to the public stockholders and has provided millions of dollars of gifts to the Crowley Family.  The ostensible purpose of providing them funds is to buy insurance to pay anticipated estate taxes and purchase family stock from various trusts. These gifts are not compensation for Defendant Crowley as Chairman of the Board and Chief-Executive Officer but are in addition to his annual compensation of about $1.000,000.

3.    This action seeks to have this Court declare that these acts and pursuing this corporate policy of perpetuating the controlling stockholders' control are violations of the fiduciary duties of the defendants and contrary to Delaware law.  The action further seeks an accounting and compensation for the damages caused as a result of the actions taken in furtherance of that corporate policy.

3

## II.    THE PARTIES

4.    Plaintiffs Franklin Balance Sheet Investment Fund and Franklin Microcap Value Fund beneficially own 4,240 and 2,342 common shares of Crowley, respectively, constituting approximately 7.3% of the outstanding shares.  Franklin Balance Sheet Investment Fund and Franklin Microcap Value Fund are part of the Franklin Templeton group of mutual funds.  They are collectively referred to herein as "Franklin".  Franklin owns and has owned Crowley shares continuously since February 25. 1997.

5.    Plaintiffs P. Oppenheimer Investment Partnership LP and Oppenheimer Close International Ltd. beneficially own 1,484 and 110 common shares of Crowley, respectively.  P. Oppenheimer Investment Partnership LP and Oppenheimer Close International Ltd. are collectively referred to herein as "Oppenheimer".  Oppenheimer owns and has owned shares in Crowley continuously since September 20, 2000.

6.    Plaintiffs Wynnefield Partners Smallcap Value LP I, Wynnefield Partners Smallcap Value LP, Wynnefield Smallcap Value Off-Shore Fund Ltd. and Channell Partnership II, LP beneficially own 460, 370, 330 and 33 common shares of Crowley, respectively. Wynnefield Partners Smallcap Value LP I, Wynnefield Partners Smallcap Value LP, Wynnefield Smallcap Value Off-Shore Fund Ltd. and Channell Partnership II, LP are collectively referred to "Wynnefield".  Wynnefield beneficially owns and has owned shares of Crowley continuously since July 26. 2001.

7.    John H. Norberg. Jr. ("Norberg") beneficially owns 9 shares of Crowley.  Norberg owns and has owned shares of Crowley continuously since 1991.

8.    Collectively plaintiffs own approximately 30% of the common shares not owned by the Crowley family.

9.    Nominal derivative defendant Crowley Maritime is a Delaware corporation with its principle executive office in Oakland, California.

10.    Defendant Thomas B. Crowley, Jr. ("Defendant Crowley"), age 37, is Chairman, President and Chief Executive Officer of the Company and has been a Director since 1994. He beneficially owns or controls approximately 65% of the voting stock of the Company.

11.    Defendant Molly M. Crowley is the mother of Defendant Crowley and has served as a member of the Board of Directors since 1994.

12.    Defendant Philip E. Bowles is first cousin of Defendant Crowley. Defendant Bowles has been a Director since 1986.

13.    Defendant William A. Pennella is and has been Vice-Chairman of the Crowley Board since 2000 and has been an Executive Vice-President of Crowley since 1996.

14.    Defendant Gary L. Depolo has been a member of the Board since 1994.

15.    Defendant Earl T. Kivett has been a member of the Board since 2002.

16.    Defendant Leland S. Prussia has been a Director since 1994.

17.    Defendant Cameron W. Wolfe, Jr., has been a Director since 1989.

## III.    DEMAND EXCUSED ALLEGATIONS

18.    As to the derivative count of this complaint, plaintiffs have not made a demand on defendants, the Board of Directors of Crowley. Plaintiffs have not made a demand because demand is excused under Delaware Law in that at least half of Crowley's Board is interested and conflicted with respect to the wrongs alleged herein and all directors are dominated and controlled by Defendant Crowley.

19.    Defendants Thomas Crowley and Molly Crowley are conflicted because they are members of the Crowley family and are direct beneficiaries of the plan to entrench the Crowley

family in control of the Company.  Defendants have conceded in this action that defendants
Thomas Crowley and Molly Crowley are interested and that demand is excused as to them.

20.    Defendant Bowles is conflicted because he is also a member of the Crowley
Family and a direct beneficiary of the plan to entrench the Crowley Family in control of the
Company.  Further, defendant Bowles is not independent because he is the first cousin of
defendant Crowley and nephew of Molly Crowley.  Also, he has agreed to perpetuate the control
of defendant Crowley.  Defendant Bowles was a party to and beneficiary of an agreement with
other members of the Crowley Family whereby it was agreed to split control of Crowley among
four branches of the Crowley Family; Thomas B. Crowley and his three sisters.  That agreement
was terminated in 1992 and all parties to that agreement including Bowles agreed to cede control
to and support the control of Thomas B. Crowley, his wife and children.

21.    Defendant Pennella is not independent because he is an employee of the
Company.  As a result, his position and compensation are under the direct control of Defendant
Crowley.  The Board of the Company has delegated to Defendant Crowley the authority to
determine the base salary and bonuses of employees whose direct annual compensation is less
than or equal to $1,000,000, which includes Defendant Pennella and indeed, all employees
except Defendant Crowley.  Defendant Pennella's total compensation in 2004 was in excess of
$664,000, in 2003 it was in excess of $712.000 and in 2002 it was in excess of $698,000.  These
amounts were and are material to defendant Pennella.  Defendant Pennella is a full-time
employee of the Company and has no other gainful employment.  The Company's bonus plan for
executives whose direct annual compensation is less than $1 million dollars, specifically states
that the plan is to be administered by defendant Crowley and that he "has the sole discretion to
determine the key employees who will be granted bonus awards and the amounts, terms and

conditions of each bonus award. Defendant Pennella's bonuses were awarded pursuant to this plan.

22.    In addition, defendant Pennella has long standing personal ties with the Crowley Family including serving as a trustee of the Thomas B. Crowley Separate Property Trust ("Crowley Separate Property Trust"), one of the vehicles through which the Crowley Family exercises control over the Company and one of the entities which has engaged in self-dealing transactions as more fully alleged herein. The Crowley Separate Property Trust is also an intended beneficiary of the wrongs challenged herein in that it owns shares of the Company which are intended to be purchased by Thomas Crowley using the proceeds of the life insurance as more fully alleged herein. The value of this stock is in excess of tens of millions of dollars.

23.    Because of Pennella's status as a senior employee and a trustee, he is neither independent nor disinterested in the challenged transactions. He works directly for defendant Crowley who determines his salary and bonus and he has a close personal relationship with the Crowley Family precluding him from properly considering a demand. He is interested because he is on the governing body of the trust which is an intended beneficiary of these policies.

24.    Defendant Wolfe is neither independent nor disinterested. He at all relevant times was a partner in the law firm of Orrick, Herrington & Sutcliffe, LLP ("Orrick Herrington"). Although, subsequent to the commencement of this litigation, it was reported that Wolfe became "of counsel" to the Orrick Herrington firm, as "of counsel" Wolfe maintains substantial economic and social ties with the firm. Orrick Herrington has been in the past and remains legal counsel to the Company. In addition to the fees Orrick Herrington receives as counsel to the Company, Orrick Herrington has been legal advisor for and behind the challenged transactions, including the split-dollar life insurance agreements and the policies to perpetuate Crowley family

control as described herein. At the time of the commencement of this action, defendant Wolfe was a senior partner in the Orrick Herrington firm. As counsel to the Company, Orrick Herrington was paid over $650,000 in 1991 and since that time has continued to receive substantial revenue every year as counsel to the Company. Recently the Company indicated that legal costs exceeded $1,000,000 per year. These amounts were and are material to Wolfe in his relationship at Orrick Harrington. The American Lawyer reported that Orrick Herrington had average revenues per lawyer of $725,000 for 2004.

25.    Orrick Harrington during this period also acted both as personal counsel to the Crowley Family and corporate counsel to the Company. The Orrick Harrington firm was intimately involved in the creation and structuring of the challenged transactions. Thus, Wolfe cannot adequately consider a demand, because to consider a demand would require that he consider authorizing legal action against a long-standing client of his firm who is responsible for millions of dollars in fees and to challenge the legality of transactions and agreements structured and approved by his firm as legal counsel. Such conduct would expose his firm and him to a legal malpractice claim for tens of millions of dollars.

26.    Defendant Wolfe also has long standing close personal ties to the Crowley family including serving as a trustee of the Crowley Separate Property Trust, one of the vehicles through which the Crowley family exercises control over the company and one of the entities which has engaged in self-dealing as more fully alleged herein. The Crowley Separate Property Trust is also an intended beneficiary of the wrongs challenged herein in that it owns shares of the Company which are intended to be purchased by Thomas Crowley using the proceeds of the life insurance as more fully alleged herein. The value of this stock is in excess of tens of millions of dollars. Because of Wolfe's role as legal counsel in these transactions and trustee, he is neither

8

disinterested nor independent. Further, he has a close personal relationship with the Crowley Family and he has been intimately involved in Crowley family personal matters including matters of inheritance. Indeed, he is a witness to the 1993 codicil of the Will of Thomas B. Crowley. He cannot properly consider a demand.

27.    All directors, including Depolo, Kivett and Prussia, are dominated by Defendant Crowley. They were selected by the Crowley family and serve at the pleasure of Defendant Crowley. From at least 1995 the Company has repeatedly stated that Defendant Crowley "controls all matters affecting . . . the composition of our Board of Directors and, through it any determination with respect to our business direction and policies, including the appointment and removal of officers." The Company's public statements acknowledge the actual domination and control Defendant Crowley exercises over the Board. The Company's disclosures are not the standard disclosures used in situations involving controlling stockholders. Ordinarily such disclosures state that a controlling stockholder "could" exercise such control. Crowley's disclosures and admissions are materially different. Crowley's disclosures state that defendant Crowley "does" exercise such control. Further, as more fully alleged in Section V(B)(2), (3) and (4), the Crowley Family has repeatedly caused the Company to engage in transactions for the purpose of benefiting the Crowley Family. The allegations in those sections detail transactions which were initiated at the request of and for the private purposes of the Crowley Family and which were further designed to conceal the extent to which the Crowley Family has improperly used corporate funds for its private purposes. These facts demonstrate actual domination and control.

28.    The challenged transactions are not the product of a valid exercise of business judgment. All of the challenged transactions received Board approval. Prior to 1994, demand is

9

also excused for this reason as to each defendant for each challenged transaction approved by such defendant when he was on the Board and since 1994, as to all defendants because the majority of the Board has consisted of board members and current defendants who approved the challenged transactions.

29. As a result of the foregoing plaintiffs are legally excused from making any demand on the Board of Directors with respect to the count alleging claims derivatively on behalf of the Company.

## IV.    CLASS ACTION ALLEGATIONS

30. Plaintiffs also bring this action as a class action, pursuant to Rule 23 of the Rules of this Court, on behalf of themselves and all other holders of Crowley common stock (except for the defendants herein and any persons, firms, trusts, corporations, family members or other entities related to or affiliated with any of them and their successors in interest) (the "Class").

31. This action is properly maintainable as a class action because:

a.    the Class is so numerous that joinder of all members is not practical. While the exact number of beneficial owners is not known it is believed that Crowley Maritime has in excess of 500 stockholders owning approximately 30,000 shares of Crowley common stock including 9,372 shares in the Crowley Maritime Retirement Stock Plan and 4,873 shares in the Stock Savings Plan.

b.    The members of the Class are situated throughout the United States and are so numerous as to make it impracticable to bring them all before this Court.

c.    There are questions of law and fact which are common to the Class which predominate over matters affecting any individual members, including but not limited to whether

the Board and the Crowley family has acted improperly for the stated purpose and effect of maintaining the Crowley family's status as controlling stockholders.

32.    Plaintiffs' claims are typical of the claims of other members of the Class in that all members of the Class have been damaged by the defendant's actions.

33.    Plaintiffs are committed to prosecuting this action and have retained competent counsel to bring litigation of this nature.  Plaintiffs are adequate representatives of the Class.

34.    A class action is superior to any other method available for fair and efficient adjudication of this controversy.

35.    Crowley's common stock historically has paid no dividends and the Company's stated policy is not to pay dividends.  The challenged transactions herein have had the effect of putting tens of millions of dollars and a sizeable percentage of the Company profits in the hands of the Crowley Family because of their ownership in stock.  In essence, these payments constituted constructive dividends on those shares.  One of the remedies this Court could direct would be requiring the payment of dividends on all common stock with the imposition of an offset on the dividends to be paid on the Crowley Family shares until such time as the Company has been repaid the damages suffered in directing tens of millions of dollars improperly diverted by the Crowley Family.  Such benefit would directly benefit each member of the Class.

## V.    OPERATIVE FACTS

### A.    Overview Of The Challenged Transactions

36.    Plaintiffs herein challenge the actions of the Board of Directors in creating, approving, funding, amending and maintaining the three life insurance agreements: Insurance Agreement 1, Insurance Agreement 2 and Insurance Agreement 3 as defined and as more fully alleged herein.  These wrongs were perpetrated for the purpose of perpetuating Crowley Family

control over the Company.  The wrongs include not only approving and entering into the agreements initially, but, funding each agreement annually; amending the agreements on several occasions; "terminating" Insurance Agreement 1 under terms designed to provide defendant Crowley further financial benefits at no cost or obligation to him; allowing defendant Crowley to use the cash surrender value of Insurance Agreements 2 and 3 to continue paying the premiums on those agreements at Company expense; and bearing the costs of the advisors for the Company and defendant Crowley to establish, maintain and amend these agreements.

37.    Plaintiffs may not be aware of all the wrongful actions of the Board as defendants have routinely failed to disclose material information to stockholders.  Nonetheless, plaintiffs are aware of at least the following actions which were wrongful and which plaintiffs challenge by this Complaint:

| Action | Date | Defendants On the Board |
|---|---|---|
| Approval of Insurance Agreement 1 (see Paragraph 73) | as of 4/6/92 | Bowles; Wolfe |
| Approval of Amendment 1 to Insurance Agreement 1 (see Paragraph 75) | as of 5/1/95 | All but Pennella and Kivett |
| Approval of Amendment 2 to Insurance Agreement 1 (see Paragraph 76) | as of 7/20/98 | All but Pennella and Kivett |
| Approval of Amendment 3 to Insurance Agreement 1 (see Paragraph 77) | as of 7/20/98 | All but Pennella and Kivett |
| Approval of Insurance Agreement 2 (see Paragraph 78) | as of 7/20/98 | All but Pennella and Kivett |
| Approval of Insurance Agreement 3 (see Paragraph 79) | as of 11/24/98 | All but Pennella and Kivett |
| Approval of each and every annual payment made under each of those agreements which payments were subject to unilateral suspension by admission of the Company in this action and its 2003 Proxy (see Paragraph 83) | Annually since 1992 | Various |
| Entering into the December 23, 2003 Settlement Agreement and the related implementing transactions including the agreement to pay the premiums due on a personal loan taken out by Thomas Crowley. (see Paragraph 87) | 12/23/05 | All |

| | | |
|---|---|---|
| Failing to rescind and void the insurance agreements and recover the funds paid hereunder (see Paragraph 97) | | All |
| Annually paying the tax consultation costs to defendant Crowley arising from the Insurance Agreements (see Paragraph 96) | Beginning at least in 2002 | All |

### B.    Background Facts

#### 1.    The Company

38.    Crowley, through its subsidiaries, provides maritime transportation services in domestic and international markets by means of four operating business lines: liner services, ship assistant escort services, oil and chemical distribution and transportation services, and energy and marine services. The Company provides numerous services with respect to the maritime trade on both the east and west coasts of the United States, Alaska, the Gulf of Mexico and Puerto Rico. The Company is involved in the construction, ownership, leasing and insuring of marine vessels. The Company employs approximately 4,000 people and has a fleet of more than 270 vessels. The Company's land-based facilities include terminals, warehouses, tank farms, office buildings, trucks, trailers, containers, chassis, cranes and other specialized vehicles. The Company was started in 1892 by the grandfather of Defendant Crowley, was incorporated in Delaware on December 1, 1972 and has operated in its current holding company structure since 1992.

39.    For the fiscal year ending December 31, 2003, Crowley reported operating income of over $42 million dollars on operating revenues of approximately $978 million dollars. The Company reported income from continuing operations (before discontinued operations and cumulative effect of a change in accounting) of $89.03 per share, down from $112.44 per share in 2002 and $122.41 per share in 2001. The Company reported total assets in excess of $1 billion dollars and total stockholder's equity of approximately $300 million dollars.

40.    As of December 31, 2003, the Company reported capital structure consisting of common voting stock with a par value of $.01, preferred Class A convertible stock $100 par value, and Class N common non-voting stock of $.01 par value.    The Company reported 4,485,000 shares of common stock were authorized, with 89,404 shares issued; 315,000 shares issued and outstanding of preferred Class A convertible stock; and 46,138 issued shares of Class N, non-voting stock of the 54,500 authorized.    As of April 25, 2003 the Crowley family owned or controlled 58,137 shares of common stock (64.6%), all of the outstanding Class N common stock and all of the Series A preferred stock.    Crowley's common stock is not traded on a national or regional exchange but prices are quoted in the "Pink Sheets".

## 2.    The 1992 Restructuring

41.    Prior to restructuring pursuant to a Plan of Reorganization and Agreement of Merger dated March 20, 1992, the Company had common stock, preferred Class A stock, preferred Class B stock, and preferred Class C stock.    The restructuring resulted in the holding company structure which exists today.

42.    The reorganization was initiated at the request of and solely for the benefit of the Crowley Family including defendants Bowles and the Bowles branch of the family.    It was structured so that the Crowley family (including the Bowles) which owned the preferred stock, not only would receive all the new preferred stock in the reorganized company but would also be able to convert the existing preferred stock dividend arrearages into additional voting common stock on a tax free basis and thereby increase the Crowley's voting control in the Company.    The transaction allowed the Crowley family to convert approximately $42,000,000 in dividend arrearages, which were contractually payable in cash, into stock allowing them to realize the value of those dividends without paying any taxes.

14

43.     At the time of the transaction, there were four branches of the Crowley Family, Thomas B. Crowley, Sr. and his three sisters including, Constance C. Bowles, mother of defendant Bowles. In connection with the reorganization, the three branches of the family agreed to accede control to Thomas B. Crowley, Sr., his wife and children and to support their control of the Company.

44.     In 1995, as a settlement of litigation challenging the transaction, the Crowley Family agreed to eliminate their enhanced voting control and to pay certain sums to the public stock holders.

45.     The materials related to the 1992 restructuring were not publicly filed and to the best of plaintiffs' knowledge are not publicly available.

### 3.     The 1995 Self-Tender

46.     By tender offer dated September 11, 1995, the Company engaged in the self tender the sole purpose of which and justification for was to comply with the request of the trustees of Thomas B. Crowley Separate Property Trust ("the Trust"), one of the vehicles through which the Crowley family exercises control over the Company, to purchase approximately $11.7 million dollars of the Trust's stock in order to provide liquidity to the Trust. At the time the trustees were Defendant Crowley and Defendants M. Crowley, Wolfe and Pennella.

47.     But for the request, the Company would not have engaged in any form of self tender. Indeed, as the purpose of the offer the Company stated:

> The Company believes that the repurchase of shares from the Trust facilitates management stability, by providing a measure of assurance that the Company will not be sold to a third party or broken up as a consequence of the Trust's short term and long term estate tax and other obligations. The Company also believes that the repurchase of shares from the Trust will serve to prevent the Trust's shares from falling into the hands of speculative investors who may later attempt to disrupt company affairs in order to encourage the Company to take

action favorable to such investors, yet not in the best interests of the Company and the remaining stockholders.

The repurchase of shares pursuant to the offer should also reduce the possibility that the Trust would seek to liquidate its holdings through a public offering (or in a transaction which could lead to a public offering) of its shares, the consequences of which the Company believes would be detrimental to the long-term interests of the Company and the remaining stockholders.

48.    Notwithstanding that the transaction was initiated by and solely for the private purposes of the Crowley family, at least the Board of Directors had a sufficient adherence to its fiduciary duties to all stockholders to extend the tender offer on equal terms to all stockholders of the Company. The Company also obtained a fairness opinion with respect to the transaction.

49.    The materials related to the offer to purchase were not publicly filed and to the best of plaintiffs' knowledge are not available in any public record.

### 4.    The 2001 Self-Tender

50.    In April 2001, Crowley commenced another self-tender, the sole purpose of which was to reduce the information available to public stockholders of Crowley.

51.    Prior to the self tender, certain shareholders attempted to convince Crowley that it had more than 500 shareholders and therefore should comply with its obligations as a reporting company under the Securities and Exchange Act of 1934 and make appropriate filings. Defendant Crowley and the Company's Board resisted that effort and insisted the Company would only consider shareholders of record in determining whether it had any obligations to file as a reporting company. As a result of that position certain shareholders began to register their shares directly in their names rather than in the names of a nominee.

52.    In order to defeat this shareholder effort and reduce the Company's accountability to its public stockholders, the Board of Crowley caused Crowley to engage in a self tender. The self tender was to all shareholders who held less than ten (10) shares, but only if those

16

shareholders held those shares of record in their own names. The tender was not extended to anyone who held shares through a nominee name even if that shareholder had less than 10 shares.

53.    While the Company stated that one of the Board's concerns was the estimated $500,000 per year cost of making these filings, the offer to purchase also stated:

> the Board is of the view that the Company should remain privately held, with most of the stock held by company employee benefit plans and descendants of the Company's founder, Thomas Crowley. Consequently, the Board has consistently been of the view that the Company should not 'go public' or become a public company.

Notwithstanding that it was apparently lost on the Board that Crowley was not a "privately held" company but in fact was a company with public stockholders, the 2001 self-tender presented the public stockholders with a "voluntary" transaction. That is, a shareholder could refuse to tender shares at the price offered. Further, the Crowley family was not permitted to participate in the transaction and therefore it provided the Crowley family *no direct financial benefit*. Nonetheless, the self tender was designed solely to protect the Crowley family's ability to continue to run the Company as if it were a privately held company.

54.    The 2001 Self-Tender attracted only 521 shares and failed in its purpose. Thus, beginning with its 2002 10-K, the Company began public filings on April 1, 2002.

55.    The documents related to the 2001 Self-Tender were not publicly filed and are to the best of plaintiffs' knowledge not available in any public record.

### 5.    Disclosure of the Insurance Agreements and Entrenchment Policy

56.    As certain members of the Crowley family grew older, concern grew about how to maintain Crowley family control over the Company. Eventually estate taxes on the value of their Crowley shares would be due and the Crowley family did not otherwise have (or wish to spend) the resources to pay those taxes from sources outside of the Company. Similarly, the

Crowley family did not wish to sell any sizeable portion of its shares in Crowley because to do so would be to lose the Crowley family control of the Company.

57.    As a result the Crowley family decided to treat their familial problem as a corporate one, thereby "justifying" using corporate funds to solve the "problem".

58.    For years Crowley's directors resisted public filings. While their stated purpose was to save the Company money, in fact, the actual effect was to minimize disclosures to the public stockholders of the Company so that the Crowley family could conceal certain actions. Only recently has the extent of the transactions involving the Crowley family begun to come to light and only then if a very determined reader pieces together the exhibits to the Company 10K filings of March 19, 2004, March 19, 2003 and April 1, 2002. Accurate and complete summaries of these exhibits and the transactions with the Crowley family do not appear either in the annual statements or the proxy statements for any of those years.

59.    While the 1995 Self-Tender materials and the 2001 Self-Tender materials suggest that the Board might consider putting the interests of the Crowley family ahead of other stockholders, those two documents are not publicly available and cannot be found on the Securities and Exchange Commission's EDGAR database. In any event in both of those transactions, at least superficially, were on terms ostensibly either non-coercive or fair to the public stockholders.

60.    The 1995 Self-Tender, while made for Crowley family purposes, was open to all stockholders. Stockholders, to the extent they chose to tender their shares, received the same price as the Crowley family. There were no overtly coercive elements to that transaction.

18

61.    In the 2001 Self-Tender, the Crowley family was not participating in the tender offer and, again there were no overtly coercive elements. Thus, a shareholder could simply refuse to tender with no apparent negative consequences.

62.    On April 1, 2002, defendants could no longer avoid their disclosure obligations to their shareholders.

### C.    The Details of the Challenged Transactions

63.    It was not until April 1, 2002 that Crowley disclosed the split-dollar life insurance arrangements. Even then, had a shareholder relied on the text of the disclosures in the annual statement, he would have been grossly uninformed and mislead.

64.    Crowley's Form 10-K for the year ending December 31, 2001 filed on April 1, 2002 disclosed for the first time a remarkable series of transactions in pursuit of a remarkable corporate policy of entrenching its controlling stockholder. The form 10-K stated:

> Mr. Crowley and his family are the beneficiaries of certain split-dollar life insurance agreements, described in "Item 6. Executive Compensation." The Board of Directors has approved these agreements in furtherance of its belief that preserving Crowley family control and the closely held nature of the Company is beneficial to the Company's stockholders and will maximize stockholder value over the long-term. The Board of Directors has long been concerned that short-term and long-term estate tax and other obligations of certain Crowley family stockholders could lead to an unrelated third party gaining a highly influential and potentially detrimental position with respect to the business and management of the Company. Such circumstances also could lead to stock falling into the hands of speculative investors who may later attempt to disrupt Company affairs in order to encourage the Company to take action favorable to such Investors, yet not in the best interests of the Company and remaining stockholders.

> The Board of Directors also has been concerned that should the Company receive a request to purchase shares held by such stockholders or their estates in lieu of a possible sale to such investors, the Company would be unable to effect such a purchase without negatively impacting its results of operations or financial condition. In this regard, the split-dollar life insurance agreements enable Mr. Crowley and certain trusts for the benefit of his descendants to purchase most, if not all, of such shares without involving the Company.

The Company expects that following the death of Mrs. Crowley the net proceeds of the policies of insurance on the life of Mrs. Crowley will be used by Mr. Crowley and the trusts under his control to purchase shares of Common Stock held by the Thomas B. Crowley Marital Trust so that this trust can pay applicable estate taxes. Essentially, the split dollar life insurance agreements enable Mr. Crowley and his family to retain ownership of shares and control of the Company under circumstances when certain of such shares otherwise might have to be sold to a third party to pay applicable estate taxes.

Item 6 Executive Compensation repeated these statements.

65.    From this disclosure it was revealed that the Company determined to give the Crowley family the amount necessary to pay the annual premiums on "certain life insurance policies" for reasons entirely unrelated to any work of Defendant Crowley as Chairman of the Board, President and Chief Executive Officer. Indeed, the Company has in place an extensive executive compensation plan which includes base compensation, annual bonus compensation, annual deferred compensation, all as part of a management incentive plan which, according to the Company's disclosures, are designed to ensure fair and proper compensation of Defendant Crowley and the other senior executives. Thus, the payments made by the Company on behalf of Defendant Crowley and the Crowley family with respect to the life insurance policies are nothing short of gifts of corporate assets to a controlling stockholder without any legitimate justification.

66.    Defendant Crowley's obligations to the Company in return are essentially nothing. Defendant Crowley is not obligated to repay the costs of these insurance policies (above cash surrender value) and is not even obligated to use the death benefits for the purported corporate purpose. Instead, the Board only "expects" Defendant Crowley to use them to retain control. It appears he has no obligation to use the proceeds in any particular fashion nor has he agreed not to sell the stock to a "speculative" investor nor in a public offering.

67.    Defendant Crowley's obligation, if the split-dollar life insurance agreements ever are terminated, repaying the cash surrender value of the policies, is meaningless. Upon

20

termination, Defendant Crowley who owns the policies would receive an amount equal to the cash surrender value and therefore the transaction would involve essentially no out-of-pocket expense to Defendant Crowley or his family. It is the Company that paid the premiums. Therefore, it is the Company that should own the policies and their cash surrender values, not Defendant Crowley.

68.    In fact, each of these insurance agreements and the amendments thereto were created, designed, written and implemented solely to benefit the Crowley Family. The Company receives no benefit whatsoever from any of these agreements. The agreements constitute a gift to the controlling stockholder and a waste of corporate assets upon the shareholders. If defendant Crowley collects the death benefit on the policies, he will receive far more than the cash surrender value. Upon the termination of the policies, either through voluntary cancellation by defendant Crowley or a collection of the death benefits, defendant Crowley will repay to the Company only a portion of the funds expended by the Company without interest. The Company is not even to receive a complete return of all its costs associated with the agreements. The reason the Company is to receive only a portion of its costs is because the cash surrender values will always be less than the costs to the Company.

69.    In economic terms, the agreements between defendant Crowley and the Company are that the Company will give defendant Crowley millions of dollars to invest in life insurance policies and is to receive in return only the cash surrender value. There is no scenario under which defendant Crowley will receive less than the cash surrender value from these insurance policies. Thus. he has no economic costs or risk in the agreements and has committed to provide the Company nothing other than a partial return of its own money. The insurance agreements, as a result, are a sham and without legal consideration.

70.    Distilled to their essence, defendant Crowley agreed that at some point in the future and only out of funds available to him (from the insurance purchased by the Company) he will repay a portion of the funds expended by the Company without interest. An agreement to loan or give a third party funds in exchange for a promise to receive back only a portion of those funds, without interest, is an agreement without legal consideration.

71.    The agreements are shams designed to hide lack of any benefit to the Company. Even the goal the Board has stated it is pursuing, maintaining the Crowley Family as controlling stockholders, is not accomplished by any of these agreements. While this "benefit" in fact is not a benefit to the Company or its other stockholders at all and is not one cognizable by this Court, the insurance agreements have caused the Company to spend tens of millions of dollars without even obtaining this "benefit". In fact, the "benefit" of avoiding speculative investors or disruptions to the Company's finances or continuity was readily available through alternative uses of the very same funds. For example, the Company could have secured benefits of protecting itself from having the Crowley Family dump a block of stock into the hands of an inappropriate investor simply by owning the insurance policy itself.

72.    The details of the insurance transactions are contained in 5 separate exhibits to the April 1, 2002 10K.

73.    Exhibit 10.6 to the April 1, 2002 10-K is the split-dollar life insurance agreement ("Insurance Agreement 1") purports to be made "as of April 6, 1992" although it was not disclosed to the shareholders until 2002. When it was actually made is nowhere revealed. However, it would appear that at least since 1992 the Company has been paying life insurance premiums for the Crowley family. Schedule A to that exhibit lists five separate life insurance policies with a total face amount of $50 million dollars. The agreement provides that the

22

Company will pay the premiums on these policies, and Defendant Crowley will repay the Company "the economic benefit" he receives, as determined by IRS regulations, and the Company, upon termination of the policy or payment of the death benefit, will receive the lesser of the balance of the amount it paid in premiums (without interest) or the cash surrender value of the policies.

74.     In 1992, defendants Bowles and Wolfe were on the Board of Directors.  In addition, Thomas B. Crowley, father to defendant Crowley, was Chairman of the Board and Chief Executive Officer.   There were 5 other board members at that time, including the Company's President (and Chief Operating Officer) and Senior Vice President (and Chief Financial Officer).  Two of the other directors, Casper H. Escher, Jr. and Gustav H. Koven, III, were cousins of defendants Crowley and Bowles.  Thomas B. Crowley was their uncle.

75.  ·  Attached as Exhibit 10.7 to the April 1, 2002 10K filing was an amendment to the Insurance Agreement 1 ("Amendment 1") "made on May 1, 1995" which stated the purpose of the amendment was to provide collateral to the Company for the obligations Defendant Crowley owed under the Insurance Agreement 1 on three of the policies totaling $40 million dollars.

76.     Exhibit 10.8 to the April 1, 2002 10K filing is a second amendment to Insurance Agreement 1 ("Amendment 2") "made on July 20, 1998".  Curiously while Amendment 1 referred to the Insurance Agreement 1 as "dated April 6, 1992", Amendment 2 goes back to the original language describing Insurance Agreement 1 as "dated as of April 6, 1992".  The purpose of Amendment 2 is to permit Defendant Crowley to transfer certain of the policies which were the subject of Insurance Agreement 1 to a trust he created on July 1, 1998.

77.     Attached as Exhibit 10.9 to the April 1, 2002 10-K filing is an agreement entitled "Split-Dollar Life Insurance Agreement (1035 Exchange Policy)," ("Amendment 3") a third

amendment to Insurance Agreement 1. The purpose of Amendment 3 was to allow Defendant Crowley to exchange the two policies which were the subject of Insurance Agreement 1 for a new policy. The effect of this exchange was to convert the two policies with a $10 million dollar face amount into one policy with a face amount $11,296,319. Thus as of Amendment 3, the Company was paying for $51,296,319 dollars of life insurance for the Crowley family. Amendment 3 states that it "is made as of July 20, 1998".

78.    Attached as Exhibit 10.10 to the April 1, 2002 10-K filing, is an agreement titled "Split-Dollar Life Insurance Agreement New Policies" ("Insurance Agreement 2"). Like Insurance Agreement 1, Insurance Agreement 2 recites that it "is made as of" a date, in this case July 20, 1998. Insurance Agreement 2 relates to entirely different insurance policies. The purpose of the agreement is to create the same type of arrangement with respect to these policies as existed under Insurance Agreement 1. Insurance Agreement 2 lists six policies with a total face amount of $50 million. Thus, as of Insurance Agreement 2, the Company was paying for $101,296,319 dollars of life insurance for the Crowley family.

79.    Attached as Exhibit 10.11 to the April 1, 2002 10-K filing is an agreement titled "Split-Dollar Life Agreement (Policies on Life of Thomas B. Crowley, Jr.)" ("Insurance Agreement 3"). Insurance Agreement 3 "is made as of November 24, 1998". Insurance Agreement 3 involves insurance policies owned by the 1998 Crowley family generation-skipping trust u/t/a dtd. November 12, 1998 by and between Thomas B. Crowley, Jr. as trustor and as trustee ("the 1998 Trust"). The agreement recites that the 1998 Trust owned certain policies on the life of Defendant Crowley and notes the existence the two life insurance policies in the face amount of $20 million dollars each, for a total of $40 million dollars. The agreement makes these insurance policies subject to the same type of arrangement as Insurance Agreement 1 and

Insurance Agreement 2. As of the existence of Insurance Agreement 3, the Company was paying for life insurance in the face amount of $141,296,319 dollars on behalf of the Crowley family.

80.    The text of the 2002 10-K does not disclose the total amount of life insurance subject to these agreements, the total benefit to the Crowley family from these agreements, the actual dates on which these agreements were made, nor the actual dates and amounts of payments made by the Company with respect to these agreements. In a footnote it does state that Defendant Crowley's 2001 annual compensation included $2,978,426 representing the non-term portion of premiums paid by the Company for that year. This amount was approximately 2.5% of the Company's operating revenue that year, and approximately 15% of the Company's net income.

81.    Crowley's Form 10-K for the fiscal year ending December 31, 2002, under the heading "Other Business Risks" the Company disclosed as follows:

> Mr. Crowley and his family are the beneficiaries of certain split dollar life insurance agreements, as more fully described in the 2003 proxy statement. The Board of Directors has approved these agreements in furtherance of its belief that preserving Crowley family control and the closely held nature of the Company is beneficial to the Company's stockholders and will maximize shareholder value over the long-term. The Board of Directors has long been concerned that short-term and long-term estate tax and other obligations of certain Crowley family stockholders could lead to an unrelated third party gaining a highly influential and potentially detrimental position with respect to the business and management of the Company. Such circumstances could also lead to stock falling into the hands of speculative investors who may later attempt to disrupt company affairs in order to encourage the Company to take action favorable to such investors, yet not in the best interests of the Company and remaining stockholders.

> The Board of Directors also has been concerned that should the Company receive a request to purchase shares held by such stockholders or their estates in lieu of a possible sale to such investors, the Company would be unable to effect such a purchase without negatively impacting its results of operations or financial condition. In this regard, the split-dollar life insurance agreements enable Mr. Crowley and certain trusts for the benefit of descendants to purchase most, if not all, of such shares without involving the Company.

25

The Company expects that following the death of Mrs. Molly M. Crowley, the net proceeds of the policies of insurance on the life of Mrs. Crowley will be used by Mr. Crowley and the trusts under his control to purchase shares of common stock held by the Thomas B. Crowley Marital Trust so that the trust can pay applicable estate taxes. Essentially, the split-dollar life insurance agreements enable Mr. Crowley and his family to retain ownership of shares and control of the Company under circumstances when certain of such shares otherwise might have to be sold to a third party to pay applicable estate taxes.

82.    The Form 10-K for the year 2002 was filed with the Securities and Exchange Commission on March 19, 2003. At the end of the disclosures regarding the corporate policy of entrenching the Crowley family as controlling stockholders the Company referred stockholders to the proxy stating: "See Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters, in the 2003 Proxy Statement." In the 2003 Proxy which was filed on April 25, 2003, one month later, there is no section entitled "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters." While there is such entitled "Security Ownership of Certain Beneficial Owners and Management," it contains no related information and there is no section entitled "Related Stockholder Matters."

83.    In the 2003 proxy, there is a section titled "Certain Relationships and Related Transactions." The entirety of the disclosure in the 2003 Proxy from the section "Certain Relationships and Related Transactions" on this issue is as follows:

Thomas B. Crowley, Jr., the Chairman of the Board of Directors, President and Chief Executive Officer of the Company, and certain trusts for the benefit of his descendants, are party to certain split-dollar life insurance agreements. These agreements were created for estate planning purposes intended to promote the long term stability of the Company and generally provide for: (a) the Company to pay the annual premiums for certain life insurance policies owned by Mr. Crowley or the trusts; and (b) Mr. Crowley, or the trusts, to reimburse the Company in an amount equal to the annual term costs of the insurance coverage. The policies are pledged to the Company as security for the obligation of Mr. Crowley, or the trusts, as the case may be, to pay to the Company, upon termination of the split-dollar life insurance agreements, an amount equal to the aggregate amounts of premiums paid by the Company as such amounts may have been reduced by certain payments made by or on behalf of Mr. Crowley or the trusts prior to the date upon which the split-dollar life insurance agreements

26

terminate, except that if the agreements are terminated prior to the death of the insured the amount owed by Mr. Crowley and the trusts is limited to the cash surrender value of the policies. At any time during the last fiscal year and as of April 25, 2003, the largest aggregate amount owed by Mr. Crowley and the trusts based upon the cash surrender value of these insurance policies was $16.9 million. No interest is charged by the Company for any and all amounts which may be outstanding under these arrangements.

It is currently uncertain whether the recently enacted Sarbanes-Oxley Act of 2002 (the "Act") prohibits the Company from continuing to pay the annual premiums for these life insurance policies owned by Mr. Crowley and the trusts. While the Act does not specifically address these types of insurance arrangements, it generally makes it unlawful for an issuer to extend or maintain credit, to arrange for the extension of credit or to renew an extension of credit, in the form of a personal loan to or for any director or executive officer (or equivalent thereof) of that issuer. Since it is possible that the Act might be construed as treating annual premium payments made after July 30, 2002 under the split-dollar life insurance agreements as new extensions of credit which would be prohibited by the Act, the Company has decided to suspend making any annual premium payments made after July 30, 2002 under the split-dollar life insurance agreements as new extensions of credit which would be prohibited by the Act, the Company has decided to suspend making any annual premium payments for the life insurance policies owned by Mr. Crowley and the trusts. The Company may decide in the future to resume making such payments. In the meantime, Mr. Crowley has advised the Company that he will continue to pay the term cost of the insurance coverage and the balance of the annual premium will be paid out of the cash surrender value of the policies.

84.    Nowhere in this disclosure or anywhere else is there disclosure of when the agreements were adopted, the total costs to the Company or the total benefit to the Crowley family. The amount of the insurance or the terms of any of these agreements is available only if one examines the exhibits to the April 1, 2002 10-K. In a footnote it was disclosed that Defendant Crowley's annual compensation included $2,700,023 representing its non-term portion of premiums paid by the Company that year. As in the prior year, this represented about 2.5% of operating revenue and over 15% of the Company's net income.

85.    Defendant Crowley was paying only for the annualized costs of the insurance afforded and the balance of the premium due under these policies continued to be a gift from the corporation to Defendant Crowley. Under this arrangement while Defendant Crowley personally

owned the policies, the Company continued to pay a large portion of the premium. The Company has never disclosed what the total premiums it has paid for these policies were nor the "term cost" of these premiums that Defendant Crowley has paid. The net premiums acknowledged by the Company on these policies for the years 2000, 2001 and 2002 were $2,999,000, $2,979,000 and $2,700,000, respectively.

86.     In the Company's Form 10-K filing on March 19, 2004, under the heading Item 13, Certain Relationships and Related Transactions, the Company stated: "The information required by this item is hereby incorporated by reference from the 2003 Proxy Statement under the heading Certain Relationships and Related Transactions."

87.     In the 2004 Proxy Statement filed one month later on April 19, 2004, the Company made the following disclosures:

> Thomas B. Crowley, Jr., the Chairman of the Board of Directors, President and Chief Executive Officer of the Company, and certain trusts for the benefit of his descendants, are party to certain split-dollar life insurance agreements. These agreements were created for estate planning purposes intended to promote the long term stability of the Company and generally provide for: (a) the Company to pay the annual premiums for certain life insurance policies owned by Mr. Crowley or the trusts; and (b) Mr. Crowley, or the trusts, to reimburse the Company in an amount equal to the annual term costs of the insurance coverage. The policies are pledged to the Company as security for the obligation of Mr. Crowley, or the trusts, as the case may be, to pay to the Company, upon termination of the split-dollar life insurance agreements, an amount equal to the aggregate amounts of premiums paid by the Company as such amounts may have been reduced by certain payments made by or on behalf of Mr. Crowley or the trusts prior to the date upon which the split-dollar life insurance agreements terminate, except that if the agreements are terminated prior to the death of the insured the amount owed by Mr. Crowley and the trusts is limited to the cash surrender value of the policies. At any time during the last fiscal year the largest aggregate amount owed by Mr. Crowley and the trusts based upon the cash surrender value of these policies was $18,039.662. As of April 25, 2004, the largest aggregate amount owed by Mr. Crowley and the trusts based upon the cash surrender value of these insurance policies was $10,531,475. As stated below, the reduction in the amount owed is the result of a payment in the amount of approximately $7.5 million that was made in December of 2003. No interest is

charged by the Company for any and all amounts which may be outstanding under these arrangements.

It is currently uncertain whether the Sarbanes-Oxley Act of 2002 (the "Act") prohibits the Company from continuing to pay the annual premiums for these life insurance policies owned by Mr. Crowley and the trusts. While the Act does not specifically address these types of insurance arrangements, it generally makes it unlawful for an issuer to extend or maintain credit, to arrange for the extension of credit, or to renew an extension of credit, in the form of a personal loan to or for any director or executive officer (or equivalent thereof) of that issuer. Since it is possible that the Act might be construed as treating annual premium payments made after July 30, 2002 under the split-dollar life insurance agreements as new extensions of credit which would be prohibited by the Act, the Company has suspended making any annual premium payments for the life insurance policies owned by Mr. Crowley and the trusts. The Company may decide in the future to resume making such payments. In the meantime, Mr. Crowley has advised the Company that he will continue to pay the term cost of the insurance coverage.

On December 23, 2003, the Company and Mr. Crowley entered into a settlement agreement terminating one of the life insurance agreements. Pursuant to this settlement agreement, Mr. Crowley paid the Company approximately $7.5 million, an amount representing premiums paid by the Company for the insurance policies subject to the terminated life insurance agreement. The settlement agreement also provides that the Company pay Mr. Crowley annually an amount, on an after tax basis, equal to the interest payable by Mr. Crowley on financing he arranged to make this payment to the Company. This obligation terminates: (i) upon surrender or termination of the policies to the settlement agreement, unless Mr. Crowley rolls over or reinvests the entire amount received upon surrender or termination into one or more new policies on the life of Mrs. Molly Crowley; (ii) at the Company's option if Mr. Crowley ceases to be employed by the Company; (iii) upon the death of Mrs. Molly Crowley; or (iv) upon the bankruptcy, insolvency or dissolution of the Company. In the settlement agreement, Mr. Crowley released any claims that he might have against the Company due to the Company having ceased making premium payments as required by the terminated life insurance agreement.

88.    In the 2004 Proxy Statement, the Company disclosed that during the fiscal year 2003, the cash surrender value of the policies exceeded $18 million dollars. As of April 25, 2004, the cash surrender value was $10.5 million dollars. The reason for this was characterized as Defendant Crowley's decision to pay the Company approximately $7.5 million dollars. In fact, Insurance Agreement I was terminated because there was no further need to pay any

premiums on the policies. The Agreement had been in place long enough and the Company had paid sufficient funds so that the cash surrender value of the policy was sufficient to continue the insurance in full force and effect until the death benefit was collected. The insurance policy had become self-sustaining.

89.    Thus, the Settlement Agreement was nothing but a sham to take Insurance Agreement 1 "off the books". Accomplishing that triggered defendant Crowley's "obligation" to pay the Company approximately $7.5 million dollars. Because he did not surrender the insurance policies however, he did not have the cash surrender value with which to pay this money. Defendants however, never intended that defendant Crowley would have to pay anything out of pocket. Thus, defendant Crowley and the other defendants concocted a scheme whereby defendant Crowley would nominally borrow the money but the Company would pay all of the costs associated with the borrowing including paying the tax cost to defendant Crowley incurred in the transaction. In essence, the Company was borrowing $7.5 million dollars for itself and making all the payments plus tax payments to Mr. Crowley. As with all these transactions, there was no independent consideration or review of this agreement, there is no fairness opinion relating to this agreement, and no disinterested shareholder approval.

90.    The Settlement Agreement terminated Insurance Agreement 1 in name only. As recited in the Settlement Agreement, the Settlement Agreement was structured so that the Company would "continue to provide [the] benefits to" defendant Crowley of Insurance Agreement 1, and to provide further benefits to defendant Crowley by making the interest payments on the $7.5 million dollars defendant Crowley borrowed to make the payment "required" under Insurance Agreement 1. The Settlement Agreement makes clear that the insurance policies which were subject to Insurance Agreement 1 remain in effect. Thus, the

30

Case 3:08-cv-00830-SI    Document 74-2    Filed 08/01/2008    Page 32 of 64

"Settlement Agreement" in reality simply converts Insurance Agreement 1 into another form which allows defendant Crowley to use the Company's collateral cash surrender value of the policy to make the required insurance premium payments. Premium payments are required in order to keep the policies in full force and effect through the death of the insured. In other words, the insurance policies which were subject to Insurance Agreement 1 no longer needed any additional premium payments in order to remain in full force. Because the insurance was self-sustaining, the Company's "obligations" under Insurance Agreement 1 in fact had been completely fulfilled. Not satisfied with this however, defendant Crowley, with Board approval, extracted additional payments from the Company and thus constructed an unnecessary transaction for the purpose of allowing him to borrow $7.5 million dollars all at the expense of the Company and the stockholders. In fact, defendant Crowley does not even incur any tax expense related to the transaction as the Company agreed to pay all associated taxes of defendant Crowley in connection with the transaction.

91.    While the proxy refers to a December 23, 2003 settlement agreement between Defendant Crowley and the Company, there are no disclosures in the text of the filing beyond the brief paragraph contained in the proxy. Who "negotiated" on behalf of the Company and why there needed to be a "settlement agreement" in the first place is not discussed.

92.    Upon termination of the insurance policy, Defendant Crowley would have received a $7.5 million cash surrender value. What is not disclosed is if the agreement was terminated, why were the policies not surrendered?

93.    As Exhibit 10.14 to the March 19, 2004 10-K filing, the Company attached the "Settlement Agreement" "made as of December 23, 2003". The agreement relates only to Insurance Agreement 1, as amended. Insurance Agreements 2 and 3 remain in effect. The

agreement states that the payment by Defendant Crowley of $7,508,187 dollars equals "the total amount of premiums paid by the corporation . . . reduced by payments made by [Defendant Crowley] . . ." under the agreement. Thus, and according to the settlement agreement from September 1992 until December of 2003 the Company spent approximately $7.5 million dollars under Insurance Agreement 1, as amended.

94.    Had Defendant Crowley repaid those funds, the economic injuries suffered as a result of Insurance Agreement 1. as amended, arguably could have been limited to the difference between the payments made by the Company and $7.5 million and the interest on the $7.5 million dollars for the 11 year period over which those funds were advanced. However, the agreement does not simply provide for repayment of the $7.5 million dollars. Instead, it provides that the Company will pay to Defendant Crowley, an amount equal to his interest expenses on a $7.5 million dollar loan until Defendant Crowley collects on the policies. Thus, the Company has agreed to loan, interest-free, to Defendant Crowley, the cash surrender value policies subject to Insurance Agreement 1.

95.    The present status of these agreements is as follows:

a.    Insurance Agreement 1 has been terminated in form only. The economic substance of the gift to the Crowley Family and the purpose of perpetuating the Crowley Family control remain in place and intact. All of the insurance policies subject to the agreement remain in force. The premiums due on these insurance policies are paid out of the cash surrender value of the policies. The Insurance Agreement 1 was not terminated to benefit the Company but was instead terminated to benefit defendant Crowley in order to take Insurance Agreement 1 "off the books". The Company did not require defendant Crowley to abide by the economic substance of his "obligations", such as they were, under the agreement when it was terminated. Instead, the

32

Company agreed to loan him the money interest free, subject only to repayment when defendant Crowley collects the death benefit from these policies. The December 23, 2003 Settlement Agreement openly acknowledges that the Company, under the direction of the defendants, intended to continue giving defendant Crowley the benefits of Insurance Agreement 1. The handling of this matter clearly demonstrates that the Board to this day continues in its desire to perpetuate the Crowley Family control at no cost to the Crowley Family and the Settlement Agreement is but one piece of the overall effort to accomplish that goal.

        b.      The Company has "suspended" payments under Insurance Agreement 2, although the economic benefits to the Crowley Family remain undiminished. The "suspension" of additional payments of premiums served only to injure the Company, not the Crowley Family because current premium is paid from the cash surrender value of the policies. The cash surrender value is a cap on defendant Crowley's obligation to repay the Company for its expenditures. (The Company has allowed this erosion and invasion of its collateral.) Further, the Company has reserved the right to reinstitute the payments of these premiums should it ever be able to figure out a way to do this without violating Sarbanes-Oxley.

        c.      The Company has "suspended" payments under Insurance Agreement 3, although the economic benefits to the Crowley Family remain undiminished. The "suspension" of additional payments of premiums served only to injure the Company, not the Crowley Family because current premium is paid from the cash surrender value of the policies. The cash surrender value is a cap on Crowley's obligation to repay the Company for its expenditures. (The Company has allowed this erosion and invasion of its collateral.) Further, the Company has reserved the right to reinstitute the payments of these premiums should it ever be able to figure out a way to do this without violating Sarbanes-Oxley.

33

96.    Therefore, all of the insurance policies purchased by the Company at Company expense for the Crowley Family as gifts to the Crowley Family remain in full force and effect. When the Crowley Family has had an "obligation" to the Company under any of these agreements, the Company has eviscerated that "obligation" from an economic perspective and seen to it that the Crowley Family pays nothing. In fact, the Company pays Thomas Crowley's expenses in connection with the tax advice and planning necessary under these agreements. Such payments included in excess of $100,000 in 2002, in excess of $50,000 in 2003 and in excess of $100,000 in 2004.

97.    Not only have the defendants taken the active steps alleged herein in violation of their fiduciary duties, but they have also failed to rescind these policies. Because these are transactions between a corporation and a director and officer which were not approved by an independent committee of the Board nor ratified by appropriate shareholder action, they are voidable. Each of the defendants herein has breached his fiduciary duty by failing to seek to have these agreements voided and to demand compensation for the Company for the amounts spent in pursuit of these agreements.

98.    The history of these transactions demonstrate that neither Defendant Crowley nor the Directors viewed any of these insurance agreements as binding Company obligations, except to the extent they favor defendant Crowley and his family. The agreements serve no legitimate Company purpose. When it is in the interest of defendant Crowley to have the agreements amended or cancelled, the agreements are amended or cancelled. When defendant Crowley has a financial obligation, he is excused from payment. Even when the defendants were concerned about the effects of Sarbanes-Oxley, the defendants concocted a scheme to evade the law's purposes and to provide, with no out of pocket cost to defendant Crowley, a means by which the

insurance could remain in place for the benefit of the Crowley Family. The Company has not gained and can gain no benefit from any of these transactions. By the Company's own admissions, it could unilaterally have suspended payments on these agreements at any time. Quite simply, these agreements only exist as "contracts" in order to provide a façade of legitimacy to this otherwise illegitimate and inappropriate authorization of the expenditure of corporate funds. Defendant Crowley is standing on both sides of the transaction, through his control and domination of the Board, has negotiated with himself in determining the terms, amendments and funding of these self-dealing transactions. All of these agreements and the amendments and all their payments have provided nothing of any cognizable legal benefit to the Company. The most the Company has ever had is the ability to receive the return of only a portion of the funds expended for the private purposes of Mr. Crowley and his family. None of the purported corporate purposes is in any way, shape or form subjected to the slightest contractually enforceable protection.

### D.    Damages

99.    The Company has disclosed that the non-term portion of premiums paid under Split Dollar Agreements with Defendant Crowley and certain trusts for the benefit of his family was $2,999,000 in 2000, $2,978,426 in 2001 and $2,700,023 in 2002. It is not clear whether that includes the costs under all three insurance agreements or simply under Insurance Agreement 1. The Company has not disclosed the cost for Insurance Agreements 2 or 3 on a separate basis, nor has it disclosed any of its costs, outside of the time periods of 2001 and 2002, other than in the context of the Settlement Agreement. However, assuming an annual cost to the Company of $2.8 million dollars for all policies and assuming the premiums on each are proportional to the

death benefits, the annual premium on the policies subject to Insurance Agreements 2 and 3 are believed to be about $1.8 million.

100.    Thus it appears that even following the illusory "repayment" of the $7.5 million dollars, the damages arising from the three insurance agreements to date include at least the following: (a) interest on $7.5 million dollars apparently commencing in 1992 and continuing to date, (b) the difference between the amounts expended under Insurance Agreement 1 and $7.5 million dollars; and (c) annual premium payments on the $90 million dollars of insurance subject to Insurance Agreement 2, and Insurance Agreement 3 from 1998 to the present at the rate of about $1.8 million annually, for a total of $10.8 million exclusive of interest on the latter portion.

101.    The bulk of the Company's long-term debt carries interest from 4.96% to 8.125%, an average in excess of 6.5%. At 6.5% simple interest, the cost of the $7.5 million dollar loan to Crowley is $487,500 per year. Assuming annual payments under Insurance Agreements 2 and 3 total $1.8 million, the interest cost from these agreements is $117,000 annually. In total, the insurance agreements have injured the Company and the Class in the amount of at least $15 million dollars as of the commencement of this action and continue to injure the Company and the Class at the rate of approximately $2.4 million dollars per year.

102.    In sum, the Company has spent tens of millions of dollars as a gift for life insurance for its controlling stockholder's family's estate plan so that stockholder can maintain his position in control. The Company has made an enormous gift to the Crowley family for Defendant Crowley's personal benefit, not for a corporate purpose and to the detriment of the Class. Forgotten by the Board is that these are personal obligations of Defendant Crowley and his family related to his interests as a controlling shareholder and thus are not proper expenditures.

103.    The wrongs alleged herein were not only breaches of fiduciary duties at the time they occurred but each and every affirmative act of the Board in perpetuating these agreements and the failure to void and rescind them constitutes a continuing wrong. The history of these agreements makes clear than neither defendant Crowley nor the Company considers these agreements enforceable "contracts" and that any time, when it suits the purpose of defendant Crowley, these "contracts" are changed to suit his personal interests. Further, as the product of gross overreaching and self-dealing by the Crowley Family, these contracts were voidable at the option of the Company at any time. Further, defendants at any time could have sought restitution from the Crowley Family but chose not to do so.

104.    The Crowley Family and the Board members (including the defendants herein when on the Board) fully expected that the agreements could and would be modified at any time to suit the Crowley Family's desires and needs. For example, Amendment 2 was entered into because defendant Crowley found it to his personal advantage to place the insurance in a revocable trust. The agreement provided no benefit at all to the Company.

105.    The Insurance Agreements have never provided any benefit to the Company. At all times under all of the agreements, defendant Crowley was the sole owner of the policies and retained the right to do anything he wished with the policies including terminate them, surrender them, and use the proceeds in any fashion. The only "right" granted to the Company was the "right" to, under certain specific circumstances, receive a return of some, but less than all, of the money it had provided to the Crowley Family. An agreement to give money to a third party in exchange for the third party's promise to return, in the future, some portion of the money given without interest, is not a contract supported by any valid consideration.

106.   None of the challenged agreements was ever submitted to an independent review by independent board members and the Crowley Family never recused themselves from consideration of these agreements nor the changes thereto.   There were no fairness opinions on any of these agreements.   The agreements were not submitted to vote of disinterested shareholders. The contracts have never been approved in good faith by disinterested directors nor approved by disinterested shareholders.   Because the transactions are not fair to the Company or its shareholders, the insurance agreements, the amendments thereto and the settlement agreement are, and have been from their inception, voidable.  Even were the contracts not sham agreements, they were not binding obligations on the Company and the Company could have legally and rightfully refused to perform its obligations under the contracts at any point and declared them void.

## COUNT I
## DERIVATIVELY ON BEHALF OF CROWLEY AGAINST ALL DEFENDANTS

107.   Plaintiffs incorporate by reference ¶¶ 1-106 hereof as if fully set forth herein.

108.   The actions taken by the defendants in connection with the challenged transactions including authorizing the costs incurred, the agreements and payments made with respect to these Life Insurance Agreements and the Settlement Agreement were in breach of their fiduciary duties.  Such constituted gifts to Defendant Crowley and the Crowley family with no valid corporate purpose and constituted a waste of corporate assets.   Further they constitute interested self-dealing transactions not entirely fair to the Company or all its stockholders.

109.   The policy of assisting Defendant Crowley and the Crowley family in maintaining his position of control and domination of the Company is an invalid corporate policy which the defendants adopted in breach of their fiduciary duties to all shareholders.

110.   The Challenged Transactions are voidable self-interested transactions.

111.    Plaintiffs also are entitled to an accounting of the use of the corporate funds in the purchase of life insurance policies and are entitled to an Order directing that the defendants cause the owners of the insurance policies to assign those policies to the Company.

112.    Alternatively, the Company is entitled to damages against the defendants in an amount to be proven at trial.

113.    Plaintiffs are entitled to a determination by this Court invalidating the corporate policy of entrenching Defendant Crowley and the Crowley family as controlling stockholder and recovering for the Company all of the costs and amounts of creating and promoting this policy, including interest.

**COUNT II**
**ON BEHALF OF THE CLASS AGAINST ALL DEFENDANTS**

114.    Plaintiffs incorporate by reference ¶¶ 1-113 hereof as if fully set forth herein.

115.    The actions of the defendants as alleged herein breach their fiduciary duties and have caused injury to plaintiffs and the Class.

116.    That injury is separate and distinct from any injury suffered by all shareholders in at least the following ways:

       a.    the policy has the benefit of favoring the majority stockholder over the minority stockholders;

       b.    the policy has resulted in payments to, gifts to and economic benefits to the Crowley family not received by all other stockholders; and

       c.    the policy has as its stated purpose frustrating the potential for the Class to gain greater voting control through the diminution of the control of the Crowley family.

117.    The challenged transactions are self-dealing transactions on behalf of the controlling stockholder, not entirely fair to the Class and are voidable.

39

118.    To the extent the Court does not order a complete and full remedy to the Company as the result of this action, plaintiffs in the Class are entitled to an Order the defendants to cause the Company to pay dividend to common stock holders of the Company in an amount sufficient to fully compensate them for the difference between other recoveries and the injuries sustained. Plaintiffs are also entitled to an Order directing that any dividends payable in stock owned by the Crowley Family be subject to an offset to pay the damages sustained by the Company.

119.    Plaintiffs and the Class have been damaged and will continue to be damaged as a result of the pursuit of this policy.

120.    Plaintiffs and the Class have no adequate remedy of law.

## PRAYER FOR RELIEF

WHEREFORE. plaintiffs respectfully pray for an order or orders providing the following relief:

A.    Declaring this action to be appropriately brought as a derivative action;

B.    Declaring this action to be properly brought as a class action and certifying the Class and the Class representatives as alleged herein;

C.    Finding that defendants have breached their fiduciary duties with regard to the Challenged Transactions as more fully alleged herein;

D.    Directing an accounting in favor of the Company by the defendants for the funds wrongfully expended in connection with the challenged transactions and directing that the defendants cause the owners of the insurance policies to have them assigned to the Company.

E.    Declaring illegal and voiding the Crowley corporate policy of entrenching Defendant Crowley as controlling stockholder;

40

F.     Awarding the Company and the Class such damages as they have suffered in an amount at a minimum equal to the premiums paid by the Company on the split dollar life insurance policies, the interest forgiven to the Crowley family on all amounts owed to the Company and the cost and expenses incurred by the Company in creating, implementing, pursuing and defending the policy;

G.     Ordering Defendants Crowley and M. Crowley and Bowles to disgorge all benefits they and their family have received from the Company as a result of this policy and all related transactions;

H.     Awarding plaintiffs and their counsel such attorneys fees and expenses as are appropriate including expert witness fees; and

I.     Awarding such further and other relief as is just and equitable.

Dated: October 24, 2006                    TAYLOR & McNEW LLP


                                           By:    _____
                                                  R. Bruce McNew (#967)
                                                  2710 Centerville Road, Suite 210
                                                  Wilmington, DE 19808
                                                  Tel: 302/655-9200

                                           COUNSEL FOR PLAINTIFFS

# EXHIBIT B

EFiled: Mar 19 2007  2:28PM EDT
Transaction ID 14171332
Case No. 888-VCP

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| Franklin Balance Sheet Investment Fund and | ) | |
| Franklin Microcap Value Fund, Oppenheimer | ) | |
| Investment Partnership LP and Oppenheimer | ) | |
| Close International Ltd., Wynnefield Partners | ) | |
| Smallcap Value LP I, Wynnefield Partners | ) | |
| Smallcap Value LP, Wynnefield Smallcap Value | ) | |
| Off-Shore Fund LPD and Channell Partnership II, | ) | |
| LP, and John H. Norberg, Jr., Individually, | ) | |
| derivatively and on behalf of a Class of similarly | ) | |
| situated stockholders, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 888-VCP |
| v. | ) | |
| | ) | |
| Thomas B. Crowley, Jr., Molly M. Crowley, | ) | |
| Phillip E. Bowles, Gary L. Depolo, Earl T. Kivett, | ) | |
| William A. Pennella, Leland S. Prussia, Cameron | ) | |
| W. Wolfe, Jr., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Crowley Maritime Corporation, | ) | |
| | ) | |
| Nominal Derivative Defendant. | ) | |

## STIPULATION AND AGREEMENT OF
## COMPROMISE, SETTLEMENT AND RELEASE

The parties to the above-captioned action (the "Action"), by and through their

attorneys, have entered into the following Stipulation and Agreement of Compromise, Settlement

and Release (the "Stipulation"), subject to the approval of the Court:

1

**EXHIBIT B**

WHEREAS:

A.     On November 30, 2004, Franklin Balance Sheet Investment Fund and Franklin Microcap Value Fund, Oppenheimer Investment Partnership LP and Oppenheimer Close International Ltd., Wynnefield Partners Smallcap Value LP I, Wynnefield Partners Smallcap Value LP, Wynnefield Smallcap Value Off-Shore Fund LPD and Channell Partnership II, LP ("Initial Plaintiffs"), filed a complaint in the Court of Chancery of the State of Delaware in and for New Castle County (the "Complaint"), which was styled to include both a derivative claim, putatively brought on behalf of the Crowley Maritime Corporation (the "Company") and class claims, putatively brought on behalf of the Initial Plaintiffs and all other holders of the Company's common stock (other than defendants and any of their affiliates). Among other things, the Complaint alleged that the directors breached their fiduciary duties by putting in place a "policy" to ensure that the Crowley family maintained control of the Company, including by entering into split-dollar life insurance agreements (the "Split-Dollar Agreements"). The Complaint alleged that by entering into and authorizing the Company to make payments under the Split-Dollar Agreements, the directors breached their fiduciary duties and injured the stockholders of the Company. The Initial Plaintiffs asked the Court to certify a class, grant declaratory relief, and order the disgorgement of profits and damages in an amount equal to the premiums, cost and expenses paid with respect to the Split-Dollar Agreements.

B.     On February 25, 2005, the defendants moved to dismiss the Complaint. The Court heard oral argument on the motion on August 3, 2005, and, pursuant to the Court's direction at the conclusion of the argument, on October 24, 2005, defendants filed a supplemental brief.

2

C.    In response, on December 27, 2005, Initial Plaintiffs, in lieu of filing a responsive supplemental brief, sought leave to amend their complaint and to add another plaintiff to address the issues raised by the motion to dismiss.

D.    On October 19, 2006, the Court granted Initial Plaintiffs leave to amend the Complaint and add another plaintiff. On October 24, 2006, the Initial Plaintiffs filed an amended complaint (the "Amended Complaint"), which added Norberg as a plaintiff, and made new allegations (together with all named Initial Plaintiffs, the "Plaintiffs").

E.    On November 7, 2006, the defendants moved to dismiss the Amended Complaint. On November 27, 2006, the parties entered into a briefing schedule on defendants' motion to dismiss the Amended Complaint, with argument to be heard on February 22, 2007.

F.    In December 2006, counsel for the defendants and counsel for the Plaintiffs engaged in extensive arm's-length negotiations concerning a possible settlement of the claims alleged in the Amended Complaint.  The parties discussed settling those claims by providing Plaintiffs an opportunity to sell their shares for cash to liquidate their minority position in the Company. After numerous discussions, Plaintiffs agreed to consider a tender offer for their shares, but insisted that their valuation of the Company indicated that the price to be offered would have to substantially exceed the bid price for the shares (which at the time was approximately $1800.00 per share). Following extended negotiations between counsel for the parties, Plaintiffs indicated that they would favorably consider an offer of $2,990.00 per share for their stock in the context of a tender offer for all shares, conditioned on at least 95% of the shares being tendered and a majority of the unaffiliated shares being tendered.

G.    In evaluating the settlement proposed herein (the "Settlement"), Plaintiffs and their counsel considered, among other things: (i) the benefit to the Plaintiffs and the class

3

provided by the Settlement, particularly the opportunity to liquidate their minority position for cash at a substantial premium to the bid price of the shares; (ii) the attendant risks of continued litigation and the uncertainty of the outcome of the litigation; (iii) the probability of recovery and nature of a judgment thereon; and (iv) the conclusion reached by the Plaintiffs and their counsel after investigation and consideration sufficient to inform themselves of the merits of the Settlement, that the terms of the Settlement are fair and reasonable and in the best interest of the Plaintiffs and the class.

        H.    Defendants have vigorously denied, and continue to deny, any wrongdoing or liability with respect to all claims, events and transactions complained of in the Amended Complaint, deny that they engaged in any wrongdoing, deny that they committed any violation of law, deny that they breached any fiduciary duties, deny that they acted improperly in any way and deny liability of any kind to Plaintiffs or the potential class, but consider it desirable that the Action be settled and dismissed on the merits and with prejudice in order to: (i) avoid the substantial expense, inconvenience and distraction of continued litigation; (ii) dispose of potentially burdensome and protracted litigation; and (iii) finally put to rest and terminate the claims asserted in the Action.

        **NOW, THEREFORE, IT IS STIPULATED AND AGREED**, subject to the approval of the Court, and pursuant to Delaware Court of Chancery Rules 23(e) and 23.1, that all claims, rights, demands, suits, matters, issues or causes of action, whether known or unknown, of the Plaintiffs and all class members (as herein defined) against all defendants and any of their present or former officers, directors, employees, stockholders, agents, attorneys, advisors, insurers, accountants, trustees, financial advisors, commercial bank lenders, persons who provided fairness opinions, investment bankers, associates, representatives, affiliates, parents,

4

subsidiaries (including the directors and officers of such affiliates, parents, and subsidiaries), general partners, limited partners, partnerships, heirs, executors, personal representatives, estates, administrators, successors and assigns (collectively, "Defendants' Affiliates"), whether such claims arise or could have arisen under state or federal law, including the federal securities laws (except for claims for appraisal pursuant to Section 262 of the Delaware General Corporation Law of stockholders who properly demand appraisal and have not otherwise waived their appraisal rights), and whether directly, derivatively, representatively or arising in any other capacity, that arise out of or in connection with, any claim that was or could have been brought in the Amended Complaint, or that arises now or hereafter out of, or that relates in any way to, the acts, facts or the events alleged in the Amended Complaint including, without limitation, the Life Insurance Agreements and the Settlement Agreement (as those terms are defined in the Amended Complaint), any premiums, expenses, costs or other monies paid or forgiven by the Company relating thereto, and any agreements and disclosures relating thereto, and any acts, facts, matters, transactions, occurrences, conduct or representations relating to or arising out of the subject matter referred to in the Amended Complaint, and the fiduciary and disclosure obligations of any of the defendants (or other persons to be released) with respect to any of the foregoing (whether or not such claim could have been asserted in the Amended Complaint), shall be forever compromised, settled, released and dismissed with prejudice (the "Settled Claims"), upon and subject to the following terms and conditions:

1.     Crowley Newco Corporation, (the "Purchaser") a corporation formed by Thomas B. Crowley Jr., will make a cash tender offer to acquire all of the outstanding public shares of common stock of the Company, including all shares currently held by Plaintiffs and the members of the putative class (the "Public Shares"), for $2990.00 per share in cash (the "Offer").

The Offer will include conditions requiring that there be validly delivered and not withdrawn prior to the expiration date of the Offer a number of shares of common stock of the Company that constitute: (a) a majority of the Public Shares (the "Majority of the Minority Condition"); and (b) together with the shares beneficially owned by the Purchaser, at least 95% of the total number of shares outstanding on the expiration date of the Offer (the "Minimum Condition"). The Offer will also include conditions that this Court shall have approved the settlement of this litigation and entered its final order (and the time for any appeal shall have expired) prior to the closing of the Offer, that there be no material adverse change in the business or assets of the Company prior to the closing of the Offer, that there be no pending governmental or legal action challenging or delaying the consummation of the Offer or the Merger (as defined below), and that the Crowley Board of Directors shall not have determined to oppose the Offer or Merger. Plaintiffs hereby agree to tender all of the shares they own or control and will not oppose the Offer or Merger, withdraw such shares, transfer or dispose or such shares or exercise appraisal rights in the Merger. Under the terms of the Offer, the Purchaser may waive certain conditions.

2.     Immediately following expiration of the Offer and at the same time as it accepts for payment and purchases the tendered Public Shares, the Purchaser will complete the acquisition of all of the shares beneficially owned or held by Thomas B. Crowley, Jr., Christine S. Crowley and Molly M. Crowley (other than 278 shares held by the Crowley Foundation), as well as those shares held by the Company's Retirement Stock Plan, Stock Savings Plan and Employee Stock Ownership Plan, then will merge with and into the Company, with the Company continuing as the surviving Company following the merger (the "Merger"). The Purchaser will complete the Merger at the same price to be paid in the Offer ($2990.00 per share), following consummation of the Offer according to its terms.

6

3.    As soon as practicable after the Stipulation has been executed, the parties hereto shall jointly apply to the Court for an Order (in the form attached hereto as Exhibit A), with respect to notice and the settlement hearing (the "Scheduling Order"):

(a.)    Provisionally certifying this Action as a class action pursuant to Delaware Court of Chancery Rules 23(a), 23(b)(1) and 23(b)(2) on behalf of the class to include all record and beneficial owners of shares of common stock of the Company on any day during the period from December 23, 2003 to and including the effective date of the consummation of the Merger (other than Defendants and their "affiliates" and "associates" (as those terms are defined in Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934)), including the legal representatives, heirs, successors-in-interest, transferees or assigns of all such foregoing holders, immediate and remote ("the Class");

(b.)    Providing that the Plaintiffs in the Action are designated as the class and derivative representatives (the "Representatives"), and designating their counsel as Class and Derivative Counsel;

(c.)    Directing that a hearing be held by the Court (the "Settlement Hearing") to determine, among other things (i) whether the Court should approve the Settlement and enter the Order and Final Judgment dismissing the Amended Complaint pursuant to Rules 23(e) and 23.1 of the Court of Chancery with prejudice and on the merits, each party to bear its own costs (except as expressly provided herein) and extinguishing and releasing any and all Settled Claims; (ii) whether, in the event that the Court approves the Settlement, to grant Plaintiffs' application for an award of attorneys' fees and for the reimbursement of expenses incurred that they may make in accordance with the Stipulation; and (iii) such other matters as the Court may deem necessary and appropriate;

(d.)    Providing that a copy of the Notice of Pendency of Class Action, Proposed Settlement of Class and Derivative Action, Settlement Hearing; and Right to Appear (the "Notice"), substantially in the form attached hereto as Exhibit B, be mailed by or on behalf of the Company by first-class mail within ten (10) business days of the date of the Scheduling Order, in the name of the Register in Chancery or by the direction of the Court, to all record holders and beneficial owners of shares of common stock of the Crowley Maritime Corporation (other than the defendants and Defendants' Affiliates) who held common stock on any day during the period from December 23, 2003 to the present at their last known addresses appearing in the stockholders' records of the Company; and

(e.)    Requesting that record holders in the Class who are not also the beneficial owners of the shares of the Company's common stock held by them of record forward the Notice to the Class to such beneficial owners of those shares. Additional copies of the Notice to the Class will be made available to the record holders for this purpose upon request.

4.    If the Settlement (including any modification thereto made with the consent of the parties as provided for herein) and all transactions preparatory or incident thereto shall be approved by the Court following a hearing as fair, reasonable and adequate and in the best interest of the Class, the parties shall jointly request the Court to enter an Order and Final Judgment (substantially in the form attached hereto as Exhibit C) (the "Final Judgment"). The Final Judgment shall, among other things:

(a.)    Certify this Action as a class action pursuant to Delaware Court of Chancery Rules 23(a) and 23(b)(1) on behalf of the Class;

(b.)    Certify the Plaintiffs in the Action as the Class and Derivative Representatives;

8

(c.)  Certify the Representative's counsel as Class and Derivative Counsel;

(d.)  Approve the Settlement, and all transactions preparatory or incident thereto, as fair, reasonable, adequate and in the best interest of the Class, pursuant to Chancery Court Rule 23(e) and the Corporation pursuant to Chancery Court Rule 23.1;

(e.)  Authorize performance of the Settlement in accordance with its terms and conditions;

(f.)  Dismiss the Action with prejudice including with prejudice against all Plaintiffs and members of the Class, without costs except as hereinafter provided and release defendants, Defendants' Affiliates, and each of them, from the Settled Claims upon consummation of the Offer and Merger in accordance with the terms and conditions of the Offer and this Stipulation.

5.  The Effective Date of the Settlement proposed by this Stipulation shall be five (5) days after the latter of: (i) consummation of the Merger and (ii) entry by the Court of a Final Order and Judgment approving the Settlement that is no longer subject to further appeal or reargument, either because the time for an appeal or reargument has expired with no appeal or reargument being taken, or an appeal has been taken but has been dismissed with no further right of appeal or reargument, or the Order and Final Judgment approving the Settlement has been finally affirmed with no further right of appeal or reargument, or the Final Order and Judgment approving the Settlement has otherwise become final.

6.  If the Settlement provided herein is approved by the Court, the Representative's counsel will apply to the Court for an award of attorneys' fees and expenses. The Company shall pay on behalf of all defendants only the fees and expenses as the Court

9

directs. Neither Crowley, nor any individual defendant, nor any of the Defendants' Affiliates shall be liable for any other fees or expenses of the Class. Any fees or expenses that are awarded pursuant to the terms of this Stipulation shall be paid within ten (10) business days after the Effective Date (defined above); provided however, that no such fees or expenses shall be paid until all proceedings described in paragraph 11 hereof have been dismissed or withdrawn.

7.    The procedure for and the allowance or disallowance by the Court of any application by Class Counsel for attorneys' fees are not part of the Settlement set forth in this Stipulation and may be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the Settlement set forth in this Stipulation. Any order or proceedings relating to the fee application, or any appeal from any order relating thereto or reversal or modification thereof, are not intended to operate to terminate or cancel this Stipulation, or affect or delay the finality of the Order and Final Judgment approving this Stipulation and the Settlement of the Action. Further, it is the intention of the parties that any order, proceedings or appeal relating to the application for fees not affect or delay the finality of the judgment approving this Stipulation or the Settlement.

8.    Except as provided in this Stipulation, defendants and Defendants' Affiliates shall bear no other expenses, costs, damages or fees incurred by the Representative, or any member of the Class, or by any attorney, expert, adviser, agent or representative of any of the foregoing persons.

9.    The Company shall assume the administrative responsibility of providing the Notice to the Class and its stockholders in accordance with the Scheduling Order, and shall bear the expense of mailing the Notice. Prior to or at the Settlement Hearing, counsel for the

Company shall file with the Court an appropriate affidavit with respect to the initial mailing of the Notice.

10.    The release contemplated by this Stipulation extends to claims that the Representatives, on behalf of themselves, the Class, and the Company do not know or suspect to exist at the time of the release, which if known, might have affected the decision to enter into this release. Each of the named Representatives and each member of the Class shall be deemed to waive any and all provisions, rights and benefits conferred by any law of the United States or any state or territory of the United States, or principle of common law, which governs or limits a person's release of unknown claims including, without limitation, Section 1542 of the California Civil Code (any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code § 1542) which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR

The Representatives, on behalf themselves, the Class, and the Company further acknowledge that members of the Class may discover facts in addition to or different to those that they now know or believe to be true with respect to the subject matter of this release, but that it is their intention, on behalf of the Class, to fully, finally and forever settle and release any and all claims released hereby known or unknown, suspected or unsuspected, which now exist, or heretofore existed, or may hereafter exist, and without regard to the subsequent discovery or existence of such additional or different facts.

11

11.    If any claims which are or would be subject to the release and discharge contemplated by the Settlement are asserted against any person in any court prior to the Effective Date of the Settlement, Plaintiffs shall join in any motion to dismiss or stay such proceedings and shall otherwise use their best efforts to effect a withdrawal or dismissal of the claims.  If, following a motion to dismiss, such claims are not dismissed or the action or actions in which such claims are asserted are not stayed in contemplation of dismissal subject only to approval of this proposed Settlement, any of the defendants may, at their sole discretion, withdraw from the Settlement.  Any party electing to withdraw from the Settlement must provide all counsel with a notice of such withdrawal within ten (10) business days of any decision or decisions denying the dismissal or stay of such claims.

12.    If, for any reason, this Stipulation (including any amendment made thereto) in whole or in part, is not approved by the Court, or the Court approves the Settlement but such approval is reversed or vacated on appeal and such order reversing or vacating the Settlement becomes final or any of the conditions to this Settlement are not fulfilled, or the Offer or Merger cannot be consummated for any reason, then the Settlement proposed herein shall be of no further force or effect and the Settlement and any amendment thereto and all orders relating to it shall be null and void and of no force and effect.  In any such event, neither this Stipulation nor any of the orders contemplated by it shall prejudice in any way the respective positions of the parties with respect to the Action or their rights relating to it.

13.    No Provision contained in this Stipulation shall be deemed an admission by any party as to any claim alleged or asserted in the Action, and neither this Stipulation nor the negotiations or proceedings in connection with this Stipulation shall be offered or received into

12

evidence at a trial or any other proceeding of any kind whatsoever, except in an action or proceeding to enforce the terms and conditions of this Stipulation.

14.     Each of the attorneys executing this Stipulation on behalf of one or more parties hereto warrants and represents that he or she has been duly authorized and empowered to execute this Stipulation on behalf of each such respective party.

15.     Counsel for the Representatives and defendants are expressly authorized to enter into changes, modifications, or amendments of the Stipulation and the attached Exhibits which they mutually deem appropriate without further notice as long as such changes are in writing and are approved by the Court and the Court does not requires such notice; provided however, Court approval is not necessary and shall not be sought for purely ministerial and non-substantive changes, modifications or amendments as counsel may determine are necessary and appropriate in connection with administration of the Settlement including, but not limited to reasonable extensions of time to carry out any of the provisions of this Stipulation.

16.     Any failure by any party to insist upon the strict performance by any other party of any of the provisions of the Settlement Agreement or this Stipulation shall not be deemed a waiver of any such provisions, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the strict performance of any and all of the provisions of the Settlement Agreement and this Stipulation to be performed by such other party.

17.     This Stipulation and all Exhibits hereto and any related settlement document shall be governed and interpreted in accordance with the laws of the State of Delaware, without regard to the conflict of law provisions thereof.

18.     In the event of any dispute or disagreement with respect to the meaning, effect or interpretation of the Stipulation or an attached exhibit or in the event of a claimed

13

TAYLOR & MCNEW, LLP

R. Bruce McNew (#967)
2710 Centerville Road, Suite 210
Greenville, DE 19808
(302) 655-9200
   *Attorney for Plaintiffs*

MORRIS NICHOLS ARSHT & TUNNELL, LLP

Jon E. Abramczyk  (#2432)
John P. DiTomo (#4850)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
   *Attorneys for Defendants*

OF COUNSEL:

Michael D. Torpey
James N. Kramer
Erin L. Bansal
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
(415) 773-5900

549006

15

# EXHIBIT C

EFiled: Apr 27 2007  4:24PM EDT
Transaction ID 14649233
EFiled: Apr 27 2007  2:11PM
Transaction ID 14645715
Case No. 888-VCP

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| Franklin Balance Sheet Investment Fund and Franklin Microcap Value Fund, Oppenheimer Investment Partnership LP and Oppenheimer Close International Ltd., Wynnefield Partners Smallcap Value LP I, Wynnefield Partners Smallcap Value LP, Wynnefield Smallcap Value Off-Shore Fund LPD and Channell Partnership II, LP, and John H. Norberg, Jr., Individually, derivatively and on behalf of a Class of similarly situated stockholders, <br><br> Plaintiffs, <br><br> v. <br><br> Thomas B. Crowley, Jr., Molly M. Crowley, Phillip E. Bowles, Gary L. Depolo, Earl T. Kivett, William A. Pennella, Leland S. Prussia, Cameron W. Wolfe, Jr., <br><br> Defendants, <br><br> v. <br><br> Crowley Maritime Corporation, <br><br> Nominal Derivative Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 888-VCP <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## ~~[PROPOSED]~~ ORDER AND FINAL JUDGMENT

The Stipulation and Agreement of Compromise, Settlement and Release, dated March 19, 2007 (the "Stipulation"), of the above-captioned consolidated action (the "Action"), having been presented at the Settlement Hearing on April 27, 2007, pursuant to the Scheduling Order for Approval of Settlement of Class and Derivative Action entered herein on March 21, 2007 (the "Scheduling Order"), which Stipulation was joined and consented to by all parties to the Action and which (along with the defined terms therein) is incorporated herein by reference;

and the Court having determined that notice of said hearing was given in accordance with the Scheduling Order to the members of the Class as certified by the Court in the Scheduling Order and that said notice was adequate and sufficient; and the parties having appeared by their attorneys of record; and the attorneys for the respective parties having been heard in support of the settlement of the Action, and an opportunity to be heard having been given to all other persons desiring to be heard as provided in the Notice (as defined below); and the entire matter of the Settlement having been considered by the Court;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, this _27th_ day of _April_, 2007, as follows:

1.    The Notice of Pendency of Class and Derivative action, Temporary and Proposed Class Action Determination, Proposed Settlement of Class and Derivative Action, Settlement Hearing and Right to Appear (the "Notice") has been given to the Class (as defined hereinafter), pursuant to and in the manner directed by the Scheduling Order, proof of the mailing of the Notice was filed with the Court by counsel for defendants and full opportunity to be heard has been offered to all parties, the Class and persons in interest. The form and manner of the Notice is hereby determined to have been the best notice practicable under the circumstances and to have been given in full compliance with each of the requirements of Due Process and Delaware Court of Chancery Rules 23 and 23.1.

2.    Due and adequate notice of the proceedings having been given and a full opportunity having been offered to the members of the Class to participate in the Settlement Hearing, or object to the Settlement, it is hereby determined that all members of the Class are bound by the Final Order and Judgment entered herein.

2

3.    Based on the record of the Action and pursuant to Court of Chancery Rule 23.1, the Court finds that (a) the Action with respect to Count I was properly instituted as a derivative action on behalf of the Company and its shareholders; and (b) at all times, the named Plaintiffs and their counsel have adequately represented the interests of the Company and its shareholders with respect to Count I of the Action and claims asserted therein.

4.    Based on the record of the Action, each of the provisions of Chancery Court Rule 23(a) has been satisfied with respect to Count II of the Complaint and the Action with respect to such Count has been properly maintained as a class action pursuant to Chancery Court Rules 23(b)(1) and (b)(2).  Specifically, this Court finds that (a) the Class is so numerous that joinder of all members is impracticable; (b) there are questions of law or fact common to the Class; (c) the claims of the representative plaintiff are typical of the claims of the Class; and (d) the representative plaintiff has fairly and adequately protected the interests of the Class. Therefore, the Action is finally certified, as a class action, pursuant to Chancery Court Rules 23(a), (b)(1) and (b)(2), with no opt-out rights, on behalf of a class (the "Class") composed of all owners of the Company's common stock as of December 23, 2003 to and including the effective date of the consummation of the Merger as defined in the Stipulation, (other than defendants and their "affiliates" and "associates" (as those terms are defined in Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934)), including the legal representatives, heirs, successors in interest, transferees and assignees of all such foregoing holders, immediate and remote.

5.    Plaintiffs are hereby finally certified as Class and Derivative representatives with their respective counsel finally certified as Class and Derivative counsel.

6.    The Settlement is found to be fair, reasonable and adequate and in the best interests of the Company, its shareholders and the Class, and it is hereby approved.  The parties

3

to the Stipulation are hereby authorized and directed to comply with and to consummate the Settlement in accordance with its terms and provisions, and the Register in Chancery is directed to enter and docket this Order and Final Judgment in the Action.

7.    The Amended Complaint in the Action is dismissed in its entirety with prejudice on the merits, with each party to bear its own costs (except, with respect to costs, as otherwise provided in the Stipulation).

8.    All claims, rights, demands, suits, matters, issues or causes of action, whether known or unknown, of the plaintiffs and all class members (as herein defined) against all defendants and any of their present or former officers, directors, employees, stockholders, agents, attorneys, advisors, insurers, accountants, trustees, financial advisors, commercial bank lenders, persons who provided fairness opinions, investment bankers, associates, representatives, affiliates, parents, subsidiaries (including the directors and officers of such affiliates, parents, and subsidiaries), general partners, limited partners, partnerships, heirs, executors, personal representatives, estates, administrators, successors and assigns (collectively, "Defendants' Affiliates"), whether such claims arise or could have arisen under state or federal law, including the federal securities laws (except for claims for appraisal pursuant to Section 262 of the Delaware General Corporation Law of stockholders who properly demand appraisal and have not otherwise waived their appraisal rights), and whether directly, derivatively, representatively or arising in any other capacity, that arise out of or in connection with, any claim that was or could have been brought in the Amended Complaint, or that arises now or hereafter out of, or that relates in any way to, the acts, facts or the events alleged in the Amended Complaint including, without limitation, the Life Insurance Agreements and the Settlement Agreement (as those terms are defined in the Amended Complaint), any premiums, expenses, costs or other monies paid or

4

forgiven by the Company relating thereto, and any agreements and disclosures relating thereto, and any acts, facts, matters, transactions, occurrences, conduct or representations relating to or arising out of the subject matter referred to in the Amended Complaint, and the fiduciary and disclosure obligations of any of the defendants (or other persons to be released) with respect to any of the foregoing (whether or not such claim could have been asserted in the Amended Complaint), shall be forever compromised, settled, released and dismissed with prejudice (the "Settled Claims"). Dismissal of the Settled Claims with prejudice and on the merits shall become effective immediately upon the entry of this Order and Final Judgment and without any further action by the Court.

9.    The release set forth herein extends to claims that plaintiffs, on behalf of the Class and the Company, do not know or suspect to exist at the time of the release, which if known, might have affected the decision to enter into this release. Each of the named plaintiffs and each member of the Class and the company shall be deemed to waive any and all provisions, rights and benefits conferred by any law of the United States or any state or territory of the United States, or principle of common law, which governs or limits a person's release of unknown claims. Plaintiffs, on behalf of the Class, acknowledge that members of the Class may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of this release, but that it is their intention, on behalf of the Class, to fully, finally and forever settle and release any and all claims released hereby known or unknown, suspected or unsuspected, which now exist, or heretofore existed, or may hereafter exist, and without regard to the subsequent discovery or existence of such additional or different facts.

10.    The Class's rights, to the extent permitted by law, to any benefits of the provisions of Section 1542 of the California Civil Code or any other similar state law, federal law or principle of common law, which may have the effect of limiting the release set forth above, are terminated. The law of the State of Delaware, is applicable to the Settlement or the Settled Claims.

11.    Without affecting the finality of this judgment, consideration of Plaintiffs' attorney's application for an award of attorney's fees and expenses is reserved for a future date.

12.    Nothing in this Final Order and Judgment shall be construed as a presumption, concession or admission by any of the parties to the Stipulation or the Action of any fault, liability or wrongdoing as to any facts or claims alleged or asserted in the Action, or any other actions or proceedings, and shall not be interpreted, construed, deemed, invoked, offered, or received in evidence or otherwise used by any person in any action or proceeding, whether civil, criminal or administrative, except in a proceeding to enforce the terms or conditions of the Stipulation or of this Order and Final Judgment.

_Donald J. Parsons_
Vice Chancellor

6

# EXHIBIT D

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| Franklin Balance Sheet Investment Fund and<br>Franklin Microcap Value Fund, Oppenheimer<br>Investment Partnership LP and Oppenheimer<br>Close International Ltd., Wynnefield Partners<br>Smallcap Value LP I, Wynnefield Partners<br>Smallcap Value LP, Wynnefield Smallcap Value<br>Off-Shore Fund LPD and Channell Partnership II,<br>LP, Individually, derivatively and on behalf of a<br>Class of similarly situated stockholders,<br><br>    Plaintiffs,<br><br>  v.<br><br>Thomas G. Crowley, Jr., Molly M. Crowley,<br>Phillip E. Bowles, Gary L. Depolo, Earl T. Kivett,<br>William A. Pennella, Leland S. Prussia, Cameron<br>W. Wolfe, Jr.,<br><br>    Defendants,<br><br>  v.<br><br>Crowley Maritime Corporation,<br><br>    Nominal Derivative<br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 888-VCP |

**MEMORANDUM OPINION**

Submitted:  June 9, 2006
Decided:  October 19, 2006

R. Bruce McNew, Esquire, TAYLOR & McNEW, LLP, Wilmington, Delaware, *Attorneys for Plaintiff*

Jon E. Abramczyk, Esquire, John P. DiTomo, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Michael D. Torpey, Esquire, James N. Kramer, Esquire, Erin L. Bansal, Esquire, ORRICK, HERRINGTON & SUTCLIFFE LLP, San Francisco, California, *Attorneys for Defendants*

**PARSONS, Vice Chancellor.**

Plaintiffs brought this action derivatively and directly, as a class action, against the directors of Crowley Maritime Corporation ("Crowley" or the "Company") for breach of fiduciary duties and waste in connection with split-dollar life insurance policies obtained for the controlling stockholder, officer, and director. Pursuant to a settlement approved by the Court on April 27, 2007, Defendants successfully took the Company private by completing a tender offer for its common stock followed by a short form merger. The action currently is before the Court on the application of Plaintiffs' counsel for an award of their attorney's fees and out-of-pocket expenses in prosecuting this litigation.

Claiming a percentage of an alleged benefit to the class of minority stockholders of $37.25 million, Plaintiffs' counsel seek attorney's fees of $6 million. By agreement of the parties, any attorney's fees and expenses approved by the Court will be paid by the Company, which one or more Defendants now wholly own. Defendants oppose Plaintiffs' counsel's fee application as seeking a windfall and as being based on the erroneous premise that this litigation was the sole cause of the benefit realized by the class as a result of the tender offer. According to Defendants, this is a "shared credit" case and the counsel fees therefore must be based on *quantum meruit*, rather than a percentage of any perceived "common fund." Using that analytical framework, Defendants urge the Court to limit the award of attorney's fees to $650,000.

For the reasons stated in this Memorandum Opinion, I conclude that, although the question is not free from doubt, Plaintiffs' counsel has made a sufficient showing that the litigation was a cause, and probably the primary one, of the sizeable benefit realized by the class from the tender offer made pursuant to the settlement agreement. Therefore, I

1

hold that Plaintiffs' counsel is entitled to recover their fees based on a percentage of the benefit conferred. I do not agree, however, with Plaintiffs' counsel's claim that this litigation constitutes the sole and direct cause of the entire premium paid in the tender offer. Because Plaintiffs' counsel instigated the action to recover $23,500,000 in damages to at least the Company, if not the class, as well, and did not seek to force the sale of the Company or similar relief, I find it most equitable to award attorney's fees by attributing different percentage rates to two separate portions of the benefit paid to Plaintiffs. Specifically, I award attorney's fees of 15% of the amount alleged in Plaintiffs' Complaint, or $23,500,000, yielding $3,525,000. Additionally, I award attorney's fees of 5% of the remaining benefit paid to Plaintiffs, or $13,744,620, yielding $687,231. Accordingly, I award fees to Plaintiffs' counsel in the total amount of $4,212,231. In addition, the expenses recoverable are $7,227.26, as opposed to the $17,227.26 requested by Plaintiffs' counsel.

## I.     BACKGROUND[1]

### A.     Facts

#### 1.     Parties

Before selling their holdings in connection with the settlement of this case, Plaintiffs and the shareholders they represent collectively owned approximately 30% of

---

[1]     Unless otherwise stated, the information in this section is taken from my earlier memorandum opinion, *Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 Del. Ch. LEXIS 188 (Oct. 19, 2006), the pleadings, or from the settlement agreement dated March 19, 2007.

2

the common stock of the Company.[2]  Thomas B. Crowley, Jr. ("Mr. Crowley") and members of his family (the "Crowley Family"), collectively, owned virtually all of the remainder of the common stock.

Crowley is a Delaware corporation with its principal executive office in Oakland, California.  It provides diversified transportation services in domestic and international markets by means of four operating lines of business:  Liner Services, Logistics, Marine Services, and Petroleum Services.  Defendant Mr. Crowley is Chairman, President, and Chief Executive Officer of the Company and has been a director since 1994.  Before settling the underlying dispute, Mr. Crowley beneficially owned and controlled approximately 65% of the voting stock of the Company.

### 2.    Plaintiffs' claims

In their Amended Class Action and Derivative Complaint (the "Complaint"), Plaintiffs alleged that on April 6, 1992, the Company and Mr. Crowley entered into the first of three split-dollar life insurance agreements (the "1992 Agreement").  The 1992 Agreement relates to five life insurance policies with a total face value amount of $50 million on the life of the survivor of Mr. Crowley's father, Thomas B. Crowley, or his step-mother, Molly Crowley.  Under the terms of the 1992 Agreement, Mr. Crowley owned the underlying policies and the Company was obligated to pay the premiums on

---

[2]    Plaintiffs are Franklin Balance Sheet Investment Fund, Franklin Microcap Value Fund, P. Oppenheimer Investment Partnership LP, Oppenheimer Close International Ltd., Wynnefield Partners Smallcap Value LP I, Wynnefield Partners Smallcap Value LP, Wynnefield Smallcap Value Off-Shore Fund Ltd., Channell Partnership II, LP, and John H. Norberg, Jr.  The named Plaintiffs owned in excess of 10% of the stock of Crowley.

3

them. On July 20, 1998, the Company and Mr. Crowley entered into a second split-dollar life insurance agreement related to six life insurance polices with a total face amount of $50 million on the life of Molly Crowley. The Company and Mr. Crowley entered into a third life insurance agreement on November 24, 1998, covering policies having a total face amount of $40 million (collectively with the July 1998 Agreement, the "1998 Agreements"). Similar to the 1992 Agreement, Mr. Crowley was the sole owner of the policies covered by the 1998 Agreements; the policies were pledged to the Company to secure Mr. Crowley's obligation to repay the Company for the premiums, upon termination of the 1998 Agreements or payment of a death benefit.

The Crowley board claimed to have approved the 1992 Agreement and the 1998 Agreements in furtherance of their belief that maintaining the closely held nature of the Company was in the best interests of the Company's stockholders and would maximize long-term stockholder value. Sometime in 2002 or 2003, however, the Company ceased making premium payments under both the 1992 and 1998 Agreements because the board was concerned that such payments might violate § 402 of the then newly enacted Sarbanes-Oxley Act. Accordingly, in its April 19, 2004, proxy statement, the Company stated that Mr. Crowley had been solely responsible for paying the premiums on the insurance provided by the 1992 Agreement since the enactment of Sarbanes-Oxley in July 2002.

On December 23, 2003, the Company and Mr. Crowley entered into an agreement that terminated and settled the parties' obligations under the 1992 Agreement. Pursuant to that agreement, Mr. Crowley repaid the Company $7.5 million, which represented the

4

total amount of premiums paid by the Company under the 1992 Agreement, but did not include any interest. In return, the Company agreed to pay Mr. Crowley for the taxes and interest payable by him on the financing he arranged to repay the $7.5 million to the Company. The life insurance policies underlying the 1992 Agreement continued in effect, but the Company paid the premiums from the cash surrender value of those policies.[3]

In their Complaint, Plaintiffs asked this Court to award damages to the Company and the class in an amount equal to the premiums paid by the Company on the split-dollar life insurance policies, the interest forgiven to the Crowley Family on all amounts owed to the Company from 1992 to the date this litigation settled, and the cost and expenses incurred by the Company in creating, implementing, pursuing, and defending the policies.[4]

The parties disagree over the total amount of damages Plaintiffs claimed in their Complaint. Plaintiffs contend they sought approximately $23.5 million, while Defendants assert that the maximum total liability would have been no more than $11 to $12 million.[5] Because the record at the preliminary stage at which this case settled is quite sparse, it is difficult to determine precisely the total amount of damages Plaintiffs

---

[3]    Similarly, by the end of 2003, the Company had "suspended" payments under the two 1998 Agreements, and allowed the current premiums to be paid out of the cash surrender values of the underlying policies. Compl. ¶¶ 95(b), (c).

[4]    Compl., Prayer for Relief, ¶ F.

[5]    Defs.' Br. in Opp. to Pls.' App. for Atty's Fees ("DAB") at 17 n.7.

actually sought. Having carefully considered the parties' divergent arguments on this issue, however, I am convinced Plaintiffs' estimate more closely comports with the allegations in the Complaint.

Plaintiffs' damages claim includes several components. The first two relate to the 1992 Agreement. In the settlement agreement the Company entered into with Mr. Crowley on December 23, 2003, the parties agreed that from September 1992 until December 2003, the Company spent approximately $7.5 million under the 1992 Agreement. Mr. Crowley borrowed that amount and paid it back to the Company pursuant to the 2003 settlement agreement, but the Company agreed to pay Mr. Crowley an amount equal to his expenses on the $7.5 million loan until he collects on the policies. For the 1992 Agreement, Plaintiffs claim as damages: (1) interest on the $7.5 million the Company paid over time between 1992 and 2003;[6] and (2) reimbursement for the interest it paid on Mr. Crowley's $7.5 million loan from December 2003 until the time of the Settlement. Assuming the Company paid its $7.5 million contribution on the 1992 Agreement in 11 equal installments from 1992 to 2003, I calculate the interest on those payments as of the end of 2003 to be approximately $2.9 million. Defendants' estimate of damages did not include anything for this aspect of Plaintiffs' claim. As to the interest on the $7.5 million Crowley borrowed at the end of 2003, the parties agree that the annual interest at 6.5% is $487,500. Thus, as Defendants acknowledge,[7] the total interest

---

[6]    Plaintiffs sought simple interest of 6.5% based on the average interest Crowley paid on its long term debt. Compl. ¶ 101.

[7]    DAB at 17 n.7.

6

cost to the Company to the date of settlement for this component of damages would be $1.6 million.

The remaining components of Plaintiffs' damages claim relate to the 1998 Agreements. Both sides have accepted an estimate of $1.8 million for the annual premiums on the insurance policies covered by the 1998 Agreements. Up until 2003 or so, the Company paid those premiums on Mr. Crowley's behalf. Thereafter, the current premiums were paid from the cash surrender values of the policies. Because the cash surrender value is a cap on Mr. Crowley's obligation to repay the Company for its expenditures under the 1998 Agreements, the Company has suffered an annual erosion and invasion of its collateral since 2003 of $1.8 million. Thus, for each year from 1998 to the time of the Settlement at the end of April 2007, the Company effectively has "paid" $1.8 million, for a total of approximately $15 million. Although Defendants suggest this number should be only $9 million, their argument is unpersuasive because it fails to include any damages for the period from 2003 to the time of the Settlement. Lastly, Plaintiffs seek simple interest at the rate of 6.5% on each of the annual payments of $1.8 million under the 1998 Agreements, or $117,000 for each year such a payment remained outstanding. Defendants do not dispute that figure, but argue that it would yield a total interest amount of somewhere between $400,000 and $1,400,000 for the entire relevant period. I find that estimate woefully short. Indeed, for the $1.8 million the Company paid in 1998 *alone*, without regard to all the later payments of $1.8 million it made, the interest through April 2007 would be over $1 million.

7

For these reasons, I reject Defendants' contention that the "maximum total liability" under the challenged insurance agreements would have been no more than $11 to $12 million. Instead, I accept as reasonable and fully supported by the Complaint, Plaintiffs' contention that the damages could have been as high as $23.5 million.

### B.     Procedural History

Plaintiffs filed this action on November 30, 2004. The original complaint asserted derivative and direct claims for, among other things, breach of fiduciary duty, entrenchment, and self-dealing arising out of the 1992 and 1998 Agreements.

Defendants moved to dismiss the complaint, and the parties briefed that motion. Pursuant to the Court's direction at the conclusion of argument, Defendants filed a supplemental brief on standing on October 24, 2005. On December 27, 2005, Plaintiffs, in lieu of responding to Defendants' supplemental brief, sought leave to amend their complaint, which Defendants opposed. On October 19, 2006, I granted Plaintiffs leave to file their amended complaint, but ordered Plaintiffs to reimburse Defendants $10,000 for the unnecessary attorney's fees and costs they incurred due to Plaintiffs' apparent misreading of Court of Chancery Rule 15(aaa).

On November 7, 2006, Defendants moved to dismiss the amended complaint. Beginning in December 2006, however, the parties engaged in arms-length negotiations in an attempt to settle Plaintiffs' claims, and deferred briefing on Defendants' motion. Plaintiffs agreed to consider liquidating their minority position in the Company by selling their shares for cash, as long as the price offered was substantially higher than the "pink sheet" bid price for the shares (at that time approximately $1,800 per share). Making a

8

tender offer gave Defendants the opportunity to settle the pending litigation while taking the Company private. Following extended negotiations, Plaintiffs indicated they would favorably consider an offer of $2,990 for any and all shares, with closing conditioned on at least 95% of the shares affiliated with Mr. Crowley being tendered as well as a majority of the unaffiliated shares. The parties entered into a settlement agreement (the "Settlement" or "Settlement Agreement") that called for Defendants to make a tender offer along those lines (the "Tender Offer") and further provided that the Company would be responsible for paying Plaintiffs' attorney's fees and expenses as directed by this Court.

After notice to the class and other Crowley shareholders, the Court held a settlement hearing on April 27, 2007, and approved the Settlement.[8]    Pursuant to the resulting Final Judgment, I reserved decision on attorney's fees and costs pending briefing and argument by the parties. I heard argument on Plaintiffs' application for fees and costs on May 30, 2007.

---

[8]    As of May 8, 2007, over 98% of the outstanding shares had been tendered for $2,990 per share as part of the Tender Offer. Crowley Schedule 13E-3, Amendment No. 7 (May 8, 2007). Two stockholders of Crowley objected to the Settlement. One argued that the Settlement forced the minority shareholders to sell out at a price that "significantly undervalues the shares." Letter to Court from Leonard Rosenthal, Ph.D., dated April 9, 2007. Dr. Rosenthal argued that the Crowley stock was worth between $4,851 and $5,826 per share. The other objecting stockholder contended that the Settlement was unfair to them and others like them who had owned Crowley stock at the time of the alleged wrongdoing, but sold it before the settlement was announced. Letter to Court from James F. & Carter P. Thacher, dated April 26, 2007. The Court considered both objections at the settlement hearing, but concluded that neither one had merit.

9

## C.    The Parties' Contentions

Plaintiffs submit that to determine reasonable attorney's fees this Court should apply a "percentage of benefit conferred" approach as found in *Sugarland Industries, Inc. v. Thomas*.[9]  Plaintiffs assert that the underlying litigation was the sole and direct cause of the Settlement Agreement, and that it resulted in a $37.25 million benefit to the Plaintiff class.  On that basis, Plaintiffs argue that the *Sugarland* standard supports an award of attorney's fees of $6 million (or approximately 16% of the claimed benefit).  Plaintiffs also request $17,227.26 in out-of-pocket expenses they incurred in this litigation.

Defendants object to Plaintiffs' request as excessive and make two main arguments against it.  First, they contend that Plaintiffs' attorney's fees cannot properly be calculated as a percentage of the benefit conferred because this litigation was not the sole cause of the Company's decision to go private.  While Defendants agree that some portion of the price paid in the Tender Offer is attributable to the litigation, they argue that, because there were multiple causes for the Tender Offer, the amount attributable to the litigation cannot be determined.  Thus, Defendants assert that the only appropriate way to decide on a reasonable attorney's fee in this situation is on a *quantum meruit* basis.  Under such a calculation, Defendants argue, Plaintiffs should receive no more than $650,000 in attorney's fees.[10]

---

[9]      420 A.2d 142 (Del. 1980).

[10]     DAB at 14-15.  Defendants arrive at this number by assuming a reasonable hourly fee for Plaintiffs' counsel of $500 per hour for their litigation efforts and a premium of $200 per hour for taking the case on contingency.  Multiplying this $700 per hour rate by the 1,047.25 hours Plaintiffs assert their counsel worked

Second, and alternatively, Defendants maintain that even if this Court decides to calculate Plaintiffs' attorney's fees under the *Sugarland* standard, the fee should be well below the $6 million Plaintiffs request. Defendants argue that the Complaint asserts claims worth only about $12 million, at best, not the $23.5 million Plaintiffs allege,[11] and certainly not the $37.25 million upon which Plaintiffs have based their fee application. Citing various factors they consider relevant to a *Sugarland* analysis, Defendants argue that the Court should not award Plaintiffs any more than $800,000 in attorney's fees, based on a percentage of the benefit conferred approach.[12]

---

yields $733,250. Defendants contend that this number should be discounted to $650,000 or less because Plaintiffs' counsel should not be compensated for the time they spent seeking to avoid the application of Rule 15(aaa).

[11]    Pls.' Op. Br. ("POB") at 3.

[12]    DAB at 15-19.

Defendants also contest $10,000 of Plaintiffs' request for $17,227.26 in out-of-pocket expenses because Plaintiffs incurred the challenged costs in the nature of a sanction in connection with their motion for leave to amend.[13]   In ruling on that motion, the Court ordered Plaintiffs to pay Defendants the sum of $10,000 to reimburse Defendants, in part, for the fees and costs they incurred as a result of Plaintiffs' motion. Defendants argue that allowing Plaintiffs to recover that $10,000 payment would be tantamount to reversing this Court's prior order.

## II.    ANALYSIS

### A.    Application for Attorney's Fees

The standards for awarding attorney's fees are well established,[14] beginning with what is commonly known as the American Rule.[15]   Under the American Rule, prevailing litigants are normally responsible for paying their own attorney's fees.    There are, however, two general exceptions to this rule:    fee-shifting statutes and equitable doctrines.[16]   Two equitable exceptions are the "common fund" and the "corporate benefit" doctrines.[17]   "Under the common fund doctrine, a litigant who confers a common monetary benefit upon an ascertainable class is entitled to an allowance for fees and

---

[13]     DAB at 3 n.1.

[14]     *Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d 1039, 1043 (Del. 1996).

[15]     *Walsh v. Hotel Corp. of Am.*, 231 A.2d 458, 462 (Del. 1967); *Maurer v. Int'l Re-Ins. Corp.*, 95 A.2d 827, 830 (Del. Ch. 1953).

[16]     *Goodrich*, 681 A.2d at 1044.

[17]     *Dunkin' Donuts S'holders Litig.*, 1990 WL 189120, at *3 (Del. Ch. Nov. 27, 1990).

expenses to be paid from the fund or property which his efforts have created."[18]  Under

the corporate benefit doctrine, a litigant who confers significant and substantial benefit to

a class, albeit not a tangible monetary one, is entitled to an allowance of fees and

expenses.[19]  If this Court grants attorney's fees under one of these exceptions, the amount

of the award lies within the Court's sound discretion.[20]  Because none of the parties to

this action argues for use of a corporate benefit analysis, I turn to a discussion of the

common fund doctrine.

### 1.    Is there a common fund?

The principle underlying the common fund doctrine is that "where a litigant has

conferred a common *monetary benefit* upon an identifiable class of stockholders, all of

the stockholders should contribute to the costs of achieving that benefit."[21]  The issue

here, as it relates to a common fund, is whether Plaintiffs' counsel, through the

underlying litigation, conferred a monetary benefit on the Plaintiff class upon which

attorney's fees can be based.[22]

---

[18]    *Id.*

[19]    *Id.*

[20]    *Chrysler Corp. v. Dann*, 223 A.2d 384, 386 (Del. 1966).

[21]    *United Vanguard Fund, Inc. v. Takecare, Inc.*, 727 A.2d 844, 850 (Del. Ch. 1998)
        (emphasis added).

[22]    As mentioned above, the claims in this case were both derivative and direct class
        claims.  Defendants agreed as part of the Settlement to pay whatever fees and
        expenses the Court awards.  Thus, a determination of those fees will not diminish
        the benefit to the class.  The purported monetary benefit to the class stemmed from
        the amount by which the Tender Offer price ($2,990) exceeded the unaffected

Defendants argue, among other things, that "neither the settlement of the litigation, nor the premium incorporated in the offer price, created a "common fund" from which attorney's fees [can] be paid."[23]  Consequently, according to Defendants, an appropriate fee can only be determined on a *quantum meruit* basis.[24]  The Delaware courts have refused to apply such a formalistic approach.[25]  Furthermore, the primary alleged wrongdoer, Mr. Crowley, now controls the Company and therefore will bear the burden of any fee award this Court makes.  I therefore conclude that this aspect of Defendants' argument is without merit.

Defendants further suggest that this case does not involve a common fund because, in their view, it is not possible to determine a monetary benefit attributable to the litigation.  In response, Plaintiffs argue that this Court has "long recognized in an unbroken line of precedent that where litigation results in an increase in a price to be paid for . . . either shares or a corporate asset, a common fund is created."[26]  Plaintiffs contend that the common fund in this case is the premium reflected in the Tender Offer made by Mr. Crowley, and that the Company and Mr. Crowley agreed to pay Plaintiffs' attorney's

---

"pink sheet" price of $1,800.  The members of the class who tendered their shares received the full amount of that benefit.

[23]    DAB at 9.

[24]    DAB at 10 n.5.

[25]    *See In re First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d 353, 357-58 (Del. Ch. 1999).

[26]    *See* Pls.' Reply Br. ("PRB") at 6 (citing *Sugarland* and *First Interstate*).

14

fees in connection with the Settlement, because it allowed them to complete the Tender Offer more quickly and easily.[27]

Defendants elevate form over substance with their suggestion that no actual common fund was created, and that Plaintiffs therefore are relegated to having their attorney's fees determined on a *quantum meruit* basis. While no formal fund may have been created, Plaintiffs' litigation unquestionably resulted in a significant monetary benefit to the Plaintiff class. I consider the premium paid by Mr. Crowley's merger vehicle in the Tender Offer to constitute a monetary benefit conferred on Plaintiffs that resulted at least in part from the litigation. Thus, I conclude that Plaintiffs' request for attorney's fees should be analyzed under the common fund exception to the American Rule.

### 2.   Do Plaintiffs qualify for attorney's fees and expenses under the common fund doctrine?

To qualify for fees and expenses under the common fund doctrine, the applicant "must show that (1) the action was meritorious at the time it was filed; (2) an ascertainable class received a substantial benefit; and (3) a causal connection existed

---

[27]    PRB at 6-7. In this regard, I find persuasive Plaintiffs' argument that had Defendants not agreed to pay the attorney's fees on behalf of Plaintiffs, the Tender Offer would have been delayed while this Court determined the fee and then deducted, pro rata, from each payment made to shareholders the amount of the fees and expenses awarded. As Plaintiffs correctly observe, this not only would have created administrative difficulties, but also would have made "drafting the tender offer materials extremely difficult because it is necessary to describe in those materials the possible consequences of various fee award[s]." *Id.* at 7.

between the action and the benefit."[28]  In this case, Defendants do not seriously dispute the existence of the first two requirements.  Moreover, the general findings I made in approving the Settlement probably preclude Defendants from disputing either of those elements.  Therefore, the real dispute concerns whether a causal connection existed between the litigation and the claimed benefit.

When determining the existence and adequacy of a causal connection, the benefit "need not be directly and entirely attributable to the underlying litigation."[29]  Still, the litigation must achieve the benefit; the fact that a benefit occurred after the commencement of the litigation does not necessarily mean that a causal connection exists.  Once the first two common fund requirements are satisfied, however, the burden shifts to the defendants to demonstrate that the lawsuit in no way caused the benefit.  To rebut the presumption of a causal connection, defendants "must show that the benefit is attributable to other causes."[30]

In this case, Defendants argue that "although the [tender] offer was made *in part* to settle the litigation, it is indisputable that a number of other specific factors also motivated the offer."[31]  Defendants claim that making the Tender Offer was motivated as much by the Crowley Family's long-standing goal of taking the Company private, as it

---

[28]    *Dunkin' Donuts S'holders Litig.*, 1990 WL 189120, at *5 (Del. Ch. Nov. 27, 1990).

[29]    *Id.* at *6.

[30]    *Id.*

[31]    DAB at 10.

was by the pending lawsuit.[32]    The Purchase Offer also details some of the specific advantages the Crowley Family sought by taking the Company private.[33]    Defendants contend that, because the Crowley Family's allegedly long-standing goal of privatization constitutes a legitimate cause contributing to the Tender Offer, the calculation of a reasonable attorney's fee must be based on *quantum meruit*, not a percentage of any claimed benefit.[34]

Plaintiffs argue that the litigation solely and directly achieved the benefit because: "[1] No other person or party undertook any action which could be claimed or found to have caused the benefit; . . . [2] The acquisition of the minority share[s] was solely a result of this settlement; [and] [3] The price at which the acquisition occurred was solely and directly the result of negotiations between the parties conducted by Plaintiffs' counsel."[35]    Further, Plaintiffs contend that the Tender Offer materials do not state that the Company had a long-standing goal of privatization; rather, they simply describe

---

[32]    DAB at 1.

[33]    DAB Ex. B at 20.   Specifically, as a private company, Crowley will not incur the managerial burdens and continuing significant audit, legal, and personnel costs and fees necessary to maintain itself as a public reporting company or be exposed to as much legal risk, including securities law compliance burdens.

[34]    *See* DAB at 8 (citing *Dunkin' Donuts* for the proposition that if two or more factors confer the benefit, it should be deemed "unquantifiable" and the calculation of attorney's fees limited to a *quantum meruit* analysis).

[35]    POB at 11.

17

Mr. Crowley's perception of the benefits he would receive from the transaction.[36]

Similarly, because Defendants have not, and cannot according to Plaintiffs, produce

admissible evidence of any tender offer or Crowley Family plan of privatization unrelated

to the Settlement of this litigation, they have failed to prove any causative factors other

than the litigation.[37]

Finally, Plaintiffs argue that Defendants, in proposing that fees should be based on

a *quantum meruit* standard, rely on an erroneous premise: that an award cannot be made

based on the *Sugarland* standard unless the litigation was the *sole* cause of the benefit.[38]

Plaintiffs see Defendants as saying that if there are multiple causes for the Tender Offer,

then this Court has no choice but to use a *quantum meruit* standard in awarding fees.

Defendants make this argument, Plaintiffs observe, despite the fact that their own brief

"acknowledges that in *Sugarland* a percentage of the benefit was awarded even when the

litigation was 'not the exclusive cause of the benefit.'"[39]

First, I find that, no matter which side bears the burden of proof, Defendants have

failed to present sufficient evidence to support a finding that the Crowley Family had a

pre-existing goal of going private, independent of the litigation.  Defendants did not

provide a single affidavit from a member of the Crowley Family or the Company's board

---

[36]    PRB at 5.   I also note that Defendants' Tender Offer materials constitute
inadmissible hearsay to the extent they are offered by Defendants, as they
apparently are, to prove the truth of the matter asserted in them.

[37]    *Id.*

[38]    *Id.* at 2.

[39]    *Id.*

in support of their claim that such a goal existed.[40]    Further, the documentation

Defendants rely on provides no support for the idea that the Crowley Family had the goal

of privatization "long" before this litigation began.  Instead, I find that the Purchase Offer

shows only that, at the time the Tender Offer was made and in light of the then-pending

litigation, the Crowley Family considered it to their advantage to settle the litigation by

taking the Company private.

Second, even assuming arguendo that the Company had a long-standing goal of

privatization, that goal alone is insufficient for the Defendants to rebut the presumption

that the litigation was a cause of the Settlement.  Because the first two common fund

doctrine requirements are satisfied here, Defendants bear the burden of demonstrating

that the lawsuit in no way caused the benefit.  For the reasons stated above, I find that

Defendants have failed to meet that burden and that Plaintiffs' litigation is a cause, if not

the sole cause, of the Settlement.  Thus, Plaintiffs are entitled to receive attorney's fees

under the common fund doctrine.[41]

---

[40]    *See Grimes v. Donald*, 2000 Del. LEXIS 188, at *4 (Mar. 21, 2000) (finding it
significant that defendants presented no affidavit in opposition to the fee
application in which the inference of a causal connection between the suit and the
decision to enter into a merger was expressly denied).

[41]    I also reject as overbroad Defendants' argument that if two or more factors confer
the benefit, it should be deemed "unquantifiable" and the determination of
attorney's fees limited to a *quantum meruit* analysis.  As discussed *infra*, the case
law does not support such a bright line rule.  Rather, I conclude that similar to
*Sugarland*, if two or more factors contribute to the creation of a benefit in a
reasonably quantifiable way, then a percentage of the benefit analysis is
appropriate.

**B.    Determination of the Appropriate Amount of Attorney's Fees**

As stated above, when a court grants attorney's fees under an exception to the American rule, the amount of the award lies within the sound discretion of this Court.[42] A threshold issue here is whether the Court should apply the percentage of the benefit approach or the *quantum meruit* approach. Further, under whichever approach applies, the Court must determine what constitutes a reasonable award of attorney's fees in this case.

**1.    Percentage of the benefit vs. *quantum meruit***

In determining the size of an award of attorney's fees, courts assign the greatest weight to the benefit achieved by the litigation.[43] When the benefit achieved is unquantifiable, however, courts often find the *quantum meruit* approach most equitable.[44] Conversely, when the benefit achieved is quantifiable courts typically apply a percentage of the benefit approach.

Defendants strenuously oppose use of a percentage of the benefit analysis in this case. Working under the assumption that the litigation was only partially responsible for the Settlement, Defendants assert that this Court cannot quantify the portion of the benefit

---

[42]    *Chrysler Corp. v. Dann*, 223 A.2d 384, 386 (Del. 1966).

[43]    *See Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 150 (Del. 1980) (discussing the importance of the benefit achieved in awarding attorney's fees).

[44]    *See Dunkin' Donuts S'holders Litig.*, 1990 WL 189120, at *3 (Del. Ch. Nov. 27, 1990) ("In cases where the benefit created is not quantifiable, the *quantum meruit* approach is often appropriate.").

20

attributable to the litigation,[45] and therefore can only award fees based on a *quantum meruit* analysis. In addition, Defendants argue that only the benefit achieved by the litigation is relevant in determining a proper fee.[46] Because the objective of Plaintiffs' Complaint was to recover money Defendants caused the Company to spend on life insurance policies, Defendants contend that Plaintiffs cannot contend that their claims solely and directly caused a going-private buy out of the minority.

Plaintiffs, on the other hand, assert that a percentage based *Sugarland* type analysis is proper here, and that "[t]he benefit conferred upon the class as a result of the settlement in this action was at least $37.25 million."[47] Plaintiffs calculated this sum by taking the difference between the pink sheet bid price of $1,800 per share of Crowley stock before the parties agreed to the Settlement, and the negotiated transaction price of $2,990 per share – a difference of $1,190 – and multiplying it by the number of shares to

---

[45]    DAB at 12-13. Defendants argue, in this regard, that the Crowley Family thought the offer of $2,990 was fair based on annual valuations of the employee stock plans dated June 2006 showing the value per share as ranging from $1,913 to $2,943. They assert that by this metric the premium paid ranged from $47 to $1,077 per share, making it impossible to determine what portion was attributable to the litigation.

[46]    DAB at 11, citing *In re Maxxam Group*, 1987 Del. Ch. LEXIS 423, at *34 (Apr. 16, 1987) ("Only the benefits '*achieved by the litigation*' are relevant when determining fee awards."); *Eisenberg v. Chicago Milwaukee Corp.*, 1998 Del. Ch. LEXIS 141, at *13 (Oct. 25, 1998) ("To serve as the basis for a fee award, a claimed benefit must have some basic relationship to the grievance which led to the filing of the complaint."); *In re Anderson Clayton S'holder Litig.*, 1998 Del. Ch. LEXIS 127, at *8 (Sept. 19, 1988) ("what is relevant is the benefit *achieved by the litigation*, not simply a benefit that…is conferred after the litigation commences.").

[47]    POB at 11.

be acquired in the transaction, or 31,289, to yield $37,244,620.[48] Plaintiffs contend that

the Settlement not only provided the shareholders "an opportunity to realize a benefit of

at least $37.25 million not otherwise available to them,"[49] but also enabled them to

receive a favorable price, as shown by the fact that by May 8, 2007, only 532 out of

31,289 shares remained untendered.[50]

Plaintiffs also contend that this Court preclusively determined the value of the

Settlement and the amount of damages sought by the Complaint when I entered a final

judgment approving the Settlement on April 27, 2007.[51] They assert that at the settlement

hearing they outlined, without comment or contradiction from Defendants, that the proper

way to calculate the benefit to the class was to use the premium paid in the Tender Offer

as described above.  Plaintiffs argue that this "Court accepted these facts as accurate

[and] entered a final judgment based on them," which extends to the present fee

calculation.[52]

---

[48]    *Id.* at 11-12.  In November and December 2006, when the financial term of $2,990 per share was negotiated, the bid price for Crowley was $1,800 per share. Affidavit of Standard Investment Chartered ¶ 6.

[49]    *Id.* at 12.   Plaintiffs argue that because the "pink sheet" bid price of $1,800 represented a thin market, had stockholders tried to liquidate a large number of shares they would have flooded the market and driven down the price of Plaintiffs' shares of Crowley stock below $1,800.

[50]    *Id.*

[51]    PRB at 8.

[52]    *Id.*

I reject Plaintiffs' suggestion that the general factual determinations this Court made in concluding that the Settlement was fair and reasonable preclude Defendants from litigating, in the context of this fee dispute, the amount of the monetary benefit to the class and the extent to which it resulted from the litigation. The hearing on the Settlement focused on whether the Settlement conferred a substantial benefit on the Plaintiff class sufficient to justify, among other things, the release of claims by the class members. In approving the Settlement, I never attempted to determine the precise amount of the benefit attributable to the Settlement.

I find equally unpersuasive Defendants' claim that the benefit in this case is unquantifiable. The possibility that the Company's decision to settle the action by way of a tender offer may have stemmed, in part, from considerations other than Plaintiffs' claims may support awarding a lower percentage of the benefit than Plaintiffs seek as a fee, but it does not require that I apply a *quantum meruit* analysis. Based on the available evidence, I find that the Settlement of Plaintiffs' claims contributed importantly to the premium paid in the Tender Offer as calculated by Plaintiffs, and that it supports a determination that Plaintiffs deserve some credit for effectively creating a common fund for the benefit of the class of approximately $37.25 million.[53]

I further find that Plaintiffs' litigation efforts enabled the class to obtain a benefit at least somewhat more favorable than could have been achieved through trial or through action taken independently of the litigation. Crowley stock had been thinly traded on the

---

[53]    *See In re First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d 353, 358-59 (Del. Ch. 1999) (discussing characteristics of common fund cases).

23

pink sheets. The Company had not paid, and had not stated any intention ever to pay, any dividends on the stock.[54]    Further, as minority stockholders, Plaintiffs were not in a position to control dividend policy of the Company and were not in a position to cause a transaction which would have provided them liquidity in their stock. Defendants have failed to rebut Plaintiffs credible showing that as a result of the underlying litigation and through creative negotiations, their counsel secured a settlement for the Plaintiff class that they probably could not have achieved otherwise, representing a significant monetary benefit. At the same time, I recognize that it was the Company's decision to settle the action by making the Tender Offer that led to the $37.25 million benefit – a decision Plaintiffs could neither have planned on nor implemented themselves. I conclude, therefore, that Plaintiffs' litigation is a primary legal cause of the Settlement and ensuing $37.25 million benefit.

The litigation, however, played a more important role in causing some aspects of the total benefit than others. In particular, I find that the record strongly supports the conclusion that the litigation caused most, if not all, of the first $23.5 million of the benefit, based on the damages allegations in the Complaint. Nevertheless, Defendants' desire to take the Company private did play some part in their deciding to pay the premium of $37.25 million. Hence, I consider it reasonable to infer that at least some portion of the Tender Offer premium above $1,800 stems from Defendants' desire to go private and the intrinsic value of the Crowley shares, as opposed to the litigation. Thus, it

---

[54]    Pls.' Br. in Supp. of Prop. Settl. at 8.

is within the bounds of equity and my discretion to determine the fee award in this case based on a percentage of the benefit achieved, and to vary the percentage depending on the extent to which Plaintiffs' counsel and the litigation are responsible for specific aspects of the $37.25 million benefit to the class. That the Company also played a part in creating the Settlement premium, especially to the extent it exceeds the $23.5 million alleged in Plaintiffs' Complaint, is one of the factors relevant to determining the amount of a reasonable attorney's fee award.

Defendants argue that this is a "shared-credit" case and focus much of their discussion on cases where the benefit conferred was unquantifiable. Specifically, Defendants rely on *First Interstate, Dunkin' Donuts*, and *Takecare II* for the proposition that when the Court cannot ascertain, with any degree of confidence, even an approximate amount reflecting the value conferred on the class members by the litigation, the Court should employ the *quantum meruit* approach. Because I find the benefit caused by this litigation sufficiently quantifiable to support awarding an attorney's fee based on a percentage of the benefit conferred, Defendants' cases are not apposite.

In *First Interstate*, class plaintiffs brought litigation concerning the merger of Wells Fargo and First Interstate. The litigation was rendered moot, however, when First Interstate's board dropped their opposition to Wells Fargo's hostile proposals and abandoned a proposed "white knight" merger agreement with First Bank Systems. Thereafter, class plaintiffs sought their attorney's fees in connection with those moot claims. The court in *First Interstate* applied the *quantum meruit* approach for several reasons; the fact that multiple factors apparently caused the claimed benefit does not

25

appear to have been controlling. The court determined that it was not a common fund case because the benefit conferred was unquantifiable and because the Court could not determine the source and amount of the fund claimed to have been created by the plaintiffs' litigation efforts.[55] The Court found it difficult to quantify the "fund" created because many factors, independent of the litigation, influenced the outcome and the litigation itself did not result in an injunction or judgment.[56] The court attributed the difficulty, "in significant part, to the fact that the litigation was played out in the context of a hotly contested battle for control of First Interstate."[57] The court could not isolate the amount of the "fund" because the litigation had no relation to one bidder's exchange offer or to the increase in the market price of the winning bidder's shares during that bidder's exchange offer.[58] The Crowley case does not involve any such complications.

Defendants argue that the court in *Dunkin' Donuts* applied *quantum meruit* because it could not attribute the whole or any part of the claimed benefit to the stockholder litigation.[59] *Dunkin' Donuts* involved a class action for breach of fiduciary duties, challenging defensive measures taken by the Dunkin' Donuts board to thwart takeover proposals. The class plaintiffs failed to obtain preliminary injunctive relief because they had not demonstrated a likelihood of irreparable injury. Approximately one

---

[55]    *Id.*

[56]    *Id.* at 358 n.2.

[57]    *Id.*

[58]    *Id.* at 359 n.3.

[59]    DAB at 10.

26

month later, Dunkin' Donuts approved an auction whereby Allied-Lyons won the bidding contest. The class plaintiffs monitored the auction process. On these facts, the court found the benefit conferred unquantifiable and applied a *quantum meruit* analysis because (1) "class plaintiffs, at the most, can only be partly credited with conferring the benefit achieved" and (2) "the class plaintiffs occupied only a monitoring, albeit active, role in the present litigation."[60]  Plaintiffs here played a much more pivotal role in achieving the benefits to the class.

Defendants advance similar arguments regarding *Takecare II*, and they are equally unpersuasive.[61]  In that case, shareholders sought to set aside a letter of intent to accept an offer to purchase a company on the grounds that it prevented a fair auction. The suit became moot after the company accepted a tender offer price higher than the price stated in the letter of intent. In that context, the court found only an "indirect and tangential relationship" between the litigation and the resulting transaction.[62]  Further, the court determined that the litigation could take no credit for the pre-lawsuit offer and at most only partial credit for any further increase in the transaction price.[63]

---

[60]    *Dunkin' Donuts S'holders Litig.*, 1990 WL 189120, at *1456-57 (Del. Ch. Nov. 27, 1990).

[61]    DAB at 10.

[62]    *United Vanguard Fund, Inc. v. Takecare, Inc.*, 727 A.2d 844, 857 (Del. Ch. 1998).

[63]    *Id.*

## 2.    A reasonable award of attorney's fees

Historically, Delaware courts grant attorney's fee awards in shareholder suits to promote efficient litigation of meritorious lawsuits, while avoiding windfalls.[64]    Fee awards should encourage future meritorious lawsuits by compensating the plaintiffs' attorneys for their lost opportunity cost (typically their hourly rate), the risks associated with the litigation,[65] and a premium.[66]  The fee award, however, can reach a point where it no longer operates as an incentive, and rather morphs into a "socially unwholesome windfall."[67]  Therefore, on a case-by-case basis, courts attempt to award attorney's fees in a way that provides the proper incentives, without granting a windfall.

Operating within that framework and having established that this is a percentage of the benefit case, I must now determine a reasonable percentage.   Exercising their discretion, Delaware courts consistently have applied a multifactor approach – originally articulated in *Sugarland* – in determining reasonable attorney's fees.[68]  The *Sugarland*

---

[64]    *See Seinfeld v. Coker*, 847 A.2d 330, 333-34 (Del. Ch. 2000) (noting the desire to produce two incentives – "the incentive for shareholders to bring meritorious lawsuits that challenge alleged wrongdoing and the incentive for plaintiffs to litigate such lawsuits efficiently," while stating the desire to avoid "socially unwholesome windfalls").

[65]    *See id.* ("Risk reflects the contingent nature of the work, the financing costs incurred with delaying the attorneys' compensation until the case is concluded, the inability to diversify away particular risks, as well as other contingencies.").

[66]    *Id.*

[67]    *Id.* at 334.

[68]    *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 547 (Del. 1998). *See, e.g., Chrysler Corp. v. Dann*, 223 A.2d 384, 386 (Del. 1966) (explaining that the amount of attorney's fees is fixed by the sound discretion of this court); *In re*

factors are:   (1) the benefit achieved in the action; (2) the contingent nature of the

undertaking; (3) the difficulty of the litigation and the efforts of counsel; (4) the quality

of the work performed; and (5) the standing and ability of counsel.[69]

As a preliminary matter, before addressing the *Sugarland* factors, I find it

appropriate to apply different percentage rates to different portions of the benefit paid to

Plaintiffs. In this case, Plaintiffs cannot claim total responsibility for the premium paid in

the Tender Offer.   While the record shows that Defendants would not have made the

Tender Offer but for the pending litigation, Mr. Crowley's motivations for privatizing the

Company contributed to his decision to settle the case by way of a Tender Offer.

Although I do not find these motivations to be directly causal, I consider Plaintiffs' claim

of sole responsibility for the almost $14 million dollar difference between the damages

sought in the Complaint and what was paid in the Tender Offer to be exaggerated.  It is in

this context that I find persuasive Defendants' arguments in that Plaintiffs' litigation only

contemplated reimbursement of the Company for insurance premiums.  The efforts of

Plaintiffs' counsel in the litigation provided the impetus for Mr. Crowley to settle.  Those

efforts brought Mr. Crowley and Defendants to the negotiating table.  Defendants may

have had additional reasons unrelated to the litigation for preferring to settle the case by

means of a Tender Offer.   In any event, Plaintiffs' counsel's representation of the

---

*Appraisal of Shell Oil Co.*, 1992 Del. Ch. LEXIS 228, at *12 (Oct. 30, 1992) ("The trial court has considerable discretion in weighing and balancing the various *Sugarland* factors.").

[69]    *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149-50 (Del. 1980).

minority shareholders of Crowley provided Defendants an opportunity effectively to kill

two birds with one stone by simultaneously negotiating a settlement of the litigation and a

defensible price for the Tender Offer. This can be seen in Defendants' Purchase Offer,

which explicitly trumpets Plaintiffs' role in the negotiation of the Tender Offer price.

While it is clear that Plaintiffs instigated the action leading to the benefit, it is

equally clear that they did not plan for the Company to settle the action by taking the

Company private. Plaintiffs' counsel deserve some credit for bringing about that

fortuitous circumstance and its consummation, but not nearly as much as they do for the

settlement of the damages claims in the litigation. As I balance these considerations and

others, I conclude that the most equitable and reasonable way to award attorney's fees in

this case is by attributing different percentage rates to each of two separate portions of the

benefit paid to Plaintiffs.[70] Specifically, I divide the benefit into two portions: (1) the

portion of the benefit fairly attributable to the claims alleged in the Complaint, which

sought a total of approximately $23,500,000; and (2) the remaining benefit paid to

Plaintiffs, $13,744,620 ($37,244,620 - $23,500,000 = $13,744,620).

First, I consider the damages alleged in the Complaint. Plaintiffs and their counsel

achieved a significant monetary benefit for the class. It is undisputed that Plaintiffs'

counsel took this case on pure contingency and represented their clients well as

---

[70]    *See Sugarland Industries, Inc. v. Thomas*, 420 A.2d 142, 151 (Del. 1980)
(awarding a 5% recovery for a portion of the benefit not exclusively caused by the
litigation); *In re NCS Healthcare, Inc. S'holders Litig.*, 2003 Del. Ch. LEXIS 56,
at *12 (May 28, 2003) (awarding more than "15% of the first $48 million of the
benefit achieved...and 5% of the next $51 million").

experienced practitioners, including primarily Mr. McNew. Although Plaintiffs argue

otherwise, I do not find that this case presented particularly novel or complex issues; at

least not to the point of tipping the scale in favor of a higher fee. The split-dollar life

insurance policies may be complicated, but they represent a single type of corporate

asset. Moreover, the 1992 and 1998 Agreements relating to such insurance policies all

obligated the Company to take certain actions regarding them for the benefit of the

controlling stockholder, Mr. Crowley, and the Crowley Family. Allegations of breach of

fiduciary duties and waste based on such self-interested transactions are commonplace in

shareholder litigation.

Additionally, while the 1,047 hours Plaintiffs' counsel worked on this case do not

strike me as disproportionately high, those hours were spent over a period of more than

four years. That considered, the fact that Plaintiffs' underlying action never progressed

beyond the motion to dismiss stage warrants a reduction in the percentage rate used in

calculating fees, as this Court has a history of properly awarding lower percentages of the

benefit where cases have settled well before trial.[71] Applying the *Sugarland* factors, in

relation to the portion of the benefit attributable to the total damages alleged in the

Complaint, $23,500,000, I award Plaintiffs' counsel attorney's fees of 15%, yielding

---

[71] *See, e.g., In re Coleman Co. S'holders Litig.*, 750 A.2d 1202, 1212 (Nov. 12, 1999) (reducing fees because counsel had only performed confirmatory discovery and had mimicked the bargaining position used by the settling party that preceded them); *Dow Jones & Co. v. Shields*, 1992 WL 44907, at *3 (Del. Ch. Mar. 4, 1992) (awarding fees of $5 million on a benefit of $95 million where the case settled and an independent committee played a significant part in raising the amount paid in the tender offer).

31

$3,525,000.[72] Not only does this percentage rate conform to the *Sugarland* analysis, but it also properly compensates Plaintiffs' counsel for the excellent benefit they achieved for the class and the risk they assumed without granting a windfall.

Second, I consider the remaining benefit paid to Plaintiffs. I conclude that Plaintiffs' counsel should receive attorney's fees for the additional benefit Plaintiffs received from the litigation and Plaintiffs' counsel's role in negotiating the Settlement. As previously discussed, however, Plaintiffs' counsel were not the sole cause of, nor did they plan for the benefit in excess of the alleged damages that Plaintiffs in fact received due to Defendants use of a Tender Offer to effect the Settlement. In my judgment, when these considerations are taken into account with the *Sugarland* factors, a percentage rate of 5% of the excess benefit achieved is fair and reasonable. Five percent of $13,744,620 yields $687,231 in attorney's fees.

Combined these awards produce a total monetary award of $4,212,231, which represents a reasonable attorney's fee under the circumstances of this case. As a "backstop check," this Court also considers whether a contemplated fee award translates

---

[72]    Given that this case settled at an early stage, this rate is fair and reasonable when compared to cases that settled at a much later stage. *See Sugarland*, 420 A.2d at 151-52 (awarding 20% of the benefit where Plaintiffs' counsel engaged in two-phase litigation working for over 15,000 hours); *In re Appraisal of Shell Oil Co.*, 1992 WL 321250, at *1170 (Del. Ch. Oct. 30, 1992) (awarding 25% of the benefit where Plaintiffs' counsel litigated a protracted trial with exhaustive pretrial preparation).

Also, there was no guarantee Plaintiffs would have been awarded the full $23,500,000 had their case been fully litigated at trial. The award likely may have been, at most, 75% of that amount. This is one of the factors that caused me to use a 15% rate.

32

into an exorbitant hourly rate.[73]  The award this Court is making does represent a high

hourly rate of $4,023, that amply rewards Plaintiffs' counsel for undertaking this

litigation on a fully contingent basis.  It is not inconsistent or unreasonable, however,

when compared with other cases where, as here, litigation has provided especially

favorable results for Plaintiffs.[74]

### C.    Application for Expenses

Under 10 *Del. C.* § 5106, this Court is authorized to "make an order concerning

costs in every case as is agreeable to equity."  Plaintiffs here request a total

reimbursement of $17,227.26, including a request for reimbursement of $10,000 that this

Court ordered them to pay Defendants' counsel after Plaintiffs' self-serving

misinterpretation of Court of Chancery Rule 15(aaa) caused unnecessary briefing and

expense related to their motion for leave to amend their Complaint.  Defendants object

only to the requested reimbursement of the $10,000 payment.  They argue that because

this Court required Plaintiffs to pay this fee as a penalty for avoiding the application of

Rule 15(aaa), refunding it to them now at Defendants' cost would be the equivalent of

---

[73]    *See In re Abercrombie & Fitch Co. S'holders Derivative Litig.*, 886 A.2d 1271, 1274 (Del. 2005) ("[U]se of hours invested…was intended as a "backstop check," or as a means to evaluate the propriety of the amount of the award.").

[74]    When this fee is compared against historic fees adjusted for inflation, the fee is at the high end of the spectrum, but not unprecedented.  Ten years ago, in 1997, this Court awarded a fee that translated into a $3,500 hourly rate.  *See In re AXA Fin., Inc.*, 2002 WL 1283674, at *7 n.20 (citing *Dagron v. Perelman,* Del. Ch., C.A. No. 15 101, tr. at 49, 51, Chandler, C. (Aug. 29, 1997)).  When adjusted for inflation, that fee would equal $4,542.35 today.  (Inflation calculated using the consumer price index calculator at http://data.bls.gov/cgi-bin/cpicalc.pl.).

33

reversing this Court's prior order.[75]  Plaintiffs counter that the issue is not whether Defendants should be required to reimburse expenses related to the Rule 15(aaa) avoidance, "but whether these expenses were properly chargeable to clients by Plaintiffs' counsel."[76]  Plaintiffs assert that, because the Court's decision did not "suggest that this expense should be borne solely by counsel and not passed along to counsel's clients," the $10,000 constitutes a proper litigation expense that, pursuant to the Settlement Agreement, Defendants should be required to reimburse.[77]

I disagree with Plaintiffs' characterization of this issue.  Although the sanction imposed by the Court did not preclude Plaintiffs' counsel from charging that $10,000 amount to their clients, counsel was in large part responsible for the problem.  The fact that Plaintiffs' counsel chose to pay the penalty themselves rather than seek payment by, or reimbursement from, their clients provides no justification for reimbursing those funds to them.  I also find unpersuasive Plaintiffs' reliance on the general reference to "expenses" in the Settlement Agreement.[78]  If Plaintiffs intended that clause to cover the $10,000 the Court ordered them to pay to Defendants, they should have stated that in the Agreement.  Thus, I deny Plaintiffs' counsel's attempt to recoup the $10,000 they paid to

---

[75]    DAB at 15 n.6.

[76]    PRB at 11 n.7.

[77]    *Id.*

[78]    Stip. and Agreement of Compromise, Settlement and Release, filed Mar. 19, 2007, ¶ 6.

defray Defendants' unnecessary litigation expenses.    The Court grants the rest of Plaintiffs' counsel's request for expenses, in a total amount of $7,227.26.

## III.    CONCLUSION

For the reasons stated, I hold that Plaintiffs' counsel are entitled to receive from Crowley Maritime Corporation a payment of their reasonable attorney's fees in the amount of $4,212,231 and expenses of $7,227.26.

**IT IS SO ORDERED.**